## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| HARRY VEGA,<br>    **PLAINTIFF** | :<br>:<br>: |
| | : |
| VERSUS | :<br>: |
| | : |
| SCOTT SEMPLE, Commissioner of<br>Correction; JAMES DZURENDA, former<br>Commissioner of Corrections;<br>LEE ARNONE, former Commissioner of<br>Correction; THERESA LANTZ, former<br>Commissioner of Corrections; JAMES<br>ARMSTRONG, former Commissioner of<br>Correction; LAWRENCE MEACHUM, former<br>Commissioner of Correction; HENRY<br>FALCONE, Warden, Garner Correctional<br>Institution; STEVEN LINK, Director,<br>Department of Correction Engineering and<br>Facilities Management; DAVID BATTEN,<br>Former Director, Department<br>of Correction Engineering and Facilities<br>Management, in their individual and<br>official capacities, and John Does 1-3<br>    **DEFENDANTS** | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**CIVIL ACTION**

CASE NO._____(_____)_____

22 JANUARY 2017

## CIVIL ACTION COMPLAINT

### Introduction

1. This is a civil action in which PLAINTIFF requests to be excluded from an already previously filed CIVIL CLASS ACTION compliant, GRENIER et al v. SEMPLE et al 3:16-CV-01465-AVC, and seeks to pursue the facts being similar in content to his own individual outcome towards the claims that PLAINTIFF having been detained at Garner Correctional Institution, was exposed to harmful levels of indoor radon gas far in excess of EPA, OSHA, and WHO standards, in Newtown, Connecticut as an inmate, in the Connecticut

RECEIVED

JAN 24 2017

CC
OF

Department of Correction.  Forcing PLAINTIFF to be exposed to indoor radon gas, a recognized human carcinogen far in excess of any published safe level for more length of duration during his time therein at said faciliity, does by its fashion and design constitute deliberate indifference by correctional officials to conditions of confinement posing an unreasonable risk of serious damage to an inmate's health in violation of PLAINTIFFS rights under the United States and Connecticut Constitutions.

2.   When radon gas is inhaled, densely ionizing alpha particles emitted by deposited short-lived decay products of radon (218Po and 214Po) can interact with biological tissue in the lungs leading to DNA damage.  Cancer is generally thought to require the occurrence of at least one mutation, and proliferation of intermediate cells that have sustained some degree of DNA damage can greatly increase the pools of cells available for the development of cancer.

3.   In Helling v. McKinney, the Supreme Court held that the Eighth Amendment protects prisoners from an official's deliberate indifference to conditions posing an unreasonable risk of serious damage to the prisoner's future health.  509 U.S. 25, 33-35 (1993).  At issue in Helling was an inmate's exposure to environmental tobacco smoke in the absence of a physical injury.  The Supreme Court held an inmate mush show he was "exposed to unreasonably high levels" of environmental toxins. Id at 35.  To violate the Eighth Amendment, the inmate must show the risk he complains of is one that "society considers...so grave that it violates contemporary standards of decency to expose anyone unwillingly to such risk" Helling, 509 U.S. at 36. ("In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate").

REC

JAN ? ...

4.   Indoor exposure to radon is recognized as the leading cause of lung cancer among non-smokers followed by exposure to environmental tobacco smoke (ETS) and exposure to radon after any history of smoking causes an exponential risk of developing lung cancer.

5.   Connecticut Department of Corrections permitted its employees at Garner to file a workers' compensation claim for exposure to high levels of indoor radon gas, without any limitations on length of exposure, thus accepting liability to its employees for the health risks imposed by a third of the daily indoor radon exposure over a five day work week as compared to inmates housed residentially at this facility twenty-four hours a day, seven days a week.

6.   PLAINTIFF seeks declatory and compensatory relief.

### JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C §§ 1983 and 1988, as well as the Eighth Amendment and Fourteenth Amendments to the United States Constitution.  The Court has supplemental jurisdiction under state law claims pursuant to 28 U.S.C. § 1367a.

### PARTIES

8. PLAINTIFF is an inmate, exposed to indoor radon gas while incarcerated at the Garner Correctional Institution, Connecticut Department of Correction, and who was thus subject to conditions of confinement that violated his rights under the U.S. Constitution as well as the Connecticut Constitution.

9. PLAINTIFF Harry Vega was incarcerated at Garner Correctional Institution (herinafter "Garner") beginning in 1998 to 2000, and again on 4 March 2010 to 10 September 2016 to the best of PLAINTIFFS memory in recollection. He is presently incarcerated in a different state correctional facility.

RECEIVED

JAN 2 4 2017

10. Defendant Scott Semple has served as the Commissioner of Connecticut's Department of Correction since August 2014; from mid 2009 through November 26, 2013, DEFENDANT Semple was Warden at Garner Correctional Institution after which time he was promoted to Deputy Commissioner of Operations prior to being named to head the Department of Correction.

11. DEFENDANT James Dzurenda served as Warden at Garner from 2005 to 2009, was Deputy Commissioner for Operations from July 2010 to April 2013 when he became Commissioner of Connecticut's Department of Correction through August 2014.

12. DEFENDANT Leo Arnone was the Commissioner of Connecticut's Department of Correction from 2010 to 2013.

13. DEFENDANT Theresa Lantz was the Commissioner of Connecticut's Department of Corrections from 2003 to 2009.

14. DEFENDANT James Armstrong was the Commissioner of Connecticut's Department of Correction from 1995 to 2003.

15. DEFENDANT Lawrence Meachum was the Commissioner of Connecticut's Department of Correction from 1987 to 1995.

16. DEFENDANT John Does 1-3 were in charge of the construction project of Garner and the engineering and building safety since its construction.

17. DEFENDANT Steven Link was the director of the Department of Correction Engineering and Facilities Management;

18. DEFENDANT DAVID BATTEN was the former Director, Department of Correction Engineering and Facilities Management.

19. Connecticut's Department of Correction is administered by the Commissioner of Correction and according to his job description shall be responsible for the overall management and direction of the Department and shall ensure that the Department's statutory duties are carried out.

4

RECEIVED

JAN 2 4 2017

CCI / CCI
OFFICE

20.   DEFENDANT Henry Falcone has been the Warden at Garner since 7 March 2014; DEFENDANT Flacone became a captain when he was first assigned to Garner in 2006; he thereafter was promoted to Deputy Warden at Garner in 2011.

21.   In accordance with Connecticut Department of Correction policy, while Wardens at Garner, DEFENDANTS Semple, Dzurenda and Falcone were the responsible individual, in their respective tenures, for the operation of that facility on a twenty-four hour basis, seven days a week.

22.   DEFENDANT Steven Link is the Director, Department of Correction Engineering and Facilities Management for the Connecticut Department of Correction.

