UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HARRY VEGA, *et al.*, | : | CIVIL NO. 3:17-CV-0107(JBA) |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| SCOTT SEMPLE, *et al.*, | : | OCTOBER 2, 2017 |
| *Defendants*. | | |

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS**

The defendants move to dismiss. They are immune from suit. The defendants' qualified immunity bars the federal individual-capacity claims seeking money damages. Connecticut's Eleventh Amendment sovereign immunity bars the official-capacity claims and the equitable relief sought. Finally, the Court should decline to exercise supplemental jurisdiction over any remaining state-law claims.

I.     BACKGROUND

Plaintiffs are current or former inmates incarcerated within the Connecticut Department of Correction ("DOC"). (Doc. 49 p. 1-2 ¶ 1; p. 5-6 ¶¶ 14-25). They bring this action under 42 U.S.C. § 1983 complaining of their conditions of confinement while incarcerated at Garner Correctional Institution ("Garner"). (Doc. 49 p. 1-2 ¶ 1; p. 5 ¶¶ 12, 14). Specifically, plaintiffs allege they were exposed to unacceptable radon gas levels while incarcerated at Garner. *See, e.g.*, (Doc. 49 p. 1-2 ¶ 1; p. 8 ¶ 41; p. 8-10 ¶ 46). They claim defendants were deliberately indifferent to their safety when building the Garner facility at the Newtown, Connecticut site; they also claim

defendants were deliberately indifferent by failing to detect or remediate the alleged radon exposure thereafter. *See, e.g.*, (Doc. 49 p. 1-2 ¶ 1; p. 30 ¶¶ 135, 136; p. 20 ¶¶ 90-91; p. 21-22 ¶¶ 92-96; p. 22 ¶ 98; p. 23-24 ¶ 103; p. 25 ¶¶ 110-111; p. 26 ¶ 114). Further, plaintiffs claim that defendants Dzurenda, Semple, and Falcone were deliberately indifferent to inmate safety by failing to notify inmates that radon testing and remediation were being conducted at Garner during 2013 and 2014, after possible elevated radon levels were discovered in late 2013. *See, e.g.*, (Doc. 49 p. 31 ¶ 140; p. 32 ¶¶ 142, 143; p. 33 ¶¶ 142, 146, 147; p. 34-35 ¶¶ 150-153; p. 36-37 ¶ 157-161).

Plaintiffs purport to bring this lawsuit as a class action.[1] (Doc. 49 p. 1-2 ¶ 1; p. 8-14). They seek to include, as plaintiffs, all inmates who were incarcerated within Garner since it opened in 1992. (Doc. 49 p. 9-11 ¶¶ 46(A); 46(B)); *see also* (*id.* p. 11 ¶ 49; p. 20 ¶ 91; p. 23 ¶ 100). This includes pre-trial detainees and post-conviction prisoners. (Doc. 49 p. 1 ¶ 1; p. 8 ¶ 41; p. 9-10 ¶ 46(A); 46(B)). Plaintiffs propose a "Damages Class" and a "Declaratory/Injunctive Class." (Doc. 49 p. 8 ¶ 46; p. 9-10 ¶¶ 46(A); 41(B)).

Plaintiffs sue numerous DOC officials in their individual and official capacities. (Doc. 49 p. 1 Caption; p. 6-8 ¶¶ 26-39). This includes naming every Commissioner of Correction dating back to the opening of the Garner facility in late 1992. (Doc. 49 p. 6-7 ¶¶ 26-32; p. 9 ¶ 46(A); p. 11 ¶ 49). It also includes naming the

---

[1] Plaintiffs have not moved to certify their proposed classes. The defendants reserve the right to fully challenge any such motion if or when it is filed.

former wardens of Garner (Doc. 49 p. 6-7 ¶¶ 26-27, 34), and the current and former Directors of the DOC Engineering and Facilities Management Unit (Doc. 49 p. 7 ¶¶ 36-38). Plaintiffs seek money damages from the individual-capacity defendants and injunctive and declaratory relief from the official-capacity defendants. *See* (Doc. 49 p. 4 ¶ 11; p. 5 ¶¶ 12, 13; p. 41 ¶ 1; p. 43 ¶¶ 7-9; p. 8-10 ¶ 46).

The post-conviction plaintiffs bring claims under the Eighth Amendment, claiming the defendants' alleged conduct regarding radon levels within Garner constituted deliberate indifference to their safety and therefore amounted to cruel and unusual punishment. (Doc. 49 p. 37 ¶ 163; p 38-39 ¶ 166, 168; p. 30 ¶¶ 135, 136). They also bring similar claims under the Connecticut Constitution. (Doc. 49 p. 40 ¶ 171; p. 40-41 ¶¶ 173-175).

The pre-conviction plaintiffs bring their claims under the Fourteenth Amendment Due Process Clause and under the Connecticut Constitution. (Doc. 49 p. 38-39 ¶¶ 164-165; p. 38 ¶ 167; p. 39 ¶ 169; p. 30 ¶¶ 135, 136); (*id.* p. 40 ¶ 172; p. 40-41 ¶¶ 173-175). They advance the same deliberate-indifference theory as the post-conviction plaintiffs, but they sue under the Fourteenth Amendment instead of the Eighth Amendment because of their pre-conviction statuses. *See, e.g.*, (Doc. 49 p. 37-38 ¶ 164; p. 38-39 ¶¶ 165-169).

Plaintiffs incarcerated within Garner beginning in approximately 2013 also bring claims against (only) defendants Dzurenda, Semple, and Falcone individually for alleged access-to-courts violations. (Doc. 49 p. 39 ¶ 170; p. 41 ¶ 176).

For injunctive relief, plaintiffs do not seek orders requiring the defendants to refrain from engaging in certain allegedly unconstitutional acts. *See generally* (Doc. 49). Instead, they seek mandatory relief requiring expenditure of state funds to provide specified costly, expansive, and ongoing medical care for thousands of inmates and former inmates, all at State expense (Doc. 49 p. 42 ¶¶ 4-6) as detailed further below. *See infra* (p. 31-32). They also seek comprehensive widespread testing for radon throughout the Garner facility and possible expenditure of state funds for radon mitigation or remediation systems in addition to those already conducted and installed in 2013 and 2014. (Doc. 49 p. 42 ¶ 3; p. 9 ¶ 46 (A)).

Except for the access-to-courts claims, plaintiffs' entire action is based on a theory of deliberate indifference to plaintiffs' safety. *See, e.g.*, (Doc. 49 p. 38-39 ¶ 168; p. 39 ¶ 169; p. 41 ¶ 175; p. 30 ¶¶ 135, 136; p. 1-2 ¶ 1; p. 37-38 ¶¶ 163-167; p. 23-24 ¶ 103). Those deliberate indifference claims are all based on the radon levels at Garner and plaintiffs' alleged exposure to those levels. (*Id.*) Some plaintiffs also bring access-to-courts claims against Dzurenda, Semple, and Falcone based on an unrecognized and unprecedented legal theory. (Doc. 49 p. 39 ¶ 170; p. 41 ¶176 ; p. 10 ¶ 46(B)). Those claims are premised on those defendants' allegedly improper decisions not to notify inmates about radon testing and remediation implemented in 2013 and 2014 at Garner until after those processes were completed. *See* (Doc. 49 p. 39 ¶ 170; p. 41 ¶176; p. 10 ¶ 46(B); p. 31 ¶ 140; p. 32 ¶¶ 142, 143; p. 33 ¶¶ 142, 146, 147; p. 34-35 ¶¶ 150-153; p. 36-37 ¶ 157-161). Plaintiffs contend that this somehow

deprived them from filing grievances, exhausting administrative remedies, and then pursuing claims with the Connecticut Office of the Claims Commissioner in an attempt to convince the state legislature to waive Connecticut's sovereign immunity and allow negligence actions against the state directly.  (Doc. 49 p. 39 ¶ 170; p. 41 ¶176 ; p. 10 ¶ 46(B); p. 11-12 ¶ 52; p. 17 ¶¶ 69, 70).

