|   |   |
|---|---|
| HARRY VEGA, *et al.*,<br>    *Plaintiffs*,<br>    *v.*<br>SCOTT SEMPLE, *et al.*,<br>    *Defendants*. | Civil No. 3:17-CV-107 (JBA)<br><br>September 27, 2018 |

### RULING ON DEFENDANTS' MOTION TO DISMISS

Plaintiff Harry Vega files this lawsuit on behalf of all inmates and pre-trial detainees exposed to levels of indoor radon gas in excess of federal Environmental Protection Agency ("EPA") and World Health Organization ("WHO") standards while incarcerated at the Connecticut Department of Correction's ("DOC") Newtown facility, Garner Correctional Institution ("Garner").[1] Plaintiffs' Amended Complaint names as Defendants numerous DOC officials in their individual and official capacities, including every Commissioner of Correction dating back to the opening of the Garner facility in late 1992, (Am. Compl. ¶¶ 26-32, 46(A), 49), as well as former wardens of Garner, (*id.* ¶¶ 26-27, 34), and the current and former Directors of the DOC Engineering and Facilities Management Unit, (*id* ¶¶ 36-38). Plaintiffs allege violations of the Eighth and Fourteenth Amendments to the United States Constitution (Count One), and violations of the Connecticut Constitution, Article First, Section 8 (Count Two). Defendants move to dismiss the Amended Complaint under Fed. R. Civ. Pro. 12(b)(6) and 12(b)(1), claiming qualified immunity and Eleventh Amendment sovereign immunity. For the reasons that follow, Defendants' Motion is granted in part and denied in part.

---

[1] The parties agreed to have Defendants' Motion to Dismiss adjudicated prior to Plaintiffs moving to certify their proposed class.

## I.     Plaintiffs' Allegations

Plaintiffs allege they were "exposed involuntarily to indoor radon gas, a recognized human carginogen, far in excess of any published safe level" while incarcerated at Garner. (*See, e.g.*, Am. Compl. ¶¶ 1, 41, 46.) They claim Defendants were deliberately indifferent to their safety when building the Garner facility at the Newtown, Connecticut site—which opened in 1992—and by failing to detect or remediate the alleged radon exposure thereafter. (*Id.* ¶¶ 1, 90-96, 98, 103, 110-11, 114, 135-36.) Further, Plaintiffs claim that Defendants Dzurenda, Semple, and Falcone were deliberately indifferent to inmate safety by failing to notify inmates that radon testing and remediation were being conducted at Garner during 2013 and 2014, after elevated radon levels were discovered in late 2013. (*Id.* ¶¶ 140, 142-43, 146-47, 150-53, 157-61.)[2]

Plaintiffs maintain that "the federal Environmental Protection Agency and the U.S. Geological Survey . . . evaluated the radon potential in the United States and developed a Map of Radon Zones to assist national, state[,] and local organizations and building code officials in deciding whether radon-resistant features should be applicable to new construction," and determined "that Newtown, Connecticut is located in Zone 1 – Highest Potential (greater than 4.0

---

[2] The post-conviction Plaintiffs bring claims under the Eighth Amendment, claiming Defendants' alleged conduct regarding radon levels within Garner constituted deliberate indifference to their safety and therefore amounted to cruel and unusual punishment. (*Id.* ¶¶ 135-36, 163, 166, 168.) They also bring similar claims under the Connecticut Constitution. (*Id.* ¶¶ 171, 173-75.) The pre-conviction Plaintiffs bring their claims under the Fourteenth Amendment Due Process Clause and under the Connecticut Constitution. (*Id.* ¶¶ 135-36, 164-65, 167, 169, 172-75.) They advance the same deliberate-indifference theory as the post-conviction Plaintiffs, but they sue under the Fourteenth Amendment in reflection of their pre-conviction statuses. (*Id.* ¶¶ 164-169.) Plaintiffs incarcerated within Garner beginning in approximately 2013 also bring claims against (only) Defendants Dzurenda, Semple, and Falcone individually for alleged access-to-courts violations. (*Id.* ¶¶ 170, 176.)

pCi/L) . . . ." (*Id.* ¶ 93.) This "designation reflects the average short-term radon measurement in a building without implementation of radon control methods." (*Id.*) Nonetheless, Defendant Meachum, on behalf of the Connecticut Department of Corrections, and Defendants Doe(s) 1 to 3 decided to construct Garner in Newtown, on a site identified as posing the highest risk for radon above the EPA action level of 4.0 pCi/L, and failed to include any preventative radon mitigation system, thereby ensuring inmates housed at Garner would be exposed to a known carcinogen. (*Id.* ¶¶ 94, 98-99.)

In 2013 the school rooms at Garner, located on the second floor level, were tested (as part of state-mandated testing, conducted "at the demand of a Garner teacher") and evidenced levels at or above the EPA action level of 4.0 pCi/L requiring additional testing. (*Id.* ¶¶ 140, 46(A).) This resulted in the installation of a radon mitigation system which was completed in October 2014. (*Id.* ¶ 46(A).) Given Garner's location in an area with a known potential for high levels of radon, and that it is a sealed building that does not use windows for ventilation, Plaintiffs claim that follow-up testing should have been widespread throughout the facility. Instead, because the state Department of Public Health required written notification of such radon testing to individuals in the areas subject to testing, Defendants Semple, Dzurenda, Falcone, Link and Does 1-3 purposefully decided not to test the cell block units. (*Id.* ¶ 141.)

