**MANDATE**

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 29th day of June, two thousand twenty.

Before:     José A. Cabranes,
            Reena Raggi,
                *Circuit Judges*,
            Edward R. Korman,
                *District Judge.* *

_____

Harry Vega,

            Plaintiff - Appellee,

Michael Cruz, on behalf of themselves and all others similarly situated, Kenya Brown, On behalf of themselves and all others similarly situated, Jeffrey Perry, On behalf of themselves and all others similarly situated, Lee Grenier, On behalf of themselves and all others similarly situated, Tavorus Fluker, On behalf of themselves and all others similarly situated, Anthony Rogers, On behalf of themselves and all others similarly situated, Thomas Marra, On behalf of themselves and all others similarly situated, Terrence Easton, On behalf of themselves and all others similarly situated, Lamont Samuel, On behalf of themselves and all others similarly situated, Ian Cooke, On behalf of themselves and all others similarly situated, J. Michael Farren, Lawrence Townsend, On behalf of themselves and all others similarly situated, John Bosse, On behalf of themselves and all others similarly situated,

            Consolidated-Plaintiffs - Appellees,

v.

Scott Semple, Commissioner of Correction, In their individual and official capacities, James Dzurenda, former Commissioner of Corrections, In their individual and official capacities, Lee Arnone,

**JUDGMENT**

Docket No. 18-3176

_____

* Judge Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

former Commissioner of Correction, In their
individual and official capacities, Theresa Lantz,
former Commissioner of Corrections, In their
individual and official capacities, James
Armstrong, former Commissioner of Corrections,
In their individual and official capacities, Lawrence
Meachum, former Commissioner of Correction, In
their individual and official capacities, Henry
Falcone, Warden, Garner Correctional Institution,
In their individual and official capacities, Steven
Link, Director, Department of Correction
Engineering and Facilities Management, In their
individual and official capacities, David Batten,
former Director, Department of Correction
Engineering and Facilities Management, In their
individual and official capacities,

        Defendants - Appellants,

John Does, 1-3,

        Defendant.

_____

     The appeal in the above captioned case from a judgment of the United States District
Court for the District of Connecticut was argued on the district court's record and the parties'
briefs.  Upon consideration thereof,

     IT IS HEREBY ORDERED, ADJUDGED and DECREED that the district court's
judgment is AFFIRMED in part, REVERSED in part, and the cause REMANDED to the district
court for further proceedings consistent with this Court's opinion.

        For the Court:
        Catherine O'Hagan Wolfe,
        Clerk of Court

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

18-3176-pr
*Vega v. Semple*

# In the
# United States Court of Appeals
## for the Second Circuit

————

AUGUST TERM 2019

No. 18-3176-pr

HARRY VEGA,
*Plaintiff-Appellee,*

Michael Cruz, on behalf of themselves and all others similarly
situated, Kenya Brown, On behalf of themselves and all others
similarly situated, Jeffrey Perry, On behalf of themselves and all
others similarly situated, Lee Grenier, On behalf of themselves and
all others similarly situated, Tavorus Fluker, On behalf of themselves
and all others similarly situated, Anthony Rogers, On behalf of
themselves and all others similarly situated, Thomas Marra, On
behalf of themselves and all others similarly situated, Terrence
Easton, On behalf of themselves and all others similarly situated,
Lamont Samuel, On behalf of themselves and all others similarly
situated, Ian Cooke, On behalf of themselves and all others similarly
situated, J. Michael Farren, Lawrence Townsend, On behalf of
themselves and all others similarly situated, John Bosse, On behalf of
themselves and all others similarly situated,
*Consolidated-Plaintiffs - Appellees,*

v.

SCOTT SEMPLE, Commissioner of Correction, in their individual and official capacities[*]; JAMES DZURENDA, former Commissioner of Correction, in their individual and official capacities; LEE ARNONE, former Commissioner of Correction, in their individual and official capacities; THERESA LANTZ, former Commissioner of Correction, in their individual and official capacities; JAMES ARMSTRONG, former Commissioner of Correction, in their individual and official capacities; LAWRENCE MEACHUM, former Commissioner of Correction, in their individual and official capacities; HENRY FALCONE, Warden, Garner Correctional Institution, in their individual and official capacities; STEVEN LINK, Director, Department of Correction Engineering and Facilities Management, in their individual and official capacities; DAVID BATTEN, former Director, Department of Correction Engineering and Facilities Management, in their individual and official capacities,

*Defendants-Appellants,*

JOHN DOES, 1-3,
*Defendants.*

————————

On Appeal from the United States District Court
for the District of Connecticut

————————

ARGUED: OCTOBER 31, 2019
DECIDED: JUNE 29, 2020

———————————

[*] Scott Semple no longer holds this office. He has been replaced by Rollin Cook, who is automatically substituted as the official-capacity party. *See* Fed. R. Civ. P. 25(d); Fed. R. App. P. 4(c)(2).

2

―――――――

Before: CABRANES and RAGGI, *Circuit Judges,* and KORMAN, *Judge.*[†]

―――――――

Plaintiffs are current and former inmates of the Connecticut Department of Correction incarcerated within Garner Correctional Institution ("Garner"), who initiated suit in the United States District Court for the District of Connecticut. They purport to bring a class action on behalf of all current and former inmates ever incarcerated at Garner since the prison opened in 1992, including pre-trial detainees and post-conviction prisoners. A class has not yet been certified. Plaintiffs allege they were "exposed involuntarily to indoor radon gas, a recognized human carcinogen, far in excess of any published safe level" while incarcerated at Garner. They claim Defendants, who are Department of Correction officials, were deliberately indifferent to inmate safety in building the Garner facility at the Newtown, Connecticut site and in failing to test for, or to remediate, the alleged radon exposure thereafter.

The Defendants moved to dismiss the complaint, under Fed. R. Civ. P. 12(b)(1) and (6), on grounds of qualified immunity and Eleventh Amendment sovereign immunity. The District Court (Janet Bond Arterton, *Judge*) framed the right at issue by holding that "reasonable prison officials were on notice that they could not

―――――――――――――――――

[†] Judge Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

knowingly or recklessly subject prisoners in their custody to toxic substances that pose a serious risk of harm." The District Court concluded that Defendants' alleged conduct violated clearly established law as of the date of the Supreme Court's decision in *Helling v. McKinney*, 509 U.S. 25, 29 (1993). Accordingly, it granted Defendants' motion to dismiss on qualified immunity grounds with respect to conduct alleged to have occurred prior to *Helling* and denied the motion with respect to conduct alleged to have occurred after *Helling*. The District Court also denied Defendants' motion to dismiss Plaintiffs' claims for prospective relief on grounds of Eleventh Amendment sovereign immunity.

This case presents two questions: (1) Whether Defendants are entitled to qualified immunity where they are alleged to have been deliberately indifferent to an unreasonable risk of serious harm to inmates posed by exposure to a toxic substance (here, radon gas), in violation of inmates' rights under the United States Constitution; and (2) Whether the doctrine of state sovereign immunity prohibits the prospective relief that Plaintiffs seek against Defendants, namely prospective medical screening, monitoring, and treatment, and radon testing and mitigation.

We conclude, like the District Court, that Defendants' alleged conduct violated clearly established law as of the date of *Helling*. We also conclude that the District Court erred in failing to dismiss Plaintiffs' claims for prospective relief for violations of state law, but did not err in declining to dismiss Plaintiffs' claims for prospective relief for violations of federal law on grounds of sovereign immunity.

Accordingly, we **AFFIRM** the District Court's judgment insofar as it determined that Defendants violated clearly established law as of the date of the Supreme Court's decision in *Helling v. McKinney*, 509 U.S. 25, 29 (1993); **AFFIRM** in part the District Court's judgment insofar as it denied Defendants' motion to dismiss Plaintiffs' federal claims for injunctive and declaratory relief; **REVERSE** in part the District Court's judgment insofar as it denied Defendants' motion to dismiss Plaintiffs' state-law claims for prospective relief against the official-capacity defendants; and **REMAND** the cause to the District Court for further proceedings consistent with this opinion.

