UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Harry Vega, Michael Cruz, Jeffrey Perry, Lee Grenier, Tavorus Fluker, Anthony Rogers, Thomas Marra, Lawrence Townsend, Terrence Easton, Lamont Samuel, John Bosse, J. Michael Farren, Brett Fennessy and Emisael Tirado, | Civil No. 3:17-cv-00107 (MEG) |
| Plaintiffs, | June 11, 2024 |
| v. | |
| Scott Semple[1], James Dzurenda, Lee Arnone, Theresa Lantz, James Armstrong, Lawrence Meachum, Henry Falcone, Steven Link, David Batten, Angel Quiros, Rollin Cook, Denise Dilworth, Anthony Corcella, Craig Washington, Richard Pease, | |
| Defendants. | |

## RULING ON PLAINTIFFS' SECOND MOTION FOR CLASS CERTIFICATION

Plaintiffs Harry Vega, and other named individuals Michael Cruz, Jeffrey Perry, Lee Grenier, Tavorus Fluker, Anthony Rogers, Thomas Marra, Lawrence Townsend, Terrence Easton, Lamont Samuel, John Bosse, J. Michael Farren, Brett Fennessy, and Emisael Tirado (collectively, "Plaintiffs" or "Named Plaintiffs"), bring this action on behalf of a putative class of all current and former pre-trial detainees and post-conviction prisoners of the Connecticut Department of Corrections ("DOC") who allege exposure to indoor radon gas while housed at Garner

---

[1] Scott Semple is no longer the Commissioner of Correction. Angel Quiros is the current Commissioner, who is automatically substituted as the official-capacity party. *See* Fed. R. Civ. P. 25(d).

1

Correctional Institution ("Garner") from June 18, 1993 to the present.[2]  Third Am. Compl. (ECF No. 156) ¶¶ 1, 8.  Defendants are current and former DOC officials who had or have supervisory responsibility for the operations of all DOC facilities, including Garner.  *Id.* ¶¶ 23–42.  Plaintiffs allege violations of the Eighth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983.  *Id.* ¶¶ 124–147.  They seek compensatory damages and prospective relief in the form of an injunction compelling radon testing throughout Garner, installation of a radon mitigation system, medical monitoring of current and former inmates' health for medical issues caused by radon exposure, and medical treatment of any such illnesses.  *Id.* at 25–26 (Claims for Relief ¶¶ 1–9).

Plaintiffs move for class certification.  They contend this action is an appropriate case to be brought and litigated as a class action pursuant to Federal Rule of Civil Procedure 23.  *See* ECF No. 192 at 23.  Defendants oppose the motion and argue that Plaintiffs fail to satisfy their burden to certify a class under Rule 23.  *See* Opp'n (ECF No. 199).  For the reasons that follow, Plaintiffs' Renewed Motion for Class Certification is granted, with a modification to the class definition as discussed below.

---

[2]  On June 18, 1993, the Supreme Court in *Helling v. McKinney,* 509 U.S. 25*,* 35 (1993) held that a petitioner properly alleged prison officials acted with deliberate indifference for exposing him to unreasonable levels of environmental tobacco smoke.  In 2020, the Second Circuit had the occasion to assess *Helling* in the context of this radon case and found that, since the *Helling* decision, "reasonable officials would recognize that a failure to take any reasonable steps to abate the risk of excessive radon exposure, of which risk they were actually aware, would constitute deliberate indifference to a serious medical need that violated inmates' clearly established Eighth Amendment rights."  *Vega v. Semple,* 963 F.3d 259, 276 (2020) ("*Vega I*").  Plaintiffs renewed their motion for class certification on October 20, 2023.  *See* Pls.' Mot. Class Cert. (ECF No. 192).

## I.  BACKGROUND[3]

In light of the lengthy history of this case, the Court assumes the parties' familiarity with the factual and procedural background. *Gannett Media Corp. v. United States*, No. 22-2160, 2022 WL 17818626, at *1 (2d Cir. Dec. 20, 2022) (assuming "familiarity with the underlying facts, the procedural history of the case, and the issues on appeal, to which we refer only as necessary to explain our decision."); *see Vega v. Semple,* No. 3:17-cv-00107-JBA, 2018 WL 4656236 (D. Conn. Sept. 27, 2018) ("*Vega II*") (denying Eighth Amendment claims arising after June 18, 1993 and claims for injunctive and declaratory relief, but granting Defendants' Motion to Dismiss the Amended Complaint on other grounds); *Vega I,* 963 F. 3d 259 (affirming district court on all grounds except the denial of state claims for prospective relief); *Vega v. Semple,* No. 3:17-cv-00107-JBA, ECF No. 179 (D. Conn. July 19, 2023) ("*Vega III*") (granting in part and denying in part Defendants' Motion to Dismiss the Third Amended Complaint); *Vega v. Semple,* No. 3:17-cv-00107-JBA, 2023 WL 5395479 (D. Conn. Aug. 22, 2023) (denying without prejudice Motion for Certification of Class) ("*Vega IV*").[4]  The Court will focus on the facts relevant to the renewed motion for class certification.

---

[3]     In this decision, the Court will evaluate the facts relevant to the motion at issue.  The following facts are drawn from Plaintiffs' Third Amended Complaint. *Johnson v. New York State Dep't of Corr. & Cmty. Supervision,* No. 18-CV-6568-CCR, 2020 WL 2558160, at *1 (W.D.N.Y. May 19, 2020) ("It is proper for a district court to accept the complaint allegations as true in a class certification motion, and it may also consider material outside the pleadings in determining whether to certify the proposed class, including affidavits.") (citations and brackets omitted)

[4]     On August 22, 2023, Judge Arterton denied the first Motion for Class Certification finding that Plaintiffs' failure to submit affidavits, exhibits, records, reports, supporting documents, or evidence was an insufficient record on which to determine if Plaintiffs satisfied the requirements of Rule 23. *See Vega IV,* 2023 WL 5395479, *2–*3.  The motion was denied without prejudice to refiling a renewed motion for class certification accompanied by appropriate documentation. *See id.* at *3.

Plaintiffs bring this putative class action against current and former DOC Commissioners, current and former Wardens at Garner, and current and former Directors of the DOC Engineering and Facilities Management.[5]   ECF No. 156 ¶¶ 23–42.   The putative class includes both post-conviction prisoners bringing suit under the Eighth Amendment and pre-trial detainees bringing suit under the Due Process Clause of the Fourteenth Amendment.   Plaintiffs allege deliberate indifference to unlawful conditions of confinement that pose a serious risk of harm to their health. Plaintiffs also allege a violation of the Equal Protection clause of the Fourteenth Amendment to the United States Constitution, claiming that Defendants "knew of the excessive radon levels throughout the facility but made the intentional choice not to inform the Plaintiffs, not to test the inmate cell block for several years after initial testing of Garner, and not to provide medical screening and management to Plaintiffs."  *Id.* ¶ 140; ¶¶ 138–147.   As a result, they were exposed to excessive levels of radon, posing a health risk.  *Id.* ¶ 142.   They allege, among other things, that Defendants "intentionally discriminated against Plaintiffs based on non-penological reasons" that are not "rationally related to a legitimate government purpose."  *Id.* ¶¶ 145–146.

### A.     Radon Gas

Radon is a radioactive gas that results from the natural decay of uranium found in most soil and many varieties of rock.  *Id.* ¶ 45.   It is odorless, colorless, imperceptible to the senses, and dangerous to humans.  *Id.*   It is a known carcinogen and alleged to be the "leading cause of cancer mortality in the United States" and the "leading cause of lung cancer among persons who have never smoked."  *Id.* ¶ 46.

---

[5]     Two former DOC employees were initially named Defendants but are no longer parties in this action.   On March 3, 2023, Defendant Amonda Hannah, former Warden at Garner, was voluntarily dismissed from this action.   Notice of Voluntary Dismissal & Order (ECF Nos. 176, 177).   Thereafter in *Vega III*, all claims against Defendant Lawrence Meachum, former Commissioner of Correction, were dismissed.   Order on Mot. Dismiss (ECF No. 179) at 4.

The risks of radon exposure have been known for some time.  "Congress listed radon as a toxic substance in 1988, and the World Health Organization ('WHO') and the U.S. Environmental Protection Agency ('EPA') recommend that homes be tested for the presence of radon gas." *Id.* ¶ 47.  Although radon may be dangerous to humans in any quantity, the EPA sets its "action level" for indoor radon exposure at 4.0 pCi/L (the measurement of radon concentration in the air).  *Id.* ¶ 48.  The EPA recommends that home dwellers take steps to mitigate radon levels until tests read below the "action level" measurement.  *Id.* ¶ 49.  The WHO recommends a lesser action level of 2.7 pCi/L, in part because indoor exposure to radon at 4.0 pCi/L is equivalent to smoking eight cigarettes per day.  *Id.* ¶ 50.  The risk of lung cancer rises sixteen percent with every 2.7 pCi/L-increase in radon exposure.  *Id.* ¶ 51.

### B.    Garner Correctional Institution

In 1988, the DOC announced plans to construct a prison facility in Newtown, Connecticut—four years later, Garner opened.  *Id.* ¶¶ 2, 59.  According to the EPA and U.S. Geological Survey, "which evaluated the radon potential in the United States and developed a Map of Radon Zones to assist national, state and local organizations and building code officials in deciding whether radon-resistant features should be applicable to new construction[,]" Newtown is located in "Zone 1-Highest Potential (greater than 4.0 pCi/L), which refers to the average short-term radon measurement in a building without radon mitigation systems."  *Id.* ¶¶ 57, 58.

Plaintiffs allege that Defendant Batten—then-Director of the DOC Engineering and Facilities Management who advised former Commissioner Meachum about the site—knowingly decided to build Garner in an area where the radon levels would likely exceed the EPA action level if no radon mitigation system was installed.  *Id.* ¶¶ 60–62, 64.  In addition, Garner was constructed on land that was formerly a waste site for a state mental health facility.  *Id.* ¶ 62.  "Because radon

in the ground can enter a building through small cracks in the foundation, and because the former waste site rendered Garner's foundation vulnerable to cracking, the prison site was especially prone to radon gas seepage." *Id.* ¶ 63.