23.   The Department of Correction Engineering and Facilities Management is responsible to provide centralized direction and technical assistance throughout the agency to include: management of the capital budget and plan: project design, approval and management; facility preventative maintenance; and repair.  In addition, this unit also coordinates compliance with the Occupational Safety Health Administration (OSHA) standards and environmental guidelines.

24.   DEFENDANT David Batten was the Former Director, Department of Correction Engineering and Facilities Management during times that inmates were exposed to radon gas historically.

25.   At all relevant times herein, DEFENDANTS listed were acting in the performance of their duties and within the scope of their employment by Connecticut Department of Correction, and under color of Law.

### CIVIL ACTION ALLEGATION

26.   PLAINTIFF brings this action partitioned from any other like pending civil action similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis, while preserving his individual rights to an outcome that favors PLAINTIFF individually versus a class action RECEIVED

JAN 2 4 2017

CCI / FOI
OFFICE

27. PLAINTIFF seeks to represent himself either pro se, or by appearing counsel, based on his being housed at Garner Correctional Institution in response to the December 2013 and January 2014 testing results for indoor radon gas that revealed levels in excess of the EPA action level of 4.0 pi C/L. The levels of radon found at the Garner Correctional facility were double, triple, and even more than quadruple the safe level set by the EPA—meaning that PLAINTIFF was exposed to a daily level equivalent of smoking three to nine (3-9) packs of cigarettes a day. As such PLAINTIFF has been thusly exposed, and with resultant claims of LUNG damage, and a growing health concern which will or may lead to his terminal status of demise. Said status has lead him to be exposed to further levels of otherwise unnecessary diagnostic radition he would and could have avoided had DEFENDANTS not been culpable for their inaction(s) leading to the harmful radon gas exposure.

28. PLAINTIFF proposes two aspects of his claims towards DEFENDANTS: A Declaratory Claim and a Damages Claim.

(A)  The Declaratory Claim being defined as PLAINTIFF while housed at Garner Correctional at any time within the following parameter: from the date of its opening in November 1992 at least through the emergency installation of the radon mitigation system completed on 10 October 2014. This claim may go beyond the installation of a remediation system as that remediation system was only place in areas tested, and may not have included areas where PLAINTIFF was housed at Garner.

(B)  The Damages Claim is defined as: PLAINTIFF either or both in occurance as either a pre-trial detainee, or post-conviction inmate, whom was exposed to levels of radon in excess of the EPA standard and who require periodic medical monitoring to determine the impact of the exposure and provide curative, and palliative care; and those already been diagnosed, or at such time in the future as they are diagnosed. At this time, these

6

RECEIVED

JAN 2 4 2017

CCI / FOI
OFFICE

those medical conditions include lung cancer and chronic non-malignant lung
diseases such as chronic obstructive pulmonary diseases (COPD), emphysema,
chronic interstitial pneumonia, pulmonary fibrosis, and or sarcoidosis.

A. **Numerosity: Fed R. Civ. P.23(a)(1)**

29. The size and potential class action of this civil action is expansive,
given the longevity of time other individuals may have been exposed to such
dangerous radon gas levels. Therefore, in order for PLAINTIFF to recoup,
and or recover a significant satisfactory basis of remuneration, PLAINTIFF
seeks this CIVIL action separate to others, to effectively remedy that effect.
The stated capacity at Garner, Correctional Institution, based on its design,
is 520 inmates; at various times since its opening, when Connecticut has
experienced an overall adult male population in excess of the officially
established capacities of its correctional facilities, Gardner has housed
up to one hundred inmates over its capacity by utilizing its gymnasium as
a dormatory.

30. In addition, the inmate population at Garner in any given year is not
static, with inmates routinely being released or transferred to other
correctional facilities. The time parameters for this civil action runs
from November 1992 through October 2014, a period just shy of twenty-two
(22) years. Although in the effect of this moving PLAINTIFF, his tenure
of exposure is the focus of loci, in addition to the maligned practice prior
to the construction of the facility where mitigation was not exercised to
maintain a safe healthy environment.

B. **Commonality: Fed. R. Civ. P. 23(a)(2)**

31. The relief of PLAINTIFF is common to other members of a Class, however
as specified, PLAINTIFF re-asserts his individual inclusion of his own civil
action in this matter. The conditions in which PLAINTIFF were kept confined
exceedingly meet those of the constituted confinement in conditions that
ARE [emphasis added] cruel and unusual punishment under the Eighth Amendment

RECEIVED
JAN 2 4 2017
CCI / CI
OFFICE

to the United States Constitution and Connecticut Constitution, Article One,
Section 8 of their right to be free from deprivation of liberty without due
process of law.  As a matter of proof, however, the due process clause of
the Fourteenth Amendment of the United States Constitution provides to pre-
trial detainees at least equal protection to that accorded convicted prisoners
under the Eigth Amendment to the United States Constitution, which does not
apply to pre-trial detainees.  The State of Connecticut Constitutional claims
follow these parameters.

    C.  **Typicality: Fed. R. Civ. P. 23(a)(3)**

32.Given the enormity of the potential claims, enjoined or in this matter
separate, it is clear that everyone has the same interests as other members
in a similar pending civil action.  The answer to whether the acts and
omissions by DEFENDANTS are unconstitutional as a matter of federal and state
law will determine the claims of the named PLAINTIFF, and any other preceeding
or subsequent person in a CLASS standing.

    D. **Adequacy: Fed. R. Civ. P.23(a)(4)**

33.PLAINTIFF meets the adequate designation as a qualified pursuant to
this action, because of his confirmed medical diagnosis casually related
meets the DAMAGE CLAIM; his interest coincides with, and is not antagonistic
to, those of other claimant Classes.  Since this is a single party civil
action, there are no known conflicts of interest to declare.  PLAINTIFF has
a sole interest in vindicating his constitutionally protected rights.

34.Additionally, Plaintiffs will adequately represent his interests, and
by further motions be represented by competent and skilled counsel whose
interests are fully aligned with the interests of the PLAINTIFF himself.

    E.      **Fed. R. Civ. P.23(b)(2)**

35.When radon gas is inhaled, densely ionizing alpha particles emitted
by deposited short-lived decay products of radon gas can interact with
biological tissue in the lungs leading to DNA damage.

RECEIVED

JAN 2 4 2017



36. Although the measure of CLASS action status is considerable and appropriate, PLAINTIFF remains to assert his individual claim due to the extensive physical damage he has been afflicted by the declaration that DEFENDANTS deliberate indifference to conditions imposing an unreasonable risk of serious damage to inmates housed at Garner through exposure to radon, established, prior to Garner's construction, as a human carcinogen by the International Agency for Research on Cancer in 1988 and added by Congress that same year to the Toxic Substances Control Act.  The fact that radon exposure has been determined to be "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such risk," Helling v. McKinney, 509 U.S. 25 (1993) the same fact basis will apply in this specific and particular civil Complaint.