## II.    SUMMARY OF ARGUMENTS

First, the individual-capacity defendants are immune from suit and from any judgment for money damages because of their qualified immunity.  There is no clearly established law rendering it 'beyond debate' that their alleged conduct rose to the level of a constitutional violation such that they were deliberately indifferent and criminally reckless.  *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003)("Deliberate indifference is a state of mind that is the equivalent of criminal recklessness.")(internal quotations omitted).  There is also no clearly established law rendering it 'beyond debate' that the alleged conduct of Dzurenda, Semple, and Falcone, in deciding how and when to disclose information regarding radon testing, rose to the level of a constitutional access-to-courts violation.  All federal individual-capacity claims should be dismissed.

Second, the official-capacity defendants are immune from suit and from the injunctive relief sought because of their Eleventh Amendment sovereign immunity. The State of Connecticut and its officials are immune from suit and from providing injunctive relief that "is in practical effect indistinguishable in many aspects from

an award of damages against the State." *Edelman v. Jordan*, 415 U.S. 651, 668 (1974).  Further, they are immune from the equitable claims because plaintiffs fail to 1) allege an ongoing violation of federal law and 2) seek relief properly characterized as prospective.  *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007).  The Eleventh Amendment bars the federal official-capacity claims seeking injunctive relief.  The Eleventh Amendment also bars all Connecticut state-law claims seeking injunctive relief.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).  Those claims violate longstanding principles of dual sovereignty secured by the Eleventh Amendment.

Further, the claims seeking declaratory relief should be dismissed too.  The Eleventh Amendment bars declaratory claims that are not prospective in their focus and that seek to hold that the defendants violated federal law in the past.

Finally, the Court should decline to exercise supplemental jurisdiction over any remaining state-law claims, including those seeking money damages.

## III.   ARGUMENT AND APPLICABLE LAW

### A.   Standard of Review, Motion to Dismiss.

A motion to dismiss is the proper vehicle to challenge a complaint for "failure to state a claim upon which relief can be granted" or for "lack of subject-matter jurisdiction."  Fed. R. Civ. Pro. 12(b)(6); Fed. R. Civ. Pro. 12(b)(1).

A motion to dismiss is also a proper vehicle to assert a defendant's qualified immunity against the allegations alleged in the complaint.  *McKenna v. Wright*, 386

F.3d 432, 436 (2d Cir. 2004)("we see no reason why even a traditional qualified immunity defense may not be asserted on a Rule 12(b)(6) motion as long as the defense is based on facts appearing on the face of the complaint.").   Because qualified immunity is "an *immunity from suit* rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)(emphasis in original).  The "driving force" behind the doctrine is to ensure that "insubstantial claims against government officials be resolved prior to discovery." *Anderson v. Creighton,* 483 U.S. 635, 640 n.2 (1987). Accordingly, the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991).

Eleventh Amendment sovereign immunity is also properly raised through a motion to dismiss.  *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 145 (1993)("a motion by a State or its agents to dismiss on Eleventh Amendment grounds involves a claim to a fundamental constitutional protection . . . whose resolution generally will have no bearing on the merits of the underlying action")(citation omitted).   "The value to the States of their Eleventh Amendment immunity, like the benefit conferred by qualified immunity to individual officials, is for the most part lost as litigation proceeds past motion practice."  *Id.*

**B.**   **Qualified Immunity Bars the Federal Claims Against the Individual-Capacity Defendants.   Those Defendants Are Immune From Suit and From Any Judgment for Money Damages.   All Federal Individual-Capacity Claims Should be Dismissed.**

The doctrine of qualified immunity shields officials from civil suit and liability, so long as their conduct does not violate 1) clearly established constitutional rights 2) of which every reasonable official in the defendants' positions would have known. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)(citations omitted).   The immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions . . . ." *Distiso v. Cook,* 691 F.3d 226, 240 (2d Cir. 2012)(quoting *Messerschmidt v. Millender,* 132 S. Ct. 1235, 1249 (2012).  It balances the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.

The qualified immunity defense is a "forgiving" and "broad shield that protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Grice v. McVeigh*, No. 15-4124-CV, — F.3d —, 2017 WL 4320253, at *2 (2d Cir. Sept. 29, 2017)(citation omitted); *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017).

It applies regardless of whether the officials' error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez,* 540 U.S. 551, 567 (2004)(Kennedy, J., dissenting)(citing *Butz v.*

*Economou,* 438 U.S. 478 (1978)).  The "driving force" behind the doctrine is to ensure that "insubstantial claims against government officials be resolved prior to discovery." *Anderson v. Creighton,* 483 U.S. 635, 640 n.2 (1987).

In determining whether a defendant is immune, the court need not decide whether there is a constitutional violation before deciding the clearly established or objectively reasonable aspects of the immunity.  *See Pearson v. Callhan,* 555 U.S. 223, 236 (2009).

> **1.      Deliberate Indifference Claims:**
> **There is no clearly established law governing the defendants' actions in the factual context in this case that demonstrates they were deliberately indifferent to plaintiffs' safety.  The defendants are therefore entitled to qualified immunity from suit and from any federal claims seeking damages.**

"As the Supreme Court has explained, 'a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'"  *Estate of Devine v. Fusaro*, No. 3:14-CV-01019(JAM), 2016 WL 183472, at *5 (D. Conn. Jan. 14, 2016)(quoting *Plumhoff v. Rickard,* 134 S. Ct. 2012, 2023 (2014)), *aff'd sub nom. Estate of Devine*, 676 F. App'x 61 (2d Cir. 2017)(Summary Order).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"

*Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards,* 132 S.Ct. 2088, 2093 (2012)(internal quotation and alteration omitted).

"Rights must be clearly established in a 'particularized' sense, rather than at a high level of generality; and such rights are only clearly established if a court can 'identify a case where an officer acting under similar circumstances' was held to have acted unconstitutionally." *Grice v. McVeigh*, No. 15-4124-CV, — F.3d —, 2017 WL 4320253, at *2 (2d Cir. Sept. 29, 2017)(quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). Existing precedent must place the purported constitutional violation in question "beyond debate." *See, e.g., Mullenix*, 136 S. Ct. at 308 (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011)).

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Mullenix*, 136 S. Ct. at 308 (quoting *al–Kidd,* 563 U.S. at 742). It did so yet again just this year: "In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases . . . . Today, it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 551-52 (2017)(citation omitted); *see also Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)(reversing); *Mullenix v. Luna*, 136 S. Ct. 305 (2015)(reversing); *Taylor v. Barkes*, 135 S. Ct. 2042 (2015)(reversing); *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774, n.3 (2015)(reversing); *Carroll v. Carman*, 135 S. Ct. 348 (2014)(reversing); *Wood v. Moss*, 134 S. Ct. 2056

(2014)(reversing); *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014)(reversing); *Stanton v. Sims*, 134 S. Ct. 3 (2013)(reversing); *Reichle v. Howards*, 132 S. Ct. 2088 (2012)(reversing); *Filarsky v. Delia*, 566 U.S. 377 (2012)(reversing); *Messerschmidt v. Millender*, 565 U.S. 535 (2012)(reversing); *Ryburn v. Huff*, 132 S. Ct. 987 (2012)(reversing); and *Lane v. Franks*, 134 S. Ct. 2369 (2014)(affirming).