At the same time, recognizing that any medical condition causally related to radon exposure may take many years to manifest itself as with asbestos, Defendants Dzurenda, Semple and Falcone advised Garner staff to obtain a base-line chest x-ray and provided them with the opportunity to file a WC-207 package to protect their legal rights should staff members develop lung cancer or other chronic pulmonary condition from such elevated radon levels. (*Id.* ¶¶ 5-10, 145-46, 154.) Given that the installation of a radon mitigation system may not have remedied

excessive indoor radon gas in those areas where Garner inmates are housed,[3] Plaintiffs assert that radon testing in those areas must be conducted going forward, with additional mitigation systems installed if this testing indicates a need for such mitigation. (*Id.* ¶ 46(A).)[4]

## II.     Defendants' Motion to Dismiss

### A.  *Legal Standard*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

"[A] claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v.*

---

[3] Plaintiffs allege the remediation system was only designed to mitigate those previously-tested areas that revealed indoor radon gas in excess of the EPA standard and therefore did not remedy any excessive indoor radon gas where inmates were housed. (*Id.*)

[4] Defendants filed a notice of supplemental authority including an administrative directive from the Connecticut DOC requiring correctional facilities to develop procedures for, among other things, detection of radon. (*See* Ex. 3 to Def.'s Notice of Supp. Authority [Doc. # 64-3] at 1-2, 5-6.) The policy did not go into effect until June 29, 2018. Plaintiffs then filed a notice of supplemental authority, attaching a Garner Correctional Institution Roll Call Notice, originated and approved by Warden Corcella, which advised that "[i]n continuation with Radon Remediation Project, A&R Environmental will be coming to Garner on June 13th, 14th, 15th to drill holes and check the air flow as part of our radon testing." (Ex. 1 to Pl.'s Notice of Supp. Authority [Doc. 67-1].) Plaintiffs also argue that the directive does not go so far as to moot their claims for prospective relief. (*See* Pls.' Supp. Mem. Law in Opp'n to Defs.' Mot. Dismiss [Doc. # 70].)

*Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008)). "When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000). In response to a motion to dismiss pursuant to Rule 12(b)(1), "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

B. *Qualified Immunity*

The doctrine of qualified immunity shields state officials from civil suit and liability for civil damages, so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Thus, in order for a plaintiff to overcome qualified immunity: (1) the facts alleged must make out a violation of a constitutional right, and (2) that right must have been "clearly established" at the time of the defendants' alleged misconduct. *See id.*[5] The immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *Distiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). "The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010)).

---

[5] The Supreme Court has held that district courts have the discretion to choose which of the two prongs of the qualified immunity standard to analyze first, depending on the circumstances of the case. *See Pearson,* 555 U.S. at 236.

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted). While there need not be a case directly on point for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011). The Supreme Court explained,

> We have repeatedly told courts . . . not to define clearly established law at a high level of generality. The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal citations and quotation marks omitted).

"Although [courts] generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right, the absence of a decision by this Court or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *Burns v. Martuscello*, 890 F.3d 77, 94 (2d Cir. 2018) (citations omitted).

As the Second Circuit has noted in the qualified immunity context, "[i]t is certainly true that motions to dismiss a plaintiff's complaint under Rule 12(b)(6) on the basis of an affirmative defense will generally face a difficult road." *Garcia v. Does*, 779 F.3d 84, 96–97 (2d Cir. 2015). "Not only must the facts supporting the defense appear on the face of the complaint, but . . . the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (internal citations omitted). Like any other motion to dismiss, when determining whether a

defendant is entitled to qualified immunity, the Court cannot consider affidavits and exhibits unless they are attached to the complaint, incorporated by reference, or are matters of which judicial notice may be taken. *See, e.g.*, *Canady v. Correct Care Sols.*, No. 15-CV-4893 (KMK), 2017 WL 4280552, at *14 (S.D.N.Y. Sept. 25, 2017).

As to Plaintiffs' allegations of constitutional violations based the conditions of their confinement, as well as being denied access to the courts, Defendants assert qualified immunity on both claims.

### i. Conditions of Confinement

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825 (1994). "To state an Eighth Amendment claim based on conditions of confinement, an inmate must allege that: (1) objectively, the deprivation the inmate suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,' and (2) subjectively, the defendant official acted with 'a sufficiently culpable state of mind . . . such as deliberate indifference to inmate health or safety.'" *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citations omitted). "To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id.* (citations omitted). "To meet the subjective element, the plaintiff must show that the defendant acted with 'more than mere negligence.'" *Id.* (citations omitted). "To constitute deliberate indifference, '[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety.'" *Id.* (citations omitted). "Evidence that a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." *Id.* (citations omitted).