———————

STEPHEN R. FINUCANE, Assistant Attorney General, *for* William Tong, Attorney General of Connecticut, Hartford, CT, *for Defendants-Appellants*.

LORI WELCH-RUBIN (Martin Minnella, *on the brief*), Minnella, Tramuta & Edwards, LLC, Middlebury, CT, *for Plaintiffs-Appellees*.

Alexander A. Reinert, Benjamin N. Cardozo School of Law, New York, NY, *for Amicus Curiae Human Rights Defense Center*.

———————

JOSÉ A. CABRANES, *Circuit Judge*:

Plaintiffs are current and former inmates of the Connecticut Department of Correction ("DOC") incarcerated within Garner Correctional Institution ("Garner") who initiated suit in the United States District Court for the District of Connecticut. They purport to bring a class action on behalf of all current and former inmates incarcerated at Garner since the prison opened in 1992, including pre-trial detainees and post-conviction prisoners. A class has not yet been certified. Plaintiffs allege they were "exposed involuntarily to indoor radon gas, a recognized human carcinogen, far in excess of any published safe level" while incarcerated at Garner.[1] They contend that Defendants, who are current and former DOC officials, were deliberately indifferent to their safety when building the Garner facility at the Newtown, Connecticut site and by failing to test for or mitigate the alleged radon exposure thereafter.[2] Further, Plaintiffs assert that Defendants Dzurenda, Semple, Link, and Falcone were deliberately indifferent to inmate safety by failing to notify inmates that radon testing and remediation were being conducted at Garner during 2013 and 2014, after elevated radon levels were discovered in late 2013.[3] Plaintiffs allege that Defendants "knew that inmates housed at Garner from its inception until the installation of the radon

---

[1] Plaintiffs' Amended Complaint ("Am. Compl.") ¶¶ 1, 41, 46.

[2] *Id.* ¶¶ 1, 90–96, 98, 103, 110–11, 114, 135–36.

[3] *Id.* ¶¶ 140, 142–43, 146–47, 150–53, 157–61.

mitigation system in October 2014 faced substantial risk of serious harm from indoor radon exposure, and disregarded that risk by failing to take reasonable measures to abate it."[4] They also allege that the mitigation system installed in 2014 was intentionally designed so as not to remedy the risk of excessive radon exposure prisoners faced in the area of Garner where inmates are housed.[5]

Defendants moved to dismiss the complaint, under Fed. R. Civ. P. 12(b)(1) and (6), on grounds of qualified immunity and Eleventh Amendment sovereign immunity. The District Court (Janet Bond Arterton, *Judge*) framed the right at issue by holding that "reasonable prison officials were on notice that they could not knowingly or recklessly subject prisoners in their custody to toxic substances that pose[] a serious risk of harm."[6] It concluded that Defendants' alleged conduct violated clearly established law as of the date of *Helling v. McKinney*, 509 U.S. 25 (1993), in which the Supreme Court held that an inmate can state a claim under the Eighth Amendment by alleging that prison officials have, with deliberate indifference, exposed him to levels of environmental tobacco smoke that pose an unreasonable risk of serious damage to his future health. Accordingly, it granted Defendants' motion to dismiss on qualified immunity grounds with regard to conduct alleged to have occurred prior to *Helling* and denied the motion with regard to conduct alleged to have occurred after

---

[4] *Id.* ¶ 136.

[5] *Id*. ¶ 46(A).

[6] Special Appendix ("SA") at 12.

*Helling.* It also denied Defendants' motion to dismiss Plaintiffs' claims for prospective relief on grounds of state sovereign immunity.

This case presents two questions: (1) Whether Defendants are entitled to qualified immunity where they are alleged to have been deliberately indifferent to a unreasonable risk of serious harm to inmates posed by exposure to a toxic substance (here, radon gas), in violation of inmates' rights under the United States Constitution; and (2) Whether the doctrine of state sovereign immunity prohibits the prospective relief that Plaintiffs seek against Defendants, namely prospective medical screening, monitoring, and treatment, and radon testing and mitigation.

We conclude, like the District Court, that Defendants' alleged conduct violated clearly established law as of the date of *Helling*. We also conclude that the District Court erred in failing to dismiss Plaintiffs' claims for prospective relief for violations of state law, but did not err in declining to dismiss Plaintiffs' claims for prospective relief for violations of federal law on grounds of sovereign immunity. Accordingly, we **AFFIRM** the District Court's judgment insofar as it determined that Defendants violated clearly established law as of the date of the Supreme Court's decision in *Helling v. McKinney*, 509 U.S. 25, 29 (1993); **AFFIRM** in part the District Court's judgment insofar as it denied Defendants' motion to dismiss Plaintiffs' federal claims for injunctive and declaratory relief; **REVERSE** in part the District Court's judgment insofar as it denied Defendants' motion to dismiss Plaintiffs' state-law claims for prospective relief against the official-capacity

defendants; and **REMAND** the cause to the District Court for further proceedings consistent with this opinion.

## I.    BACKGROUND[7]

Plaintiff Harry Vega brings this action on behalf of a putative class (jointly, the "Plaintiffs") of all current and former post-conviction prisoners and pre-trial detainees at DOC's Garner facility in Newtown, from Garner's opening in 1992 to the present. Defendants are former and current DOC officials during the same time period.[8]

---

[7] The following facts are drawn from the Plaintiffs' Amended Complaint. For the purposes of this appeal, we assume the truth of Plaintiffs' factual allegations. *See Edrei v. Maguire*, 892 F.3d 525, 529 (2d Cir. 2018).

[8] As of August 16, 2017, the date that the operative complaint was filed, the Defendants are described as follows: Defendant Scott Semple ("Semple") has served as the Commissioner of DOC since August 2014; from mid-2009 through November 26, 2013, Semple was the Warden at Garner, after which time he was promoted to Deputy Commissioner for Operations. Defendant James Dzurenda ("Dzurenda") served as Warden at Garner from 2005 to 2009, and was Deputy Commissioner for Operations from July 2010 to April 2013, when he became Commissioner. Defendant Leo Arnone was the Commissioner of DOC from 2010 to 2013. Defendant Theresa Lantz was the Commissioner of DOC from 2003 to 2009. Defendant James Armstrong was the Commissioner of DOC from 1995 to 2003. Defendant Lawrence Meachum ("Meachum") was the Commissioner of DOC from 1987 to 1995. Defendant Henry Falcone ("Falcone") has been the Warden at Garner since March 7, 2014; Defendant Falcone became a captain when he was first assigned to Garner in 2006; he thereafter was promoted to Deputy Warden at Garner in 2011. Defendant Steven Link ("Link") is the Director, Department of Correction Engineering and Facilities Management for DOC. Defendant David Batten ("Batten") was the former Director, Department of Correction Engineering and Facilities Management during times that inmates were exposed to radon.

A.

Radon gas is a radioactive gas that results from the natural decay of uranium found in most soil and many varieties of rock.[9] It is odorless, colorless, imperceptible to the senses, and it is also dangerous to humans.[10] It is a known carcinogen and alleged to be the "leading environmental cause of cancer mortality in the United States."[11] It is also alleged to be the leading cause of lung cancer among persons who have never smoked.[12]

The risks of radon exposure have been known for some time. Congress listed radon as a toxic substance in 1988.[13] Not surprisingly, the World Health Organization ("WHO") and U.S. Environmental Protection Agency ("EPA") recommend that homes be tested for radon gas. Although radon may be dangerous to humans in any quantity, the EPA sets its "action level" for indoor radon exposure at 4.0 pCi/L, a measurement of the radon concentration in the air.[14] The EPA recommends that home dwellers take steps to mitigate radon

---

[9] Am Compl. ¶ 72.