According to Plaintiffs, Defendants "knew of the existence of several factors that warranted testing the radon levels and/or installing a radon mitigation system at Garner, but ignored those factors for decades." Pls.' Mot. Certify Class Mem. at 2 (ECF No. 193); ECF No. 156 ¶¶ 57–100. They further allege that once they knew of the excessive radon levels throughout the facility they failed to inform Plaintiffs, did not test the inmate cell blocks for several years after initially testing Garner, and did not provide medical screening and management to Plaintiffs. *Id.* ¶¶ 126, 133. They contend that for post-conviction inmates, Defendants' conduct constitutes cruel and unusual punishment by acting with deliberate indifference to the serious harm of exposure to excessive levels of indoor radon gas in violation of the Eighth Amendment. *Id.* ¶¶ 124–136 (Count One). For pre-trial detainees, they allege Defendants' conduct constitutes deprivation of liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution. *Id.* ¶¶ 131–137 (Count Two). They contend violations will continue under the Eighth and Fourteenth Amendments "until such time as the DOC (1) completes testing of the entire Garner facility and installation of a proper, effective, and fully functioning radon mitigation system throughout the entire Garner facility, and (2) provides medical monitoring and management." *Id.* ¶¶ 128, 135.

Plaintiffs list a number of incidents throughout Garner's history that, in their view, are probative of the issue of whether Defendants were aware of a substantial risk of serious harm from radon exposure. They allege that Garner's heating, ventilation, and air conditioning system ("HVAC") originally installed to circulate fresh air throughout the facility was inadequate from

the start.  *Id.*  ¶ 68.  The original HVAC system was replaced with a system that did not circulate

fresh air, resulting in a higher risk of radon exposure at Garner.  *Id.* ¶ 69.  Plaintiffs also allege

that, in the fall of 1996, a Connecticut Department of Public Health ("DPH") survey that tested

well water in Newtown revealed high levels of radon in the water.  *Id.* ¶ 71.  They contend that

"[t]he results of the DPH survey, including high radon levels and associated risks, were highly

publicized throughout Connecticut[.]"  *Id.* ¶ 72.  Survey results publicly released in 2001 revealed

that a Newtown school that "shared a water well with Garner had uranium levels in the drinking

water that were approximately eight (8) times greater than the EPA guideline for uranium in

drinking water."  *Id.* ¶ 73.  They allege that Defendants knew of the high uranium levels in the

well water as demonstrated by Defendant Semple's statement to Garner staff "that he never drank

water from Garner's well" and the fact "Defendants closed Garner's water supply on false

pretenses, banned showers, and provided the inmates with bottled water."  *Id.* ¶¶ 74–76.

### C.      Radon Testing at Garner

In February and March of 2013, Garner's facility's classroom area was first tested.[6]  *Id.* ¶

87; Defs.' Ex. 5, Radon Testing Docs. Bates 100–225 (ECF No. 204) at 3.  "[F]urther testing of

the remainder of the facility" was conducted in December 2013 and January 2014.  *Id.*  "Radon

concentrations at and above 4.0 pCi/L were found in some of the school rooms at Garner on the

test dates March 11 through 14, 2013."  Defs.' Ex. 3, Radon Testing Docs Bates 1–74 (ECF No.

202) at 2–3 (Apr. 29, 2013 Ltr. from Allison Perry Sullivan, Environmental Analyst 3 to Richard

Pease, DOC); ECF No. 204 at 10–13.  From March 25 through 28, 2013, follow-up testing was

---

[6]      "Pursuant to Connecticut General Statute § 10-220(d)(2), public schools in the state must be specifically tested for radon."  *Id.* ¶ 82.  Plaintiffs allege that Garner's classroom was tested in response to a demand from a non-inmate teacher to test the classroom area for radon pursuant to the statute.  *Id.* ¶ 88.

conducted, "in sections of the facility which qualify under Connecticut Statutes as a 'school'" to confirm the elevated radon levels.  ECF No. 202 at 3; ECF No. 204 at 10–11.  Ten of the thirteen tested school rooms had radon levels at or above the EPA Action Level of 4.0 pCi/L, at which point further testing/mitigation was recommended.[7]  ECF No. 202 at 3; Defs.' Ex. 4, Radon Testing Docs. Bates 75–99 (ECF No. 203) at 3; ECF No. 204 at 11.

Further initial testing of the facility was conducted December 11 through 17, 2013 and follow-up/confirmatory testing was conducted January 13 through 16, 2014.  ECF No. 203 at 1 (Jan. 27, 2014 Ltr. from Allison Perry Sullivan, Environmental Analyst 3 to Richard Pease, DOC); ECF No. 204 at 3 (Sept. 2015 TRC Compliance Report Radon Mitigation at Garner).  "The data revealed that out of one hundred thirty (130) test locations, sixty-eight (68) locations had radon at levels above the EPA Action Level of 4.0 pCi/L, at which mitigation was recommended by the EPA and the DPH.[8]  *See id.* at 2–3 (listing 59 locations, not including the 10 school rooms that were previously identified as having radon levels at or above 4.0 pCi/L); ECF No. 204 at 16–17.

Radon Mitigation Systems were installed from September 8 through October 3, 2014, as a result of radon penetration in the following six areas:

- System 1-Floor penetration located in Clerical Office 831; covering the upper level areas between the Central and Main North Corridors and the Chapel areas.
- System 2-Floor penetration located in Classroom 807; covering the upper level North Classrooms adjacent to the Central North Corridor.
- System 3-Floor penetration located in Mechanical Equipment Room 305; covering lower level Medical Areas and associated offices.

---

[7]     The ten rooms were: Classroom 1 808, Classroom 4 865, Classroom 5 864, Classroom 6 863, Librarian Office 818, Library 826, Office 825, Principal's Office 856, Room 817 Library, and Teacher's Workshop 855.  ECF No. 202 at 3; ECF No. 204 at 11.

[8]     "These locations were found within three (3) general areas, which included: the lower level medical and administration areas, the upper level Gymnasium and mechanical room sunken-slab areas, and the upper level Chapel/classroom/office areas."  ECF No. 204 at 3.

- System 4-Floor penetration located in Psychologist Room 333; covering the lower level Medical Areas and associated offices.
- System 5-Floor penetration located in Staff Lounge Room 120; covering the lower level Lobby, Main Control and adjacent offices by the South Entrance.
- System 6-Floor penetration located in Recreational Office 860; covering the lower level Gym area and surrounding offices.

ECF No. 204 at 4.  In October 2014, post-mitigation air testing was performed in "representative locations found within each of the six areas" and all were found to contain radon at levels at or below 2.1 pCi/L.  *Id.* at 5–6.

In February 2015, full scale post-mitigation testing was conducted.  *See id.* at 6.  Several of the areas in the upper Chapel/Office/Gym area were found to have radon levels which remained greater than 4.0 pCi/L, and corrective measures were taken.  *Id.*  Follow-up testing, conducted on March 18 through 20, 2015, found radon at levels below 4.0 pCi/L.  *Id.*  It was recommended that those school areas previously above 4.0 requiring mitigation would need ongoing testing every 2.5 years.  The remainder of the school areas would need ongoing testing every five years.  *Id.* at 7.

The parties do not dispute that radon testing began at Garner in 2013.  Defendants contend that the "inmate housing units" were all tested beginning in 2013.  Notably, Plaintiffs contend that Defendants' testing documentation does not show that individual inmate cells were tested.

There is insufficient evidence of record to confirm Defendants' assertion that the entire facility including *all* individual inmate cells were tested for radon.  Rather, Defendants show that Housing Blocks A through H "Center S" and "Officer Stations" were tested in December 2013, including some rooms within these housing units.[9]  ECF No. 199 at 12–13 (citing ECF No. 203 at 11 (Bates No. 000085) (showing Housing Blocks A through H "Center S" were tested in December

---

[9]     The rooms tested in Housing Blocks A through H in February 2023 are: A134, A136, B134, B136, C121, C134, C136, C150, D120, D121, D134, D136, E101, E121, E134, E136, F120, F134, F136, G120, G136, H134, and H136.  *See* Defs.' Ex. 10, Radon Testing Docs. (ECF No. 209) at 3 (Bates No. 000303).

2013)); *id.* at n.4 (Bates Nos. 000303–000304) (citing testing documents showing "Officer Stations" in Housing Blocks A through H and certain rooms within these housing units were tested in February 2023).

Whether or not Defendants failed to test individual inmate cells in *all* Housing Block and/or the entirety of the Facility is a disputed issue of fact and goes to a time limitation on the scope of the class and/or damages—a determination that is not necessary to assessing whether the Rule 23 requirements are met.[10] *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."). Defendants may raise this issue at a later time in this case.

## D.   <u>Notice to DOC Employees and Inmates</u>

On December 3, 2013, the DOC distributed a letter to all Garner staff, notifying them about the completed radon testing. ECF No. 203 at 1 ("Air testing was conducted in all frequently occupied school rooms[.]"); ECF No. 204 at 15, Attach. A (Dec. 3, 2013 Memo to all Garner Staff from Warden Henry Falcone). Following the testing of the classroom areas, Defendant Falcone informed DOC staff that elevated radon levels were detected in the facility and that such radon exposure required mitigation. ECF No. 156 ¶ 92. DOC staff received a complete report of the radon test results. *Id.* ¶ 93. On May 8, 2014, the DOC also informed DOC staff that they could file a "WC207 package" to preserve their workers' compensation benefits should they develop any

---

[10]     On February 12, 2024, the Court directed Defendants to provide the Court, *in camera,* with "specific maps and diagrams of the Garner Building's layout" to assist the Court in reviewing the radon testing reports. Order (ECF No. 237) (citing ECF No. 199 n.3 (stating that the maps and diagrams were subject to a protective order and would be provided on request)). These documents identified as Bates Nos. 000181-000183; 000189-000196 and 000239-240, do not show that Housing Blocks A through H and *all* the corresponding individual inmate cells were tested and do not provide the results of that testing.

future medical condition resulting from prolonged radon exposure at Garner. *Id.* ¶ 93; *see* Anthony

L. Moffa, *Env't Indifference,* 45 Harvard Env't L. Rev. 333, 346 n.67 (2021) (citing Associated

Press, *Connecticut Prison Guards, Inmates Ally Against State in Radon-Exposure Cas*es, WBUR

NEWS (Oct. 14, 2018), https://perma.cc/CLH2-7NUB).