F:      Fed. R. Civ. P.23(b)(3)

37. Plaintiff acknowledges that while Class treatment may be considered an obvious pursuit, he remains to assert his individual claim.  Whether the question of liability can be determined on a class-wide basis, or in this matter individually, is moot to the point that PLAINTIFF asserts that the DEFENDANTS liability is far superior to any standard, and such radon exposure while incarcerated at Garner is tantamount to the near criminal in its effect to the PLAINTIFF and others in similar circumstances.

38. While such classes of individuals damages do and may vary, PLAINTIFF claims that his status is one of an imminent pulmonary growth in his right upper lung region, with associative pains, and a increasingly difficulty sleeping due to this presence. Such an existence has required and shall require ongoing monitoring , care, and palliative treatment.  It has yet to be consistently monitored since its discovery as routinely as dictated by the radiologist at University of Connecticut's Health Center (UCONN) specified, and can not be therefore further specified as to its growth or if what time PLAINTIFF has remaining for such functionality of his lungs

RECEIVED

JAN 2 4 2017

9

to remain as functionally compliant.  PLAINTIFFS present condition can be
verified through his existing medical records, and will show that his onset
of the development of his pulmonary condition only developed after being
housed in Garner for a total sum of nearly if not over eight (8) years, the
equivalent of One Thousand and Ninety-Five (1095) packs of cigarettes per
year, or Eight Thousand Seven-Hundred and Sixty (8760) packs total based
on the minimum calculation of Three packs per day equivalent, and consequently
Three Thousand Two Hundred and Eighty-Five (3285) packs of cigarettes total
annually, or Twenty-Six Thousand Two-Hundred and Eighty (26,280) packs total
based on the maximum calulation of eight (8) packs per day over the entire
Eight year span of his exposure to the harmful radon gas exposure.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

39. At no time did the DEFENDANTS Semple, Dzurenda and Falcone provide to
the PLAINTIFF, or any other inmate housed at Garner with notice of the test
results from December 2013, and January 2014 that revealed high levels of
indoor radon gas, even though PLAINTIFF, with one exception, was confined
at Garner during the periods of radon testing.

40.At no time did DEFENDANTS Semple, Dzurenda and Falcone provide PLAINTIFF,
or any other inmate housed at Garner, with the information provided thereafter
to Garner's correction officers, administrative staff and medical unit:

> (1) That the radon testing results necessitated an emergency capital
> expenditure for the installation of a radon mitigation system;
>
> (2)  Information on the risks associated with indoor radon exposure
> and the determination that quarantining the medical block was not
> mandated even though the radon results in various rooms were the
> equivalent of being exposed to more than two to eight (2-8) packs
> of cigarette smoke per day, and;
>
> (3)  Written documentation that a mass filing of workers'
> compensation claims for all Garner correctional staff and medical

RECEIVED

JAN 2 4 2017

COI/FOI
OFFICE

care unit workers was under consideration by the carrier.

41. By intentionally and willfully depriving the PLAINTIFF and other inmates confined to Garner, of notice as to the indoor radon testing results, and installation thereafter of a radon mitigation system, DEFENDANTS Semple, Dzurenda, and Falcone deprived PLAINTIFF and any other party affected by such actions, or rather inaction, of the radon testing results and installation thereafter of a radon mitigation system and the significant health risks from exposure to this known carcinogen, constituted a predetermination of the outcome of ANY [emphasis added] inmate grievance on radon related constucts, rendered the entire inmate grievance procedures in accordance with administrative directives, as being futile as a matter of law and fact.  Furthermore, damage done by the excessive levels of radon is now concluded, and there is nothing correctional staff can now do to remediate the problem.  The issue is now compensation which the correctional department cannot do and is not authorized to do on a monetary remuneration basis.

### STATEMENT OF FACTS

**RADON: a known human carcinogen**

42. Radon is a radioactive gas that comes from the natural decay of uranium that is found in nearly all soils as well as rock and water.

43. Because radon is a noble gas, it is tasteless, oderless, colorless and imperceptible to the senses.

44. In sharp contrast to an inmates active and conscious perception of exposure to the toxicity of environmental tobacco smoke (ETS or second hand smoke) through his visual, and olfactory senses, PLAINTIFF and other inmates

11

RECEIVED

JAN 2 4 2017

CCI / FOI
OFFICE

confined at Garner, could not personally confirm their exposure to radon
by virtue of their incarceration at Garner, with its closed ventilation system
that trapped any radon leaked from the soil inside.

45. PLAINTIFF was entirely dependent on DEFENDANTS affirmatively to disclose
that inmates at Garner experienced indoor radon gas exposure on a daily basis
over prolonged periods of time, except for that limited time during which
they were permitted outdoors for recreation or other authorized purposes.

46. Radon is a source of ionizing radiation and a proven carcinogen; radon
is the leading environmental cause of cancer mortality in the United States.

47. Soil gas infiltration is recognized as the most important source of
residential radon; the primary health risk of radon in well water is from
the inhalation of radon released indoors.

48. Once radon has diffused into a building, further disintegration produces
radon progeny (daughters) that tend to be electronically charged and tend
to attract to dust particles that are thereafter inhaled into the lungs where
they further decay.  Radon progeny are the major source of human exposure
to alpha radiation that may directly or indirectly damage DNA and other cell
components, resulting in radon-induced lung diseases or cancer.

49. Alpha particles, which can only penetrate a short distance into bronchial
epithelium, induce more biological damage than beta or gamma radiation, and
can induce DNA base mutations and chromosomal strand breaks.

50. The substantive health risks associated with indoor radon exposure are
underscored by the fact that in 1988, when the Connecticut Department of
Correction, under the leadership of Defendant Meachum were in the planning
phases of constructing Garner, Congress added Title III on Indoor Radon
Abatement to the Toxic Substances Control Act.

RECEIVED

JAN 2 4 2017

CCI / FOI
OFFICE

51. That same year, in which Garner was still in the planning phases, the Surgeon General of the United States warned that radon is the second leading cause of lung cancer in the United States and the leading cause of lung cancer in individuals who never smoked.

52. According to the World Health Organization, lung cancer risks rises sixteen percent (16%) with every 2.7 pCi/L increase in radon exposure.

53. All major U.S. health orgainzations, such as the Centers for Disease Control and Prevention, the American Lung Association, and the American Medical Association, concur with estimates that radon causes thousands of preventable lung cancer deaths each year.

54. The absolute numbers of radon-induced lung cancers are much larger in people who smoke or who have smoked in the past, due to a synergistic effect between radon and smoking.