"[T]he clearly established law must be 'particularized' to the facts of the case." *White*, 137 S. Ct. at 552 (quoting *Anderson,* 483 U.S. at 640). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 136 S. Ct. at 308 (emphasis in original)(quoting *al–Kidd,* 563 U.S. at 742). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004); *Saucier v. Katz,* 533 U.S. 194, 201 (2001)); *see also Reichle, Jr.*, 132 S. Ct. at 2094. "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *Coollick v. Hughes*, 699 F.3d 211, 220 (2d Cir. 2012)(quotations omitted).

No authority of this Circuit or the Supreme Court clearly establishes that a supervisory correctional official commits deliberate indifference to inmate safety in the particular factual contexts alleged in this case.

Plaintiffs allege Commissioner Meachum was responsible for constructing the Garner facility and selecting the site.  (Doc. 49 p. 19 ¶ 82; p. 20 ¶ 90-91; p. 21 ¶ 92,

94).  Plaintiffs allege Director Batten provided Meachum with input about the site.
(Doc. 49 p. 21 ¶ 92).  They allege the Newtown, Connecticut region is a high radon-
level area.  (Doc. 49 p. 21-22 ¶ 93, 96).  They claim Meachum's involvement in site
selection and prison construction amounts to deliberate indifference because of the
allegedly high radon levels.  *See* (Doc. 49 p. 30 ¶¶ 135, 136; p. 22 ¶ 99; p 19 ¶ 82; p.
20 ¶ 90-91; p. 21-22 ¶ 92-96).  They allege Meachum failed to ensure that the
Garner facility was tested for radon before it opened in 1992 and failed to ensure it
was built with a radon remediation system.  (Doc. 49 p. 30 ¶¶ 135, 136; p. 22 ¶ 99;
p. 19 ¶ 82; p. 20 ¶ 90-91; p. 21-22 ¶ 92-96; p. 22 ¶ 98).  They also allege Meachum
failed to install a radon mitigation system after the Garner facility opened.  (Doc. 49
p. 30 ¶¶ 135, 136; p. 23 ¶ 100; p. 24 ¶ 105; p. 23-24 ¶ 103).

　　　Further, plaintiffs assert that the remaining defendants failed to correct the
allegedly high radon levels after they took over office for Meachum and Batten.
This includes alleging that Commissioners Armstrong, Lantz, Arnone, Dzurenda,
and Semple failed to correct the problem, as did Wardens Falcone (and Dzurenda
and Semple) and Director Link.  (Doc. 49 p. 30 ¶¶ 135, 136; p. ¶ 103; p. 24 ¶¶ 105,
107; p. 25 ¶¶ 110-111, p. 26 ¶ 114; p. 23-24 ¶ 103).

　　　Finally, they allege that once Dzurenda, Semple, Falcone, and Link
discovered the possibility of allegedly high radon levels in 2013, they chose not to
inform the inmates at Garner but did inform DOC staff, public health officials, and
local town officials before the installation of a radon remediation system in October

2014.  (Doc. 49 p. 31 ¶ 140; p. 32 ¶¶ 142, 143; p. 33 ¶¶ 142, 146, 147; p. 34-35 ¶¶ 150-153; p. 36-37 ¶ 157-161).

No authority of this Circuit or the Supreme Court places it 'beyond debate' that a Commissioner of Correction (Meachum) commits deliberate indifference when the State decides to build a prison facility in an allegedly elevated radon region.  Nor does any such authority clearly establish deliberate indifference regarding the conduct of a facilities engineer (Batten) in the same circumstances. Instead, research reveals *no* Supreme Court or Second Circuit decisions involving radon and prison construction.

Further, no sufficient authority specifies that the failure to learn of allegedly elevated radon levels by subsequent Commissioners (Armstrong, Lantz, Arnone, Dzurenda, and Semple), Wardens (Dzurenda, Semple, and Falcone), and Director of Facilities (Link) constitutes criminally reckless culpability reaching the level of a constitutional tort.

Finally, no sufficient authority requires supervisory correctional officials to notify inmates in the prison of the possibility of the presence of elevated radon levels while they test or remediate.

Therefore, none of the defendants can be said to have violated a clearly established right.  The rights' contours were not sufficiently definite that any reasonable official in the defendants' various positions would have understood that he was violating them.  *See Estate of Devine*, 2016 WL 183472, at *5.

Plaintiffs implicitly recognize this through their reference to *Helling v. McKinney* in the Complaint in their attempt to establish liability in this case. (Doc. 49 p. 2-3 ¶ 3; p. 13 ¶ 57)(citing *Helling v. McKinney*, 509 U.S. 25 (1993)). *Helling* is a 1993 Supreme Court decision that involved injunctive relief[2] regarding environmental tobacco smoke ("ETS") within a prison. *Helling*, 509 U.S. at 27-28. The plaintiff was a prisoner who did not smoke but was housed in a prison cell with a cellmate that smoked five packs of cigarettes each day. *Id.* at 28. He claimed the risk of future damage to his health from the ETS he was exposed to by his cellmate violated his Eighth Amendment rights. The Court allowed the Eighth Amendment claims for injunctive relief to proceed.

However, *Helling* did not involve elevated radon gas regions or prison construction. Nor did it involve failure to learn of elevated radon levels by other supervisory correctional officials in the years following prison construction. It also did not involve supervisory correction officials failing to detect radon gas in a prison or the lack of testing for radon in a prison. It did not involve radon remediation within a prison once allegedly elevated levels were discovered. And it did not involve failure to inform prisoners of the possibility of elevated radon levels while a

---

[2] As discussed further below, the plaintiff in *Helling* also sought damages. The damages claims were dismissed as barred by the individual defendants' qualified immunity. This was specifically because there was no clearly established law the applicable to factual context of that case. *Helling*, 509 U.S. at 29 ("The Court of Appeals also held that the defendants were immune from liability for damages since there was at the time no clearly established law imposing liability for exposing prisoners to ETS.").

facility was tested or remediated.  Simply stated, *Helling* did not involve radon at all.  It therefore cannot clearly establish 'beyond debate' that the defendants' particularized conduct alleged in this action constituted deliberate indifference.