As they confirmed at oral argument, Defendants do not claim in their Motion that the allegations regarding Plaintiffs' conditions of confinement could not amount to a constitutional violation, but rely on their contention that no authority clearly establishes that a supervisory correctional official can be found deliberately indifferent to inmate safety in the particular factual contexts alleged in this case.

As discussed above, Plaintiffs allege Defendant Meachum, who was responsible for site selection and construction of the Garner facility, and Director Batten, who provided him with input about the site, decided to have Garner built in an area where radon levels would likely exceed the EPA action level if no mitigation system were implemented. (Am. Compl. ¶¶ 82, 90-92, 94.) Plaintiffs claim Meachum failed to ensure that the Garner facility was tested for radon before it opened in 1992 and failed to ensure it was built with a radon remediation system. (*Id.* ¶¶ 82, 90-96, 98, 99, 135-136.) They also allege that until the mandated testing in 2013, Defendants failed to install any radon mitigation system after the Garner facility opened despite many opportunities to do so. (*Id.* ¶¶ 100, 103, 105, 135-136.)

Further, Plaintiffs assert that the remaining Defendants, including Commissioners Armstrong, Lantz, Arnone, Dzurenda, and Semple failed to correct the problem, as did Wardens Falcone (and Dzurenda and Semple) and Director Link. (*Id.* ¶¶ 103, 105, 107, 110-11, 114, 135-36.) Finally, they allege that after Dzurenda, Semple, Falcone, and Link discovered the possibility of allegedly high radon levels in 2013, they chose not to inform the inmates at Garner but did inform DOC staff, public health officials, and local town officials before the installation of a radon remediation system in October 2014. (*Id.* ¶¶ 140, 142-143, 146-147, 150-153, 157-161).

Defendants contend that no authority of this Circuit or the Supreme Court places it 'beyond debate' that a Commissioner of Correction (Meachum), or a facilities engineer (Batten),

commits deliberate indifference when the State decides to build a prison facility in an elevated radon region. Further, according to Defendants, no sufficient authority specifies that the failure to learn of allegedly elevated radon levels by subsequent Commissioners (Armstrong, Lantz, Arnone, Dzurenda, and Semple), Wardens (Dzurenda, Semple, and Falcone), and Director of Facilities (Link) constitutes criminally reckless culpability reaching the level of a constitutional tort. Finally, they argue there is no clearly established law requiring supervisory correctional officials to notify inmates in the prison of the possibility of the presence of elevated radon levels.

In response, Plaintiffs argue that at least after the Supreme Court's decision in *Helling v. McKinney*, 509 U.S. 25, 29 (1993), a reasonable prison custodian would have understood that they would violate a prisoner's Eight Amendment rights by knowingly or recklessly subjecting a prisoner to an unreasonably high risk of exposure to a toxin known to cause lung cancer.[6] As another district court notes, "[t]he *Helling* line of cases involve situations where persons are in custody, are exposed to conditions that are substantially likely to cause serious harm, and the victims therein are unable to take corrective action or avoid the harm because of their custodial status." *Citizens Accord, Inc. v. Town of Rochester*, No. 98-CV-0715, 2000 WL 504132, at *24 (N.D.N.Y. Apr. 18, 2000).

---

[6] Plaintiffs also argue that Defendants breached several standards of care established by statute and under EPA or World Health Organization standards. Plaintiffs do not bring this cause of action under any of the specific statutes that they reference, but rather the Eighth and Fourteenth Amendments. While violation of a recognized standard of care may provide evidence of a substantive Eighth Amendment violation, it does not necessarily aid Plaintiffs in proving that that right was clearly established. *See Jamison v. Fischer*, 617 F. App'x 25, 28 (2d Cir. 2015) ("'[n]either federal nor state officials lose their [qualified] immunity by violating the clear command of a statute or regulation—of federal or of state law—unless that statute or regulation provides the basis for the cause of action sued upon.'" (quoting *Davis v. Scherer*, 468 U.S. 183, 194 (1984)) (first alteration in original)).

The context of *Helling* was an inmate's exposure to environmental tobacco smoke ("ETS") where no physical injury had yet manifested itself. The plaintiff was a prisoner who did not smoke but was housed in a prison cell with a cellmate who smoked five packs of cigarettes each day. *Id.* at 28. He claimed the risk of future damage to his health from the ETS to which he was exposed by his cellmate violated his Eighth Amendment rights. The Supreme Court allowed the Eighth Amendment claims for injunctive relief to proceed, holding that to state a cause of action under the Eighth Amendment the plaintiff needed to show that he was "exposed to unreasonably high levels of ETS" and that the risk he complains of is one that "society considers . . . so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such risk." *Id.* at 35-36.[7] "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Id.*

Notably, the novel question in *Helling* was not whether the plaintiff could state an Eighth Amendment claim for "currently suffering serious medical problem[s] caused by exposure to ETS[,]" but instead whether the plaintiff could the meet the deliberate indifference standard by claiming that his exposure to ETS posed a likely risk of *future* harm. *Id.* at 32-33. The Supreme Court "reject[ed] [the defendants'] central thesis that only deliberate indifference to current serious health problems of inmates is actionable under the Eighth Amendment." *Id.* at 34.