[10] *Id*. ¶ 73.

[11] *Id*. ¶ 76.

[12] *Id*. ¶ 83.

[13] *Id*. ¶ 88.

[14] Defendants-Appellants' Appendix ("A.") at 156. pCi/L stands for picocuries per liter of air. *See* Am. Compl. ¶ 153.

exposure until tests read below that "action level" measurement.[15] The WHO recommends a lesser action level of 2.7 pCi/L, in part because indoor exposure to radon at 4.0 pCi/L is equivalent to smoking eight cigarettes per day.[16] Indeed, the risk of lung cancer rises sixteen percent with every 2.7 pCi/L increase in radon exposure.[17] Put simply, radon is a silent but known killer.

### B.

In 1988, the DOC announced its plan to construct a prison facility in Newtown, CT that would become Garner; it was opened on November 17, 1992.[18] According to the EPA and the U.S. Geological Survey, which "evaluated the radon potential in the United States and developed a Map of Radon Zones to assist national, state and local organizations and building code officials in deciding whether radon-resistant features should be applicable to new construction[,]" Newtown, CT is located in "Zone 1- Highest Potential (greater than 4.0

---

[15] A. at 157.

[16] Am. Compl. ¶ 138.

[17] *Id.* ¶ 84.

[18] *Id.* ¶¶ 90–91.

pCi/L) . . . ."[19] That designation refers to the average short-term radon measurement in a building without radon mitigation systems.

Plaintiffs allege that Defendant Meachum, who was responsible for site selection and construction of the Garner facility, and Defendant Batten, who advised Meachum about the site, knowingly decided to have Garner built in an area where the radon levels would likely exceed the EPA action level if no mitigation system were implemented.[20] Meachum decided to construct Garner on top of what was formerly a waste site for a different Connecticut facility. Because radon in the ground can enter a building through small cracks in the foundation, and because the former waste site rendered Garner's foundation vulnerable to cracking, the prison site was particularly vulnerable to radon gas seepage.

Plaintiffs maintain that they were involuntarily exposed to excessive levels of radon in violation of their constitutional rights. They allege Meachum acted with deliberate indifference to inmate safety and violated their constitutional rights by building Garner in a high-risk area for radon exposure without installing any radon mitigation systems.[21] They also claim that Defendants were

---

[19] *Id*. ¶ 93.

[20] *Id*. ¶¶ 82, 90–92, 94.

[21] *Id*. ¶ 99.

deliberately indifferent to inmate safety in failing to test for or mitigate radon exposure thereafter.[22]

In addition to the allegations that Garner was constructed on a site likely to present a greater risk of radon exposure, Plaintiffs point to a series of incidents throughout Garner's history that, in their view, are probative on the issue of whether Defendants were aware of a substantial risk of serious harm of radon exposure.

Plaintiffs allege that Garner's heating, ventilation, and air conditioning ("HVAC") system, which was installed in part to help circulate fresh air throughout the prison facility, was inadequate from its inception.[23] The original HVAC was inadequate for the size of Garner, and the replacement HVAC did not circulate fresh air year-round, as contemplated by the original system specifications. That failure further increased the risk of radon exposure in Garner.[24]

Plaintiffs also allege that, in the fall of 1996, a Connecticut Department of Public Health survey, which tested well water in Newtown, revealed high levels of radon in the water. Plaintiffs allege that these high radon levels and the health risks presented were widely publicized.[25] Additionally, Plaintiffs allege that test results

---

[22] *Id.* ¶¶ 1, 90-96, 98, 103, 110-114, 135-136.

[23] *Id.* ¶ 101.

[24] *Id.*

[25] *Id.* ¶ 106.

13

publicly released in 2001 revealed that a Newtown school that shared a water well with Garner had elevated uranium levels, approximately eight times greater than the EPA guideline for uranium in drinking water; it bears recalling that radon results from the natural decay of uranium.[26] Plaintiffs further allege that, around this time, Defendants managing Garner temporarily closed the facility's water supply on false pretenses, banned showers, and provided the inmates with bottled water.[27]

## C.

Garner was not, however, tested for radon gas until 2013, and even then, testing was only limited to the facility's classroom area. Garner offers educational programs to inmates and has classrooms designated for that purpose on the second floor of the facility. Pursuant to Connecticut General Statute § 10-220(d)(2), public schools in the state must be specifically tested for radon.[28] In 2013, a non-

---

[26] *Id.* ¶ 112.

[27] *Id.* ¶ 115.

[28] Connecticut General Statute 10-220(d) provides in relevant part that:

> Prior to January 1, 2008, and every five years thereafter, for every school building that is or has been constructed, extended, renovated or replaced on or after January 1, 2003, a local or regional board of education shall provide for a uniform inspection and evaluation program of the indoor air quality within such buildings, such as the Environmental Protection Agency's Indoor Air Quality Tools for Schools Program. The inspection and evaluation program shall

inmate teacher at Garner requested that the classroom area of the facility be tested for radon pursuant to that statute. Following this request, Garner's school area was tested for radon in December 2013 and early 2014. As discussed in greater detail below, Plaintiffs allege that Defendants tested only the school area and that the cell blocks were intentionally not tested for radon.[29] Of those areas that were tested, the results varied by location, between measurements of 5.0 pCi/L to 23.7 pCi/L.[30] Exposure to indoor radon at 10.0 pCi/L is equivalent to smoking more than 1 pack of cigarettes a day; and exposure to indoor radon at 20.0 pCi/L is equivalent to smoking more than 2.5 packs of cigarettes a day.[31] Plaintiffs' amended complaint avers that at least two members of the putative class have already been diagnosed with lung cancer.[32]

Following the school-area testing and discovery of undesirable radon levels at Garner, Defendants promptly began to address the problem of radon exposure in that limited area. On March 13, 2014,

---

include, but not be limited to, a review, inspection or evaluation of the following: . . . (2) radon levels in the air.

Conn. Gen. Stat. Ann. § 10-220 (West).

[29] Am. Compl. ¶ 141.

[30] *Id*. ¶ 139.

[31] *Id*. ¶ 138.

[32] *Id*. ¶¶ 15, 21.

Defendant Henry Falcone, the Warden of Garner,[33] informed DOC staff that elevated radon levels were detected in the facility and that such radon exposure required remediation.[34] A complete report of the radon test results was made available to the DOC staff. DOC employees were informed on May 8, 2014 that they could file a "WC 207 package" to preserve their right to workers' compensation benefits should they develop any future medical condition resulting from prolonged radon exposure at Garner.[35]

Although DOC employees were informed of the elevated radon levels, this information was not shared with the inmates.[36] Defendants Semple, Dzurenda, Falcone, Link, as well as Does 1–3,[37] were informed that follow-up testing was needed beyond only the school area that was tested, but they allegedly made the deliberate choice that the cell blocks where inmates are housed would not be tested.[38] Plaintiffs allege that this choice was made because state law would have

---

[33] *See* Note 8, *ante*.

[34] Am. Compl. ¶ 142.

[35] *Id*. ¶¶ 151–54; A. at 160, 224–25.

[36] Am. Compl. ¶¶ 150–151.

[37] *See* Note 8, *ante*.

[38] Am Compl. ¶ 141.

required that the inmates be notified in writing of any testing done where they were housed.[39]

Defendants acted promptly in attempting to remedy the radon levels in those areas that were tested. A May 2, 2014 e-mail indicates that Defendant Link had received a draft remediation design for Garner.[40] Bids were entertained for the installation contract, and on October 10, 2014, the emergency radon mitigation system was completed. Plaintiffs allege that this mitigation system was only designed to mitigate the tested areas, which excluded the cell block where inmates are housed. Accordingly, Plaintiffs aver that the mitigation system was intentionally designed so as not to remedy excessive radon gas in the cell blocks.[41] Plaintiffs maintain that Defendants acted with deliberate indifference to their serious medical needs in failing to notify them that elevated radon levels were detected and in failing to mitigate allegedly dangerous levels of radon in the cell blocks.