Although the DOC informed DOC employees of the elevated radon levels and gave them

information necessary to protect their rights, no such information was shared with inmates. *Id.* ¶

95. Defendants also were told that follow-up testing was needed beyond the classroom areas, *id.*

¶ 96, but Plaintiffs allege that "Defendants Semple, Dzurenda, Arnone, Armstrong, Falcone, Link,

Batten and Pease intentionally chose not to test the inmate cell blocks for several years after the

initial testing at Garner, because doing so would have required that they notify the inmates in

writing of any testing done in the housing units." *Id.* ¶ 97. They contend that "Defendants

intentionally chose not to inform Plaintiffs of the elevated radon levels, or provide information to

help Plaintiffs protect their rights, despite Plaintiffs' right to be free from toxic environmental

substances that pose an unreasonable risk of future harm such as radon." *Id.* ¶ 98. Although the

DOC installed a radon mitigation system in October 2014, the mitigation system did not include

the inmate cell block, "thereby further prolonging Plaintiffs' exposure to indoor radon gas and

increasing the likelihood of serious health issues." *Id.* ¶ 99. Further, they allege that Defendants

Quiros, Cook, Dilworth, Corcella, and Washington knew since 2018, that "radon levels continue

to be above 4.0 pCi/L in certain areas of the prison, but have deliberately failed to take any action

to mitigate, subjecting all current inmates and pretrial detainees to ongoing exposure to harmful

levels of radon." *Id.* ¶ 100.

### E.   Class Action and Relief Sought

Plaintiffs propose the certification of three classes (collectively, "Proposed Classes"):

(1) Declaratory/Injunctive Relief Class under Rule 23(b)(2) defined as Plaintiffs who remain incarcerated and are suffering ongoing violations of their federal constitutional rights, *id.* ¶ 102(c), and "will require periodic medical monitoring to determine the impact of the radon exposure and provide treatment in the event monitoring reveals class members have suffered physical symptoms as a result of their exposure to excessive levels of radon." *Id.* ¶ 109.

(2)  Current Inmate Damages Class under Rule 23(b)(3) defined as "all currently incarcerated inmates who, either as post-conviction or as pre-trial detainees, have been exposed to levels of radon in excess of the EPA standard while incarcerated at Garner during the relevant time period, and as a result developed medical conditions linked to high radon exposure, and those who may be diagnosed in the future with those medical conditions as  previously linked, or may in the future be linked, with exposure to radon.  At this time, those medical conditions include but are not limited to lung cancer and chronic, nonmalignant lung diseases such as chronic obstructive pulmonary disease ("COPD"), emphysema, chronic interstitial pneumonia, and pulmonary fibrosis." *Id.* ¶ 107; *see id.* ¶ 102(a).[11]

(3) Former Inmate Damages Class under Rule 23(b)(3) defined as "all formerly incarcerated persons who, either as post-conviction or as pre-trial detainees, were exposed to levels of radon in excess of the EPA standard while housed at Garner during the relevant time period, and as a result developed medical conditions linked to excessive levels of radon exposure; and those who may be diagnosed in the future with medical conditions linked to radon exposure. At this time, those medical conditions include but are not limited to lung cancer and chronic,

---

[11]    While not in the Complaint, the Named Plaintiffs argue in the memorandum supporting class certification that additional "degenerative conditions such a multiple sclerosis, Alzheimer's disease, Parkinson's disease, and Paget's disease of the bone" should be included.  ECF No. 193 at 6 & 6 n.2.

nonmalignant lung diseases such as COPD, emphysema, chronic interstitial pneumonia, and pulmonary fibrosis.  *Id.* ¶ 108, *see id.* ¶ 102(b).[12]

### F.   <u>Medical Conditions</u>

Plaintiffs alleged associated medical conditions include but are not limited to lung cancer and chronic, nonmalignant lung diseases such as COPD, emphysema, chronic interstitial pneumonia, and pulmonary fibrosis.  *Id.* ¶¶ 107, 108.  Plaintiff's memorandum also lists additional diagnoses: "degenerative conditions such a multiple sclerosis, Alzheimer's disease, Parkinson's disease, and Paget's disease of the bone" should be considered.  ECF No. 193 at 6 & 6 n.2.  Plaintiffs allege that at least two members of the putative class have been diagnosed with lung cancer.[13]  *Id.* ¶¶ 10, 16.

Defendants argue throughout their brief that "[P]laintiffs fail to prove that *any* medical condition *other than lung cancer* is sufficiently, conclusively tied to radon exposure" (ECF No. 199 at 35 (emphasis in original)), "and they may not rely on conclusory assertions at this stage or claims that other conditions may be associated or correlated to radon."  *Id.* at 36.

### II.   STANDARD OF LAW

"Class actions under Rule 23 of the Federal Rules of Civil Procedure are an exception to the general rule that one person cannot litigate injuries on behalf of another."  *Kinkead v. Humana*

---

[12]     As with the Current Inmate Damages Class, the Named Plaintiffs argue "degenerative conditions such a multiple sclerosis, Alzheimer's disease, Parkinson's disease, and Paget's disease of the bone" should be included.  ECF No. 193 at 6 & 6 n.2.

[13]     Plaintiff Michael Cruz, who was incarcerated at Garner beginning in 2010 for approximately five years, was diagnosed with lung cancer.  *Id.* ¶ 10.  Plaintiff Thomas Marra, who was incarcerated at Garner at various times between the mid-1990's and 2022, was diagnosed with terminal lung cancer.  *Id.* ¶ 16.

*at Home, Inc.,* 330 F.R.D. 338, 345 (D. Conn. 2019) (citing *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 93 (2d Cir. 2018)).  Subsections (a) and (b) of Rule 23 sets forth two stages of requirements that plaintiffs must satisfy for class certification.  *See* Fed. R. Civ. P. 23(a)-(b).  "First, plaintiffs must satisfy the four threshold requirements of Rule 23(a)— numerosity, commonality, typicality, <u>and</u> adequate representation of the class."  *Kinkead,* 330 F.R.D. at 345 (citing *In re Petrobras Secs.*, 862 F.3d 250, 260 (2d Cir. 2017)) (emphasis added).  "If the Rule 23(a) criteria are satisfied, an action may be maintained as a class action only if it also qualifies under <u>at least one</u> of the categories provided in Rule 23(b)."  *Severin v. Project Ohr, Inc.,* No. 10 CIV. 9696 (DLC), 2012 WL 2357410, at *4 (S.D.N.Y. June 20, 2012).

"At the class certification stage, courts generally accept the factual allegations of the complaint as true."  *In re Synchrony Fin. Sec. Litig.*, No. 3:18-CV-1818 (VAB), 2023 WL 1503032, at *2 (D. Conn. Feb. 3, 2023).  The court must also look beyond the pleadings insofar as it "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."  *Brown v. Kelly,* 609 F.3d 467, 480 (2d Cir. 2010) (citation omitted).  The party seeking class certification bears the burden of demonstrating compliance with Rule 23's requirements by a preponderance of the evidence.  *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) (citing *Comcast Corp. v. Behrend,* 569 U.S. 27, 33  (2013)).

At times, the "rigorous analysis" of class certification "may entail some overlap with the merits of the plaintiff's underlying claim."  *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350–51 (2011) (internal quotation marks and citation omitted).  But the court's assessment of the record must stop once class certification is satisfied: "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the

extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466.

"The Second Circuit has emphasized that Rule 23 should be 'given liberal rather than restrictive construction.'" *Gortat v. Capala Bros., Inc.,* 257 F.R.D. 353, 361 (E.D.N.Y. 2009) (quoting *Marisol A. v. Giuliani,* 126 F.3d 372, 377 (2d Cir. 1997)). Courts are not "bound by the class definition proposed," *see Robidoux v. Celani,* 987 F.2d 931, 937 (2d Cir.1993), and may, but need not, consider alternative ways of structuring the class "on its own initiative." *Adkins v. Morgan Stanley,* 656 F. App'x 555, 557 (2d Cir. 2016) (summary order) (citation omitted). "Thus, district courts in this Circuit tend to err on the side of class certification," *Mirkin v. XOOM Energy, LLC*, No. 18CV2949 (ARR) (RER), 2023 WL 5622099, at *4 (E.D.N.Y. Aug. 31, 2023), "for it is always subject to modification should later developments during the course of the trial so require." *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968). Once a court finds that class certification is appropriate, any order certifying a class must define the class, appoint class counsel, and order notice to the class. Fed. R. Civ. P. 23(c)(1)(B), (c)(2)(B).

## III.   MERITS-BASED ARGUMENTS

As an initial matter, the Court declines Defendants' invitation to consider the legal and factual sufficiency of Plaintiffs' claims at the class certification stage. Defendants ask the Court to "probe behind the pleadings" to assess the facts, claims and applicable law to deny class certification. ECF No. 199 at 4. They argue, among other things, that: (1) all the claims based on alleged failure to test Garner housing units for the presence of radon are meritless; (2) all the claims based on alleged failure to provide medical care are meritless; (3) the Eleventh Amendment bars the injunctive claims premised on alleged failure to test or remediate inmate housing units; and (4) the injunctive claims are barred by the Prison Litigation Reform Act ("PLRA").