55. In January 2005, the Surgeon General, after reaffirming early warnings that breathing indoor radon gas over prolonged periods presents a significant health risk, noted in a public release that "It's important to know that **this threat is completely prevenatable.** Radon can be detected with a simple test and fixed through well-established venting techniques." [Emphasis supplied].

**Garner Correctional Institution**

56. After Congress added radon to the list of toxic substances in 1988, the public policy concerns that caused the U.S. Environmental Protection Agency (EPA) and other local and state public health organization and non-profits to advocate testing for radon gas in the home grew from an acknowledgement that individuals spent the most time indoors (70%) in their residential setting.

57. For inmates of a correctional facility, such as the PLAINTIFF here, and those similarly situated, Garner Correctional Institution is their home; their residential setting 100% of the time.

JEIVEL

JAN 2 4 2017

CCI / FOI
OFFICE

58. In 1988, when Congress added radon to the list of toxic substance, Connecticut Department of Correction, under the leadership of DEFENDANT, announced that it planned to build a Four Hundred (400) bed jail on the Seven Hundred (700) acre grounds of the state-owned Fairfield Hills psychiatric hospital, South of the center of Newtown, despite active town opposition.

59. Garner Correctional Institution, a level four (4) high security facility, is located at 50 Nunnawauk Road, in Newtown, Connecticut, that houses adult males; it opened on 17 November 1992.

60. DEFENDANT Meachum, after consideration of the input provided by then Director, Department of Engineering and Facilities Management, decided to construct Garner Correctional Institution on land that had once been a state mental health facility located in Fairfield Hills Hospital in Newtown, Connnecticut.

61. According to the Federal Environmental Protection Agency and the U.S. Geological Survey, which evaluated the radon potential in the United States and developed a Map of Radon Zones to assist national, state, and local organizations and building code officials in deciding whether radon-resistant features should be applicable to new construction, Newtown, Connecticut is located in Zone 1 - Highest Potential (greater than 4.0 pCi/L), which designation reflects the average short-term radon measurement in a building without implementation of radon remediation control methods.

62. DEFENDANT Meachum, on behalf of the Connecticut Department of Corrections, thus decided to construct Garner in an area where indoor radon levels would likely exceed the EPA action level of 4.0 pCi/L if no radon mitigation system were implemented.

63. Radon resistant construction techniques are effective in preventing or minimizing radon entry.

RECEIVED

JAN 2 4 2017

CCI / FOI
OFR

64. In the early 1980's and early 1990's, the Environmental Protection Agency's Office of Research and Development promulgated recommendations for radon prevention in the design and construction of schools and other large buildings.  Because it is easier and much less expensive to design and construct a new building with radon-resistant and/or easy to mitigate features than to add these features after a building has been completed and occupied, the EPA recommended that architects and engineers should use of combination or radon construction prevention techniques when building in an area that is identified as having the potential for high radon levels such as Newtown, Connecticut where the Department of Corrections built Garner Correctional Institution.

65. Under a 1990 law approved overwhelmingly by the Connecticut General Assembly after a top public health official testified that radon was one of the "most significant environmental hazards today, which when into effect on January 1, 1991 well in advance of Garner's construction, the Department of Public Health was tasked with establishing acceptable limits for radon in the air and drinking water in schools and for public drinking water.

66. Because the Engineering and Facilities Management division of the Department of Corrections is tasked with the centralized direction and technical assitance, among other responsibilities, for project design, approval and management as well as charged with coordinating compliance with OSHA standards and environmental guidelines, that department should have recommended to DEFENDANT Meachum that the construction plans for Garner include a radon mitigation system.

15


REC
JAN 7 1
OFF

67. Given the substantive health risks associated with indoor radon exposure in 1988 made more manifest by DEFENDANT Meachum's decision to construct Garner on a site identified as posing the highest risk for radon above the EPA action level of 4.0 piC/L, DEFENDANT Meachum's decision, as the Department of Correction's ultimate authority, to construct Garner without any preventative radon mitigation system ensured that inmates housed at Garner would be intentionally exposed to a known carcinogen, with no known threshold of exposure.

68. By failing to conduct indoor radon testing as is recommended after the completion of construction before Garner opened its doors to house inmates in November 1992, DEFENDANT Meachum missed another opportunity to install a radon mitigation system that would have prevented inmate exposure to the health risks associated with indoor radon.

69. Higher radon levels are usually observed during the winter months when buildings are sealed; because Garner Correctional Institution is a closed ventilation system, there was no capacity to open windows to mitigate indoor radon levels.

70. During each of their respective tenures, DEFENDANTS were afforded various opportunities to test for indoor radon at Garner and consequently to mitigate its harmful effects and staff alike, triggered by the adoption of state/federal laws and/or regulations relating to radon toxicity or highly publicized environmental concerns for high radon and/or uranium levels in the water drawn from the undergrown aquafier from which Garner obtained its water supply water.  On each such occasion, DEFENDANTS failed to test for indoor radon at Garner, thus missing earlier opportunities to mitigate this preventable health risk for inmates and staff alike many years before the ultimate installation of a radon mitigation system in October 2104.

RECEIVED

JAN 2 4 2017

CCI / FOI
OFFICE

71. Public Act 95-311, later codified as Connecticut General Statutes §
20-327b, which went into effect on 1 Janurary 1996, provided that residential
property sellers must provide a written residential condition report to a
prospective buyer, which disclosure from adopted through regulations requires
sellers to disclose any radon testing results.

72. Because Garner is the residential setting for inmates, the public policy
underlying Connecticut General Statutes § 20-327b provided such trigger which
DEFENDANTS Meachum, Armstrong, and Druzenda, in his then capacity as Warden
at Garner, ignored to the detriment of the PLAINTIFF and others in similar
circumstances.

73. In the Fall of 1996, the Department of Public Health's survey testing
of well water across Connecticut, including the Middle Gate School in Newtown,
revealed high levels of radon in the water.  Because the Commissioner of
the Department of Public Health initially refused to disclose the locations,
despite an opinion from then State Attorney General Richard Blumenthal that
the names of the towns, schools and utilities could be released so the public
would learn of the problem, these high radon levels and the health risks
presented was widely publicized.

74. As of October 1997, the federal Environmental Protection Agency's Office
of Indoor Air and Radiation had issued a publication entitled "An Office
Building Occupant's Guide to Indoor Air Quality" that was intended, among
other things, to encourage those in facilities management, such as DEFENDANTS
Link and Batten, to develop preventative indoor air quality management
programs following guidance from EPA and the National Institute for
Occupational Safety and Health (NOISH).


RECEIVED

JAN 2 4 2017

COURT
OFFICE

75. Given that such indoor air quality management programs were intended to address conditions faced by those occupants that spend extended time indoors such as a full workday, DEFENDANTS should have been cognizant that these same principles applied to inmates housed at Garner in a closed indoor ventilation system for up to twenty-four (24) hours per day, seven days per week, many of whom resided in these conditions for many months or years.