Plaintiffs in this case allege unique facts regarding radon gas and its inherent qualities.  *See, e.g.*, (Doc. 49 p. 2 ¶ 2; p. 13 ¶ 56; p. 18 ¶¶ 72, 73, 74; p. 19 ¶¶ 78, 80, 81; p. 23 ¶ 102).  This includes the tasteless, odorless, and undetectable nature of radon gas.  (Doc. 49 p. 18 ¶ 44)("Because radon is a noble gas, it is tasteless, odorless, colorless and imperceptible to the senses.").  Plaintiffs even allege that the ability to detect exposure to radon "sharp[ly] contrasts" with the ability to perceive and detect environmental tobacco smoke (ETS).  (Doc. 49 p. 18 ¶ 74).  Given these specific and particularized aspects of radon and its detection, testing, remediation, and other unique qualities, only a radon (prison) case from the Supreme Court or the Second Circuit can define the particularized conduct alleged with reasonable specificity.  *See Mullenix*, 136 S. Ct. at 308 (requiring that the "violative nature of *particular* conduct is clearly established.")(emphasis in original); *see also Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017)("No precedential decision of the Supreme Court or this Court 'clearly establishes' that the actions of [the defendants], viewed in the circumstances in which they were taken, were in violation of the Fourth Amendment."); *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014)("Eleventh Circuit precedent did not preclude Franks from

reasonably holding that belief.  And no decision of this Court was sufficiently clear to cast doubt on the controlling Eleventh Circuit precedent.").

Instead, plaintiffs attempt to establish liability using case law not applicable to the factual context in this case, and using a legal theory that broadly imposes liability for deliberate indifference without sufficient precedent.

The Second Circuit already rejected broadly imposing liability for deliberate indifference in situations involving complex environmental dangers in *Benzman v. Whitman*, 523 F.3d 119, 123 (2d Cir. 2008).  There, it reversed a District Court's denial of a motion to dismiss on qualified immunity grounds.  *Id.* at 123.  The plaintiffs in *Benzman* attempted to use a deliberate indifference theory to impose liability against EPA officials for their false statements in telling New Yorkers it was safe to return to ground zero following the September 11th attacks.  They alleged that following September 11th, the air quality was compromised and contained dangerous dust, which affected the air quality in apartments, offices, and schools.  They alleged that the defendants "knew of the dangers posed by WTC [World Trade Center] dust and yet issued and approved a series of press releases that 'falsely represented to Plaintiffs and the putative Class that the air in and around Lower Manhattan was safe to breathe.'"  *Id.* at 126, 123.  They claimed this amounted to deliberate indifference in violation of the plaintiffs' Fourteenth Amendment rights.  *See id.* at 123.

The District Court denied defendants' motion to dismiss, which asserted the defendants' qualified immunity from suit. *Id.* 123-24. The Second Circuit reversed. *Id.* at 123. It refused to recognize a broad (*Bivens*) "right to be free from official government policies that increase the risk of bodily harm." *Id.* at 124, 123.

Here, plaintiffs seek recognition of a similarly broad deliberate-indifference right despite absence of clearly established law in this Circuit. They do so despite recent Supreme Court decisions prohibiting courts from broadly defining the prohibited conduct, purported right, and resulting violation as courts did in the past. In comparing these recent Supreme Court decisions with older cases and their analysis, *LaBounty v. Coughlin* is instructive. *See LaBounty v. Coughlin*, 137 F.3d 68, 74 (2d Cir. 1998).

In *Labounty*, the Second Circuit reversed a District Court for defining an Eighth Amendment right at issue as "the right to be free from crumbling asbestos," and instead held it should have determined "that the right to be free from deliberate indifference to serious medical needs, established in *Estelle v. Gamble,* 429 U.S. 97, 104 (1976), best encompasses the alleged conduct." *LaBounty*, 137 F.3d at 74 (citations omitted). However, that analysis does not clearly establish anything as 'beyond debate,' or allow reasonable officials to know what constitutes a violation. Most important, it does not focus on the defendants' particular conduct at all. *See Mullenix*, 136 S. Ct. at 308 ("The dispositive question is 'whether the violative nature of *particular* conduct is clearly established." And that inquiry "must be

undertaken in light of the specific context of the case, not as a broad general proposition.")(quotations omitted).   Given the ample Supreme Court decisions regarding 'clearly established' law, the defendants respectfully submit that *LaBounty v. Coughlin*, 137 F.3d 68 (2d Cir. 1998) and similar cases are no longer good law, at least regarding how to define clearly established constitutional rights.

Recent decisions correctly require that the violative nature of specific conduct, given the particular factual contexts in the case, must be clearly established as unlawful.   Just this summer, the Second Circuit affirmed the granting of qualified immunity for police officers accused of excessive force in *Brown v. City of New York*, 862 F.3d 182, 189-92 (2d Cir. 2017).   There, the Court recounted at least fifteen separate facts used to determine the issue.   *Id.* at 189-91. These included the "repeated use of pepper spray, the kicking of [plaintiff's] legs out from under her to bring her to the ground, and [that defendant's] using his hand to push [plaintiff's] face onto the pavement, occurred after [plaintiff] refused to comply with the instructions to place her hands behind her back for handcuffing.   During her noncompliance with the instructions, she was warned prior to each application of the pepper spray."   *Id.* at 190.   The Court then determined that no Supreme Court or Second Circuit precedent clearly established that those actions, viewed in context of the particular circumstances in which they were taken, violated the Fourth Amendment.   *Id.*

Also just this summer, the Court reversed the denial of qualified immunity in *Kass v. City of New York* and affirmed the granting of qualified immunity in *Basinski v. City of New York*.  In those cases, the Court conducted similar fact-specific, contextual analysis in determining the scope of the purported clearly established rights at issue.  *Kass v. City of New York*, 864 F.3d 200, 207-13 (2d Cir. 2017); *Basinski v. City of New York*, No. 16-2429, — F. App'x —, 2017 WL 3635188, at *4-5 (2d Cir. Aug. 24, 2017)(Summary Order).

Then, just three days ago the Second Circuit issued yet another decision reversing the denial of qualified immunity.  There, it again emphasized that "[r]ights must be clearly established in a 'particularized' sense, rather than at a high level of generality; and such rights are only clearly established if a court can 'identify a case where an officer acting under similar circumstances' was held to have acted unconstitutionally."  *Grice v. McVeigh*, No. 15-4124-CV, — F.3d —, 2017 WL 4320253, at *2 (2d Cir. Sept. 29, 2017)(quoting *White*, 137 S. Ct. at 552).

Further, in *Arroyo v. City of New York*, the Second Circuit also affirmed on qualified immunity grounds.  There, the Court again properly conducted the analysis by looking to the factual context surrounding the purported clearly established right:

> the Officers (1) received a 911 call from an identified caller reporting possible elder abuse and stating that Arroyo was bipolar; (2) spoke with an identified source (the supervisor of Arroyo's mother's home attendant) with knowledge of Arroyo's conduct who indicated that Arroyo was threatening to her mother and kept a gun at home;

(3) observed Arroyo acting in an erratic and unresponsive manner; and (4) spoke to Arroyo's mother, who expressed that she was not permitted to leave her bedroom. With these facts taken together, a reasonable officer could have found that probable cause existed to remove Arroyo to a hospital under MHL § 9.41.

*Arroyo v. City of New York*, 683 F. App'x 73, 74 (2d Cir. 2017)(Summary Order).

The Court conducted similar context-specific analysis in affirming qualified immunity for the defendants in *Estate of Devine*:

> Devine's right to be free from less-than-lethal force in the circumstances, was not clearly established in the described circumstances. As the district court observed, three undisputed facts support that conclusion: (1) the police used force designed to be less-than-lethal, rather than deadly; (2) they used such force against a man reasonably believed to be suicidal and armed with a loaded gun while occupying public property; and (3) they used such force only after several hours of a standoff and negotiations that had not convinced Devine to surrender his gun.

*Estate of Devine*, 676 F. App'x 61, 63 (2d Cir. 2017)(Summary Order).