---

[7] The Ninth Circuit had held that the plaintiff was not entitled to damages because "at the time the defendants acted, there was no clearly established liability for exposing prisoners to ETS" and thus the defendants were shielded by qualified immunity. *See McKinney v. Anderson*, 924 F.2d 1500, 1509 (9th Cir.), *cert. granted, judgment vacated sub nom. Helling v. McKinney*, 502 U.S. 903 (1991), and *judgment reinstated,* 959 F.2d 853 (9th Cir. 1992). This was not at issue before the Supreme Court, as the plaintiff did not cross-appeal the Court of Appeals' grant of qualified immunity.

Defendants note that *Helling* did not deal with radon, and specifically, did not "evaluate the constitutional implications of elevated radon gas regions or prison construction." (Def.'s Reply at 3-4.) Nor did it "involve detecting radon gas or the lack of radon testing in prison[,] . . . radon remediation after discovery[,] . . . or failure to inform prisoners about radon levels during testing or remediation." (*Id.*) Moreover, Defendants continue, Plaintiffs here allege unique facts regarding radon gas and its inherent qualities, including the tasteless, odorless, and undetectable nature of radon gas, (Am. Compl. ¶ 44), and that the ability to detect exposure to radon "sharp[ly] contrasts" with the ability to perceive and detect ETS, (*id* ¶ 74). Defendants therefore contend that "[g]iven the[] specific and particularized aspects of radon and its detection, testing, remediation, and other unique qualities, only a radon (prison) case from the Supreme Court or the Second Circuit can define the particularized conduct alleged with reasonable specificity." (Mem. Law Supp. Defs.' Mot. Dismiss [Doc. # 52-1] at 15.) Defendants' arguments with respect to the naked eye or nose's ability to detect radon, however, fail to address Plaintiffs' allegations that Garner was built on land actually known to contain extremely high potential for unsafe concentration of radon, and that with respect to more recent years, some of the Defendants actually knew about high levels of radon in the areas of the facility that they *did* test.

If anything, knowing or reckless exposure of prisoners to radon, given the facts alleged by Plaintiffs, is *more* obviously unconstitutional than exposure of prisoners to ETS was in 1993, when, as the Supreme Court noted, the United States as *amicus curiae* had argued that "the harm to any particular individual from exposure to ETS is speculative, . . . the risk is not sufficiently grave to implicate a 'serious medical nee[d],' and . . . exposure to ETS is not contrary to current standards of decency." *Helling*, 509 U.S. at 34. By contrast, radon in 1993 had already five years earlier been identified "as a human carcinogen by the International Agency for Research on Cancer . . . and

added by Congress that same year to the Toxic Substances Control Act." (Am. Compl. ¶ 57.) And while in 1993 the defendants in *Helling* could reasonably argue that many people at the time willingly exposed themselves to second-hand smoke, Defendants here advance no argument that anyone—today or at the time *Helling* was decided—would voluntarily expose themselves to the levels of radon concentration that Plaintiffs allege.

The Second Circuit's ruling in another *Helling*-line case makes even clearer that post-*Helling*, reasonable prison officials were on notice that they could not knowingly or recklessly subject prisoners in their custody to toxic substances that posed a serious risk of harm. In *LaBounty v. Coughlin*, a prisoner "allege[d] that chemicals placed in the drinking water and the presence of friable asbestos particles in the air at Woodbourne [Correctional Facility] caused him to suffer myriad illnesses." 137 F.3d 68, 70 (2d Cir. 1998). The district court in *LaBounty* granted the defendants' summary judgment motion "on the asbestos claim on the grounds of qualified immunity." *Id.* at 71 (citation omitted).

The Second Circuit in *LaBounty* reversed the district court's grant of qualified immunity, holding that "[g]iven the known dangers of friable asbestos in 1991–92 . . . a reasonable person would have understood that exposing an inmate to friable asbestos could violate the Eighth Amendment." *Id.* at 74. In support of the court's conclusion that the dangers of friable asbestos were widely known at the time, the court noted that "[f]riable asbestos was recognized by Congress to be a dangerous toxic chemical in the early 1970s and was listed as a 'hazardous air pollutant' in the regulations to the Clean Air Act." *Id.* n.5 (citation omitted).[8]

---

[8] Defendants object that *LaBounty* should no longer be followed because the Second Circuit's analysis there does not focus on the defendants' particular conduct, and "does not clearly establish anything as 'beyond debate,' or allow reasonable officials to know what constitutes a

At the time *LaBounty* was decided, no Supreme Court case had established that an inmate's exposure to friable asbestos over an extended period of time could constitute an Eighth Amendment violation. Rather, the Second Circuit noted that "[f]riable asbestos was recognized by Congress to be a dangerous toxic chemical in the early 1970s and was listed as a 'hazardous air pollutant' in the regulations to the Clean Air Act." *Id.* at 74 n.5.