### D.

In February 2017, Plaintiffs filed this action, captioned *Cruz v. Semple*, 3:17-cv-0348 (JBA).[42] On July 24, 2017, Judge Arterton held a

---

[39] *Id.*

[40] *Id.* ¶ 150.

[41] *Id.* ¶¶ 46(A), 141.

[42] Cruz DC ECF 1.

telephone conference, during which the District Court allowed Plaintiffs to amend their complaint in response to the Defendants' proposed motion to dismiss.[43] At this conference, the District Court also discussed with the parties the possibility of consolidating their case with the action of Harry Vega, which was filed on January 26, 2017. After the conference, the two cases were indeed consolidated on September 1, 2017, with Vega dropping his individual suit and joining the putative class in the case brought by Cruz.[44]

Plaintiffs filed their amended complaint, which is now before us on appeal.[45] They allege violations of the Eighth and Fourteenth Amendments to the United States Constitution (Count One), and violations of the Connecticut Constitution, Article First, Section Eight (Count Two).[46] They seek monetary damages and prospective relief in the form of an injunction compelling radon testing in Garner, medical

---

[43] A. at 269–271.

[44] A. at 227, 270.

[45] A. at 002.

[46] The Eighth Amendment to the U.S. Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Eighth Amendment's prohibition against cruel and unusual punishment is incorporated by the Fourteenth Amendment. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 764 n.12 (2010). The Fourteenth Amendment to the U.S. Constitution provides, in relevant part that, no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Connecticut Constitution also provides, in relevant part, that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law." Conn. Const. art. 1, § 8.

monitoring of current- and former-inmate health for radon-related illness, and medical treatment of any such illnesses.

Defendants moved to dismiss the amended complaint (hereinafter, "the complaint"), arguing that they are entitled to qualified immunity on the damages claim and to sovereign immunity on the injunction claim. With regard to the qualified immunity defense, Defendants do not argue that Plaintiffs' claims cannot amount to constitutional violations; rather, they argue only that at relevant times there was no clearly established law that they violated through their actions or inaction.[47]

During the pendency of this action before the District Court, Defendants filed a notice of supplemental authority on June 29, 2018, including an administrative directive from the Connecticut DOC requiring correctional facilities to develop procedures for, among other things, detection of radon.[48] The policy did not go into effect until June 29, 2018, the day the supplemental authority was filed with the District Court. The District Court allowed both Plaintiffs and Defendants to file supplemental authority and briefing regarding the new directive.

---

[47] *See, e.g., Taylor v. Barkes*, 575 U.S. 822, 822 (2015) ("When properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." (internal brackets, quotation marks, and citation omitted)).

[48] A. at 229.

On September 27, 2018, the District Court granted in part and denied in part Defendants' motion to dismiss.[49] Specifically, the District Court denied Defendants' sovereign immunity defense to Plaintiffs' claims for equitable relief. Regarding the money damages claims, the District Court granted in part and denied in part Defendants' qualified immunity defense, dismissing the claims arising from conduct that preceded the Supreme Court's decision in *Helling v. McKinney*, 509 U.S. 25 (1993).[50]

This timely appeal by Defendants followed.

## DISCUSSION

### II.   <u>The Damages Claim Against Individual-Capacity Defendants</u>

Defendants challenge the denial of their motion to dismiss on grounds of qualified immunity for conduct occurring after the Supreme Court's decision in *Helling*, issued on June 18, 1993.

---

[49] The District Court also granted the Defendants' motion to dismiss Plaintiffs' access-to-court claim. SA at 18. Plaintiffs do not challenge that decision on appeal.

[50] Although the District Court granted Defendants' motion to dismiss on the basis of qualified immunity with regard to all conduct alleged to have occurred before June 18, 1993, it did not make clear whether that grant applied to *both* the pre- and post-conviction Plaintiffs or only the latter. Both parties on appeal agree that the District Court effectively dismissed both the pre- and post-conviction claims—brought under the Fourteenth and Eighth Amendments, respectively—alleged to have occurred before June 18, 1993. Appellants' Br. at 37; Appellees' Br. at 38. We agree with that construction of the District Court's judgment.

Defendants assert that they have not violated any clearly established law and that they are entitled to qualified immunity for conduct alleged to have occurred at all relevant times described in the complaint. We disagree.

## A.    Standard of Review

Because we are presented with a question of law, the District Court's denial of qualified immunity presents a final reviewable order.[51] We review a denial of qualified immunity *de novo*.[52] Having presented their immunity defense on a Rule 12(b)(6) motion "instead of a motion for summary judgment, the defendants must accept the more stringent standard applicable to this procedural route."[53] Accordingly, "we accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiffs' favor, including both

---

[51] *Edrei*, 892 F.3d at 532.

[52] *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012).

[53] *Edrei*, 892 F.3d at 532 (brackets omitted).

those that support the claim and those that defeat the immunity defense."[54] This standard represents a "formidable hurdle."[55]

### B.    Qualified Immunity

The Supreme Court has instructed that "[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[56] To strike the proper balance, the doctrine of qualified immunity protects government officials from suits brought against them in their individual capacity for money damages where their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[57]

Accordingly, "[q]ualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged

---

[54] *Id.* (internal quotation marks and citations omitted).

[55] *Id.*

[56] *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).

[57] *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

conduct."[58] If a plaintiff fails at either step, the official is entitled to qualified immunity.

The Defendants in this appeal have staked their defense on the second step. For the purposes of their motion to dismiss in the District Court, the Defendants merely asserted that they had not violated any clearly established law; they did "not disput[e] . . . that the plaintiffs' alleged conditions of confinement at Garner . . . amounted to or could amount to a constitutional violation."[59] Accordingly, the District Court considered only the second step—whether the right was clearly established at the relevant times pleaded in the complaint. Like the District Court, our inquiry is only as to whether the Defendants violated clearly established law.[60]

## C.    Conditions of Confinement Claims – "Deliberate Indifference"

The putative class in this case includes both post-conviction prisoners and pre-trial detainees. The former bring suit under the Eighth Amendment; the latter bring suit under the Due Process Clause of the Fourteenth Amendment. Both advance their claims based on

---

[58] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

[59] A. at 281–82 (District Court Oral Argument Transcript).

[60] *See Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) (Where "Defendants have assumed, for the purposes of this appeal that as a threshold matter, plaintiffs have shown a deprivation of a constitutional right[,] [w]e need only . . . concern ourselves with the second part of the qualified immunity inquiry." (internal quotation marks omitted)).

allegations of deliberate indifference to unlawful conditions of confinement that pose a serious risk of harm to health.

To state a claim under the Eighth Amendment on the basis that a defendant has failed to prevent harm, a plaintiff must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the defendant acted with "deliberate indifference."[61] Deliberate indifference under the Eighth Amendment standard means the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[62] We have observed that "[e]vidence that a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk."[63]

To state a claim of deliberate indifference under the Due Process Clause of the Fourteenth Amendment, a plaintiff must allege both (a) conditions that objectively "pose an unreasonable risk of serious

---

[61] *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

[62] *Id*. at 837.

[63] *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003)); *see also Farmer*, 511 U.S. at 843 n.8 (noting that prison official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist . . . ").

damage to . . . health"; [64] and (b) that the "defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to health or safety."[65] Accordingly, the "deliberate indifference" prong under the Fourteenth Amendment is said to be defined objectively.

Plaintiffs have alleged that, from Garner's inception until the installation of the radon mitigation system in October 2014, Defendants knew that inmates housed at Garner faced substantial risk of serious harm from indoor radon exposure and that Defendants disregarded that risk by failing to take reasonable measures to abate it.[66] At this stage in the litigation, we must assume these factual allegations are true.