These are factual and legal questions the resolution to which "the Court should not determine at the class certification stage where—as here—such a determination is not necessary to assessing whether the Rule 23 requirements have been met." *Alfonso v. FedEx Ground Package System, Inc.*, No. 3:21-CV-01644 (SVN), 2024 WL 1007220, at *11 (D. Conn. Mar. 8, 2024) (citing *Amgen*, 568 U.S. at 466); *see also In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006), *decision clarified on other grounds on denial of reh'g sub nom. In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007) (holding that district court must make Rule 23 determinations even when "a merits issue" is "identical with a Rule 23 requirement," but that, "in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement"); *Guadagna v. Zucker*, 332 F.R.D. 86, 92 (E.D.N.Y. 2019) (noting that it is "beyond well-settled that a motion for class certification is not a vehicle for deciding the merits of the case," and that the "dispositive question" is "whether the requirements of Rule 23 have been met").

Indeed, "courts regularly certify classes where the legality of a practice is an open question." *Alfonso*, 2024 WL 1007220, at * 11 (citing cases); *see also, Barfield v. Cook,* No. 3:18-cv-01198 (MPS) 2019 WL 3562021, at *10 (D. Conn. Aug. 6, 2019) (certifying a class where common questions existed regarding prisoners' Eighth Amendment rights under 42 U.S.C. § 1983, the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794); *Butler v Suffolk Cnty.*, 289 F.R.D. 80, 98 (E.D.N.Y. 2013) (certifying class where common question of law existed regarding violations of both the Eighth and Fourteenth Amendments of the United States Constitutions arising out of the allegedly "cruel and inhumane prison conditions"); *McGee v. Pallito*, No. 1:04-cv-00335-jgm, 2015 WL 5177770, at *4 (D. Vt. Sept. 4, 2015) (finding that the determination of whether a prison policy amounted to deliberate indifference presented a

"common issue" and explaining that "common questions . . . frame the ultimate question of whether the Defendant's policy violates the Constitution, such that they should be enjoined from implementing it"); *Brown v. City of Barre, Vermont*, No. 5:10-CV-81, 2010 WL 5141783, at \*7 (D. Vt. Dec. 13, 2010) (finding that "not only do the Plaintiffs' requests for injunctive and declaratory relief give rise to a presumption of commonality and typicality, there are also common legal questions regarding the constitutionality of a state statute and the City's interpretation of it as applied to rental tenants whose landlords have defaulted on the water bill.").

Defendants argue that Plaintiffs' claims are so clearly contrary to law or fact that class certification would be inappropriate. The Court will address Defendants' merits arguments "only to the extent they overlap with questions pertinent to Rule 23." *Guadagna*, 332 F.R.D. at 92 ("The dispositive question is not whether the Plaintiff stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 have been met."). Therefore, while the Court will closely consider any such arguments in a properly briefed motion for summary judgment, the Court declines to address these arguments when deciding the class certification motion.

## IV.    ANALYSIS

Plaintiffs propose three classes for certification: one class of current DOC inmates seeking injunctive and declaratory relief under Rule 23(b)(2) (the Declaratory/Injunctive Relief Class), and two classes of former and current DOC inmates seeking damages for injuries at Garner (Former Inmate Damages Class and Current Inmate Damages Class, respectively) under Rule 23(b)(3). Defendants challenge all three Proposed Classes.

The Court begins with Rule 23(a), as all Proposed Classes must satisfy this threshold inquiry.  Because the proposed classes satisfy Rule 23(a), the Court will then move on to subsections (b)(2) and (b)(3) as they apply to the specific Proposed Classes.

### A.       Rule 23(a) Requirements

As a threshold matter, Rule 23(a) requires Plaintiffs to satisfy four factors: numerosity, commonality, typicality, and adequacy.  For the most part, the parties brief the Rule 23(a) requirements as if the three Proposed Classes constitute one entity.  The Court therefore presumes the arguments apply equally to each Proposed Class unless specifically stated otherwise.

### 1.       Numerosity

With respect to the first requirement, numerosity is satisfied if the proposed class is "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "[N]umerosity is presumed where a putative class has forty or more members."  *Falberg v. Goldman Sachs Grp.*, No. 19 Civ. 9910 (ER), 2022 WL 538146, at *7 (S.D.N.Y. Feb. 14, 2022) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).  Plaintiffs, however, need not show the "exact class size or identity of class members to satisfy the numerosity requirement." *Robidoux*, 987 F.2d at 935 (citations omitted); *see also Basso v. New York Univ.*, 363 F. Supp. 3d 413, 421 (S.D.N.Y. 2019) (finding numerosity met where there were "over 300" class members in the proposed class).

Plaintiffs propose a class of "all persons who, since June 18, 1993, are either currently incarcerated or who have been released from incarceration, and who were exposed to indoor radon gas while incarcerated at Garner, and who were thus subject to conditions of confinement that

violated their rights under the United States Constitution."[14]  ECF No. 156 ¶ 8.  Appended to their brief is a list of individuals incarcerated at Garner during the relevant time period, which contains "nearly 40,000 people."  Pls.' Mot. Cert. Class, Ex. A, List (ECF No. 193-1).[15]  Plaintiffs state that at least 500 potential class members confirmed their desire to pursue this litigation and efforts to confirm additional potential class members is ongoing.  ECF No. 156 at 7.  They add that "[t]he vast majority of putative class members have not been medically screened for radon-associated illnesses[.]"  Pls.' Mot. Cert. Class Mem. (ECF No. 193) at 8.

Defendants contest numerosity.  They argue that Plaintiffs have only identified three or four individuals who were exposed to radon gas while housed at Garner since 1993 *and* were diagnosed with lung cancer.  ECF No. 199 at 34 (citing ECF No. 156  at 3, 4 ¶¶ 10, 16; ECF No. 193 at 8 & 9 n.5 (Michael Cruz, Thomas Marra, & Elbert Harris, Jr. (Harris, who elected to pursue relief separate from this class action)); Pls.' Mot. Cert. Class, Ex. H, Polis Med. Records (ECF No. 193-8) (Nicholas Polis)).  Additionally, they maintain that it is insufficient to state "via conclusory assertion" that there are 500 potential class members or to provide a list of "thousands or tens of thousands" of inmates who were exposed to radon gas while housed at Garner since 1993.  *Id.* Defendants reason that "[i]f the alleged radon problem at Garner was as extreme, widespread, ongoing and severe as plaintiffs would have the Court believe" they would have "identified more

---

[14]    Plaintiffs alleges that Garner has a stated capacity to house 520 inmates.  However, at various times "Garner has housed up to [100] inmates over its capacity by utilizing its gymnasium as a dormitory" which tested more than twice the acceptable EPA level of indoor radon gas.  ECF No. 156 ¶ 111.

[15]    The Court notes that the actual number of inmates listed in Exhibit A is significantly lower as inmates are listed multiple times to capture each time they were housed at Garner.

than four out of tens of thousands of people with lung cancer after investigating the matter for six years."[16]  *Id.* at 34–35.

The Court disagrees.

"[T]he numerosity inquiry is not strictly mathematical but must take into account the context of the particular case," including whether joinder is impractical based on "(i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their ability to sue separately, and (v) requests for injunctive relief that would involve future class members." *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014) (citations omitted).  Plaintiffs need only "show some evidence of or reasonably estimate the number of class members" and "need not show the exact number."  *Robidoux*, 987 F.2d at 935. Here, the putative class members' limited financial resources, the difficulty they would face prosecuting individual suits, and their requests for injunctive relief weighs in favor of finding numerosity.  *See J.B. v. Onondaga Cty.*, 401 F. Supp. 3d 320, 331 (N.D.N.Y. 2019) ("Class members' limited financial resources, and the difficulties they would face prosecuting individual suits, confirm that joinder is impractical.") (citing *Pennsylvania Pub. Sch. Emps.' Ret. Sys.*, 772 F.3d at 120).

Furthermore, the putative inmate class members depend on the DOC to access information and medical care.  They seek medical screening for lung cancer and/or other medical conditions related to radon exposure through injunctive relief to identify individuals impacted by radon exposure.  With a putative class in the tens of thousands and a potential class of 500 inmates, it is possible that presently undiagnosed class members have already or will develop medical

---

[16]      However, Plaintiffs allege that on May 8, 2014, DOC staff were informed that they could file a "WC207 package" to preserve their workers' compensation benefits should they develop any future medical condition resulting from prolonged radon exposure at Garner.  ECF No. 156 ¶ 93.

conditions through exposure to radon gas.  Defendants acknowledged as much when they informed

staff they could file a "WC207 package" to preserve their workers' compensation benefits should

they develop any future medical condition resulting from radon exposure at Garner.  For these

reasons, the Court finds Plaintiffs have sufficiently established numerosity.  *See Barfield,* 2019

WL 3562021, at *9 (finding numerosity where Plaintiffs named four plaintiffs diagnosed with

HCV and proposed a class consisting of all people "(1) who have or will be diagnosed with chronic

Hepatitis C; (2) who are or will be in the custody of the Connecticut Department of Corrections;

and (3) who have at least sixteen weeks remaining to serve on their sentences").

### 2.    Commonality

Commonality requires that "there are questions of law or fact common to the class," Fed.

R. Civ. P. 23(a), and that Plaintiffs "demonstrate that the class members have suffered the same

injury."  *Wal-Mart Stores*, 564 U.S. at 350 (internal citations and quotation marks omitted). "This

requirement has been characterized as a low hurdle."  *McIntire v. China MediaExpress Holdings,*

*Inc.,* 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014).  "Where the question of law involves standardized

conduct of the defendant towards members of the proposed class the commonality requirement of

Rule 23(a)(2) is usually met."  *Easterling v. Connecticut Dep't of Corr.*, 265 F.R.D. 45, 52 (2010)

(internal quotation marks and citation omitted).