76. Had the DEFENDANTS Link and Batten applied such guidelines to the issue of the indoor air quality at Garner, the high levels of radon could have been ben detected many years earlier and exposure to such high levels of radon posing significant health risks would have been avoided for staff and [emphasis added] inmates alike.

77. Correctional and medical staff (first DOC employees and later designated employees of the University of Connecticut Health Center Correctional Managed Care (CMHC) who worked in the medical, mental health and dental areas at Garner Correctional Institution that are below ground level regularly and routinely throughout the years beginning shortly after Garner opened complained about the indoor air quality, including issues of mold, water and mildew. Had DEFENDANTS Link and Batten or their predecessors properly and thoroughly investigated such complaints over the years in accordance with recommended EPA and NIOSH guidelines, the high levels of radon that posed significant health risks to staff and inmates alike would have been detected and mitigated years earlier.

78. In November 2000, Newtown public officials had the drinking water at its town schools tested for the presence of uranium. In late January, 2001, the test results for Middle Gate School were publically released, revealing an elevated level of uranium in the school's drinking water of 211 pCi/L, approximately eight times greater than the EPA guideline of 27 pCi/L for

RECEI

JAN 2 4 2017

allowable uranium in drinking water.  Middle Gate School thereafter made
bottled water available as its sole drinking source.

79. Notably, Middle Gate School is the only town school at those times to
share its water supply with Garner Correctional Institution.  In its January
2003 update to its Community Facilities Plan of Conservation and Development
(Plan Memorandum #10), Newtown was to improve the Middle Gate School by
connecting it to the United Water Connecticut's water system so it was no
longer dependent upon the well system it had previously shared with Garner
Correctional Institution which tested high for radon and uranium in the
drinking water.

80. DEFENDANTS Armstong again ignored such triggering events and failed
to test for indoor radon at Garner in from November 2000 to January 2003
to the detriment of the PLAINTIFF.

81. At the direction of the DEFENDENT Batten, DOC Director of Engineering
and Facilities, and informational column published in the September 10-23,
2006 issue of the Department of Correction's periodic newsletter P.R.I.D.E.
at Work discussed indoor radon gas, including its identification as the second
leading cause of lung cancer in the United States, the significant health
risk imposed by breathing it over prolonged periods.

82. Although DEFENDANT Batten recognized that radon can enter through the
cracks in the foundation or through well water, thereafter trapping this
hazardous gas inside dwellings, he failed to ensure during this tenure as
Correction's Director of Engineering and Facilities that indoor radon testing
occurred at Garner, which houses inmates within a closed ventilation system
in an area identified by the EPA as having high concentrations of radon gas.

RECE

83.The high levels of radon found at Garner as a result of the testing first in December 2013 and thereafter in January 2014 were thus entirely preventable; and would have been prevented years earlier but for the acts and omissions of the DEFENDANTS.

**Impact of the presence of a school at Garner**

84. Radon testing of Garner's school classrooms in December 2013 was federally mandated; had such federal mandate not been imposed at that time, no radon testing at Garner would have occurred and it is highly probable the inmates [and PLAINTIFF inclusively] would continue to be exposed to the harmful effects of radon to this date.

85. As early as 1971, under the leadership of Commissioner John Manson (1971-1983), Connecticut Department of Correction became the second in the country to organize the educational system into a unified school district, designated by the state as Unified School District #1.

86. Garner's educational offerings include completion of a high school diploma and special education services for those inmates entitled by law to a public education through their twenty-first birthday under the Individuals with Disabilities Education Act (IDEA).

87. The Student and Parent/Guardian Handbook of Unified School District #1, Connecticut Department of Correction provides notice under the heading "Asbestos" that "[l]egislation requires all school buildings to be reevaluated to determine if asbestos is present and if it poses a significant health hazard to the building's occupants.  The Department of Corrections meets or exceeds these OSHA standards."

88. Connecticut General Statutes § 19a-333 entitled "Regulations re asbestos-containing materials in schools" provides in relevant part that "[t]he Department of Public Health shall adopt regulations in accordance with the



provisions of chapter 54 which shall meet or exceed the requirements mandated by the United States Environmental Protection Agency standard for asbestos-containing materials in schools in accordance with federal regulations as from time to time amended."

89. Although the presence of a school on site required to educate inmates eligible under the IDEA at Garner should have also triggered the legal obligations established for radon in schools, just as Unified District #1 complied with legal directives on asbestos, DEFENDANTS failed to comply with these state dictates.

90. Connecticut General Statutes § 19a-37b, which went into effect in 1990 prior to Garner's construction, required the state Department of Public Health to adopt regulations to establish radon measurement requirements and procedures to reduce elevated radon levels in public schools.

91. Connecticut General Statutes § 10-203, since its amendment in 1996, has required each local and regional board of education to maintain its facilities in accordance with applicable public health statutes and regulations.

92. Since 2003, Connecticut has required indoor air quality testing in its public schools using EPA protocols that include testing for radon purusant to Connecticut General Statutes § 10-220(d)(2).

93. Pursuant to General Statutes § 10-220(d)(7) and (14), Connecticut has also required since 2003 making radon test results and plans for mitigation available for public inspection, including Board's or school's website(s).

94. Since 2003, Connecticut General Statutes § 10-291 provides that the Department of Education cannot approve a school building project or plan located in EPA Zone 1, the same EPA designated zone in which Garner was constructed, unless project plan incorporates techniques to mitigate radon levels in air of facility.

RECEIVED

JAN 2 4 20

CCI / FC
OFFICE

95. The passage in 2003 of this comprehensive state legislative structure to address the substantive health risks of radon to children attending school again provided, at a minimum, a triggering event such that DEFENDANTS Lantz and Batten should have tested for radon in Garner's classrooms.

96. On June 30, 2003, DEFENDANT Lantz publicized its fiscal stewardship as an agency accomplishment when it returned $9,333,754 to the Connecticuts General Fund at the conclusion of the fiscal year 2002–2003, highlighting that the Department is especially proud of its prudent fiscal management at a time when state government overall is battling ever tightening budgetary constraints.  Had indoor radon testing been conducted at Garner in 2003, the cost of installing a mitigation system preventing any future harmful radon exposure would likely have been significantly less than the $60,000 paid in 2014.

97. Ongoing compliance with these directives on indoor radon at schools would have alerted DEFENDANTS SEMPLE, Dzurenda, Arnone, Falcone, and Link of the need to test for radon in Garner's classrooms, the very testing location in December 2013 that revealed indoor radon levels in excess of EPA's action level of 4.0 piC/L.