This analysis for defining clearly-established rights applies in cases involving both prison confinement and environmental conditions too. The *Benzman* Court awarded qualified immunity and refused to recognize a broad deliberate-indifference right "to be free from official government policies that increase the risk of bodily harm." *Benzman*, 523 F.3d 119, 124 (2d Cir. 2008).

Then, in *Taylor v. Barkes* the Supreme Court utilized context-specific qualified immunity analysis in a lawsuit arising from a prison suicide. *Taylor v. Barkes*, 135 S. Ct. 2042, 2043 (2015). There, the Court decided whether there was a

clearly established right best defined as "an incarcerated person's right to the proper implementation of adequate suicide prevention protocols." *Id.* at 2044. The Court reversed both the District Court and the Third Circuit's denial of qualified immunity because "[n]o decision of this Court establishes a right to the proper implementation of adequate suicide prevention protocols." *Id.* In deciding whether such a clearly established right existed, the Court premised its decision on the fact that "[n]o decision of this Court *even discusses* suicide screening or prevention protocols." *Id.* (emphasis added). Here, no decision of the Supreme Court or Second Circuit even discusses radon exposure within a prison or during prison construction.

Finally, and most helpful for analysis of this motion, the defendants in *Helling* received qualified immunity barring all claims for money damages because "[a]t the time the defendants acted, there was no clearly established liability for exposing prisoners to ETS [environmental tobacco smoke]. The defendants are therefore entitled as a matter of law to prevail on their defense of qualified immunity, and McKinney's claim for damages must fail." *McKinney v. Anderson*, 924 F.2d 1500, 1509 (9th Cir.) *cert. granted*, *judgment vacated sub nom. Helling v. McKinney*, 502 U.S. 903 (1991), and *judgment reinstated,* 959 F.2d 853 (9th Cir. 1992); *see also McKinney v. Anderson*, 959 F.2d 853, 853 (9th Cir. 1992)("Although we held that McKinney had stated a cause of action for injunctive relief, we found that he was not entitled to damages on that cause of action because the defendants were entitled to qualified immunity as a matter of law."), *aff'd sub nom. Helling v.*

*McKinney*, 509 U.S. 25 (1993); *Helling v. McKinney*, 509 U.S. 25, 29 (1993)("The Court of Appeals also held that the defendants were immune from liability for damages since there was at the time no clearly established law imposing liability for exposing prisoners to ETS.").

In sum, there is no Supreme Court or Second Circuit decision that places it 'beyond debate' that any of the defendants' alleged particularized conduct amounts to wanton "radon poisoning" constituting deliberate indifference in violation of the Eighth or Fourteenth Amendments. *See* Member Consolidated Case: *Cruz v. Semple*, 3:17-cv-0348(JBA)(Docket, Entry 1, alleging "*Radon Poisoning*")(emphasis in original). All of the individual-capacity defendants are therefore entitled to qualified immunity from suit and any judgment for money damages. The individual-capacity defendants and the individual-capacity deliberate-indifference claims should be dismissed from the action outright.

Also noteworthy regarding persuasive authority: District Court decisions do not support plaintiffs' suit either. Decisions by District Courts in this Circuit involving radon in prisons favor the defendants' position. *See, e.g.*, *Toliver v. Commissioner Semple*, 3:16-cv-1899(SRU), 2016 WL 7115942, at *3 (D. Conn. Dec. 6, 2016)(dismissing deliberate indifference claims complaining of radon exposure at Garner, for failure to state a claim); *Cepeda v. Bloomberg*, No. 11 CIV. 2914 WHP, 2012 WL 75424, at *1 (S.D.N.Y. Jan. 4, 2012)(dismissing prisoner's lawsuit complaining of exposure to various toxins, including radon, for failure to state a

claim); *Loccenitt v. City of New York*, No. 11 CIV. 5651 PAC HBP, 2012 WL 3822701 (S.D.N.Y. July 30, 2012), *report and recommendation adopted*, No. 11 CIV. 5651 PAC HBP, 2012 WL 3822213 (S.D.N.Y. Sept. 4, 2012)(dismissing prisoner's lawsuit complaining of exposure to various toxins, including radon).

> **2.      Access To Court:**
> **There is no clearly established law governing defendants Dzurenda, Semple, and Falcone's actions in the factual context in this case that demonstrates they denied plaintiffs access to court. Those defendants are therefore entitled to qualified immunity from suit and from any federal claims seeking damages.**

Just as with plaintiffs' other claims, their access-to-court claims are totally lacking in sufficient precedent to overcome qualified immunity. No authority of this Circuit or the Supreme Court clearly establishes that a correctional Warden or Commissioner commits an access-to-courts violation in the particular factual contexts alleged in this case.

Plaintiffs' access-to-courts claims against Dzurenda, Semple, and Falcone are entirely without sufficient precedent. They claim that when these officials learned of the potential presence of radon at the Garner facility, they initially informed DOC staff, state public health officials, and municipal officials but chose not to inform the inmates. This allegedly occurred during the initial testing in late 2013 and early 2014 and the remediation later completed in October 2014. They allege that the relevant defendants never informed the inmates of the radon issues before

testing and remediation were completed.  It is not entirely clear from the complaint when the plaintiffs allegedly learned of the radon concerns.[3]

The access-to-court claims depend entirely on the plaintiffs' assertion that they have been deprived the opportunity to bring negligence claims[4] before the Connecticut Office of the Claims Commissioner.  (Doc. 49 p. 11-12 ¶ 52; p. 17 ¶¶ 69, 70; p. 39 ¶ 170; p. 41 ¶ 176); *see also* (Doc. 49 p. 31 ¶ 140; p. 32 ¶¶ 142, 143; p. 33 ¶¶ 142, 146, 147; p. 34-35 ¶¶ 150-153; p. 36-37 ¶ 157-161).  Qualified immunity bars all such claims.  They are premised on an unrecognized legal theory, and they lack sufficient precedent to overcome the defendants' qualified immunity from suit.

No clearly established law places it beyond debate that a correctional Warden or Commissioner commits an access-to-courts violation when declining to affirmatively inform prisoners of a potential negligence action against the State of Connecticut.  There is no clearly established law holding that a correctional Warden or Commissioner commits an access-to-court violation in declining to assist prisoners in discovering and then actively pursuing tort claims against the officials themselves or the state as an entity.  There is no clearly established law requiring

---

[3] It cannot be disputed that the plaintiffs filed a similar action in this District in August 2016.  *Grenier v. Semple*, 3:16-cv-1465(AVC)(Doc. 1).  At the absolute latest, plaintiffs were aware the facts alleged in the complaint by the August 26, 2016 filing date of that action.  Further, because of Fed. R. Civ. Pro. 11 and other rules governing professional conduct that require investigation of the facts alleged in the complaint, plaintiffs must have been aware well before they authorized their attorneys to bring that action.

[4] The Claims Commissioner can entertain only negligence claims, not recklessness actions or other intentional torts.  *See, e.g., Horan v. Connecticut*, 60 Conn. L. Rptr. 168 (Conn. Super. Ct. March, 17, 2015).

DOC or DOC officials to provide any legal assistance to prisoners wishing to bring negligence claims.