Plaintiffs allege it was public knowledge at the time Garner was still in the planning phases that radon was the leading cause of lung cancer in non-smokers, yet Defendants still chose to build the facility in an area with a known potential for elevated, unsafe radon levels. (*See* Am. Compl. ¶ 83.) They claim to have been exposed to indoor radon gas, a known carcinogen, well in excess of the EPA standard. (*Id.* ¶ 66.) They assert that once Defendants were notified that radon levels were indeed high in 2013, Defendants failed to notify the inmates housed there, and intentionally did not do any testing in the areas that house inmates, only testing and remediating other areas of the

---

violation." (Mem. Law Supp. Defs.' Mot. Dismiss at 17.) They contend that in light of the ample Second Circuit and Supreme Court decisions requiring that the violative nature of specific conduct, given the particular factual contexts in the case, must be clearly established as unlawful, *LaBounty* and other similar cases are no longer good law. (*Id.* at 18.) However, *LaBounty* has never been overruled, and indeed it is a Second Circuit decision with somewhat analogous facts— involving a prisoner's exposure to an airborne or gaseous toxic substance known to cause lung cancer—that supports what has been found clearly established in the prison inmate toxic exposure context. Moreover, more recent cases outside the Second Circuit confirm that *Helling*'s constitutional rule was not limited to ETS, but rather applied more broadly to the deliberately indifferent exposure of prisoners to toxic substances that posed a serious risk of harm. *See, e.g., Bd. v. Farnham*, 394 F.3d 469, 486-87 (7th Cir. 2005) (applying *Helling*, affirming denial of qualified immunity where pretrial detainees alleged that jail's inadequate ventilation system resulted in "flow of black fiberglass dust into cells [that] caused numerous nosebleeds and respiratory problems" as well as risk of future health problems).

facility. They did, however, notify staff at the facility of the potential exposure and resulting dangers.

As the Supreme Court held in *Hope v. Pelzer*, "officials can still be on notice that their conduct violates established law even in novel factual circumstances" and directed that "the salient question . . . is whether the state of the law [at the time of the alleged violation] gave [Defendants] fair warning that their alleged treatment of [Plaintiffs] was unconstitutional." 536 U.S. 730, 741 (2002). Defendants provide no relevant authority in the Eighth Amendment context showing why, based on the allegations here, they lacked fair warning of the unconstitutionality of their alleged actions.

Notwithstanding appellate authority from 1993 and 1998 holding that prisoners' Eighth Amendment rights are violated by exposure to unreasonably dangerous levels of other types of toxins that had been recognized as such at the time, Defendants' argument suggests, in effect, that qualified immunity would be available for any deliberately indifferent exposure of prisoners to a known and federally regulated toxic substance, unless the Supreme Court had previously held that exposure of prisoners to that specific toxin violated the Eighth Amendment. Defendants argue, essentially, that a reasonable officer could not have predicted that it would violate the Constitution's prohibition on cruel and unusual punishment to expose prisoners—whose care and lives are virtually exclusively in the DOC's control—to a known carcinogen. Given substantially similar cases involving ETS and asbestos, Defendants' argument fails at least from the date of *Helling* (June 18, 1993).[9] Accordingly, Defendants' Motion to Dismiss on qualified immunity

---

[9] Neither party analyzes the separate Fourteenth Amendment deliberate indifference standard for pre-trial detainees. As the Second Circuit recently held,

grounds is unavailing with respect to alleged Eighth Amendment violations occurring after that date.

### ii. Access to Courts

Plaintiffs also claim that Defendants have deprived them of their right of access to the courts under the Fourteenth Amendment. As Defendants correctly note, prison access-to-court claims are often brought either as a challenge to the sufficiency of legal services provided to prisoners, or as "actions claiming direct interference" with litigation. (Mem. Law Supp. Defs.' Mot. Dismiss at 27 (citing *Montanez v. Cuoco*, 361 F. App'x 291 (2d Cir. 2010).) *See also* John Boston & Daniel Manville, *Prisoners' Self-Help Litigation Manual* 228-29 (4th ed. 2010) (cataloging examples of court access claims in three categories of right-of-assistance claims, interference claims, and retaliation claims). Because both parties agree that the Supreme Court's decision in *Lewis v. Casey*, 518 U.S. 343 (1996), governs Plaintiffs' access-to-court claim, Plaintiffs appear to allege a "right of assistance" claim rather than an "interference" claim.

---

to establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety. In other words, the "subjective prong" (or "mens rea prong") of a deliberate indifference claim is defined objectively.

*Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). While neither party argues that this difference between the Eighth and Fourteenth Amendment deliberate indifference standards bears on the outcome of Defendants' Motion to Dismiss, the Court notes that a future motion for class certification would need to take account of the differing deliberate indifference standards for post-conviction and pre-trial class members.

In *Lewis*, the Supreme Court held that in order to show that defendants violated an inmate's right of access to the courts, that inmate must allege facts demonstrating an actual injury stemming from the defendants' unconstitutional conduct. 518 U.S. at 349. The Court noted that if an inmate were able to show that, as a result of the defendant's action, he was unable to file an initial complaint or petition, or that the complaint he filed was so technically deficient that it was dismissed without consideration of the merits of the claim, he could state a claim for denial of access to the courts. *Id.* at 351. The "actual injury" described above cannot derive from "just any type of frustrated legal claim." *Id.* at 354. Inmates must be afforded access to court to file a direct appeal, a petition for writ of habeas corpus, or a civil rights action challenging the denial of a basic constitutional right. *Id.* "Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.* at 355.