Defendants argue that Plaintiffs are trying to press claims for negligence and that a failure to discover radon is not actionable under the Eighth Amendment deliberate indifference standard. We agree, and Plaintiffs do not dispute, that Defendants cannot be liable under the Eighth Amendment for mere negligence. Indeed, Plaintiffs expressed that understanding at oral argument before the District Court. There, they argued that on the issue of subjective deliberate

---

[64] *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017).

[65] *Id.* at 35 (emphasis added).

[66] Am. Compl. ¶¶ 1, 46(A), 57, 135–36.

indifference, they enjoy a pleading standard at this stage that draws all inferences in their favor but conceded that they must ultimately prove that Defendants were aware of the risk of harm.[67]

Inasmuch as we assume on this appeal that Plaintiffs have sufficiently alleged violations of their constitutional rights, we turn to the question of whether the Defendants violated clearly established law.

D.    Whether Defendants Violated "Clearly Established" Law

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[68] It is understood that this analysis is undertaken to "ensure that the official being sued had fair warning that his or her actions were unlawful."[69] Because we assess  the official's conduct at the time it is alleged to have occurred,

---

[67] A. at 292–293. Of course, on any future motion for summary judgment, unlike on a motion to dismiss, Plaintiffs must actually point to record evidence creating a genuine dispute as to the specific facts alleged. *See, e.g.*, *Salahuddin v. Goord*, 467 F.3d 263, 282 (2d Cir. 2006).

[68] *Ashcroft*, 563 U.S. at 741 (brackets and internal quotation marks omitted).

[69] *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (internal quotation marks omitted); *see also Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 60 (2d Cir. 2014) ("The salient question instead is whether the case law at the time in question would have put reasonable officers on fair warning that their conduct violated the plaintiff's rights." (internal quotation marks omitted)).

we look to precedent of the Supreme Court and our own Court existing at the time of the alleged violation to determine whether the conduct (or inaction) violated a "clearly established right."[70]

Though the rule is stated simply enough, the application of the rule often presents challenges. As Dean John C. Jefferies, Jr. has commented, "determining whether an officer violated 'clearly established' law has proved to be a mare's nest."[71] Defining the precise right at issue poses a "chronic difficulty" for courts.[72] By framing the relevant right too narrowly, we may unduly permit officials to escape liability; by framing the relevant right too generally, however, we risk allowing plaintiffs "to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."[73]

On the one hand, "the clearly established right must be defined with specificity."[74] Indeed, the Supreme Court instructs courts that "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established," and that "[t]his inquiry must be undertaken in light of the specific context of the case, not as a

---

[70] *Moore v. Vega,* 371 F.3d 110, 114 (2d Cir. 2004).

[71] John C. Jefferies, Jr., *What's Wrong with Qualified Immunity?*, 62 FLA. L. REV. 851, 852 (2010).

[72] *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998).

[73] *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

[74] *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).

broad general proposition."[75] On the other hand, the Supreme Court has also emphasized that, while the "contours of the right must be sufficiently clear[,]" that "is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful."[76]

In attempting to determine the right at issue here, the District Court turned to a Supreme Court case decided in 1993, *Helling v. McKinney*.[77] In *Helling*, the plaintiff alleged that defendant prison officials housed him with a cellmate who smoked five packs of cigarettes per day, and that officials permitted cigarettes to be sold to inmates without proper warnings regarding the hazard of tobacco smoke.[78] Even though the plaintiff had not developed health complications from exposure to environmental tobacco smoke ("ETS"), he maintained that the officials' actions manifested deliberate indifference to the serious health risks to which they exposed him in violation of the Eighth Amendment. The Supreme Court agreed, holding that the plaintiff "state[d] a cause of action under the Eighth

---

[75] *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).

[76] *Anderson*, 483 U.S. at 640; *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances"); *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 129 (2d Cir. 2004) ("[T]he right in question must not be restricted to the factual circumstances under which it has been established.").

[77] 509 U.S. 25; *see also* SA at 14–15.

[78] *Helling*, 509 U.S. at 27.

Amendment by alleging that [the officials] have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health."[79] The Court explained that "it would be odd to deny [relief] to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."[80]

The District Court concluded that *Helling* established a prisoner's right to be free from toxic environmental substances that, like ETS, posed an unreasonable risk of some future harm. Accordingly, the District Court denied Defendants qualified immunity for conduct alleged to have occurred after *Helling*, decided on June 18, 1993, finding the right to be clearly established as of that date.

On *de novo* review, we hold the same: as of June 18, 1993, reasonable officials were on notice that deliberate indifference to Plaintiffs' excessive exposure to radon, then a known toxic environmental substance, violated their Eighth Amendment right.

Reasonable officials had such "fair notice"[81] as of that date because of *Helling*'s clear pronouncement: inmates exposed to toxic substances did not need to wait to get sick to file a lawsuit; they did

---

[79] *Id.* at 35.

[80] *Id.* at 33.

[81] *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

not need to wait, in other words, for "a tragic event" to occur.[82] Rather, they could bring a claim under the Eighth Amendment as soon as an "unreasonable risk of serious damage to . . . future health" existed.[83]

But in what context would a reasonable official know that right to be violated? This court has stated that "after *Helling* it was clearly established that prison officials could violate the Eighth Amendment through deliberate indifference to an inmate's exposure to levels of ETS that posed an unreasonable risk of future harm to the inmate's health."[84] Put another way, as of 1993, no reasonable prison official could be unaware that deliberate indifference to levels of ETS that posed an unreasonable risk of future harm to the inmate's health was a Constitutional violation.

But what about radon exposure? Were the "contours of the right" in *Helling* "sufficiently clear that a reasonable officer would understand" that deliberate indifference to radon exposure "violates that right" as well?[85]

The answer is "yes." As the District Court concluded: "[i]f anything, knowing or reckless exposure of prisoners to radon, given the facts alleged by Plaintiffs, is *more* obviously unconstitutional than

---

[82] *Helling*, 509 U.S. at 33.

[83] *Id.* at 35.

[84] *Warren v. Keane*, 196 F.3d 330, 333 (1999).

[85] *LaBounty*, 137 F.3d at 74 (quoting *Anderson*, 483 U.S. at 640).

exposure of prisoners to ETS was in 1993."[86] The District Court reached this conclusion because, while the dangers of ETS were still being debated in 1993, "radon in 1993 had already five years earlier been identified 'as a human carcinogen by the International Agency for Research on Cancer . . . and added by Congress that same year to the Toxic Substances Control Act."[87]

Given that we have found the contours of rights to be defined by similar sources—such as the right to be free from friable asbestos, which originated in decisional law but was given definition by, among other things, Clean Air Act regulations[88]—we agree with the District Court that the right at issue here was clearly established as of 1993. If a reasonable officer was aware of the future risk of ETS by that point, then surely a reasonable officer would have been aware of the future risk of a known carcinogen like radon.

This conclusion extends with even more force to the allegations of deliberate indifference after 2014, when Defendants implemented a partial radon mitigation system in the classroom area of Garner. Plaintiffs have alleged that the mitigation system installed in 2014 was

---

[86] *Vega v. Semple*, No. 3:17-cv-107 (JBA), 2018 WL 4656236, at *6 (D. Conn. Sept. 27, 2018); SA at 11–12.

[87] *Id.* (citing Am. Compl. ¶ 57).

[88] *LaBounty*, 137 F.3d at 74, n. 5; *see also Warren*, 196 F.3d at 333 (relying in part on prison's internal "Policy and Procedure," which expressly recognized harms of ETS exposure, in concluding ETS exposure violated clearly established law).