Plaintiffs seek to redress a common violation of their constitutional rights under the Eighth

and Fourteenth Amendments; namely, Defendants' deliberate indifference to Plaintiffs' exposure

to harmful radon gas.  ECF No. 193 at 11.  They assert that whether Defendants were deliberately

indifferent to the dangerous levels of radon gas at Garner is a question common to all putative

class members.  *See id.* at 12.  They do not challenge Defendants' conduct with respect to any

individual Plaintiff, but rather, they are challenging Defendants' practice of violating all Plaintiffs'

constitutional rights and thus satisfy the commonality requirement. *Id.* (citing *Butler*, 289 F.R.D. at 98 ("Whether the County was aware of and deliberately indifferent to the conditions at [a New York county correctional facility] is a common question subject to class-wide resolution.")); *see Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question.") (internal citation marks and citation omitted). Together, these questions are sufficient to establish the requisite common questions of law and fact. *See Wal-Mart Stores*, 564 U.S. at 359 (noting that, for commonality, "even a single common question will do"). Plaintiffs meet their burden of establishing commonality.

### 3.      Typicality

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) (internal quotation marks omitted). Typicality does not require that the representative parties' claims "be identical to those of all class members." *Wilson v. LSB Indus., Inc.*, No. 15 Civ. 7614 (RA) (GWG), 2018 WL 3913115, at *4 (S.D.N.Y. Aug. 13, 2018) (internal citations removed). "Minor conflicts . . . do not make a plaintiff's claims atypical; it is when the conflict goes to the very subject matter of the litigation that the conflict will defeat the claim of representative status." *Walker v. Asea Brown Boveri, Inc.*, 214 F.R.D. 58, 63–64 (D. Conn. 2003).

Plaintiffs assert that the typicality requirement is met because "their claims arise out of the same unconstitutional conditions and present identical legal questions as the claims of each

22

potential class member." ECF No. 193 at 14. Defendants argue that typicality is not satisfied for three reasons: (1) each Plaintiff has "different correctional histories, including amounts of time incarcerated at Garner and different specific times incarcerated at Garner;" (2) with regard to the damages classes, "each named plaintiff and putative class member can only sue the *specific defendants* at issue for their *specific time* periods in question;" and (3) "plaintiffs identify only four individuals with lung cancer: Cruz, Marra, Polis and Harris (who refuse to join the class)." ECF No. 199 at 35-36 (emphasis in original).[17]

Here, the Court finds that the Named Plaintiffs satisfied the typicality requirement, as, they allege injuries arising out of the same allegedly unconstitutional conditions. "Although the extent of their exposure to these conditions and the exact nature of their injuries will necessarily differ from those of the proposed class members, the representative claims need not be identical to the claims of every class member in order to meet the typicality requirement." *Butler*, 289 F.R.D. at 99 (internal quotation marks, citation and alterations omitted). "Differences in the degree of harm suffered, or even in the ability to prove damages, do not vitiate the typicality of a representative's claims." *Easterling*, 265 F.R.D. at 52 (citation omitted). Accordingly, "it is unnecessary to determine whether [the Named Plaintiffs'] damages are the same as those suffered by others in the class." *Id.* In light of the reasoning discussed in the preceding sections, the Court finds that each class member's claims arises from the same course of events, and that each class member would rely on similar legal arguments to prove the Defendants' liability. *Id.*

---

[17]    Defendants also argue that typicality is not met because Plaintiffs failed to meet the deliberate indifference standard when they did not "produce evidence demonstrating that medically *required care* is being denied to inmates[.]" *Id.* at 36. However, Plaintiffs base their constitutional violations on the Defendants' "deliberate indifference to the serious harm of *exposure to excessive levels of indoor radon gas.*" ECF No. 156 ¶¶ 128, 134 (emphasis added). The demand for radon mitigation and medical care and monitoring is understood to be a request for relief. *Id.* ¶¶ 128, 135; Claims for Relief ¶¶ 3–6.

Accordingly, Plaintiffs established typicality.

### 4. Adequacy

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy entails two inquiries, "whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced[,] and able to conduct the litigation." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)).

"The focus is on uncovering 'conflicts of interest between named parties and the class they seek to represent.'" *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). "[A] conflict or potential conflict alone," however, "will not . . . necessarily defeat class certification— the conflict must be fundamental." *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 134 (S.D.N.Y. 2014) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)).

"A finding that a proposed class representative satisfies the typicality inquiry," though not sufficient on its own, "constitutes strong evidence that [its] interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiff['s] claims will vindicate those of the class." *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 109 (S.D.N.Y. 2011) (quoting *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y. 2008)); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 461 (S.D.N.Y. 2018) (explaining that adequacy of representation overlaps with the commonality and typicality inquiry).

### i.    *Adequacy of Class Representatives*

As to the first adequacy inquiry, Defendants argue that "[t]he named plaintiffs have not satisfied their burden of affirmatively proving the adequacy of all named plaintiffs as class representatives" because they "have different health needs, medical histories, incarceration histories, litigation backgrounds, and other specific needs or interests."  ECF No. 199 at 38.

First, they point out that two of the Named Plaintiffs, Kenya McCullough (formerly Kenya Brown) and Ian Cooke, released and waived their claims, *id.*, and state that Harry Vega is not an adequate class representative because he twice absconded from parole and appears to be "at large." *Id.* at 39 (citing Def. Ex. 26).  Second, with regard to injunctive relief, Defendants argue "there is no adequate class representative, because no representative can properly seek the main form of injunctive relief for medical care, and [the] DOC is already providing scheduled and extensive radon testing for the Garner facility itself for the radon testing claims." *Id.* at 40.  They state that John Bosse, the sole Named Plaintiff currently housed at Garner and therefore the *sole* proposed injunctive relief class representative, was provided with a baseline chest X-ray in 2022. *Id.* (citing Def. Ex. 27).  Defendants posit that the proposed representative has already received the very medical care that the injunctive relief class is seeking.

It is a rarity for a court to deny class certification based on inadequate qualifications.  *See In re Frontier Ins. Grp., Inc. Sec. Litig.,* 172 F.R.D. 31, 47 (E.D.N.Y. 1997).  Such a denial is permissible "only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." *Id.*  From the Court's assessment of the current record, the interests of the Named Plaintiffs and the Proposed Classes do not appear to conflict.  Therefore, because the Named Plaintiffs do not have any apparent

antagonistic interests, the Named Plaintiffs were and continue to be actively involved in the litigation, and the Named Plaintiffs are more than willing to continue participating in this case—whether it be participating in discovery and settlement discussions, or simply assisting counsel to identify additional class members—the adequacy requirement as it relates to the Named Plaintiffs is satisfied. *See Butler,* 289 F.R.D. at 101 (finding that although "some of the class representatives remain incarcerated [it] does not affect their interest in vigorously pursuing the claims of the class.").

### ii. *Adequacy of Class Counsel*

Defendants do not challenge the adequacy of Class Counsel.  Two firms represent the Named Plaintiffs.  ECF No. 193 at 17.  Minella, Tramuta & Edwards LLC has represented the Named Plaintiffs since the inception of the case; continues to work to identify other potential class members; and demonstrated competence responding to the motions to dismiss, appeal to the Second Circuit, and filing the motions for class certification.  *Id.* at 17.  It is also clear that class counsel has spent significant time, effort, and resources in communicating with Named Plaintiffs, investigating Defendants' policies and practices, and researching class claims.  Additionally, McCarter & English, LLP, has significant experience handling complex litigation matters and class action litigation in federal courts throughout the country.  The Court is satisfied on this showing that Plaintiffs' attorneys are "qualified, experienced, and able" to conduct this litigation. *See e.g.*, *Flores v. CGI Inc.*, No. 22-cv-350 (KHP), 2022 WL 13804077, at *4 (S.D.N.Y. Oct. 21, 2022) (finding adequacy was satisfied where the plaintiffs "do not have any interests that are different from or adverse to the Class Members" and the plaintiffs retained "qualified and experienced counsel" that "ha[d] litigated and settled numerous" similar cases such that they were "highly experienced in this type of litigation").

Accordingly, Plaintiffs established that the Named Plaintiffs and the selected class counsel, Minella, Tramuta & Edwards, LLC and McCarter & English, LLP, will adequately represent the Proposed Class.

### 5.     Ascertainability

In the Second Circuit, there is an "implied Rule 23 requirement of ascertainability." *In re Petrobras Sec.*, 862 F.3d at 257.  This is because a class must be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Kinkead*, 330 F.R.D. at 345 (citing *In re Petrobras Sec.,* 862 F.3d at 260).  "[A] class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d at 257.

Plaintiffs argue that the Proposed Classes are ascertainable because the "inmates who were incarcerated at Garner can be determined from records maintained by the DOC, which Defendants can access to ascertain the individuals who were incarcerated within Garner during the relevant time period and exposed to radon." Reply (ECF No. 236) at 8; *see* ECF No. 193-1, Ex. A.

Defendants first argue that the "injunctive and damages classes both fail to be defined by specific, objective criteria that are administratively feasible." ECF No. 199 at 41.  The Court disagrees.  Plaintiff appended a spreadsheet listing the inmates incarcerated at Garner from June 18, 1993 through May 9, 2023, which was provided by Defendants. ECF No. 193-1, Ex. A. Here, the Proposed Class's inmate status is an objective criteria that can be readily ascertained from DOC records.  *See, e.g.*, *In re Teva Sec. Litig.*, 2021 WL 872156, at *10 ("The proposed Class here is ascertainable because records document the purchasers of the relevant Teva securities.").

Next, Defendants argue that determination of damages will "require mini hearings for every single individual *before* the classes can be ascertained and *before* liability could be litigated

on the merits." ECF No. 199 at 41. As set forth below, this argument relates to manageability concerns that can be ameliorated later in litigation. *See infra* at 35.

Lastly, Defendants argue that the proposed damages class should be limited to those with lung cancer. ECF No. 199 at 41. The Court addresses this argument later in this opinion. *See infra,* at Section V(A).