98. By first failing to include a radon mitigation in Garner's design, and thereafter failing to test for indoor radon, despite numerous legislative prompts and environmental events in Newtown revealing high levels of radon and uranium in the underground water supply shared with Garner that should have triggered indoor radon testing over the years, the acts and omissions of DEFENDANTS constitutes deliberate indifference to the condition of confinement to which PLAINTIFF, and those similarly situated, were subjected.



99. DEFENDANTS knew that inmates housed at Garner from its inception until the installation of the radon mitigation system in October 2014 faced substantial risk of serious harm from indoor radon exposure, and disregarded that risk by failing to take reasonable measures to abate it.

100. PLAINTIFF does have a confirmed diagnosis of a lung condition, and another per Grenier et al v. Semple et al 3:16-CV-01465-AVC, also have a confirmed diagnosis of lung cancer, future risk can suffice to constitute a substantial risk of serious harm, even if an inmate experiences no present symptoms.  Additionally, there are a number of former employees who suffer from lung cancer and lung disease.

101. The World Health Organization has urged that countries adopt an action level of 2.7 pCi/L because 4.0 pCi/L is the equivalent of smoking 8 cigarettes a day; exposure to indoor radon at 10.0 pCi/L is equivalent to smoking more than 2 packs of cigarettes per day; and exposure to indoor radon at 20.0 pCi/L is equivalent to smoking more than 4 packs of cigarettes a day.

**Radon Test Results**

102. Indoor radon exposure at Garner depending on location (and housing units were not tested) equates to smoking from ten (10) cigarettes a day (5.0 pCi/L) to more than four packs of cigarettes a day (23.7 pCi/L).

103. When federal mandated testing of Garner's frequently occupied school rooms was conducted in December 2013, the Connecticut Department of Public Health, Environmental Health Section - Radon Program distributed a letter for notification purposes of the radon testing event to all Garner staff (both DOC and CMHC).  No inmates at Garner were ever informed that radon in air testing was being conducted.

RECEIVED

JAN 2 4 2017

CCI / PCI
OFFICE

104. DEFENDANTS Semple, Dzurenda, Falcone and Link made a deliberate and clearly conscious chose, after having been informed of the need for follow -up testing over an expanded area beyond the classrooms at Garner initially tested, that the cell blocks housing inmates would not be tested because pursuant to the Connecticut Department of Public Health, Environmental Health Section - Radon Program protocol, inmates [PLAINTIFF inclusively] would have to be notified in writing of the radon testing event.

105. On January 27, 2014, Allison Perry Sullivan, an Environmental Analyst with the Connecticut Department of Public Health, Environmental Health Section - Radon Program, sent a detailed letter to Richard Pease, the Environmental Analyst for the Connecticut Department of Correction under its Division of Engineering and Facilities Management, setting forth the results from the radon in air testing performed at Garner, initially from December 11-17, 2013, and thereafter from January 13-16, 2014.

106. Although that January 27, 2014 letter closed with the State of Connecticuts Department of Public Health's stated desire "to assist [DOC] in the radon testing efforts to promote a healthy environment for GCI residents and staff," [Emphasis supplied], DEFENDANTS Semple, Dzurenda and Falcone failed to inform inmates at Garner of the high levels of radon found, all of which exceeded the EPA action level, and may of which were multiples of the EPA action level of 4.0 pCi/L, including some areas producing an average test result in excess of 20.0 pCi/L.

107. As reported by Connecticut's Department of Correction in 2011, the overall cost per inmate for medical, mental health and dental services was $4,780; the per inmate health cost at Garner Correctional Institution was significantly higher, approximately $12,000.

RECEIVED

JAN 1 2017

108. The medical, mental health and dental sections of Garner had

significantly higher radon levels than other sections tested that also

demonstrated levels above the EPA action level of 4.0 pCi/L, many of which

were several multiples of the EPA action level.

109. On March 13, 2014, DEFENDANT Falcone thereafter informed DOC staff,

through Roll Call, (which Roll Call notice CMHC also utilized to inform Garner

medical staff) of the elevated indoor radon testing results, necessitating

remediation.

110. Although DEFENDANTS Semple, Dzurenda and Falcone considered it necessary

to inform DOC staff on March 13, 2014, they intentionally, willfully and

recklessly failed to inform inmates [PLAINTIFF] residing at Garner or who

had previously resided at Garner of this "emergency" situation, whom by

definition of their [his] 24/7 incarceration, had significantly longer

exposure to the high indoor radon levels than any DOC staff member, ergo

a higher significant interest in his [their] self-preservation of health,

and well-being.

111. Although as of March 13, 2014, DEFENDANTS Semple, Dzurenda and Falcone

had made the complete report of radon testing results available in the Human

Resources Office for review by DOC staff, they intentionally, willfully,

and recklessly failed to make such indoor radon testing report available

to inmates residing at Garner, or to any inmate who had previously resided

at Garner, despite DEFENDANT Falcone's claim in the March 13, 2014 Roll Call

notice that "[DOC] are committed to the health and safety of our inmates...."

112. On March 14, 2014, Richard Bush, Health Services Administrator 2 of

UCONN Health Corrections Managed Health Care Central Office, sent an email

to CMHC employees at Garner, which in addition to attaching DEFENDANT

Falcone's March 13, Roll Call, stated, as part of the list of

initiatives/actions that have been taken or are pending concerning the high

RECE

JAN 2 4 2017

levels of radon found at Garner, that "DOC staff are having their employees complete WC [Workers Compensation] paperwork.  I will be reviewing this with CMHC Central Office and HR.  It's very likely that we will follow DOC's lead on this."

113.On March 21, 2014, Richard Bush sent an email to CMHC employees at Garner entitled "Radon Update – WC claims;" that email stated, after speaking with the Department of Administrative Services representative who is coordinating the best way to file the claims for both DOC and CMHC, **"[t]hey are looking at creating a mechanism with the WC carrier to mass file the WC 207 Forms for both Agencies." [Emphasis supplied].**

114.On May 2, 2014, in a message to Roll Call at Garner – Deputy Warden Denise Dilworth informed DOC staff that DEFENDANT Link "has received the draft remediation design for Garner and [is] reviewing it and corresponding with the consultant with comments/questions.  At this time it is not ready for bidding however they are working as fast as possible to bring it to that point...They will expedite all phases as much as possible while making sure we get a good product/project."  This information however was not shared with Garner's inmates [or PLAINTIFF].

115. In its May 8, 2014 issue of P.R.I.D.E. at Work, DEFENDANTS Semple, Falcone and Link disclose to correctional employees the need for Radon Mitigation at Garner Correctional Institution, but failed to disclose such elevated indoor radon levels requiring remediation to [PLAINTIFF] inmates housed at Garner.