It is not even clear that the Claims Commissioner even qualifies as a sufficient tribunal for access-to-court purposes, at least in the factual contexts of this case. The Office of the Claims Commissioner is not a judicial authority. It is administrative tribunal created by Connecticut's legislature to decide whether to waive sovereign immunity in negligence cases. *See* Conn. Gen. Stat. §§ 4-141—4-142b; *Horan v. Connecticut*, 60 Conn. L. Rptr. 168 (Conn. Super. Ct. March, 17, 2015). At least one decision from this District holds that the inability to effectively litigate negligence claims before the Claims Commissioner fails to constitute a cognizable prisoner access-to-court claim. *Hanton v. Marto*, No. 3:02-CV-997(CFD), 2005 WL 465422, at *10-11 (D. Conn. Feb. 17, 2005)(attached). There, the Court ruled that because the negligence claims before the Claims Commissioner did not challenge prisoner convictions or constitutional rights, frustration of those claims fails to satisfy the actual-injury requirement for prisoner access-to-court claims imposed by *Lewis v. Casey*, 518 U.S. 343 (1996).

Next, plaintiffs' access-to-courts claims are premised on the assertion that because they could not exhaust their remedies within DOC, that they then could not proceed before the Claims Commission. But exhaustion was not required in the Claims Commission before June 9, 2016. Conn. Pub. Act. 16-127 § 23 (attached); and *compare* Conn. Gen. Stat. § 4-165b (2015) *with* Conn. Gen. Stat. § 4-165b

(2017)(both attached). And it appears from the record that the plaintiffs must have been aware of their claims before the exhaustion requirement took effect given when they filed their first action and how long it must have taken their counsel to adequately investigate their claims before filing them. *See supra* (FN 3, above).

Further, the Claims Commission is not the only way to pursue negligence claims against the State of Connecticut. Hopeful claimants, including the plaintiffs in this action, can or could have sought permission from the General Assembly itself. Conn. Gen. Stat. § 4-159(c)(2017); Conn. Gen. Stat. § 4-159(c)(2015); Conn. Gen. Stat. § 4-159(c)(2013); Conn. Gen. Stat. § 4-159(c)(2011)(all attached). Nowhere do plaintiffs allege that they attempted to do this or that Dzurenda, Semple, or Falcone prevented them from doing so. *See generally* (Doc. 49). Therefore, plaintiffs cannot demonstrate the actual injury required to proceed with an access to courts claim.

Because the plaintiffs cannot show actual injury and given the unique processes available for pursuing negligence claims in Connecticut, plaintiffs' complaint cannot overcome the relevant defendants' qualified immunity. There is no clearly established law allowing plaintiffs' unprecedented access-to-court claims.

In addition to the complicated procedural and legislative history imbedded in plaintiffs' claims, the legal theory behind those claims fails to comport with established prison access-to-court jurisprudence. Prison access-to-court claims are usually brought as actions challenging either 1) the sufficiency of legal services

provided to inmates so they can challenge their convictions, sentences, or the constitutional nature of their confinement, or 2) actions claiming direct interference by staff with specific litigation, such as stealing or destroying filings. *See, e.g.*, *Montanez v. Cuoco*, 361 F. App'x 291 (2d Cir. Jan. 22, 2010)(Summary Order)(discussing difference between legal services claims compared with affirmative interference claims).

The sufficiency of the legal services available to assist prisoners in challenging their convictions, sentences, or the constitutional nature of their confinement is heavily litigated. *See, e.g.*, *Bourdon v. Loughren*, 386 F.3d 88 (2d Cir. 2004)(inmate challenging refusal of his request for resources from the law library and challenging the adequacy of his appointed counsel); *Johnson v. Avery*, 393 U.S. 483 (1969)(inmate challenging policy prohibiting jailhouse lawyers from assisting other inmates in the absence of assistance from persons adequately trained in the law); *Fowler v. Dep't of Correction*, No. 3:17-CV-00848(JAM), 2017 WL 3401252, at *7 (D. Conn. Aug. 8, 2017)(inmate alleging officials denied him access to legal books from the law library); *Taylor v. Coughlin*, 29 F.3d 39 (2d Cir. 1994)(no constitutional right to a typewriter with a certain memory capacity, or to any typewriter at all). Nowhere in the complaint do plaintiffs allege that they were denied adequate legal services needed to bring actions litigating constitutionally protected concerns. *See generally* (Doc. 49).

Other than challenging the sufficiency of legal services, prison access-to-courts claims also often complain of direct interference with filing specific legal actions or documents. *See, e.g.*, *Morello v. James*, 810 F.2d 344 (2d Cir. 1987)(inmate alleging prison officials stole or removed inmate's appellate brief and related research); *Farrow v. Rachavich*, No. 3:16-cv-0334(JAM), 2016 WL 7441062 (D. Conn. Dec. 27, 2016)(inmate alleging correction officer confiscated legal paperwork). Nowhere in the complaint do plaintiffs allege that any of their legal work was stolen, discarded, destroyed, or confiscated by Dzurenda, Semple, or Falcone. *See generally* (Doc. 49).

Plaintiffs' claims in this action do not invoke either of the two legal theories detailed above. Instead, plaintiffs base their access-to-court claims on an unrecognized theory that prison officials were required to actively inform plaintiffs of a possible negligence action against the state as an entity. *See, e.g.*, (Doc. 49 p. 11-12 ¶ 52; p. 17 ¶¶ 69, 70; p. 39 ¶ 170; p. 41 ¶ 176). This is not a recognized legal basis to bring an access-to-courts claim and there is no clearly established law defining the contours of that purported right or rendering the defendants conduct unconstitutional.

The Supreme Court rejected this type of theory in *Lewis v. Casey*, 518 U.S. 343, 354 (1996). "These statements [in *Bounds v. Smith*] appear to suggest that the State must **enable the prisoner to *discover* grievances**, and to *litigate effectively* once in court. These elaborations upon the right of access to the courts

have no antecedent in our pre-*Bounds* cases, and we now disclaim them." *Lewis*, 518 U.S. at 354 (bold typeface added, italics in original)(citing *Bounds v. Smith,* 430 U.S. 817, 825-26, and n.14); *see also Hannon v. Schulman & Assocs.*, No. 3:15-CV-583 JAM, 2015 WL 3466847, at *4 n.3 (D. Conn. June 1, 2015)(quoting *Lewis*, 518 U.S. at 354-55), *aff'd*, 634 F. App'x 61 (2d Cir. 2016)(Summary Order); *Christopher v. Harbury*, 536 U.S. 403 (2002)(rejecting widow's access-to-court claim that alleged officials concealed information about her husband's death or whereabouts).

In light of traditional prison access-to-court jurisprudence, plaintiffs' claims are either 1) entirely unprecedented and therefore lacking clearly-established law, or 2) squarely rejected by *Lewis v. Casey*, where the Supreme Court refused to recognize an access-to-court right requiring prison officials to help inmates discover grievances. *See* 518 U.S. at 354.   Either way, the claims are barred by the defendants' qualified immunity.

Given the complex factual and procedural premises of plaintiffs' access-to-court claims, no clearly established law places it 'beyond debate' that Dzurenda, Semple, and Falcone's alleged conduct constituted an access-to-courts violation. Dzurenda, Semple, and Falcone are entitled to qualified immunity from suit and any judgment for money damages.  The access-to-court claims against them should be dismissed.

**C.      Eleventh Amendment Sovereign Immunity Bars The Federal Official-Capacity Claims, Which Seek to Impose Upon the Connecticut Treasury and Require It to Retroactively Expend State Funds for Past Conduct, All Under the Guise of Injunctive Relief.**
.