Plaintiffs allege that because they were not notified of the indoor radon testing results and, thereafter, installation of a radon mitigation system, they "were unable to exhaust their administrative remedies," which prevented them from being able to "comply with the procedures set forth in Connecticut Public Act 16-127 § 23 to file for damages with the Claims Commissioner." (Am. Compl. ¶ 69.)[10] According to Plaintiffs, they suffered an actual injury on account of "[D]efendants Dzurenda, Semple and Falcone willfully, intentionally and recklessly never

---

[10] Plaintiffs maintain that, but for information supplied by their former attorneys, they would never have known that they were exposed to unacceptably high levels of a known carcinogen, that such exposure may be ongoing because the areas in which they reside were purposefully never tested for radon either before or after the remediation system was installed, and that those Plaintiffs not diagnosed with lung cancer are not being afforded the community standard of medical care for individuals exposed to radon toxicity.

inform[ing] Garner inmates of the radon exposure . . . to thwart any civil rights action from ever being filed." (Pl.'s Opp'n at 21.)

Defendants appear to challenge both whether this amounts to a constitutional violation, and whether such constitutional violation was "clearly established" at the time of Defendants' conduct.

### Constitutional Violation

Defendants argue that Plaintiffs cannot demonstrate actual injury as required to proceed with their access to courts claims. Under *Lewis v. Casey*, prisoners may bring a constitutional claim for denial of their right to access to courts where a prison hinders a prisoner's ability to "challeng[e] their convictions or conditions of confinement." 518 U.S. at 356. Plaintiffs do not claim that Defendants have prevented them from challenging their convictions. To the extent that Plaintiffs claim that Defendants have prevented them from challenging their conditions of confinement related to unremediated risk of radon exposure, Plaintiffs do not explain what actual injury Plaintiffs have suffered in view of the fact that Plaintiffs are currently litigating this case, in which they challenge the DOC's policies related to that very issue. It is not inconceivable that Defendants will raise affirmative defenses to this action that, if credited, could result for example in a diminution of the damages that Plaintiffs might otherwise be entitled to, and that Plaintiffs might then at such time be able to identify an actual injury that they have suffered for the purpose of proving a claim for denial of the right to access to courts.[11] But any such injury is merely

---

[11] For example, Plaintiffs argue that their right of access to the courts *may* be impeded because Defendants have indicated that if their Motion to Dismiss is not granted in its entirety,

hypothetical at this time. Indeed, Plaintiffs acknowledged at oral argument that this claim may not yet be ripe. Insofar as the right of access to the courts claim, as articulated by Plaintiffs, fails to raise any actual injury that it is ripe for adjudication, Defendants' Motion to Dismiss is granted as to this claim. *See Lewis v. Casey*, 518 U.S. at 349 (holding that standing doctrine requires prisoners alleging denial of right of access to the courts to show actual injury).

C.  *Sovereign Immunity*

Next, Defendants argue that Eleventh Amendment sovereign immunity bars Plaintiffs' claims for injunctive and declaratory relief against Defendants in their official capacities. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Eleventh Amendment extends beyond the terms of its text to bar suits in federal courts against states by their own citizens. *See, e.g.*, *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974).

i.  **The Ex Parte Young Exception**

Under *Ex parte Young*, 209 U.S. 123 (1908), "a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief

---

they intend to raise other affirmative defenses, such as failure to exhaust administrative remedies under the Prisoner Litigation Reform Act. Plaintiffs are correct that insofar as Defendants intend to argue that Plaintiffs have failed to exhaust administrative remedies, the facts and legal theory that Plaintiffs articulate in their claim for right of access to the courts remain relevant to Plaintiffs' Eighth Amendment claim and a proper subject for discovery, notwithstanding the Court's dismissal of this claim.

from violations of federal law." *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007) (internal quotation marks omitted). Defendants argue this exception is not applicable because (1) the injunctive relief Plaintiffs seek is indistinguishable from an award of damages against the State, and (2) Plaintiffs' claims seek to remedy past conduct, rather than an ongoing violation of federal law.

### a. Injunctive Relief vs. Money Damages

"[S]overeign immunity bars suits [against states in federal court] whose direct outcome will diminish the public fisc through the award of retroactive damages." *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 374 (2d Cir. 2005) (citation omitted). Defendant argues this is exactly the situation here.

Plaintiffs seek injunctive relief compelling widespread medical care for an injunctive class allegedly "number[ing] in the thousands." (Am. Compl. ¶¶ 1-2, 46(A), 50, p. 42 ¶¶ 4-6). This includes:

1) "comprehensive baseline medical examination of all class members – including either a chest X-ray or pulmonary CAT Scan, the determination of which shall be made by a medical provider knowledgeable about radon toxicity and based on that class member's individual health history;"

2) "medical monitoring, including but not limited to periodic comprehensive physical examinations, and updated chest X-rays and/or pulmonary CAT Scan, the determination of which shall be made by a medical provider knowledgeable about radon toxicity and based on that class member's individual health history;" and

3) "follow-up health care treatment for all diagnosed medical conditions as have been previously identified, or may in the future be identified, with exposure to radon by one or more of these entities: the federal Environmental Protection Agency; the National Research Council of the National Academy of Sciences; the National Cancer Institute; the American Medical Association; and the World Health Organization. At this time, those medical conditions include lung

cancer and chronic, nonmalignant lung diseases such as chronic obstructive pulmonary disease (COPD), emphysema, chronic interstitial pneumonia and pulmonary fibrosis."