"only designed to test areas that revealed radon"—which excluded the cell block area of Garner where prisoners were housed—and "*intentionally* did not remedy any excessive indoor radon gas where inmates [are] housed."[89] Taking the allegations as true, we conclude that the mitigation effort implemented was not a reasonable measure taken to abate the risk of excessive radon exposure in the cell block; instead, the allegedly excessive radon in the cell block went unattended. A conscious decision not to address a known risk of excessive radon exposure, as described by Plaintiffs, would violate clearly established law for all the reasons we have expressed above.[90]

### E. Defendants' Arguments

Defendants raise three principal arguments challenging the conclusion that they violated clearly established law at any time. We address each in turn, and we reject all as without merit.

### i.

First, Defendants argue that they are entitled to qualified immunity on the basis that no binding decision discusses the constitutional implications of *radon* exposure to inmates. Essentially, they argue that qualified immunity must be granted absent binding precedent that addresses the *very same* carcinogen in this case. The

---

[89] Am. Compl. ¶ 46(A) (emphasis added).

[90] We do not consider, much less decide, how the implementation of the radon mitigation system in 2014 would affect the qualified immunity analysis if Plaintiffs' allegations in ¶ 46(A) of the complaint are inaccurate.

argument is not compelling. The Supreme Court has held that "officials can still be on notice that their conduct violates established law even in novel factual circumstances."[91] We have repeatedly rejected this type of argument,[92] and we do so once more today.

ii.

Defendants next argue that the District Court erred by relying on statutes, not case law, in partially denying qualified immunity. We disagree. While "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision,"[93] we have previously held that "we may examine statutory or administrative provisions in conjunction with prevailing circuit or Supreme Court law to

---

[91] *Hope*, 536 U.S. at 741.

[92] *Edrei*, 892 F.3d at 542 ("Defendants' first argument echoes a common refrain in qualified immunity cases—pointing to the absence of prior case law concerning the precise weapon, method, or technology employed by the police. But novel technology, without more, does not entitle an officer to qualified immunity." (citation and internal quotation marks omitted)); *Jones v. Parmley*, 465 F.3d 46, 57 (2d Cir. 2006) ("[Defendants] essentially argue that we should find qualified immunity unless a Supreme Court or Second Circuit case expressly denies it, but that standard was rejected by the Supreme Court in favor of one in which courts must examine whether in the light of pre-existing law the unlawfulness is apparent." (alterations and internal quotation marks omitted)).

[93] *Davis v. Scherer*, 468 U.S. 183, 194 (1984).

determine whether an individual had fair warning that his or her behavior would violate the victim's constitutional rights."[94]

The District Court did not rely exclusively on any alleged violation of statutes or regulations to determine that Defendants had violated clearly established rights. Rather, the District Court relied on the binding case law in *Helling* and this Circuit's decision in *LaBounty v. Coughlin*, recognizing a prisoner's right to be free from exposure to friable asbestos,[95] to establish the contours of the right. In conjunction with those cases, it referred to regulations and statutes provided in the complaint to bolster the conclusions that radon is a dangerous carcinogen; that society is unwilling to tolerate the risks accompanying certain levels of radon exposure; and that such risks are—and have been since 1988—well known. Both the Supreme Court and this Court have similarly considered statutes as part of the qualified immunity analysis.[96] Moreover, our decision also relies on our binding decisional

---

[94] *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433–34 (2d Cir. 2009).

[95] *See* 137 F.3d at 73–74.

[96] *Hope*, 536 U.S. at 741–45 (considering binding circuit precedent, applicable state regulations, and a Department of Justice report informing the state's Department of Correction of the "constitutional infirmity" of alleged practice, to conclude a clearly established right was violated); *see also Warren*, 196 F.3d at 333 (relying in part on prison's internal "Policy and Procedure", which expressly recognized harms of ETS exposure, in concluding ETS exposure violated clearly established law); *Labounty*, 137 F.3d at 74 n.5 (relying in part on Congressional recognition of asbestos toxicity and Clean Air Act regulations to decide that exposing prisoners to friable asbestos could violate clearly established law); *cf. Tooly v. Schwaller*, 919 F.3d 165, 173 (2d Cir. 2019) (rejecting district court analysis

law in *Warren v. Keane*, which held that, after *Helling*, it was "clearly established" that defendants could violate the inmates' Eighth Amendment rights by exposing them to unreasonable levels of ETS with deliberate indifference.[97]

iii.

Third, Defendants argue that the denial of their qualified immunity motion is inconsistent with the Supreme Court's decision in *Taylor v. Barkes*.[98] We think that *Taylor* is distinguishable and does not preclude our ruling on qualified immunity.

In *Taylor*, the plaintiffs, including the widow of a deceased prisoner named Christopher Barkes, alleged that the defendants-officials failed to properly supervise medical contractors in the prison they oversaw, and thus failed to ensure that those contractors undertook necessary suicide screenings of incoming prisoners like Barkes, who ultimately took his own life. This failure, plaintiffs alleged, amounted to an Eighth Amendment violation.

The Third Circuit agreed, defining the specific right at issue as the "right to the proper implementation of adequate suicide

---

that relied "almost exclusively" on state statutes and "did not assess" whether the conduct alleged violated constitutional rights "as laid out" in case law).

[97] *Warren*, 196 F.3d at 333.

[98] 575 U.S. 822 (2015).

35

prevention protocols."[99] That court determined that the right was clearly established by the time of Barkes' intake and affirmed the denial of the defendants-officials' summary judgment motion for qualified immunity.

But the Supreme Court reversed, concluding that no decision of the Supreme Court, nor the weight of circuit precedent, nor Third Circuit precedent, clearly established "a right to the *proper* implementation of adequate suicide prevention protocols."[100]

A brief recitation of the facts in that case helps clarify how it is distinct from the allegations in this appeal. The prison in *Taylor* contracted with a private vendor to provide suicide prevention screening during inmate intake in accordance with standards published by the National Commission on Correctional Health Care ("NCCHC") in 1997 and revised in 2003.[101] Barkes alleged that the vendor failed to properly implement those standards and failed to implement NCCHC's 2003 revisions. However, NCCHC accredited the prison approximately one year before Barkes's suicide.[102] Indeed, Barkes was screened at intake in 2004 for suicide risk by a licensed

---

[99] *Id.* at 822 (quoting *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 327 (3d Cir. 2014)).

[100] *Id.* (emphasis added).

[101] *Barkes*, 766 F.3d at 312–13 (3d Cir. 2014), *cert. granted, judgment rev'd sub nom. Taylor v. Barkes*, 575 U.S. 822 (2015).

[102] *Id.* at 313.

nurse practitioner, who employed a screening form based on NCCHC's 1997 standards. The form included seventeen questions designed to assess suicide risk. Barkes was not entirely candid in responding to these questions and was subsequently not labeled a suicide risk.[103] Among the constitutional deficiencies alleged by Barkes's widow was that a physician, not a nurse, should have administered the screening.

In reversing the Third Circuit's denial of qualified immunity, the Supreme Court first emphasized that Third Circuit precedent had not "identif[ed] any minimum screening procedures or prevention protocols that facilities must use."[104] To highlight that point, the Supreme Court noted that in the case on which the Third Circuit relied in denying qualified immunity, the court ruled for defendants on all claims, despite the fact that the "booking process of the jail at issue included no formal physical or mental health screening."[105] Accordingly, the Supreme Court concluded that no case gave fair warning to officials that their existing risk mitigation regime, even with its alleged deficiencies, was *constitutionally* deficient.

---

[103] *Taylor,* 575 U.S. at 822.

[104] *Id.* By contrast, our opinion is based on a failure to take steps to mitigate a known risk. We do not hold that Defendants should have taken affirmative steps to discover a risk of which they had no knowledge, nor could we under the Eighth Amendment standard.

[105] *Id.* (alterations and internal quotation marks omitted).