Accordingly, Plaintiffs established that the Proposed Classes are ascertainable.

## B.     Rule 23(b)(2) Requirements

Having satisfied Rule 23(a) for all Proposed Classes, the Court now turns to the additional requirements under Rule 23(b), beginning with Rule 23(b)(2).[18] "Rule 23(b)(2) provides that an action may be maintained as a class action if, in addition to the threshold requirements of numerosity, commonality, typicality, and adequacy of representation, 'the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.'" *Parker v. Time Warner Ent. Co., L.P.*, 331 F.3d 13, 18 (2d Cir. 2003) (quoting Fed. R. Civ. P. 23(b)(2)). "Actions for injunctive relief will satisfy the requirements of Rule 23(b)(2) if the injunctive relief sought will benefit the entire class." *Guadagna*, 332 F.R.D. at 96 (quoting *Nicholson v. Williams*, 205 F.R.D. 92, 99 (E.D.N.Y. 2001)). The rule "does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Wal-Mart Stores, Inc.,* 564 U.S. at 360 (emphasis in original).

Plaintiffs argue the Declaratory/Injunctive Relief Class should be certified because it satisfies Rule 23(b)(2). Plaintiffs define the "Declaratory/Injunctive Relief Class", under Fed. R.

---

[18] Plaintiffs do not argue any Proposed Class satisfies Rule 23(b)(1).

Civ. P. 23(b)(2), as "Plaintiffs who remain incarcerated and are suffering ongoing violations of their federal constitutional rights," ECF No. 156 ¶ 102(c), and "will require periodic medical monitoring to determine the impact of the radon exposure and provide treatment in the event monitoring reveals class members have suffered physical symptoms as a result of their exposure to excessive levels of radon." *Id.* ¶ 109.

Defendants argue Plaintiffs fail to satisfy Rule 23(b)(2) for two reasons.  First, Defendants argue the requested injunctive relief fails Rule 23(b)(2) because "claims concerning radon testing, mitigation, or remediation" are factually baseless.  ECF No. 199 at 45–46.  This is a merits-based argument and, for the reasons explained above, shall not be considered for the purposes of this motion.

Second, Defendants argue that injunctive class certification is unnecessary under the Second Circuit's decision in *Galvan v. Levine*, 490 F.2d 1255 (2d Cir. 1973).  The Court disagrees.

 "Under the doctrine established by the Second Circuit's decision in *Galvan v. Levine,* certification of a Rule 23(b)(2) class is unnecessary when prospective relief will benefit all members of a proposed class to such an extent that the certification of a class would not further the implementation of the judgment."  *Casale v. Kelly*, 257 F.R.D. 396, 406 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).  "In *Galvan*, the Second Circuit concluded that class certification under Rule 23(b)(2) was unnecessary because, after the plaintiffs had won summary judgment on a constitutional claim, the government 'withdrew the challenged policy,' 'stated it did not intend to reinstate the policy,' and 'made clear that it understands the judgment to bind it with respect to all claimants.'"  *Nnebe v. Daus*, No. 06-CV-4991 (RJS), 2022 WL 615039, at *13 (S.D.N.Y. Mar. 1, 2022) (quoting *Galvan,* 490 F.2d at 1261).  Rather than requiring Plaintiffs to prove that class certification is necessary, the *Galvan* rule makes it permissible for a

29

court to deny certification if the "class action designation is largely a formality." *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 541 (E.D.N.Y. 2017) (quoting *Galvan*, 490 F.2d at 1261–62). Courts have "wide discretion" in determining class certification under Rule 23(b)(2). *Id.*

Courts have focused on four factors to evaluate when certification is not necessary under *Galvan:*

> *First,* notwithstanding the presumption that government officials will abide by a court's decision as to similarly situated individuals, an affirmative statement from the government defendant that it will apply any relief across the board militates against the need for class certification. *Second*, withdrawal of the challenged action or non-enforcement of the challenged statute militates against the need for class certification. *Third*, the type of relief sought can affect whether class certification is necessary. Courts have found that where the relief sought is merely a declaration that a statute or policy is unconstitutional, denial of class certification is more appropriate than where plaintiffs seek complex, affirmative relief. *Fourth*, courts also consider whether the claims raised by plaintiffs are likely to become moot, making class certification necessary to prevent the action from becoming moot.

*Casale*, 257 F.R.D. at 406–07 (emphasis in original) (citing *Blecher v. Dep't of Hous. Pres. & Dev.*, No. 92-cv-9760 (CSH), 1994 WL 144376, at *4–*5 (S.D.N.Y. Apr. 19, 1994)).

As to the first factor, Defendants make no concessions regarding medical screening and treatment. Whether the entire Garner facility was tested, including individual inmate cells, remains an issue of fact, and they have not entered into an agreement regarding the injunctive relief sought. *Casale,* 257 F.R.D. at 414; *Barfield,* 2019 WL 3562021, at *12 (citing cases). This factor favors class certification.

As to the second factor, withdrawal of the challenged action, Defendants do not concede the allegations in the Third Amended Complaint, they continue to object to the relief sought, and they strenuously contest the existence of numerosity, commonality, typicality, adequacy, and ascertainability. *See Barfield,* 2019 WL 3562021, at *12 (citing cases); *Casale,* 257 F.R.D. at 414 (finding that the Court cannot "conclude that the problem has been solved."). This factor favors class certification.

The third *Galvan* factor—the complexity of the relief sought—also weighs in favor of class certification.  Plaintiffs seek testing of the entire Facility, ongoing monitoring, radon gas exposure mitigation, periodic medical monitoring, and appropriate medical treatment.  Defendants assert that the alleged failure to test or mitigate is moot and do not address the request for medical monitoring or treatment.

Last, the fourth *Galvan* factor—the potential for Plaintiffs' claims to be rendered moot— yields a mixed result.  Should Defendants demonstrate there is no issue of fact regarding radon testing, ongoing monitoring, and mitigation at the Facility, it could render this request for injunctive relief moot.  However, there is also a claim for periodic medical monitoring and appropriate medical treatment that is not addressed in Defendants' brief.  "Nevertheless, this fourth factor is insufficient to overcome the other factors weighing in favor of class certification." *Casale,* 257 F.R.D. at 414.

Accordingly, the Court concludes the proposed injunctive relief—testing for radon gas at Garner, including individual inmate cells, and periodic medical monitoring and treatment as necessary—would benefit the Declaratory/Injunctive Relief Class as a whole.  *See Shakhnes ex rel. Shakhnes v. Eggleston*, 740 F. Supp. 2d 602, 628 (S.D.N.Y. 2010), *aff'd in part, vacated in part sub nom. Shakhnes v. Berlin*, 689 F.3d 244 (2d Cir. 2012) ("[C]ivil rights actions like this one—alleging systemic administrative failures of government entities—are frequently granted class action status under Rule 23(b)(2).") (citing cases).  Plaintiffs' request for certification of a 23(b)(2) class is granted as to the Declaratory/Injunctive Relief Class.

## C.   <u>Rule 23(b)(3) Requirements</u>

Plaintiffs argue the remaining putative classes, the Current Inmate Damages Class and the Former Inmate Damages Class, should be certified because they satisfy Rule 23(b)(3).  Under Rule

23(b)(3), class certification is appropriate if "the Court finds that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class litigation is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### 1.   Predominance

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Brown,* 609 F.3d at 476 (citation omitted).  The purpose of Rule 23(b)(3) is to limit class certification to cases where "it would achieve economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (citation and quotation marks omitted).  The requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Id.* (citation and quotation mark omitted).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (quoting Fed. R. Civ. P. 23(b)(3)).  "Although predominance is a more demanding criterion than commonality, the shared issues of law and fact laid out in the discussion of commonality are also sufficient to demonstrate predominance." *Casale*, 257 F.R.D. at 414 (quoting, in part, *In re Nassau Cnty. Strip Search Cases,* 461 F.3d 219, 225 (2d Cir. 2006) (internal quotation marks omitted)).

As set forth above, the Court finds that the following issues of fact and questions of law are common to the class: (1) whether Defendants' knew of the excessive radon levels throughout the Facility but made the intentional choice not to inform Plaintiffs, not to test inmate cell blocks for several years after initial testing of Garner, and not to provide medical screening and management to Plaintiffs; (2) whether Defendants sufficiently tested and installed proper, effective and fully functioning radon mitigation system(s) throughout the entire Facility; (3) whether Defendants' practices, policies, acts and omissions constitute deliberate indifference to Plaintiffs' Eighth and Fourteenth Amendment rights to the United States Constitution; (4) whether Defendants subjected Plaintiffs to cruel and unusual punishment by acting with deliberate indifference to the serious harm of exposure to excessive levels of indoor radon gas; (5) whether Defendants' failure to provide medical monitoring and management violates Plaintiffs' Eighth and Fourteenth Amendment rights; and (6) whether Defendants' failure to exercise proper oversight renders them liable as supervisors.  ECF No. 156 ¶¶ 124–147; ECF No. 193 at 20–21.  "[A]lthough 'a defense may arise and may affect different class members differently, this occurrence does not compel a finding that individual issues predominate over common ones.'"  *In re Nassau Cnty. Strip Search Cases*, 461 F.3d at 225 (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 138 (2d Cir. 2001), *abrogated on other grounds by In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24)).

On the basis of the evidentiary record before the Court, common issues of law or fact predominate over individual inquiries.  Accordingly, the predominance requirement is met.

## 2.    Superiority

Finally, under Rule 23(b)(3), Plaintiffs must show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Nextel*, 780 F.3d at 137.

To determine whether a class action is superior, courts consider (1) "the class members' interests in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(A)-(D).

Plaintiffs claim that the "existence of a large number of plaintiffs with commonality of claims necessarily shows that a class action is the most efficient method of adjudication," without class certification there "will be a strong likelihood of numerous *pro se* actions bringing identical claims" as demonstrated by the number of cases already consolidated into the present case, and the existence of "significant practical barriers and costs [] associated with individual actions" that may "prevent the potential class members from obtaining effective relief."  ECF No. 193 at 22.