116.That newsletter issue further revealed to correctional employees, but not [PLAINTIFF] inmates housed at Garner, that a complete report of the radon testing results is available for review in Garner's Administrative Office

RECEIVED

JAN 2 4 2017

CCI / FOI
OFFICE

(Room 104).  At no time did DEFENDANTS Semple, Falcone and Link make such complete report available to [PLAINTIFF] inmates housed at Garner for their review.

117. That same newsletter further revealed to DOC employees, but not to PLAINTIFF or those similarly situated, that is other inmates housed at Garner at that time or who had been incarcerated at Garner in the past but were now housed at a different DOC facility, that DOC employees had the ability to complete a WC 207 package in order to preserve their right to workers' compensation benefits in the future should they have or develop a medical condition linked to indoor radon exposure above the EPA action level of 4.0 pCi/L (picocuries per liter of air).

118. In permitting its employees to file a workers' compensation claim for exposure to high levels of indoor radon gas, without any limitations on length of exposure, DEFENDANTS Semple, Falcone and Link have established both as a matter of fact and law that a serious risk to health or future health exists due to indoor radon exposure.

119. In its October 11, 2014 to November 21, 2014 issue of P.R.I.D.E. at Work, DEFENDANTS Semple, Falcone and Link disclosed the following:  The need for the mitigation system was discovered earlier this year when, after the completion of federally mandated radon testing of schools throughout the department, radon levels above the action level of 4 picocurie/liter were found at Garner CI.  Current Environmental Protection Agency guidelines suggest that action be taken if the radon level in any occupied part of the building reaches or exceeds 4 pCi/L.  Radon is measured in picocuries per liter of air (PCi/L).  To better understand the relative amounts to which a person may be exposed, the average indoor level is 1.3 pCi/L, and about 0.4 pCi/L is normally found in the outside air.

RECEIVED

JAN 2 4 2017

CCI / FOI

120. That same newsletter also disclosed that "[a]s a result of the testing, the Department of Correction (DoC) in conjunction with the Department of Public Health (DPH) initiated an **emergency** radon remediation project.  An environmental consultant was hired to evaluate the situation and develop an action plan.  Two licensed radon remediation contractors with experience in large facility remediation were invited to design and bid on a system to lower the radon levels.  The system designs were evaluated by an environmental consultant along with staff members from the DoC's Facilities Management and Engineering Unit.  They settled on a design consisting of six Active Soil Depressurization System units." (Emphasis supplied).

121. DEFENDANTS Semple, Falcone and Link intentionally withheld such information from [PLAINTIFF] inmates housed at Garner.

122. Under state law, the Department of Correction is tasked with establishing a public safety committee in each municipality in which a correctional facility is located.  The (DOC/Garner) Public Safety Committee meets quarterly to review correctional safety and security issues that affect Newtown.

123. The Public Safety Committee (DOC/Garner) Minutes on March 4, 2014 reveal in relevant part that defendant Warden Falcone informed Newtown public officials that "[t]he facility tested high for radon last year and again even higher this year.  They will work toward rectifying this problem."

124. The Public Safety Committee (DOC/Garner) Minutes on December 2, 2014 reveal in relevant part that DEFENDANT Warden Falcone updated Newtown public officials and other present on the radon mitigation system installed at Garner Correctional Institution and that further testing would take place when the ground freezes to ensure that indoor radon levels were safe.

RECEIVED

JAN 2 4 2017

CCI / FOI
OFFICE

125.   Although DEFENDANT Warden Falcone considered it prudent to inform Newtown

public officials and other members of the Public Safety Committee about the testing

results from December 2013 and January 2014 that revealed high levels of radon

and the installation of the new radon mitigation system to alleviate this

problem, at no time did DEFENDANT Warden Falcone inform [PLAINTIFF] those

inmates incarcerated at Garner about the high levels of indoor radon found within

its facility and the installation of a radon mitigation system to bring indoor

radon levels under the EPA action level.  Furthermore, such a notice to

[PLAINTIFF] inmates housed at Garner have had been given, at the onset of

this resulting outcome of test results, or even consequently at Garners inception

(prior to and after building), DEFENDANTS may have been adversely challenged

to support this disclosure for imminent concerns of its target population [inmates]

inciting a refusal to be housed enmass, thus the DEFENDANTS in part, moreso

those who worked in administrative positions at Garner [to be] would have

been in a conflict of interest in that their respective positions of potentially

higher pay (through promotions, and an available job post through a new facility)

would not be available due to the facility either by design of its elements

of toxic exposure potential, or when hence thereafter upon discovery of the

toxic indoor radon levels chose consciously to preserve their own interests of

having such employment (with higher pay), versus that of acting and being "committed

to the health and safety of our inmates" clearly spells out such conflict in their

omission and inaction under color of law.

### Count I - Federal Constitutional Violations

126. PLAINTIFF incorporates all previous paragraphs published, as if more fully

set forth herein, inclusively numbers One through One Hundred and Twenty-Five.

127. For the named PLAINTIFF having been housed at Garner Correctional pre,

and post-conviction, the practices, policies, acts and omissions alleged in this

Complaint that exposed him to toxic indoor radon gas levels are in violation of the

Eighth Amendment to the United States Constitution in that they deprived him to be

free from cruel and unusual punishment.

REC'
JAN 2 4 2017
CCI / FOI

128. Although the Eighth Amendment to the United States Constitution does not apply to pre-trial detainees, the due process clause of the Fourteenth Amendment to the United States Constitution provides to pre-trial detainees at least equal protection to that accorded to convicted prisoners.

129. For those inmates housed at Garner Correctional Institution as pre-trial detainees, the practices, policies, acts and omissions alleged in this Complaint that exposed them to indoor radon gas are in violation of the Fourteenth Amendment to the United States Constitution in that they deprived them of their right to be free from deprivations of liberty without due process of law.

130. Although the installation of the radon mitigation system at Garner Correctional Institution completed on October 14, 2014 corrected the unconstitutional conditions of confinement, the harms suffered by [PLAINTIFF] inmates of all inclusion whom were housed at Garner since its inception and their requisite spans of confinement, their exposure to such unconstitutional conditions of confinement prior to that date caused irrepairable physical harm.

131. Although the installation of the radon mitigation system at Garner Correctional Institution completed on October 10, 2014 corrected the due process violations, the harms suffered by pre-trial [and PLAINTIFF] detainees from their [PLAINTIFFS] exposure to such unconstitutional conditions of confinement prior to that date caused irreparable physical harm.

132. By virtue of their deliberated indifference to the serious health risks associated with indoor radon exposure, including their intentional refusal to provide medical monitoring and management to those post-conviction [inclusive of PLAINTIFF], and other members who may not yet exhibit a medical condition associated with radon exposure, DEFENDANTS Semple, Dzurenda and Falcone, all of whom had actual actionable knowledge of the December 2013

RECEIVED

JAN 2 4 2017

and January 2014 test results revealing high levels of indoor radon gas,
violated the Eighth Amendment to the United States Consitution as determined
under Estelle v. Gamble, 429 U.S. 97 (1976).