"The Judicial power of the United States Shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI.    The Eleventh Amendment bars suits against a state by its own citizens.  *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Pawlow v. Dep't of Emergency Servs. & Pub. Prot.*, 172 F. Supp. 3d 568, 556-57 (D. Conn. March 23, 2016).

The Eleventh Amendment bars lawsuits against states absent consent from the state or abrogation of the immunity by Congress.  *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253–54 (2011)("[A]bsent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State.")  Here, Connecticut never waived Eleventh Amendment immunity in this action.  Plaintiffs do not allege otherwise.  *See generally* (Doc. 49).  And Congress did not abrogate the immunity for suits brought under 42 U.S.C. § 1983.  *Quern v. Jordan*, 440 U.S. 332, 338-45 (1979).

The *Ex parte Young* doctrine is the only remaining exception.  *See Ex parte Young*, 209 U.S. 123 (1908).  "The doctrine of *Ex parte Young* . . . is regarded as carving out a necessary exception to Eleventh Amendment immunity."  *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).  It

"permits prospective injunctive relief against state officials for ongoing federal law violations." *White v. Martin*, 26 F. Supp. 2d 385, 388 (D. Conn. 1998)(citing *Ex parte Young*). The exception is narrow. *Puerto Rico Aqueduct & Sewer Auth.*, 506 U.S. at 146.   It does not apply here.

The official-capacity claims fail to invoke *Ex parte Young* because the injunctive relief sought "is in practical effect indistinguishable in many aspects from an award of damages against the State." *See Edelman*, 415 U.S. at 668. "[S]overeign immunity bars suits whose direct outcome will diminish the public fisc through the award of retroactive damages." *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 374 (2d Cir. 2005)(citation omitted).

Plaintiffs seek injunctive relief compelling widespread medical care for an injunctive class allegedly "number[ing] in the thousands." (Doc. 49 p. 11 ¶ 50; p. 42 ¶¶ 4-6; p. 1-2 ¶ 1; p. 8-10 ¶ 46(A)).  This includes:

1) "comprehensive baseline medical examination of all class members – including either a chest X-ray or pulmonary CAT Scan, the determination of which shall be made by a medical provider knowledgeable about radon toxicity and based on that class member's individual health history;"

2) "medical monitoring, including but not limited to periodic comprehensive physical examinations, and updated chest X-rays and/or pulmonary CAT Scan, the determination of which shall be made by a medical provider knowledgeable about radon toxicity and based on that class member's individual health history;" and

3) "follow-up health care treatment for all diagnosed medical conditions as have been previously identified, or may in the future be identified, with exposure to radon by one or

31

> more of these entities: the federal Environmental
> Protection Agency; the National Research Council of the
> National Academy of Sciences; the National Cancer
> Institute; the American Medical Association; and the
> World Health Organization. At this time, those medical
> conditions include lung cancer and chronic, nonmalignant
> lung diseases such as chronic obstructive pulmonary
> disease (COPD), emphysema, chronic interstitial
> pneumonia and pulmonary fibrosis."

(Doc. 49 p. 42 ¶¶ 4-6). Plaintiffs seek that this be provided at state expense to every putative class member, regardless of whether they are still incarcerated within Garner. The putative class seeks to include every inmate ever incarcerated at Garner since the prison opened in 1992 and is therefore alleged to number in the thousands. (Doc. 49 p. 11 ¶ 50; p. 42 ¶¶ 4-6; p. 1-2 ¶ 1; p. 8-10 ¶ 46(A)). They also seek widespread testing for radon throughout the Garner facility and possible expenditure of state funds for mitigation or remediation systems in addition to those already conducted and installed in 2013 and 2014. (Doc. 49 p. 42 ¶ 3).

This relief and the compelled expenditure of state funds required to provide it amount to a suit for damages. It "is in practical effect indistinguishable in many aspects from an award of damages against the State," *see Edelman*, 415 U.S. at 668, instead of merely ancillary to other valid injunctive relief or "sufficiently narrow to retain its character as a mere case-management device," *see Green v. Mansour*, 474 U.S. 64, 71 (1985). This relief "requires payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question

determination, but as a form of compensation . . . ."  *See Edelman*, 415 U.S. at 668.
The Eleventh Amendment bars it.

Also, *Ex parte Young* does not apply because these claims seek to remedy past
conduct.   The Supreme Court has "refused to extend the reasoning of *Young*,
however, to claims for retrospective relief."  *See Green*, 474 U.S. at 68 (citing *Quern*,
*Edelman*, and *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89
(1984).   The injunctive relief is retrospective.   "It is one thing to tell the
Commissioner . . . that he must comply with the federal standards for the future . . .
.   It is quite another thing to order the Commissioner to use state funds to make
reparation for the past."   *Edelman*, 415 U.S. at 665 (internal quotation omitted).
"The latter would appear to us to fall afoul of the Eleventh Amendment if that basic
constitutional provision is to be conceived of as having any present force."   *Id.*   To
avoid violating the Eleventh Amendment, plaintiffs' Complaint must 1) allege an
ongoing violation of federal law and (2) seek relief properly characterized as
prospective.   *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007)(quotations
and citations omitted).   Plaintiffs fail these requirements and therefore seek to
improperly impose upon the state treasury.

The defendants read the complaint as claiming that the alleged violations are
based on past conduct, that there are no unsafe levels of radon currently at Garner,
and no alleged ongoing violations:  "the installation of the radon mitigation system
at Garner Correctional Institution completed on October 10, 2014 may have

corrected the unconstitutional conditions of confinement . . . ."  (Doc. 49 p. 38 ¶ 166); *see also* (*id.* p. 38 ¶ 167; p. 40 ¶¶ 173, 174).  Plaintiffs further claim that the "damage done by the excessive levels of radon *is now presumptively concluded*, and there is nothing that correctional staff can do to remediate the problem unless compelled by the courts."  (Doc. 49 p. 16-17 ¶ 68)(emphasis added).  Notably, the complaint appears unclear regarding current radon levels.  *See, e.g.*, (Doc 49. p. 9 ¶ 46(A); p. 11 ¶ 50).

Given the allegations as a whole, the defendants construe the complaint as claiming that all alleged misconduct by the defendants is based on their past conduct and is not ongoing.  Under this reading, all injunctive claims are barred by the Eleventh Amendment because they seek to remedy past conduct.  There is no current conduct to enjoin.  *Green*, 474 U.S. at 71 ("Because there is no continuing violation of federal law to enjoin in this case, an injunction is not available.").  "To order the Commissioner to use state funds to make reparation for the past . . . fall[s] afoul of the Eleventh Amendment if that basic constitutional provision is to be conceived of as having any present force."  *Edelman*, 415 U.S. at 665 (quotation omitted).

Plaintiffs seek widespread radon testing throughout a state facility that has already been tested.  They seek mitigation or remediation in a facility already mitigated and remediated.  And they demand that this all be done at state expense based on speculation of current radon levels, without providing a sufficient factual

basis to adequately allege improper radon levels at Garner currently.  Further, they seek widespread medical care for thousands or tens of thousands of people, most of whom are not incarcerated at Garner.  All of these claims fail to invoke *Ex parte Young*.  They fail to seek relief properly characterized as prospective.  *See In re Deposit Ins. Agency*, 482 F.3d at 618.  At least four of the named plaintiffs are no longer incarcerated at Garner.  (Doc. 49 p. 5 ¶¶ 15, 16, 17, 18).[5]  And if this lawsuit somehow survives and is certified as a class action, any putative plaintiffs that discharged from custody or are incarcerated in a different facility cannot pursue injunctive relief without violating the Eleventh Amendment.  The Supreme Court has "refused to extend the reasoning of [*Ex parte*] *Young* . . . to claims for retrospective relief."  *See Green*, 474 U.S. at 68 (citations omitted).  While the putative class is alleged to number in the thousands or tens of thousands, Garner incarcerates only about 500 inmates.  (Doc. 49 p. 10 ¶ 48).  So for most in the putative class:  without current, ongoing violation there is nothing to enjoin and no prospective injunctive relief to award.