(Am. Compl. at 42, ¶¶ 4-6.) Plaintiffs also seek widespread testing for radon throughout the Garner facility and possible expenditure of state funds for mitigation or remediation systems in addition to those already conducted and installed in 2013 and 2014. (*Id.* ¶ 3).

Defendants argue that this relief "is in practical effect indistinguishable in many aspects from an award of damages against the State," and "requires payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation . . . ." *See Edelman*, 415 U.S. at 668. Under Connecticut tort law the cost of future medical care is specifically included as an item of future economic damages. *See Hamernick v. Bach*, 77 A.2d 806, 812 (Conn. 2001); *see also Daigle v. Metro. Prop. & Cas. Ins. Co.*, 760 A.2d 117, 120 n.1 (Conn. App. Ct. 2000), *aff'd*, 777 A.2d 681 (Conn. 2001); *Benedetto v. Zaku*, 963 A.2d 94, 95 n.1 (Conn. App. Ct. 2009). Thus, Defendants conclude that Plaintiffs are attempting to obtain such damages from the State of Connecticut under the guise of official-capacity injunctive relief.

Plaintiffs respond that, contrary to Defendants' claim that baseline chest radiographic imaging and ongoing medical monitoring are simply the equivalent of future economic damages under Connecticut tort law, Plaintiffs and putative class members still incarcerated are entirely dependent upon DOC to secure and provide their medical care, and deliberate indifference by prison officials to a prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

### b. Ongoing, Prospective Violation

The Supreme Court has "refused to extend the reasoning of *Young* to claims for retrospective relief." *See Green*, 474 U.S. at 68 (internal citations omitted). "It is one thing to tell the Commissioner . . . that he must comply with the federal standards for the future . . . . It is quite another thing to order the Commissioner to use state funds to make reparation for the past." *Edelman*, 415 U.S. at 665 (internal quotation omitted). Thus, to avoid violating the Eleventh Amendment, Plaintiffs' Complaint must 1) allege an ongoing violation of federal law and (2) seek relief properly characterized as prospective. *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (quotations and citations omitted).

**Ongoing Violation**

Defendants construe the Complaint as claiming that all alleged misconduct by Defendants is based on their past conduct and is not ongoing. Under this reading, all injunctive claims would be barred by the Eleventh Amendment because they seek to remedy past conduct, meaning there is no current conduct to enjoin. *See Green*, 474 U.S. at 71 ("Because there is no continuing violation of federal law to enjoin in this case, an injunction is not available."). Defendants cite to portions of the Complaint that state: "the installation of the radon mitigation system at Garner Correctional Institution completed on October 10, 2014 may have corrected the unconstitutional conditions of confinement," (Am. Compl. ¶¶ 166-167, 173-174), and the "damage done by the excessive levels of radon is now presumptively concluded, and there is nothing that correctional staff can do to remediate the problem unless compelled by the courts[,]" (*id.* ¶ 68).

However, Plaintiffs argue that their allegations that Defendants failed to conduct radon testing in those areas where inmates are housed at Garner in an effort to conceal this toxic problem from Plaintiffs, including after the installation of a remediation system designed to alleviate

excessive radon levels in other areas of the facility, describe an ongoing violation as to the conditions of confinement. Furthermore, Plaintiffs maintain that they have alleged continuing deliberate indifference to ongoing medical needs, which could be remedied in the future by an injunction ordering Defendants to provide Plaintiffs and other Garner inmates—who are entirely dependent upon Defendants for their medical treatment—with a baseline chest-x-ray or CT scan and ongoing medical monitoring. While it is clear that *part* of what Plaintiffs allege is a past violation, at the pleadings stage, Plaintiffs adequately allege that at the very least *current* Garner inmates are still being subjected to an unreasonable risk of radon exposure. The fact that some proposed class members, including individuals no longer in DOC custody, may no longer suffer an alleged ongoing violation does not mean that Defendants' Motion to Dismiss should be granted, but rather simply that if a class were to be certified, an injunctive relief class would have to be limited to members who actually face ongoing rather than solely past violations. The question of how to conceptualize class members no longer at Garner but still in DOC custody will be addressed in the context of a future motion for class certification, but is not dispositive to the outcome of the instant Motion to Dismiss.

### Prospective Relief

Defendants also maintain that Plaintiffs fail to seek relief properly characterized as prospective.