But just as important as what the Supreme Court *did* conclude in *Taylor* is what it *did not* conclude. It did not conclude that it would have been reasonable for the prison guards to completely forego suicide-prevention screening—to simply not act at all. Nor did it conclude that it would have been consistent with clearly established law for the prison guards to forego preventive measures if they were aware that an inmate posed a suicide risk—to operate in a state of knowing indifference.

And so, the Supreme Court did not address the distinct possibility that complete inaction in the face of a risk to a prisoner's health—or complete indifference to that risk once it was known—could be unreasonable, in violation of a prisoner's clearly established constitutional rights.

With that in mind, we see no difficulty in appreciating the difference between the present appeal and *Taylor*. In this case, Plaintiffs have alleged that prior to 2014, Defendants failed to take *any* steps to mitigate the substantial risk of excessive radon exposure.[106] Unlike *Taylor*, where there was a risk-mitigation system in place that allegedly should have been *better*, the Plaintiffs here complain that Defendants took no action whatsoever. Worse still, Plaintiffs here plausibly allege that Defendants had knowledge of the radon exposure risk and still failed to act. *Taylor* granted immunity to prison guards who took *some* effort to remediate the health risks of the prisoners they

---

[106] *See also* Part II.D, *ante*, discussing allegations of deliberate indifference occurring after the installation of a partial mitigation system in 2014.

oversaw; but it hardly stands for the principle that prison guards are immune even where *no* action is taken, especially when a health risk is known.[107]

*       *       *

In sum: Plaintiffs have alleged that from Garner's inception, Defendants had knowledge of an unreasonable risk of serious harm to the inmates' health, namely excessive radon exposure, and that Defendants were deliberately indifferent in failing to take any

---

[107] Our recent decision in *McCray v. Lee*, 2020 WL 3273346 (2d Cir. June 18, 2020), is also instructive on this point. Plaintiff there brought a damages claim under the Eighth Amendment, alleging that the defendant prison officials' policy of allowing naturally occurring snow and ice to remain uncleared in the prison's recreational yard for the entire winter constituted a violation of his right to some meaningful opportunity for exercise. *Id*. at *5. In denying defendants qualified immunity on this claim, we first noted that a prisoner's right to a meaningful opportunity for physical exercise had been clearly established since 1985. *Id*. at *6 (citing *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985)). Defendants argued that, notwithstanding that proposition, they were entitled to qualified immunity because—as the District Court concluded—"there is no clearly established constitutional right to a prison yard without naturally accumulating ice or snow during winter months." *Id*. (internal quotation marks omitted). We  rejected that argument because "[t]he right need not be described with specific references to the weather or characteristics of the seasons of the year in order for a reasonable prison official to understand that climatic features may necessitate responsive measures to ensure that the right to a meaningful opportunity for physical exercise not be denied." *Id*. In other words—the prison officials were on notice that they needed to take some action in the case that the prison yard was inaccessible, even if the Court refrained from saying what the proper action was. At the very least, they could not get away with not acting.

39

reasonable steps (including testing and mitigation) to abate this risk.[108] On the basis of these allegations, accepted as true, we conclude that a failure to take any steps to abate the risk of excessive radon exposure violated Plaintiffs' clearly established right to be free from deliberate indifference to exposure to excessive radon gas, a toxic substance that poses a serious health risk—a right clearly established in *Helling*.[109]

---

[108] We emphasize that Plaintiffs seeking to recover against any individual defendant under the Eighth Amendment must ultimately prove that the individual defendant had subjective knowledge of the objectively serious risk alleged. We express no view about whether they can do so. At this juncture, Plaintiffs have plausibly alleged subjective knowledge and deliberate intent by pleading, *inter alia*, that Defendants took *no action* in response to various triggering events, such as the discovery of unsafe uranium levels in a school that shared Garner's water supply and, most significantly, the discovery of unsafe radon levels in Garner's classroom areas. Am. Compl. ¶¶ 112–16, 120–21. Taken as true, these allegations easily admit an inference that Defendants were deliberately indifferent to a serious health risk to prisoners from radon exposure. Indeed, the pleadings admit no obvious alternative explanation. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (holding allegations of discriminatory purpose implausible where the facts alleged admitted "obvious alternative explanation").

[109] It is worth noting that we are not the only Circuit to have relied on the *Helling* line of cases to reject qualified immunity in similar circumstances. In *Board v. Farnham*, 394 F.3d 469, 485 (7th Cir. 2005), the Seventh Circuit affirmed the denial of qualified immunity where plaintiffs alleged deliberate indifference to a deficient ventilation system, which caused a "flow of black fiberglass dust into cells [and] numerous nosebleeds and respiratory problems" for the inmates. *Id.* at 486. The Seventh Circuit held that such conduct violated the clearly established "right to adequate and healthy ventilation." *Id.* at 487. In making that determination, the Court relied on both *Helling* and its own precedent discussing the constitutionality of a ventilation system that allegedly exposed inmates to unconstitutional temperatures. *Id.*

### III.  Prospective Relief

Defendants also appeal the denial of their motion to dismiss Plaintiffs' claims for injunctive and declaratory relief. They argue that these claims are barred by state sovereign immunity under the Eleventh Amendment. Defendants also argue that Plaintiffs' claims for injunctive relief under state law are barred by *Pennhurst State School & Hospital v. Halderman*.[110]

Our review of a district court's denial of a motion to dismiss based on a claim of Eleventh Amendment immunity is *de novo*.[111]

### A.  Sovereign Immunity

Absent proper Congressional abrogation or State waiver, the Eleventh Amendment bars a federal court from hearing suits at law or in equity against a State brought by citizens of that State or another.[112] There is a well-known exception to this rule—established by the Supreme Court in *Ex parte Young*[113] and its progeny—by which suits for prospective relief against an individual acting in his official capacity may be brought to end an ongoing violation of a federal law.

---

[110] 465 U.S. 89 (1984).

[111] *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007).

[112] *Papasan v. Allain*, 478 U.S. 265, 276 (1986).

[113] 209 U.S. 123 (1908). *See generally* 13 Charles Alan Wright *et al.*, Federal Practice & Procedure § 3524.3 (3d ed. 2008).

In determining whether a litigant's claim falls under the *Ex parte Young* exception, we ask two questions: whether the complaint (1) alleges an ongoing violation of federal law; and (2) seeks relief properly characterized as prospective.[114]

Plaintiffs seek two forms of injunctive relief: (1) individual medical screening, monitoring, and treatment; and (2) facility radon testing and mitigation.[115] Defendants contend that the first category of

---

[114] *In re Dairy Mart Convenience Stores, Inc.,* 411 F.3d 367, 372 (2d Cir. 2005).

[115] Plaintiffs seek injunctive relief compelling widespread medical care for an injunctive class allegedly "number[ing] in the thousands." Am. Compl. ¶¶ 1–2, 46(A), 50, p. 42 ¶¶ 4–6. This includes:

(1) "comprehensive baseline medical examination of all class members – including either a chest X-ray or pulmonary CAT Scan, the determination of which shall be made by a medical provider knowledgeable about radon toxicity and based on that class member's individual health history;"

(2) "medical monitoring, including but not limited to periodic comprehensive physical examinations, and updated chest X-rays and/or a pulmonary CAT Scan, the determination of which shall be made by a medical provider knowledgeable about radon toxicity and based on that class member's individual health history;" and

(3) "follow-up health care treatment for all diagnosed medical conditions as have been previously identified, or may in the future be identified, with exposure to radon by one or more of these entities: the federal Environmental Protection Agency; the National Research Council of the National Academy of Sciences; the National Cancer Institute; the American Medical Association; and the World Health Organization. At this time, those medical conditions include lung cancer and chronic, nonmalignant lung diseases such as chronic obstructive pulmonary disease (COPD), emphysema, chronic interstitial pneumonia and pulmonary fibrosis."

these claims is, in substance, a claim for retrospective damages poorly disguised as prospective relief, and is therefore barred. They also contend that the second category of claims is barred because the current DOC radon testing policy provides even greater relief than Plaintiffs seek, which demonstrates that Plaintiffs have failed to allege an ongoing violation of federal law.