After considering the parties' arguments and the four factors of superiority, the Court concludes Plaintiffs established that bringing this case as a class action will promote judicial efficiency and provide relief to those who may have limited resources and lack familiarity with the legal system.  First, a class action is well-suited to the claims in this case because of the "fluid composition" of the prison population.  *Clarkson v. Coughlin*, 783 F. Supp. 789, 797 (S.D.N.Y. 1992) ("The class action device is particularly well-suited in actions brought by prisoners due to the 'fluid composition' of the prison population.").  Pre-conviction detainees and sentenced prisoners are transferred into and out of Garner to other corrections facilities and/or released from the DOC each day.  ECF No. 193-1, Ex. A.  *See Clarkson*, 783 F. Supp. at 797 ("Veteran prisoners are released or transferred, while new prisoners arrive every day.  Nevertheless, the underlying claims tend to remain.  Class actions therefore generally tend to be the norm in actions such as

this."). Second, there is no showing that the proposed class members expressed an interest in individually controlling the litigation. *See In re Pfizer*, 282 F.R.D. at 53 (finding superiority established where "[t]here is no indication that individual class members have any interest in prosecuting their claims separately, or that any such litigation has already commenced," "concentrating the litigation in this forum would promote judicial economy," and there were no identified "difficulties in managing this case as a class action"). Third, the "extent and nature of the litigation" favors class certification. Plaintiffs faced several legal challenges since 2017 with the assistance of counsel familiar with the legal system and with resources to assert their claims. *See supra* at 2–3.

The Court finds that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Magtoles v. United Staffing Registry, Inc.,* No. 21CV1850 (KAM)(PK), 2022 WL 1667005, at *10 (E.D.N.Y. May 25, 2022) (finding that a "class action is particularly desirable . . . where it is likely the *only* device by which many of the proposed class members—who may have limited resources and lack of familiarity with the legal system—could obtain relief.") (citation and internal quotation marks omitted) (emphasis in original); *Casale,* 257 F.R.D. at 407 ( "It is appropriate for the court to consider the inability of the poor or uninformed to enforce their rights and the improbability that large numbers of class members would possess the initiative to litigate individually."). In addition, "[w]hile the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prod.*, 521 U.S. at 617 (internal citation and quotation marks omitted).

Defendants' contentions regarding inferiority of a class action concern manageability. They argue that, because damages will require individualized proof, the Court should decline to certify the damages class.  ECF No. 199 at 45.  Recently, this district court explained in *Alfonso v. FedEx Ground Package System, Inc.,* that contentions regarding inferiority of a class action that concern manageability "can be ameliorated by the district court's authority to manage the litigation effectively, including, if necessary, bifurcating the proceedings to home in on threshold class-wide inquiries." [19]  *Alfonso,* 2024 WL 1007220, at *15 (citing *In re Petrobras Sec.*, 862 F.3d at 274) (internal quotation marks and alterations omitted).  Accordingly, Defendants' argument falls within a manageability concern to be addressed later in litigation.

Accordingly, Plaintiffs established superiority, the final Rule 23 requirement, and the Court will grant the motion for class certification.

## V.        CLASS DEFINITION

Where a court determines class certification is appropriate, Rule 23(c)(1)(B) requires the order certifying the class to "define the class and the class claims, issues, or defenses" and appoint class counsel.  The Court modifies each proposed class definition based on the rulings set forth below and to clarify and/or address concerns raised by Defendants.

---

[19]        Further, the Second Circuit identified several management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.  *In re Visa*, 280 F.3d at 141.

### A.    <u>Scope of Medical Conditions</u>

For the damages classes, Plaintiffs seek certification of a class to include a broad definition of medical conditions associated with radon gas exposure.  Plaintiffs state that the applicable medical conditions include but are not limited to: "lung cancer and chronic, nonmalignant lung diseases such as chronic obstructive pulmonary disease ("COPD"), emphysema, chronic interstitial pneumonia, and pulmonary fibrosis" (ECF No. 156 ¶¶107, 108), and "degenerative conditions such a multiple sclerosis, Alzheimer's disease, Parkinson's disease, and Paget's disease of the bone."  ECF No. 193 at 6 n.2.  Although Plaintiffs do not allege that each named Plaintiff suffered radon-associated conditions, they "need not have contracted an illness to state a cognizable claim."  *Rogers v. Semple*, No. 3:20-CV-1813 (MPS), 2021 WL 124310, at *2 (D. Conn. Jan. 13, 2021) (inmate can state Eighth Amendment claim for exposure to unsafe conditions, such as radon, that pose unreasonable risk of harm to *future* health) (citing *Helling*, 509 U.S. at 34-35); *Tyus v. Semple*, No. 3:19-CV-73 (VAB), 2019 WL 1877076, at *2 (D. Conn. Apr. 26, 2019) (exposure to radon); *Gonyer v. McDonald*, 874 F. Supp. 464, 466 (D. Mass. 1995) ("Pursuant to 42 U.S.C. § 1983, a county prisoner may bring an Eighth Amendment claim that environmental hazards in a prison, such as exposed asbestos, pose an unreasonable risk of serious damage to future health.") (citing *Helling,* 509 U.S. 25 (1993); *Powell v. Lennon,* 914 F.2d 1459 (11th Cir. 1990) (asbestos in a prison dormitory); *Smith v. Fiedler,* 867 F. Supp. 832 (E.D. Wis. 1994) (addressing alleged exposure to asbestos and lead in drinking water)).

Plaintiffs submit the declaration of Dr. Edward W. Boyer, and several abstracts of medical studies regarding medical conditions associated with radon exposure.[20]  Dr. Boyer is a board-

---

[20]    Pls.' Mot. Class Cert. Ex. B, Boyer Decl. (ECF No. 193-2); Ex. C, Shaina L. Stacy, et al., *Abstract 3240: Radon exposure, lung cancer, and respiratory outcomes in a cohort of former and current smokers: An ecologic analysis*, Cancer Research (July 2018) (concluding that "higher

certified medical toxicologist with over twenty-five years of clinical practice experience.  Based

on his education and work experience, he states he is "able to render conclusions about the likely

factors that explain, to a reasonable degree of medical certainty, the toxicology of substances such

as radon, alone and in combination with other exposures and behaviors."  Aff. Dr. Boyer at 4.

Regarding exposure, he opined that "[i]nhalation is the principal route of radon exposure in

humans."  *Id.* at 4.  He stated that "[r]adon and radon progeny cause lung cancer."  *Id.* at 5.  He

also opined that "[r]adon has been *associated* with other health effects" such as "noncancer

respiratory diseases including asthma, bronchitis, pneumonoconiosis, emphysema, pulmonary

fibrosis, and interstitial pneumonitis" and "has also been *associated* with blood disorders such as

leukemias."  *Id.* (emphasis added).  He stated that, because radon concentrations at Garner

"exceeded EPA guidelines, the potential exists for inmates exposed to elevated radon levels to

develop lung cancer and related health consequences in the future."  *Id.* at 6.

---

radon levels were positively associated with increased odds of COPD diagnosis determined at
baseline" and stating "As COPD is an important predisposing factor for respiratory health, lung
cancer development, and overall survival, this potential association between residential radon level
and COPD risk warrants additional follow up") (ECF No. 193-3); Ex. D; Kyle P. Messier & Marc
L. Serre, *Lung and stomach cancer associations with groundwater radon in North Carolina, USA*,
Int'l J. Epidemiology (Apr. 1, 2017) (concluding that "groundwater radon is associated with
increased risk for lung and stomach cancer") (ECF No. 193-4); Ex. E, C.J. Groves-Kirkby, et al.,
*Environmental Radon Gas and Degenerative Conditions – An Overview*, IRPA Paris (2006)
(concluding that "a growing body of experimental evidence suggests that radon may be implicated
in the prevalence of other conditions, including Multiple Sclerosis, Alzheimer's and Parkinson's
Diseases and Paget's Disease of the Bone") (ECF No. 193-5);  Ex. F, S. Cristina Oancea, et al.,
*County level incidence rates of chronic lymphocytic leukemia are associated with residential
radon levels*, Future Oncology (Sept. 13, 2017) (concluding that chronic lymphocytic leukemia "is
significantly associated with [residential radon] at the county level") (ECF No. 193-6); Ex. G, S.
Kjellberg & J.S. Wiseman, *The relationship of radon to gastrointestinal malignancies*, Am. Surg.
(Sept. 1995) (concluding that there exists "a relationship between radon levels and gastric cancer
mortality" and stating" "This study suggest a relationship between radon levels and gastric cancer
mortality. Further investigation into the role of radon carcinogenesis may be warranted.") (ECF
No. 193-7).

Defendants do not dispute that lung cancer is a medical condition that may arise from radon gas exposure. ECF No. 199 at 31 (conceding Boyer's "statements support the defendant's position that lung cancer is the only condition that can be considered in this case, not others."); *see* Aff. Dr. Boyer at 5 ("Radon and radon progeny cause lung cancer."). Defendants argue Plaintiffs have not made a showing by the preponderance of the evidence regarding other medical conditions associated with radon gas exposure.