133. By virtue of their deliberate indifference to the serious health risks
associated with indoor radon exposure, including their intentional refusal
to provide medical monitoring and management to those pre-trial detainees
[PLAINTIFF inclusively], and those persons who have yet to exhibit a medical
conditoin associated with radon exposure, DEFENDANTS Semple, Dzurenda and
Falcone, all of whom had actionable knowledge of the December 2013 and January
2014 test results revealing high levels of indoor radon gas, violated the
Fourteenth Amendment to the United States Consitution by deprivation of
Liberty without due process of law as applied under Estelle v. Gamble, 429
U.S. 97 (1976).

### Count II - State Law Claims

134. PLAINTIFF incorporates all previous paragraphs published, as if more
fully set forth herein, inclusive of #'s One through One Hundred and Thirty-three.

135. For the named PLAINTIFF, having been housed at Garner Correctional
Institution post-convition, the practices, policies, acts and omissions
alleged in this Complaint are in violation of Connecticut Constitution,
Article One, Section 8 in that they deprived PLAINTIFF of his rights to
be free from cruel and unusual punishment.

136. For the named PLAINTIFF, having been housed at Garner Correctional
Institution in a pre-trial context, the practices, policies, acts and
omissions alleged in this Complaint are in violation of Connecticut
Constitution, Article One, Section 8 in that they deprived PLAINTIFF
of his rights to be free from deprivations of Liberty without due process
of law.

RECEIVED

JAN 2 4 201

OFFICE

137. Although the installation of the radon mitigation system at Garner Correctional Institution that was completed on October 10, 2014 corrected the unconstitutional violations of due process, the harms suffered by the PLAINTIFF [in any pre-trial context] from his exposure to such unconstitutional conditions of confinement prior to that date caused irreparable physical harm to PLAINTIFF.

138. By virtue of their deliberate indifference to the serious health risks associated with indoor radon exposure, including their intentional refusal to provide medical monitoring and continuity of healthcare to PLAINTIFF, and also any member who has yet to exhibit a medical condition associated with radon exposure, DEFENDANTS Semple, Dzurenda and Falcone, all of whom had actual actionable knowledge of the December 2013 and January 2014 test results revealing high levels of indoor radon gas, violated Connecticut Constitution, Article One.

139. By virtue of their deliberate indifference to the serious health risks associated with indoor radon exposure, including their intentional refusal to provide medical monitoring and a continuity of healthcare to PLAINTIFF, and any other member who has yet to exhibit a medical condition associated with radon exposure, DEFENDANTS Semple, Dzurenda, and Falcone, all of whom had actionable knowledge of the December 2013 and January 2014 test results revealing high levels of indoor radon gas, violated Connecticut Constitution, Article One, by deprivation of Liberty without due process of Law.

Claims for Relief

140. Wherefore, PLAINTIFF having been irreparably harmed physically, and having his rights violated hereby request the following relief:

1.      For the PLAINTIFF, a declatory judgment that the acts and omissions of the DEFENDANTS violate the consitutional rights under both the U.S. and Connecticut Constitutions respectively as well as violate federal and state law;

2.    Notice to provide to PLAINTIFF, with the costs of such notice

borne by the DEFENDANTS;

3.    A comprehensive medical insurance coverage to PLAINTIFFS choosing,

without limitations of use or any cost inclusive of deductibles

of any kind imposed upon PLAINTIFF;

4.    Ongoing access to medical professional specialists experienced

in the care of PLAINTIFFS individual history without restrictions,

or delay of care imposed for any reason;

5.    Comprehensive coverage visa vie private premium insurance to

PLAINTIFFS choosing, of ongoing PALLIATIVE care, including but

not limited to full time hospice care, when the time is necessary

for PLAINTIFF to require such level of care;

6.    Follow up health care treatment for all diagnosed medical

conditions has have been previously identified, or may in the future

be identified, with exposure to radon.  At this time those medical

conditions to include but not be limited to lung cancer and chronic,

non-malignant lung diseases such as chronic obstructive pulmonary

disease (COPD), emphysema, sarcoidosis, chronic interstitial

pneumonia, pulmonary fibrosis, and any other conditions which may

develop in conjunction with or as a secondary cause of PLAINTIFFS

diminishing capacity, and health.

7.  Allowance for PLAINTIFF, with full compensation to this effect,

to chose and retain a health care advocate to be court appointed,

upon PLAINTIFFS designation, to speak and accompany PLAINTIFF during

times of encounters with medical professional encounters in order

to aid in PLAINTIFFS comprehension of his status, albeit in past,

present, and future tense context.  The Court shall also appoint RECEIVED

this person, being one of a significant educational background

JAN 2 4 2017

CCI / FOI
OFFICE

in health care, whom will also speak for PLAINTIFF on and and in
his behalf, during periods when PLAINTIFF is not longer with the
capacity albeit, temporarily or permanently in a state where he
he is no longer able to competently function in an adequate physical
and/or mental state of comprehension as deemed by the Court
appointed advocate;

8.    Non-economic monetary damages for PLAINTIFF, whom having been
unnecessarily exposed to high levels of indoor radon gas while
housed at Garner Correctional Institution, developed medical
conditions which as a result of that exposure, has already been
diagnosed, or may in the future be diagnosed with medical conditions
as have been previously identified from the exposure to high levels
of indoor radon gas.  At this time, those medical conditions could
include lung cancer and chronic, non-malignant lung diseases such
as chronic obstructive pulmonary disease (COPD), emphysema, chronic
pulmonary interstitial pneumonia, pulmonary fibrosis, and sarcoidosis,
or those conditions which may develop in the future as a result
of PLAINTIFFS failing, and/or diminishing medical capacity.
Additionally, damages for loss of wages and earnings capacity,
and/or impending premature untimely death induced from conditions
secondary to exposure to high levels of indoor radon gas, and
punitive damages if permitted;

9.    Reasonable attorney's fees and costs;

10.    Such other relief as the Court may deem just and proper.

34

RECEIVED

JAN 2 4 2017

CO
OFI

WHEREFORE, the PLAINTIFF being the undersigned, swears the truth of the aforementioned allegations under pains of perjury, and prays for relief. RESPECTFULLY SUBMITTED, on this 22 day of JANUARY , 201 7 .

                                        _____ ,
                                        HARRY VEGA,
                                        900 Highland Avenue,
                                        NB-431
                                        Cheshire, Connecticut
                                                    06410-1668

RECEIVED

JAN 2 4 2017

CCI / F
OFFIC