The Prison Litigation Reform Act is also instructive here.  The PLRA requires that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626.  "The court shall not grant or

---

[5]  Inmate locations are also publically available through the Connecticut Department of Correction website:  http://www.ctinmateinfo.state.ct.us/ (last visited October 2, 2017).

approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* While defendants do not move to dismiss under the PLRA directly (at this time[6]), the PLRA requirements help demonstrate that the injunctive claims, including those seeking medical treatment, are not prospective. They are retrospective and expansive. They improperly impose upon the state treasury.

Connecticut tort law also provides insight. Essentially, the concept of future economic damages used in Connecticut tort law is equivalent to the injunctive claims seeking medical treatment in this case. The cost of future medical care is specifically included as future economic damages in Connecticut tort actions. *See Hamernick v. Bach*, 64 Conn. App. 160, 169 (2001); *see also Daigle v. Metro. Prop. & Cas. Ins. Co.*, 60 Conn. App. 465, 467 n.1 (2000), *aff'd*, 257 Conn. 359 (2001); *Benedetto v. Zaku*, 112 Conn. App. 467, 469 n.1 (2009). Here, plaintiffs attempt to obtain those damages from the State of Connecticut under the guise of official-

---

[6] As decided in the pre-filing conference, the defendants assert only qualified immunity and Eleventh Amendment defenses (and the resulting supplemental jurisdiction grounds) in this motion to dismiss because those immunity defenses include immunity from suit and from even participating in further proceedings. If this action or part of it survives, the parties will litigate class certification. They will then hold another Rule 26(f) conference and set briefing schedules for additional motion practice, including a motion to dismiss for failure to state a claim or other defenses such as the PLRA or possible affirmative defenses.

capacity injunctive relief. This further demonstrates that the injunctive claims in this case amount to suit for damages against the state.

Connecticut's Eleventh Amendment immunity bars the federal injunctive claims. The Court should grant the defendants' motion and dismiss those claims.

**D.    The Eleventh Amendment Bars All Connecticut State-Law Claims Seeking Injunctive Relief, If Any.**

Additionally, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). "Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* "We conclude that [*Ex parte*] *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law." *Id.*

Plaintiffs bring claims under the Connecticut Constitution. *See, e.g.*, (Doc. 49 p. 1-2 ¶ 1; 40-41 ¶¶ 171-176; p. 5 ¶ 12). If those claims seek injunctive relief (*id.* p. 42 ¶¶ 3-6), the Eleventh Amendment bars them. Plaintiffs cannot bring claims that ask a federal court to order state officials to comply with state law. Those claims violate the Eleventh Amendment. *White v. Martin*, 26 F. Supp. 2d 385, 388 (D. Conn. 1998)(citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)). The Court should dismiss all state-law claims that seek injunctive relief, if any.

**E.    The Eleventh Amendment Bars the Claims Seeking Declaratory Relief Regarding Past Conduct.  The Defendants Are Immune from Claims Seeking a Declaration That Their Past Conduct Violated The Constitution.**

The Eleventh Amendment bars claims seeking judgments declaring that defendants violated federal law in the past.  *See, e.g., Lee v. Dep't of Children & Families*, 939 F. Supp. 2d 160, 166 (D. Conn. 2013); *New York State Corr. Officers & Police Benev. Ass'n, Inc. v. New York*, 911 F. Supp. 2d 111, 129 (N.D.N.Y. 2012); *New York State Court Clerks Ass'n v. Unified Court Sys. of the State of New York*, 25 F. Supp. 3d 459, 468 (S.D.N.Y. 2014)(citation omitted).

Plaintiffs seek a declaration holding that "the acts and omissions of the Defendants violate the constitutional rights under both the U.S. and Connecticut Constitutions respectively as well as violate federal and state law."  (Doc. 49 p. 41 ¶ 1).  The Eleventh Amendment bars such a declaration regarding any past conduct by the defendants.  The Court should dismiss all declaratory claims.

**F.    The Court Should Decline to Exercise Supplemental Jurisdiction Over Any Remaining State-Law Claims.**

"[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Lennon v. Miller*, 66 F.3d 416, 426 (2d Cir. 1995)(quoting, *inter alia*, *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)); *cf. Healy v. City of N.Y. Dep't of Sanitation*, 286 F. App'x 744, 746 (2d Cir. 2008)(Summary Order)("Given that plaintiff's only federal claim was dismissed at an early stage of the litigation . .

. and that there is a paucity of state-court decisions construing § 12–113. . . we conclude that the district court exceeded the bounds of discretion in deciding [plaintiff's state-law] claim on its merits rather than declining to exercise supplemental jurisdiction")(internal citations omitted).

All of plaintiffs' federal claims should be dismissed for the reasons detailed above.  The Court should therefore also decline supplemental jurisdiction over the any remaining Connecticut state-law claims and should dismiss them too.

## IV.   CONCLUSION

The Court should grant the defendants' motion and dismiss this lawsuit entirely.

DEFENDANTS
Semple, Meachum, Armstrong,
Lantz, Arnone, Dzurenda,
Falcone, Batten, and Link
in their individual and official capacities

GEORGE JEPSEN
ATTORNEY GENERAL

JANE R. ROSENBERG
SOLICITOR GENERAL


BY:__/s/_*Stephen R. Finucane*_____
Stephen R. Finucane
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct30030
E-Mail:  stephen.finucane@ct.gov
Tel: (860) 808-5450
Fax: (860) 808-5591

BY:___/s/_*DeAnn S. Varunes*_____
      DeAnn S. Varunes
      Assistant Attorney General
      110 Sherman Street
      Hartford, CT  06105
      Federal Bar #ct25903
      E-Mail:  deann.varunes@ct.gov
      Tel: (860) 808-5450
      Fax: (860) 808-5591

BY:___/s/_*Michael A. Martone*_____
      Michael A. Martone
      Assistant Attorney General
      110 Sherman Street
      Hartford, CT  06105
      Federal Bar #ct28804
      E-Mail:  michael.martone@ct.gov
      Tel: (860) 808-5450
      Fax: (860) 808-5591

BY:___/s/_*Terrence M. O'Neill*_____
      Terrence M. O'Neill
      Assistant Attorney General
      110 Sherman Street
      Hartford, CT  06105
      Federal Bar #ct10835
      E-Mail:  terrence.oneill@ct.gov
      Tel: (860) 808-5450
      Fax: (860) 808-5591

**CERTIFICATION**

I hereby certify that on October 2, 2017, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  A copy was also mailed to the following:

Harry Vega
Inmate #246806
Carl Robinson Correctional Institution
285 Shaker Road
P.O. Box 1400
Enfield, CT 06083-1400

_/s/_Stephen R. Finucane_____
Stephen R. Finucane
Assistant Attorney General