Plaintiffs allege that "[r]adon testing in those areas that house inmates must be conducted to ensure the indoor radon gas levels in those areas are below the EPA action level pursuant to requisite testing protocols." (Am. Compl. ¶ 46(A).) They further claim that "[i]f the levels are found to be above the EPA action level then further mitigation systems must be installed to ensure that inmates are not exposed by their living conditions to unsafe, toxic housing conditions." (*Id.*)

Additionally, they point to their claim for relief in the form of baseline chest x-ray or CAT scan and medical monitoring, which they contend properly constitutes prospective relief.

According to Defendants, "Plaintiffs seek widespread radon testing throughout a state facility that has already been tested[,]" and "mitigation or remediation in a facility already mitigated and remediated." (Mem. Law Supp. Defs.' Mot. Dismiss at 34.) All of this, Defendants contend, is sought despite the fact that Plaintiffs merely speculate as to the current radon levels, failing to provide a sufficient factual basis to adequately allege that radon levels at Garner are currently improper. (*Id.* at 34-35.) Furthermore, Defendants argue that any putative plaintiffs that are discharged from custody or are incarcerated in a different facility cannot pursue injunctive relief without violating the Eleventh Amendment. "While the putative class is alleged to number in the thousands or tens of thousands, Garner incarcerates only about 500 inmates. So for most in the putative class: without current, ongoing violation there is nothing to enjoin and no prospective injunctive relief to award." (*Id.* at 35.)

Given the facts alleged in Plaintiffs' Amended Complaint, the long history of alleged cover-up and failure to remediate radon, and the specific allegations involving failure to test housing blocks at Garner, Plaintiffs' allegations that they face an ongoing risk of unreasonably dangerous exposure to radon are not merely speculative. At the very least, class members currently incarcerated at Garner may properly seek prospective relief both for continued testing to check the cell blocks' radon level, as well as baseline medical screening and medical monitoring. Defendants' argument that current Garner inmates make up a minority of the proposed injunctive relief class is similarly not dispositive. Defendants suggest that in the motion to dismiss context, where a proposed class has not yet been certified, the fact that sovereign immunity may bar injunctive relief as to a majority of proposed class members means that a proposed class action must be dismissed

in its entirety. Defendants cite no authority to this effect, however. Finally, the fact that it would allegedly cost Defendants a substantial amount of money to implement the injunctive relief that Plaintiffs seek is beside the point where Plaintiffs allege an ongoing violation of federal constitutional law and seek prospective relief in the form of radon testing of Garner cell blocks and medical monitoring for inmates currently in DOC custody. Finally, even taking judicial notice of the newly-announced DOC directive on radon testing, the result or impact of this directive remains for discovery and, on a fully developed record, a determination of the scope of injunctive relief, if and when the Court determines that Plaintiffs have established their entitlement to such relief. While the directive may contour Plaintiffs' claims for injunctive relief, it does not provide a basis for granting Defendants' Motion to Dismiss.

D. *Pennhurst*

Defendants further assert that *Pennhurst State Sch. & Hosp. v. Halderman* bars Plaintiffs' claims for injunctive relief because Plaintiffs seek an injunction from a federal court requiring state officials to comply with state law. *See* 465 U.S. 89, 106 (1984) (*Ex parte Young* exception is "inapplicable in a suit against state officials on the basis of state law."). Defendants argue that Plaintiffs claim that Department of Correction directives and the community standard of medical care render appropriate a variety of testing and monitoring, and they seek that care in the form of an injunction requiring Defendants to comply with the Department directive and with the community standard, characterizing Plaintiffs' claim as one of medical negligence, as opposed to deliberate indifference.

However, Plaintiffs are alleging deliberate indifference to their medical needs in violation of the Eighth Amendment, and therefore the requested medical injunctive relief simply requires Defendants to provide the care they are obligated to provide under the Constitution. As Plaintiffs

made clear at oral argument, they cite state standards merely as evidence that helps inform the Eighth Amendment analysis, and not as a mandate that they seek to enforce via injunctive relief. While any injunction issued in this case must comply with *Pennhurst*, Defendants have not shown that they are entitled to dismissal of Plaintiffs' claim for injunctive relief on this basis.

Finally, Defendants argue that the Eleventh Amendment bars claims seeking judgments declaring that defendants violated federal law in the past. Although *Edelman* analyzed prospective/retrospective *injunctive* rather than *declaratory* relief, its holding encompasses the latter as well, and the Supreme Court made no distinction between the two types of relief in reversing and remanding the case. *See* 415 U.S. at 653, 677-78. Thus, any certified class in this case cannot seek retrospective injunctive or declaratory relief concerning past violations, but because Plaintiffs also seek declaratory relief related to the alleged ongoing constitutional violation, dismissal of Plaintiffs' claim for declaratory relief is unwarranted at this stage.

### III. Conclusion

For the reasons set forth above, the Court GRANTS Defendants' Motion to Dismiss on qualified immunity grounds as to Eighth Amendment violations occurring before June 18, 1993, DENIES Defendants' Motion to Dismiss as to Eighth Amendment violations occurring after that date, GRANTS Defendants' Motion to Dismiss Plaintiffs' Fourteenth Amendment claim of denial of access to the Courts, and DENIES Defendants' Motion to Dismiss Plaintiffs' claims for injunctive and declaratory relief.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 27th day of September 2018.