B.     <u>Retrospective *versus* Prospective Relief</u>

i.

We turn first to Defendants' argument that Plaintiffs' claims for medical screening, monitoring, and treatment seek impermissible retrospective relief. In doing so, we look to the substance rather than to the form of the relief sought.[116] As a result, relief that is "tantamount to an award of damages for a past violation of federal law, even though styled as something else," is barred.[117] Importantly, however, "relief that serves directly to bring an end to a present violation of federal law

---

*Id.* at 42, ¶¶ 4–6. Plaintiffs also seek widespread testing for radon throughout the Garner facility and possible expenditure of state funds for mitigation or remediation systems in addition to those already conducted and installed in 2013 and 2014. *Id.* ¶ 3.

[116] *Edelman v. Jordan*, 415 U.S. 651, 668 (1974).

[117] *Papasan*, 478 U.S. at 278.

43

is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury."[118]

Plaintiffs have alleged that they are entitled to baseline x-rays and prospective medical monitoring and treatment as a function of their Eighth and Fourteenth Amendment rights to be free from deliberate indifference to serious medical needs.[119] This alleged ongoing constitutional violation—deliberate indifference to serious medical needs of incarcerated persons—is the type of continuing violation for which a remedy may permissibly be fashioned under *Ex parte Young.*[120]

Defendants are correct, however, in arguing that this prospective relief cannot be granted to those putative class members who are not currently incarcerated, as there is no ongoing violation of

---

[118] *Id.*

[119] *Estelle*, 429 U.S. at 104; A. at 10–11; 14–15; 39–40.

[120] We do not express a view on the merits of whether Plaintiffs can ultimately obtain the relief sought. *See In re Deposit Ins. Agency*, 482 F.3d 612, 621 (2d Cir. 2007) ("[T]he Supreme Court explained that 'the inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim.'" (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 153 U.S. 635, 646 (2002))). Rather, we note only that an ongoing violation of federal law has been alleged. *See id.* at 623 ("When a court reviews the legal merits of a claim for purposes of *Ex parte Young,* it reviews only whether a violation of federal law is *alleged*; appellate review of allegations is necessarily deferential, and only frivolous and insubstantial claims will not survive its scrutiny.").

federal law with regard to class members who are not in custody. Accordingly, we agree with the District Court that Defendants will be entitled at the class certification stage to raise their objection to the fact that most of the putative class is not presently incarcerated.

ii.

We next address Defendants' argument that Plaintiffs' request for facility testing and mitigation fail as a function of their failure to allege a continuing violation of federal law. During the pendency of their motion to dismiss, Defendants filed a notice of supplemental authority with the District Court that reflected a new DOC administrative directive, which requires radon testing and mitigation in corrections facilities throughout Connecticut.[121] Defendants contend these new policies remedy any alleged ongoing violation of federal law stated in the complaint. The District Court rejected that argument and so do we.

We agree with the District Court that given "the long history of alleged cover-up and failure to remediate radon," Plaintiffs' allegations of an ongoing violation of federal law were not speculative.[122] Even if we were to take "judicial notice of the newly-announced DOC directive on radon testing, the result or impact of this directive remains for discovery, and, on a fully developed record, a

---

[121] *See* Part I.D, *ante*.

[122] SA at 23; *see also* Part I, *ante* (discussing allegations of Defendants' alleged propensity to cover up unsafe conditions at Garner).

45

determination of the scope of injunctive relief, if and when the [District] Court determines that Plaintiffs have established their entitlement to such relief."[123]

## C.     The *Pennhurst* Doctrine

Finally, Defendants contend that the injunctive relief sought in the complaint is barred by *Pennhurst State School & Hospital v. Halderman*.[124] In *Pennhurst*, the Supreme Court held that sovereign immunity prohibits federal courts from entering injunctions against state officials on the basis of *state* law, notwithstanding the *Ex parte Young* exception to sovereign immunity with respect to violations of *federal* law.[125]

Plaintiffs seek prospective relief—in the form of medical screening, monitoring, and treatment, and radon testing and mitigation—to remedy alleged violations of *both* federal and state law.[126] In response, Defendants press two arguments. First, they argue that the *Pennhurst* doctrine prohibits Plaintiffs' prayer for prospective relief for violations of federal law because Plaintiffs point to Connecticut law in discussing the federal constitutional standard allegedly violated. Second, Defendants argue that the *Pennhurst* doctrine requires dismissal at least of those claims for injunctive relief

---

[123] SA at 24.

[124] 465 U.S. 89.

[125] *Id.* at 106.

[126] Am. Compl. ¶ 46(A); A. at 38–44.

that are expressly based on violations of state law. We find only the latter argument compelling.

Defendants' first point is unavailing. Plaintiffs allege deliberate indifference to their serious medical needs in violation of federal law. As the District Court correctly observed, Plaintiffs "cite state standards merely as evidence that helps inform the Eighth Amendment analysis, and not as a mandate that they seek to enforce via injunctive relief."[127] While any relief ultimately granted must serve to remedy a violation of federal law, the *Pennhurst* doctrine does not compel dismissal of claims for prospective relief against state officers in their official capacities for alleged violations of federal law simply because the party seeking such relief refers to state law in order to bolster their federal claim.

Defendants' second point, however, has merit. The Eleventh Amendment presents a jurisdictional bar that deprives federal courts of the power to hear certain claims. "A federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment."[128] The *Pennhurst* Court concluded "that a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment," and the Court

---

[127] SA at 24–25.

[128] *Pennhurst*, 465 U.S. at 121.

extended the principle to apply equally to "state-law claims brought into federal court under pendent jurisdiction." [129]

To the extent Plaintiffs seek prospective relief against Defendants in their official capacity for violations of the "Connecticut Constitution" and "state law," [130] those claims are indeed barred by the Eleventh Amendment under the *Pennhurst* doctrine.

### III. CONCLUSION

To summarize, we hold as follows:

(1) As of the date of the Supreme Court's decision in *Helling* (June 18, 1993), reasonable officials would recognize that a failure to take any reasonable steps to abate the risk of excessive radon exposure, of which risk they were actually aware, would constitute deliberate indifference to a serious medical need that violated inmates' clearly established Eighth Amendment rights;

(2) Installing a radon mitigation system that was intentionally designed or installed in a manner that caused it to not address the risk of excessive radon exposure in the area where inmates are housed does not constitute a reasonable measure to abate that allegedly known risk;

---

[129] *Id.*

[130] Am. Compl. ¶¶ 171–76.

(3) In light of the *Pennhurst* doctrine, the District Court erred in failing to dismiss Plaintiffs' claims for prospective relief for violations of state law; and

(4) The District Court did not err in denying Defendants' motion to dismiss on grounds of sovereign immunity Plaintiffs' claims for prospective relief for violations of federal law.

Accordingly, we **AFFIRM** the District Court's judgment insofar as it determined that Defendants violated clearly established law as of the date of the Supreme Court's decision in *Helling v. McKinney*, 509 U.S. 25, 29 (1993); **AFFIRM** in part the District Court's judgment insofar as it denied Defendants' motion to dismiss Plaintiffs' federal claims for injunctive and declaratory relief; **REVERSE** in part the District Court's judgment insofar as it denied Defendants' motion to dismiss Plaintiffs' state-law claims for prospective relief against official-capacity defendants; and **REMAND** the cause to the District Court for further proceedings consistent with this opinion, including supervised discovery as to the DOC's recent radon-mitigation directive and the Defendants' knowledge of the radon risk alleged— *see e.g.*, notes 63, 67, 90, 108, and 122—and, thereafter, such summary judgment motions as may be appropriate under the circumstances.