For two main reasons, the Court agrees the evidence for medical conditions *associated* with radon is not as strong as the evidence about lung cancer. First, the Court agrees that Dr. Boyer's opinion distinguishes between "extensive studies [that] have confirmed that radon is the second leading cause of lung cancer" and other medical conditions "associated" with radon exposure. Aff. Dr. Boyer at 5. Moreover, the Court agrees that mere "association" may not be sufficient to establish causation, given that Dr. Boyer states that the association of radon exposure to other health effects were "observed in occupational settings as well as in laboratory animals exposed to radon and its progeny" and "[c]ohorts of miners." *Id.* Second, the Court is not persuaded that these abstracts of various articles on regional-based radon gas exposure and medical studies will survive a challenge on summary judgment.[21] "[T]he Court is not bound by the class

---

[21]     Defendants accurately observe that some of the articles or abstracts contain limiting language, including "potential association" or the "risk warrants additional follow-up." ECF No. 193-3 at 2 ("Abstract 3240: Radon exposure, lung cancer, and respiratory outcomes in a cohort of former and current smokers: An ecologic analysis. (2018)), or, are limited to a specific geographic region." The 2017 abstract, *County level incidence rates of chronic lymphocytic leukemia are associated with residential radon levels*, summarizes a study from four states: Iowa, North Dakota, Texas and Wisconsin. ECF No. 193-6. Similarly, a 2017 abstract, *Lung and stomach cancer associations with groundwater radon in North Carolina, USA*, provides another regionally focused study finding a "positive association between groundwater radon exposure and lung cancer incidence rates." ECF No. 193-4; *see also* ECF No. 193-5 ("Environmental Radon Gas and Degenerative Conditions-An Overview" 2017 study of radon exposure and degenerative medical conditions in the United Kingdom and Ireland); ECF No. 193-7 ("The relationship of radon to

definition proposed in the complaint, and "is empowered under Rule 23(c)(5) to carve out an appropriate class—including the construction of subclasses." *Butler*, 289 F.R.D. at 98 (internal quotation marks and alterations omitted) (citing *Robidoux,* 987 F.2d at 937 (2d Cir.1993)); *Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.,* 993 F.2d 11, 14 (2d Cir.1993).

That said, the Court is mindful that—for the purposes of Rule 23 class certification—Plaintiffs made a showing, albeit slim, that radon exposure *may* cause other medical conditions other than lung cancer.  The Court is not convinced that it is appropriate to exclude these plaintiffs, as it effectively dismisses these claims at the class certification stage when this issue overlaps with a determination on the merits. *Guadagna*, 332 F.R.D. at 92 (noting that it is "beyond well-settled that a motion for class certification is not a vehicle for deciding the merits of the case," and that the "dispositive question" is "whether the requirements of Rule 23 have been met"). Stated differently, the Court concludes the prudent approach is not to exclude plaintiffs at the current stage of litigation, because this issue requires further briefing and evidentiary showing. *Johnson v. New York State Dep't of Corr. & Cmty. Supervision,* 2020 WL 2558160, at *1 ("It is proper for a district court to accept the complaint allegations as true in a class certification motion, and it may also consider material outside the pleadings in determining whether to certify the proposed class, including affidavits.") (citations and brackets omitted).  Accordingly, the Court concludes the class should include individuals with or who develop lung cancer but reserves decision on whether to alter or modify the class to include a wider range of medical conditions. *See Barfield,* 2019 WL 3562021, at *8  (citing *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001) (noting that district courts have "the ability . . . to alter or modify the class, create

---

gastrointestinal malignancies" 1995 study of radon exposure and gastrointestinal malignancies in the Commonwealth of Pennsylvania).

subclasses, and decertify the class whenever warranted")); *see also* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").

The Court is inclined to address the medical conditions at summary judgment and modify the class if warranted at that time.  However, the Court is open to separate briefing before summary judgment, if the parties articulate the practical reasons why doing so earlier would be beneficial. The parties are directed to meet and confer to discuss (1) any modifications to the class definition, (2) class notice, and (3) the best approach for briefing the medical conditions issue.  Within fourteen (14) days of this Order, the parties shall file a joint proposed class notice and propose deadlines for briefing the issue of medical conditions, other than lung cancer.  The parties will address whether further expert discovery is needed, propose a schedule for completion of this discovery (if it is necessary) and address whether this issue is better addressed in a motion for summary judgment.  The parties are reminded the operative Scheduling Order remains in effect.[22]

### B.     Scope, Including Time Period

The Proposed Classes are limited to individuals housed at Garner during a specific time period.  The <u>start date</u> is undisputed: June 18, 1993, the date of the Supreme Court's decision in *Helling v. McKinney*, 509 U.S. 25 (1993).  *See Vega I,* 963 F.3d at 276 (affirming the District

---

[22]     The period for fact discovery closed thirty days after Judge Arterton's ruling on class certification. *See* ECF No. 154 (entered 12/01/2022) ("Discovery, including service of the parties' merits expert reports (excluding damages), will close 30 days *after* ruling on class certification. [and] Plaintiffs' medical expert reports will be served by 1/30/23 … Defendants' motion for summary judgment will be filed 30 days after the close of discovery; opposition will be filed 21 days thereafter; any reply will be filed in 10 days …. This case is deemed trial ready no later than 8/1/23.").  After the ruling on class certification, and transfer of the case to the undersigned, the parties did not seek an extension or modification of the December 1, 2022, Scheduling Order.

Court's judgment insofar as it determined that Defendants violated clearly established law as of the date of the Supreme Court's decision in *Helling, supra).*  The <u>end date</u> of the Current and Former Inmate Damages Classes is also undisputed: the applicable time period "expires upon the DOC's testing of the entire Garner facility and installation of a proper, effective, and fully functioning radon mitigation system throughout the entire facility."  ECF No. 156 ¶ 105.

The only dispute is the Declaratory/Injunctive Relief Class's <u>end date</u>.  Plaintiffs argue the time period "runs through the present day, as those class members face ongoing violations of their federal constitutional rights due to continued exposure to radon and lack of proper medical testing and management."  *Id.* ¶ 106.  Defendants contend the time period should end in December 2013 when they assert that "the inmate housing units were tested for the presence of radon" (ECF No. 199 at 12) and "retested repeatedly thereafter."  *Id.* at 14.

After reviewing the parties' briefing, the Court concludes the scope of the Declaratory/Injunctive Relief Class should only be limited by incarceration status, not time period. As noted above, putative declaratory/injunctive relief class cannot include individuals no longer in Connecticut DOC custody.  *See Vega*, 963 F.3d at 282-283 (finding that "prospective relief cannot be granted to those putative class members who are not currently incarcerated, as there is no ongoing violation of federal law with regard to class members who are not in custody."); *see also, Vega II*, 2018 WL 4656236, at *12 ("[I]f a class were to be certified, an injunctive relief class would have to be limited to members who actually face ongoing rather than solely past violations.").  However, Defendants have not established a basis to exclude individuals who do not yet have diagnoses but were exposed, given the alleged "lack of proper medical testing and management."  As such, the Court modifies the putative declaratory/injunctive relief class, under

Fed. R. Civ. P. 23(b)(2), to include individuals presently in DOC custody—whether at Garner or another DOC facility—incarcerated at Garner at any point from June 18, 1993 through the present.

### C.　　Modified Definitions

For the reasons explained in subsections (A) through (C), the Court modifies the three Proposed Classes and certifies the following:

(1)　　Declaratory/Injunctive Relief Class: Post conviction inmates or pre-trial detainees currently in DOC custody—who are incarcerated at Garner and/or have been incarcerated at Garner at any point from June 18, 1993 through the present—who are suffering ongoing violations of their federal constitutional rights related to radon exposure and/or will require periodic medical monitoring to determine the impact of the radon exposure and provide treatment, in the event monitoring reveals class members suffered physical symptoms as a result of their exposure to excessive levels of radon.

(2)　　Current Inmate Damages Class: Post-conviction inmates or pre-trial detainees currently in DOC custody—who are incarcerated at Garner and/or have been incarcerated at Garner at any point from June 18, 1993 through the present—who developed lung cancer or may be diagnosed in the future with lung cancer as a result of exposure to radon levels exceeding the EPA standard.　The diagnoses of chronic, nonmalignant lung diseases (such as COPD, emphysema, chronic interstitial pneumonia, pulmonary fibrosis) and degenerative conditions (such a multiple sclerosis, Alzheimer's disease, Parkinson's disease, and Paget's disease of the bone) may be included at a later time.

(3)　　Former Inmate Damages Class: Individuals no longer in DOC custody—who were post-conviction inmates or pre-trial detainees at Garner at any point from June 18, 1993 through the present—who developed lung cancer or may be diagnosed with lung cancer in the future as a

result of exposure to radon levels exceeding the EPA standard. The diagnoses of chronic, nonmalignant lung diseases (such as COPD, emphysema, chronic interstitial pneumonia, pulmonary fibrosis) and degenerative conditions (such a multiple sclerosis, Alzheimer's disease, Parkinson's disease, and Paget's disease of the bone) may be included at a later time.

## VII.   CONCLUSION

Having certified a class as defined above, and for the reasons set forth *supra* section IV (A)(4) (Adequacy) pursuant to Rule 23(g), the Court appoints as class counsel the law firms of Minella, Tramuta & Edwards, LLC and McCarter & English, LLP. Based on the foregoing, Plaintiff's Renewed Motion for Class Certification is granted with the modifications to the class definition discussed above. ECF No. 192. Defendant is directed to file an answer to the Third Amended Complaint within twenty-one (21) days of the date of this Order.

Accordingly, Plaintiffs will provide notice to putative class members, who will have the opportunity to opt out of the lawsuit if they choose to do so. The parties are directed to meet and confer to discuss (1) any modifications to the class definition, (2) class notice, and (3) the best approach for briefing the medical conditions issue. Within fourteen (14) days of this Order, the parties shall file a joint proposed class notice and propose deadlines for briefing the issue of medical conditions, other than lung cancer. The parties will address whether further expert discovery is needed, propose a schedule for completion of this discovery (if it is necessary) and address whether this issue is better addressed in a motion for summary judgment. A status conference will be scheduled thereafter.

This is not a recommended ruling. The parties consented to the jurisdiction of the undersigned Magistrate Judge, who may therefore direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. ECF No. 181. Appeals may be

made directly to the appropriate United States Court of Appeals.  *See* 28 U.S.C. § 636(c)(3); Fed.

R. Civ. P. 73(c).  It is so ordered.

_/s/_
_____
Hon. Maria E. Garcia
United States Magistrate Judge
