UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | | |
|---|---|---|---|
| HARRY VEGA, *et al.*, | : | CIVIL NO. | 3:17-CV-0107(MEG) |
| *Plaintiffs*, | : | | consolidated with |
| | : | | 3:17-CV-0348 |
| | : | | |
| v. | : | | |
| | : | | |
| SCOTT SEMPLE, *et al.*, | : | DECEMBER 1, 2025 | |
| *Defendants*. | | | |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

The defendants move for summary judgment on all claims.  *See* Fed. R. Civ. Pro. 56.  There are no genuine issues of fact, and the defendants are entitled to judgement as a matter of law.

**I.      BACKGROUND, FACTS, AND PROCEDURAL HISTORY**

Plaintiffs are current and former inmates incarcerated within the Connecticut Department of Correction ("DOC").  (Doc. 156 ¶¶ 1, 8-22).  They bring this action under 42 U.S.C. § 1983 complaining of their conditions of confinement while incarcerated at Garner Correctional Institution ("Garner").  (*Id.* ¶¶ 1-8).

**A.      Claims and Allegations in Third Amended Complaint**

Specifically, plaintiffs allege they were exposed to unacceptably high levels of radon gas while incarcerated at Garner.  *See, e.g.*, (*id.* ¶¶ 1-8).  They claim the defendants were deliberately indifferent to their safety when building the Garner facility at the Newtown, Connecticut site; they also claim defendants were deliberately indifferent by failing to detect or mitigate the alleged radon exposure thereafter.  *See, e.g.*, (*id.* ¶¶ 57-100).  Plaintiffs also claim they were denied equal protection of the law, but it is unclear how.

Plaintiffs bring this lawsuit as a class action.  (*Id.* ¶¶ 3, 101-123); (Docs. 192; 193); (Doc. 242 p. 2, 43-44)(Court certifying classes).  They hope to include, as plaintiffs, potentially all inmates who were incarcerated within Garner since June 18, 1993, or at the very least a subset of such inmates that includes several hundred, possibly even thousands potential individual plaintiffs. (Doc. 156 ¶¶ 102 a and b, 103, 113); (Doc. 192 p. 2); (Doc. 193 p. 7, 8).  This includes pre-trial detainees and post-conviction prisoners.  (Doc. 156 ¶¶ 102, 124-130, 131-137).

Plaintiffs sue numerous DOC officials in their individual and official capacities.[1]  (*Id.* p. 1 Caption; p. 7 ¶ 42).  This includes naming every Commissioner of Correction (Meachum, Armstrong, Lantz, Arnone, Dzurenda, Semple, Cook, Quiros) dating back to June 18, 1993, including Commissioner Meachum, who was the Commissioner when Garner opened in November, 1992 and continued as the Commissioner after June 18, 1993, when the timeline begins in this case.  *See, e.g.*, (Doc. 156 ¶ 111)("The time parameters for this action will run from June 18, 1993, through the DOC's testing of the entire Garner facility . . . .").  It also includes naming several former wardens of Garner:    Dzurenda, Semple, Falcone, Dilworth, Corcella, and Washinton.[2]  (*Id.* p. 1 Caption; p. 5-7 ¶¶ 25, 26, 32-36).  It also includes former Directors of the DOC Engineering and Facilities Management Unit:  Batten and Link (*id.* ¶¶ 41, 38).  Finally, the current complaint also names a DOC Environmental Analyst (Rich Pease) who is alleged to have

---

[1]    While plaintiffs refer to the defendants as single defendants sued in both individual and official capacities, this is a misnomer.  Individual versus official capacities are actually separate defendants entirely.  The individual-capacity defendants are the individuals themselves as individual citizens.  Official-capacity defendants are the current (or former) government offices themselves held by the individuals during employment with the State of Connecticut. They are not the same thing or the same defendants.  *See e.g.*, *Tanvir v. Tanzin*, 894 F.3d 449, 458-59 n.7 (2d Cir. 2018)(citing Fed. R. Civ. Pro. 17(d); 25(d)).

[2]    The plaintiffs withdrew the action against Hannah.  (Docs. 176; 177).

overseen the radon testing and mitigation projects starting in 2013 and received correspondence and updates concerning the radon levels at Garner since 2013.  (*Id.* ¶ 39).

Plaintiffs seek money damages and injunctive and declaratory relief.  *See* (Doc. 156 ¶¶ 1-6).  The post-conviction plaintiffs bring claims under the Eighth Amendment, claiming the defendants' alleged conduct regarding radon levels within Garner constituted deliberate indifference to their safety and therefore amounted to violation of Cruel and Unusual Punishment Clause.  (*Id.* ¶¶ 124-130).  They also bring claims under the Fourteenth Amendment claiming violation of the Equal Protection Clause.  (*Id.* ¶¶ 138-147).

The pre-conviction plaintiffs bring their claims entirely under the Fourteenth Amendment.  They advance the same deliberate-indifference theory but sue under the Fourteenth Amendment's Due Process Clause (instead of the Eighth Amendment) because of their pre-conviction statuses.  *See, e.g.*, (*id.* ¶¶ 131-137).[3]  They also sue under the Equal Protection Clause.  *See* (*id.* ¶¶ 138-147).  All claims are based on allegedly excessive radon levels at Garner.  (*Id.* ¶¶ 124-137).

B.    **The Complaints Contain Critical Omissions or Misstatements That Served as the Sole Basis that the Case Survived to Motion to Dismiss and Related Appeal.**

As detailed further below, the complaints throughout this case have conveniently omitted the most important facts concerning radon testing at Garner in 2013 and thereafter:  beginning in December, 2013, the Connecticut DOC *did in fact have the inmate housing areas tested for radon.*

Before the defendants' opposition to the first motion for class certification (Doc. 172), this Court had not been informed of this, as the first two complaints (*Cruz* Doc. 1; *Vega* Doc. 49) falsely alleged the defendants failed to ever test the inmate housing areas for radon.   And the

---

[3]    The Eighth Amendment does not apply for inmates that are pre-trial rather than post-conviction status.  *See, e.g.*, *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)(collecting cases).

current Third Amended Complaint (*Vega* Doc. 156) alleges that the defendants did not test the inmates housing areas "for several years after" initial testing of the school areas at Garner in 2013. (Doc. 156 ¶¶ 96; 97; 99; 104; 126; 133; 140; 66; 5; p. 25 ¶ 3). Such allegations are false, however. (Plimpton Decl. ¶¶ 9-20); (Semple Decl. ¶ 16); (Pease Dec. ¶ 7). The inmate housing units were tested by the Connecticut Department of Public Health (DPH) in December, 2013, along with the rest of the Garner facility, and have been tested repeatedly since. (*Id.*) There can be no genuine dispute of material fact about that at this stage. It's confirmed in the testing reports and by witness testimony.

Further, not only did DOC have sample testing conducted throughout the entire Garner facility including its housing units starting in 2013, but the testing was conducted by the Connecticut Department of Public Health (DPH), an outside agency tasked with protecting the public's health. And thereafter, DOC hired private contracting companies to continue testing and mitigation where needed in the years since, which included the inmate housing areas. Further, Commissioner Semple also then in 2018 issued a department-wide policy to test all DOC facilities statewide and all inmate housing units therein, not just those at Garner. *See* (Doc. 66-1). These important facts have been conveniently left out of the complaints, but the Court can finally now consider them.

### C.    Additional Procedural History

The case has an extensive procedural history. The case was filed *via* the original complaint in *Cruz v. Semple*, 3:17-CV-0348(JBA)(Doc. 1), and that action was then consolidated with this one at plaintiffs' request when Mr. Vega decided to join the putative class action. *See* (*Vega* Doc.

40; 47; 48)[4]; (*Cruz* Docs. 14; 19; 20).   The defendants filed a motion seeking a pre-filing conference under the Court's chambers practices, and for permission to move to dismiss.  (*Vega* Doc. 39); (*Cruz* Doc. 15).  The plaintiffs then filed the First Amended Complaint, adding facts and access-to-court claims *via* theories of defendants' alleged failure to inform the plaintiffs of discovery of radon at Garner.  *See* (*Vega* Doc. 49 ¶¶ 170, 61-71); (*Cruz* Doc. 23).

The defendants moved to dismiss all claims and counts, asserting grounds of qualified immunity and sovereign immunity.  (Doc. 52 *et seq.*); *see also* (Docs. 52; 52-1; 61 – 67; 69; 70; 73).  The Court granted the defendants' motion in part and denied it in part.  *See* (Doc. 73).

The Court granted the motion on qualified immunity grounds in part, and dismissed all conditions-of-confinement claims arising from conduct that occurred before the Supreme Court issued its opinion in *Helling v. McKinney*, 509 U.S. 25, 29 (1993), on June 18, 1993.  *See* (*Vega* Doc. 73 p. 26); *Vega v. Semple*, 963 F.3d 259, 272 n.50 (2020).  The Court also dismissed the access-to-court claims.  *See* (Doc. 73 p. 15-18, 26); *Vega*, 963 F.3d at 272 n.49.  The Court denied the rest of the motion asserting other qualified immunity grounds and denied the motion on all Eleventh Amendment grounds.  *See* (Doc. 73 p. 26).  The defendants appealed (Doc. 75), and the Second Circuit affirmed in part and reversed in part.  *See* (Doc. 84); *Vega*, 963 F.3d at 284-85.  The Second Circuit reversed the decision to not dismiss injunctive state-law claims but otherwise affirmed.  *Id.* at 284-85.

The plaintiffs filed a Second Amended Complaint (Docs. 114), which the defendants sought a pre-filing conference to move to dismiss (Docs. 115; 120).  However, proceedings were stayed pending settlement discussions.  In October, 2022, the plaintiffs brought additional counsel.

---

[4]    All record citations in this case are to the *Vega* docket, unless otherwise indicated.

*See* (Docs. 144; 145; 146).  Thereafter, at a status conference (Doc. 153), the plaintiffs asked for permission to file one, last, final complaint, which the Court allowed.  The plaintiffs filed their Third Amended Complaint on December 12, 2022, containing three counts. (Doc. 156 p. 20-24).

The Third Amended Complaint also named several new defendants:  Cook, Quiros, Dilworth, Corcella, Washington, and Pease.  (*Id.* Caption, ¶¶ 33, 34, 35, 36, 39).  These new parties appeared, and the defendants then moved to dismiss the current complaint in part, *via* the Second Motion to Dismiss (Doc. 158).  *See* (Docs. 158; 161; 157; 167 – 170).  The plaintiffs opposed that motion and also clarified some of their claims.  *See* (Doc. 159).  The Court granted the second motion to dismiss in part and denied it in part, dismissing all claims against defendant Meachum (deceased), dismissing Meachum as a defendant entirely.  (Doc. 179).

The plaintiffs then moved for class certification, first unsuccessfully and then again a second time.  *See* (Docs. 163; 164; 180; 192; 193; 199; 242).

In the times since *Cruz* was filed, the plaintiffs have filed three amended complaints; pursued discovery, including the defendants providing access to hundreds of thousands of pages of records and other materials (Doc. 279 p. 6, 5-10); contested motion practice and an interlocutory appeal, which continued to narrow the scope of the case and disputes before the Court; and had multiple rounds of settlement discussions.  Thereafter, the plaintiffs then moved for class certification a second time.  They sought a total of three total, distinct classes, "two damages classes under Rule 23(b)(3) and one injunctive class under Rule 23(b)(2)."   (Doc. 193 p. 5-7); (Doc. 192 p. 2).  For the damages' classes, they seek one class for post-conviction inmates to bring claims for money damages under the Eighth Amendment (and the Fourteenth Amendment's Equal Protection Clause) and another class for pre-trial detainees to bring claims for damages under the

Fourteenth Amendment Due Process Clause (and the Equal Protection Clause).  (Doc. 193 p. 5-7); (Doc. 192 p. 2).  For the proposed injunctive class, plaintiffs sought a class of "all persons currently incarcerated at Garner," who they claim are having their rights violated based on the alleged lack of sufficient radon testing at Garner and unspecified medical care.  (Doc. 193 p. 6, 5-7); (Doc. 192 p. 2).

The Court granted the motion in part, certifying three distinct classes as redefined by the Court, two damages class and one injunctive class.  (Doc. 242).  The parties then proceeded with expert discovery.  *See generally* (Doc. 243 p. 2); (Doc. 279 p. 5-10); (Docs. 257 - 260); (Doc. 297); (Doc. 299); (Tr., 8-14-25 Status Conf.).

One critical part of expert discovery was plaintiffs identifying anyone with a confirmed lung cancer diagnosis, including providing a list of such plaintiffs, or identifying the individuals on a rolling basis as soon as plaintiffs identified the individuals, and also providing the defendants the medical records for such individuals for care outside DOC custody.  This was agreed to by the parties, and the defendants repeatedly reminded and stressed the importance of it.  (Doc. 243 p. 2); (Doc. 279 p. 5-10); (Tr., 2.3.25 Status Conf. p. 5, 14-15, 27-28); (Tr., 8-14-25 Status Conf. p. 10).

To date, the defendants have not been provided a list of plaintiffs with confirmed lung cancer diagnoses, nor have the defendants been provided medical records for outside medical care for any such individuals.  The defendants continue to assert their right to such information, as it was needed for vetting and investigation during the defendants' expert discovery process, which is now closed.  At this stage, it appears no plaintiffs have confirmed diagnoses of lung cancer.  *See* (Tr., 8-14-25 Status Conf., p. 10)(plaintiffs' counsel acknowledging none of the "main plaintiffs" have lung cancer); (Doc. 310)(plaintiff Marra confirming he does not have lung cancer).

The parties have spent the past year conducting expert discovery. Plaintiffs disclosed two experts. The defendants also disclosed two experts. The experts' depositions have been completed. The defendants now move for summary judgment.

## II.    ARGUMENT

### A.    Legal Standards

#### 1.    Motions for Summary Judgment

Federal Rule of Civil Procedure 56 requires entry of summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file together with any affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "[T]he mere existence of a factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no genuine issue of material fact." *Id.* at 247-48. A factual dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* A "material fact" is one whose resolution will affect the ultimate determination of the case. *Id.*

The Supreme Court confirms:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules, as a whole, which is designed to secure the just, speedy and inexpensive determination of every action.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Used properly, Rule 56 is a "vital procedural tool to avoid wasteful trials." *Capitol Imaging Assocs. v. Mohawk Valley Medical Assocs.*, 996

F.2d 537, 541 (2d Cir.), *cert. denied*, 510 U.S. 497 (1993).  It is properly used to "isolate and dispose of factually unsupported claims."  *Celotex Corp.*, 477 U.S. at 323-24.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the portions of the pleadings, affidavits or other documentary evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323.  Those facts that are material will be identified by the substantive law governing the case.  *Anderson*, 477 U.S. at 248.

Once the moving party meets its burden, the burden shifts to the non-moving party to produce admissible evidence establishing an issue of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)(citing Fed. R. Civ. Pro. 56).  To defeat a motion for summary judgment, the non-moving party may not merely rely upon unsupported allegations made in the complaint, nor rely on "mere speculation or conjecture" to overcome a motion for summary judgment.  *Knight v. Fire Ins. Company*, 804 F.2d 9, 12 (2d Cir. 1986), *cert. denied*, 480 U.S. 932 (1987); *Federal Trade Commission v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019)(citations omitted).  "Conclusory allegations or denials therefore are not evidence and cannot themselves create a genuine issue of material fact where none would otherwise exist."  *Moses*, 913 F.3d at 305 (quotations omitted).

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50.  At the summary judgment stage, a nonmoving party "must offer some hard evidence showing that its version is not wholly

fanciful." *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998). "Summary judgment cannot

be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim." *Fincher*

*v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010)(quotation omitted).

The evidence provided at the summary judgment stage must be presented in a manner

consistent with its admissibility at trial. *See Porter v. Qurantillo*, 722 F.3d 94, 97 (2d Cir.

2013)("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for

summary judgment.")(citation omitted).

"In ruling on a motion for summary judgment, the district court may rely on any material

that would be admissible or usable at trial." *Camera v. Freston*, No. 3:18-CV-1595(SALM), 2022

U.S. Dist. LEXIS 55068, *3 (D. Conn. March 28, 2022)(quoting *Major League Baseball Props.,*

*Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008)). Moreover, the plaintiff must point to and

support with admissible evidence "each issue of material fact as to which it is contended there is a

genuine issue to be tried." Local R. 56(a) *et seq.*; *see also Anderson*, 477 U.S. at 248. The plaintiff

must produce evidence to show the existence of every element which it bears the burden of proving

at trial. *Equimark Comm. Finance Co. v. C.I.T. Fin. Serv. Corp.*, 812 F.2d 141, 144 (3d Cir. 1987).

> **2.     Legal Standards for 42 U.S.C. § 1983 Actions Alleging
> Violations of the Eighth or Fourteenth Amendment Concerning
> Prison Conditions.**

Plaintiffs bring this action under 42 U.S.C. § 1983 and claim violations of their

constitutional rights under the Eighth Amendment and Fourteenth Amendments. *See* (Doc. 156 p.

20-24 ¶¶ 124-147). All claims in the case are constitutional claims brought under § 1983; there

are no other claims, such as state tort or other state-law claims, in the case. *See* (Doc. 156 p. 7 ¶

43; p. 20-24 ¶¶ 124-147). Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

To properly bring a § 1983 action for a constitutional violation, a plaintiff must demonstrate she or he suffered injury caused by the conduct of a person acting under color of state law and who's conduct violated the plaintiff's constitutional rights. *See* 42 U.S.C. § 1983; *see also Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998)("[I]n all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury.").

That is, "under Section 1983, a plaintiff must show: '(1) actions taken under color or law; (2) deprivation of constitutional or statutory right; (3) causation; and (4) damages.'" *Gothberg v. Town of Plainville*, 148 F. Supp. 3d 168, 176 (D. Conn. 2015)(quotation omitted). "Moreover, [i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Id.* (quotation omitted). The Second Circuit confirms *direct* personal involvement by a defendant is required for § 1983 claims. *See Tangreti v. Bachmann*, 983 F.3d 609, 614-20 (2020).

### Eighth Amendment Cruel and Unusual Punishment Clause

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S Const. amend. VIII. Deliberate indifference to a prisoner's serious safety or medical needs can constitute an Eighth Amendment violation. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The deliberate indifference

11

standard embodies both objective and subjective elements. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). "[T]he alleged deprivation must be, in objective terms, 'sufficiently serious.'" *Id.* (citation omitted). "[T]he charged official must act with a sufficiently culpable state of mind." *Id.*

### Fourteenth Amendment
### Due Process Clause

"No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)(citations omitted). "A pretrial detainee's claims are evaluated under the Due Process Clause because, '[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner—neither cruelly and unusually nor otherwise.'" *Id.* at 29. "A detainee's rights are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Id.* (quoting *City of Revere*, 463 U.S. 239, 244 (1983)).

### Fourteenth Amendment
### Equal Protection Clause

"The Fourteenth Amendment provides in relevant part that no state shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *Marcello v. Currey*, 364 F. Supp. 3d 155, 158 (D. Conn. 2019)(quoting U.S. Const. amend. XIV, § 1). "The Equal Protection Clause protects prisoners from invidious discrimination. This provision does not mandate identical treatment for each individual; rather it requires that similarly situated persons be treated the same." *Muhmmaud v. Murphy*, 632 F. Supp. 2d 171, 178 (D. Conn. 2009)(citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985).

"It is well-established that '[m]erely being a prisoner is insufficient to place [one] in a suspected class.'"  *Campbell v. Quiros*, No. 3:17-CV-0946(CSH), 2018 U.S. Dist. LEXIS 23207, *12 (D. Conn. Feb. 13, 2018)(citation omitted).  "Courts have applied rational basis analysis to equal protection claims  where prison policies  distinguished  between  non-suspect  classes  of prisoners." *Id.* (collecting cases).

**B.**     **The Key Allegations from Plaintiffs' Complaints (Alleging the Inmate Housing Units were Never Test) are Untrue, and Those Allegations Served as the Basis for the Case to Survive Dismissal.  The Defendants are Therefore Now Entitled to Judgment as a Matter of Law at this Stage.**

The undisputed facts confirm that the inmate housing units at Garner have been tested for radon beginning in December 2013, first by the Department of Public Health (DPH).  Radon testing was later contracted out to companies in the industry, who undertook testing and mitigation work, when appropriate.  This was all done in accordance with industry standards at the times, as confirmed by the defendants' industry expert.[5]  And this continues today, through the present.

Throughout this lawsuit, the plaintiffs have based their lawsuit on a house of cards.  Its flawed foundation is the flat-out false allegation that DOC never had the inmate housing units at Garner tested for radon.  *See* (*Vega* Doc. 49 ¶¶ 139; 141; 46(A)); (*Cruz* Doc. 1 ¶¶ 124; 126; 41(A)); *see also* (*Vega* Doc. 156 ¶¶ 96; 97; 99; 104; 126; 133; 140; 66; 5; p. 25 ¶ 3)(later alleging housing areas were not tested "for several years" following initial testing in 2013).

---

[5]     The plaintiffs did not disclose an industry expert of any kind, and they cannot rebut or genuinely dispute the fact that, beginning in December 2013 and thereafter, the housing units at Garner were tested for radon in accordance with industry standards, and subsequent testing and mitigation in the years that have followed have been consistent with industry standards.

This is not overstated. These allegations were not mere afterthought or oversight. They are the main reason the case survived the motion to dismiss and the resulting appeal. This Court stressed in its decision denying the original motion to dismiss that,

- "In 2013 the school rooms at Garner, located on the second floor level, were tested (as part of state-mandated testing, conducted 'at the demand of a Garner teacher') and evidenced levels at or above the EPA action level of 4.0 pCi/L requiring additional testing."

- And that "Defendants . . . purposefully decided not to test the cell block units."

(Doc. 73 p. 3). The Court also further based its analysis on the plaintiffs' false allegations:

- "[plaintiffs] assert that once Defendants were notified that radon levels were indeed high in 2013, Defendants ... ***intentionally did not do any testing in the areas that house inmates***, only testing and remediating other areas . . . ."

(Doc. 73 p. 13-14)(emphasis added). That is, in denying the defendants' first motion to dismiss, this Court unquestionably relied upon the plaintiffs' representation that the defendants intentionally refused to ever test the inmate housing areas. *See* (Doc. 73 p. 3, 13-14).

On appeal, the Second Circuit's analysis was also premised on such allegations contained in the First Amended Complaint (Doc. 49):

- "Garner was not, however, tested for radon gas until 2013, and even then, testing was only limited to the facility's classroom area."

- "In 2013, a non-inmate teacher at Garner requested that the classroom area of the facility be tested for radon pursuant to that statute. Following this request, Garner's school area was tested for radon in December 2013 and early 2014."

- "As discussed in greater detail below, ***Plaintiffs allege*** that Defendants tested only the school area and ***that the cell blocks were intentionally not tested for radon***."

*Vega*, 963 F.3d at 269-270 (emphasis added); *see also id.* at 277 n.90.

The operative Third Amended Complaint (Doc. 156) now attempts to pivot, alleging that inmate housing areas were not tested "for several years" following the initial school testing at Garner in 2013:

- (Doc. 156 ¶ 96)("Defendants intentionally chose not to test the cell blocks for several years [after the initial testing at Garner in 2013, *see* ¶ 89]");

- (Doc. 156 ¶ 97)("Defendants Semple, Dzurenda, Arnone, Lantz, Armstrong, Meachum, Falcone, Link, Batten, and Pease intentionally chose not to test the inmate cell blocks for several years after the initial testing at Garner . . . .");

- (Doc. 156 ¶¶ 126, 133; 140)("Each Defendant . . . made the intentional choice . . . not to test the inmate cell blocks for several years after initial testing of Garner ...");

- *See also* (Doc. 156 p. 25 ¶ 3)(seeking "injunctive relief by way of comprehensive radon testing over time in all areas that house inmates . . . .").

And while plaintiffs' more recently in their Third Amended Complaint attempted this shift away from alleging that the inmate housing units were *never* tested, (and instead incorrectly alleging the housing units were not testing for years after DPH's December-2013 testing), plaintiffs' counsel still continues to falsely claim and represent this to the Court (including as recently as August 2025, just a few months ago) that there was some intentional decision to exclude testing the inmate housing units.  *See* (Tr., 8-14-25 Status Conf. p. 13)(Minnella stating "On their own, they decided not to test where these people -- where the inmates were twenty hours a day.

They made that decision not to test . . . .  That is a big problem in this case, that they chose not to test the facility where these inmates lived, number one.").

The plaintiffs also furthered the baseless accusations in the press as part of perpetrating this false narrative.  *See Who Got the Work?  Meet Attorneys Litigating Federal Lawsuit Alleging Radon Dangers at Connecticut Prison*, CT Law Tribune, July 6, 2020, (Minnella saying "We want them to test the cell block areas, which they have never done.")(available on LEXIS).[6]  And plaintiffs and their legal team continue to falsely state this on their current recruiting or advertising websites.  *See* https://garnerjustice.com (last visited Nov. 30, 2025)(falsely alleging that "Court records show:  . . .  Only classrooms were tested; **cell blocks and housing units were excluded**.")(bold in original)(attached); https://radoncase.com (last visited Nov. 30, 2025)(same).[7]

---

[6]    Disappointingly, plaintiffs' lead attorney even went so far as to issue public quotes calling Garner a "death box." *Prisoners Clear Early Hurdle Against Connecticut Over Radon Exposure*, CT Law Tribune, October 4, 2018)(Minnella saying, "We call it [Garner] the 'death box.'")(available on LEXIS).

[7]    To the best of the defense's knowledge, these websites and also the billboard, (*see infra.*), put up by the plaintiffs' legal team were done in the last few months, years after plaintiffs' counsel has been provided the testing reports.

However, these allegations are false.  The inmate housing units were tested for the presence of radon in December, 2013, and repeatedly thereafter.

| Kit # | Room Id | Started | Ended | pCi/L | Analyzed |
|---|---|---|---|---|---|
| 4642260 | 850 | 2013-12-11 @ 3:00 pm | 2013-12-13 @ 3:00 pm | 5.1 | 2013-12-16 |
| 4642264 | 853A | 2013-12-11 @ 3:00 pm | 2013-12-13 @ 3:00 pm | 4.9 | 2013-12-16 |
| 4642223 | 860 GYM OFFICE | 2013-12-11 @ 12:00 pm | 2013-12-13 @ 1:00 pm | 5.5 | 2013-12-16 |
| 4642234 | A134 | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | 2.7 | 2013-12-16 |
| 4642227 | A136-D1 | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | 2.7 | 2013-12-16 |
| 4642228 | A136-D2 | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | 3.6 | 2013-12-16 |
| 4642232 | B134 | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | 0.9 | 2013-12-16 |
| 4642231 | B136 NURSE | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | < 0.3 | 2013-12-16 |
| 4642281 | B403 DINING HALL | 2013-12-11 @ 4:00 pm | 2013-12-13 @ 4:00 pm | 3.0 | 2013-12-16 |
| 4642233 | BLOCK A-CENTER S | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | 1.6 | 2013-12-16 |
| 4642230 | BLOCK B- CENTER | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | < 0.3 | 2013-12-16 |
| 4642235 | BLOCK C -CENTER | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | 1.4 | 2013-12-16 |
| 4642239 | BLOCK D-CENTER S | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | 2.5 | 2013-12-16 |
| 4642244 | BLOCK E-CENTER S | 2013-12-11 @ 2:00 pm | 2013-12-13 @ 3:00 pm | < 0.3 | 2013-12-16 |
| 4642250 | BLOCK F-CENTER S | 2013-12-11 @ 3:00 pm | 2013-12-13 @ 3:00 pm | 3.1 | 2013-12-16 |
| 4642249 | BLOCK G-CENTER S | 2013-12-11 @ 3:00 pm | 2013-12-13 @ 3:00 pm | 0.6 | 2013-12-16 |
| 4642257 | BLOCK H-CENTER S | 2013-12-11 @ 3:00 pm | 2013-12-13 @ 3:00 pm | 0.9 | 2013-12-16 |
| 4642238 | C121 | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | 1.6 | 2013-12-16 |
| 4642237 | C134 | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | 2.0 | 2013-12-16 |
| 4642236 | C136 | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | 4.0 | 2013-12-16 |
| 4642243 | D120 MENTAL HEAL | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | 4.4 | 2013-12-16 |
| 4642242 | D121 | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | 3.5 | 2013-12-16 |
| 4642240 | D134 | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | 3.1 | 2013-12-16 |
| 4642241 | D136 NURSE | 2013-12-11 @ 1:00 pm | 2013-12-13 @ 1:00 pm | 4.4 | 2013-12-16 |
| 4642248 | E121 | 2013-12-11 @ 2:00 pm | 2013-12-13 @ 3:00 pm | < 0.3 | 2013-12-16 |
| 4642245 | E134 | 2013-12-11 @ 2:00 pm | 2013-12-13 @ 3:00 pm | 0.7 | 2013-12-16 |
| 4642246 | E136-D1 | 2013-12-11 @ 2:00 pm | 2013-12-13 @ 3:00 pm | 0.9 | 2013-12-16 |
| 4642247 | E136-D2 | 2013-12-11 @ 2:00 pm | 2013-12-13 @ 3:00 pm | 0.6 | 2013-12-16 |
| 4642253 | F120 | 2013-12-11 @ 2:00 pm | 2013-12-13 @ 3:00 pm | 2.5 | 2013-12-16 |
| 4642252 | F134 | 2013-12-11 @ 2:00 pm | 2013-12-13 @ 3:00 pm | 3.4 | 2013-12-16 |
| 4642251 | F136 NURSE | 2013-12-11 @ 2:00 pm | 2013-12-13 @ 3:00 pm | 4.2 | 2013-12-16 |
| 4642256 | G124 CELL | 2013-12-11 @ 3:00 pm | 2013-12-13 @ 3:00 pm | 1.3 | 2013-12-16 |
| 4642255 | G134 | 2013-12-11 @ 2:00 pm | 2013-12-13 @ 3:00 pm | 1.8 | 2013-12-16 |
| 4642254 | G136 | 2013-12-11 @ 2:00 pm | 2013-12-13 @ 3:00 pm | 2.3 | 2013-12-16 |
| 4642224 | GYM -WD FRONT | 2013-12-11 @ 12:00 pm | 2013-12-13 @ 1:00 pm | 5.0 | 2013-12-16 |
| 4642226 | GYM-WC | 2013-12-11 @ 12:00 pm | 2013-12-13 @ 1:00 pm | 5.5 | 2013-12-16 |
| 4642225 | GYM-WD BACK | 2013-12-11 @ 12:00 pm | 2013-12-13 @ 1:00 pm | 5.8 | 2013-12-16 |

| Kit # | Room Id | Started | Ended | pCi/L | Analyzed |
|---|---|---|---|---|---|
| 4642259 | H134 | 2013-12-11 @ 3:00 pm | 2013-12-13 @ 3:00 pm | 0.9 | 2013-12-16 |
| 4642258 | H136 | 2013-12-11 @ 3:00 pm | 2013-12-13 @ 3:00 pm | 0.6 | 2013-12-16 |
| 4642287 | IPM-1 501 NURSE | 2013-12-11 @ 4:00 pm | 2013-12-13 @ 4:00 pm | < 0.3 | 2013-12-16 |
| 4642285 | IPM-1 508 OFFICE | 2013-12-11 @ 4:00 pm | 2013-12-13 @ 4:00 pm | < 0.3 | 2013-12-16 |
| 4642283 | IPM-1 535B | 2013-12-11 @ 4:00 pm | 2013-12-13 @ 4:00 pm | 0.7 | 2013-12-16 |
| 4642284 | IPM-1 CENTER STA | 2013-12-11 @ 4:00 pm | 2013-12-13 @ 4:00 pm | < 0.3 | 2013-12-16 |

*See* (Radon Test Documents BATES Pages 000085, 000086)(attached).[8]  As the excerpt shows,

the housing units (A Block through H Block) were tested from December 11th through 13th of

2013, with the results analyzed on December 16, 2013.  This testing was the same year as the

original, initial testing done in the school areas of Garner in March, 2013.  *See* (BATES Pages

000002; 000049; 000051; 000063).  In fact, this December-2013 testing that ***included*** Garner's

inmate housing areas was done following the Connecticut Department of Public Health's

recommendation to DOC to test the entire Garner facility.  *See* (BATES Pages 000001 – 000004);

(Semple Decl. ¶ 15); (Pease Decl. ¶ 6).  Following that recommendation from DPH, the DOC had

Garner tested by DPH as an entire facility in December 2013 and included the inmate housing

units.  (BATES Pages 000084 – 000096; 000075 – 000099).  The reports show this.  (BATES

Pages 000001 - 000004); (BATES Pages 000084 – 000096; 000075 – 000099).  This included

numerous sample areas in each housing unit.  *See* (BATES Pages 000085, 000086).  The officer

stations in the housing units were tested along with other sample areas in the units.  *See* (above).

The officer' stations in A through H Units are all open desk areas in or near the center of the

housing areas.  *See* (Plimpton Decl. ¶¶ 13, 9-20); (Semple Decl. ¶¶ 8, 9).

Further, following the 2013 testing, the Department of Public Health informed Link and

Semple that no inmates or staff were being exposed to unacceptable living or working conditions

as a result of the radon levels, but that DOC should still begin the process of mitigating radon

---

[8]    There are several different testing reports for testing done in different years that are attached.  The page citations
in this memorandum refer to the BATES Stamp page numbers added in the footers of the pages.  Those BATES Page
numbers were added as part of document disclosure in this litigation.  There are several pages (BATES Stamp Pages
000188 – 000196; 000239 – 000240) that are designated and disclosed as Confidential Attorneys' Eyes' Only pursuant
to the Protective Order (Doc. 113) issued by the Court in this case on Feb. 8, 2021.

levels in the facility.[9]  *See* (Link Decl. ¶ 6); (Semple Decl. ¶¶ 18).  Semple and Link relied upon this, and they and others believed that the facility could continue to operate during the mitigation and testing process and believed that it did not need to be closed or temporarily shut down.  See (Link Decl. ¶ 6); (Semple Decl. ¶¶ 18-23); (Pease Decl. ¶¶ 3-18); (Falcone Decl. ¶¶ 8-19).

The testing of these officer's stations in the housing units alone is constitutionally sufficient for the defendants' purposes, as it is testing in open areas in the housing units and done by the State's public health agency.  However, there were tests placed in other areas in the housing units, such staff rooms, empty cells, converted cells, or other areas that would allow for a secure, undisturbed testing location to provide additional sampling data.  *See* (BATES Pages 000085, 000086)(A136-D1; A136-D2; B134; B136; C121; C134; C136; D120 Mental Heal; D121; D134; D136 Nurse; E121; E134; E136-D1; E136-D2; F120; F136; G124 Cell; G134; G136; H134; H136); (Plimpton Decl. ¶¶ 6-20).

Throughout the years since, radon testing at Garner was done *via* area sampling such as this.  *See generally* (testing reports); (Plimpton Decl. ¶¶ 6-20).  Testing could not be appropriately done in the prison cells occupied by inmates due to both safety and scientific purposes.  (Plimpton Decl. ¶¶ 13, 14, 9-20).

The individually occupied inmate cells were not tested for these reasons, and the testing instead was done *via* selecting sampling locations in the housing units that would allow for undisturbed tests.  (*Id.*)  This is consistent with practices in the industry in other instances where there are concerns about the tests being disturbed.  (*Id.*)

---

[9]    Such statements go to the defendants' state of mind.  *See Terbush v. Mitchell*, No. 3:15-CV-1339(SALM), 2017 U.S. Dist. , LEXIS 22854, *18 (D. Conn. Feb. 17, 2017)(citing *Smith v. City of N.Y.*, 388 F. Supp. 2d 179, 182 (S.D.N.Y. 2005)("It is well established, though, that statements offered for their effect on the listener are non-hearsay.")(citing *United States v. Garcia*, 900 F.2d 571, 576 (2d Cir. 1990))).

To the extent plaintiffs now attempt to pivot and claim every single prison cell should have been tested, there is no such requirement. *See* (Doc. 236 p. 3)(plaintiffs arguing "Defendants were deliberately indifferent by not testing the inmate cells."). Area sampling is sufficient and accepted in the industry (Plimpton Decl. ¶¶ 10, 11, 15, 17, 20),[10] and it is certainly acceptable under the constitution given the Supreme Court's decisions and the legal landscape in the Circuit.

Also, as detailed below and in the reports, the Garner facility and its housing units have been tested on other occasions and in other years following the December, 2013 testing. *See, e.g.*, (Mar. 2013)(BATES Pages 000001 – 000004; 000049; 000051; 000063); (Dec. 2013)(BATES Pages 000085; 000086); (Feb. 2015)(BATES Page 000215); (Feb. 2016)(BATES Page 000231); (Jan. 2018)(BATES Pages 000262; 000266; 000267; 000269; 000272; 000273; 000274; 000276; 000286); (Feb. 2019)(BATES Page 000295); (Mar. 2021)(BATES Page 000300); (Feb. 2023)(BATES Pages 000303; 000304).[11]

After the initial rounds of testing by DPH, the State contracted with outside vendors that were licensed to do radon testing and mitigation work. (Semple Decl. ¶¶ 12-23); (Pease Decl. ¶¶ 3-18). The TRC company did comprehensive review of the data from the previous testing done by DPH when it began working with the Connecticut DOC. *See* (BATES Page 000102, 000100 - 000225); (Plimpton Decl. ¶¶ 9, 10). TRC has continued to do the testing since, through the present. *See generally* (Testing Reports). Further, TRC's engineer designed a mitigation system as well,

---

[10]     The plaintiffs did not disclose industry expert or any expert that can opine on the industry standards and practices for radon testing and mitigation.

[11]     The DOC Statewide testing policy was implemented June 29, 2018. *See* (Doc. 66-1). The 2019 re-testing at Garner followed the January, 2018, testing (done before the State-wide testing policy was implemented). Garner has been tested in accordance with the two-year testing schedule contemplated in § 7.d.ii of the Directive since the statewide testing policy was implemented effective June 29, 2018.

which was then built and installed by another contracting company called A&R, a licensed radon mitigation contractor.  (Plimpton Dec. ¶¶ 6-8).

There can be no argument or allegation at this stage that the inmate housing areas at Garner have supposedly never been tested for radon.  They have been tested, repeatedly.  Nor can there be any argument that the inmate housing units were not tested for "several years after" the initial testing at Garner of the school areas in March of 2013.  The housing units were first tested in December of 2013, and that is not "several years after" March of 2013.  The housing units have also been retested repeatedly thereafter as detailed in the testing reports.  Also important, there can be dispute that the radon testing and mitigation was consistent with industry standards throughout the times in question.  *See* (Plimpton Decl. ¶¶ 20, 9-20).  DOC continues to have the housing units at Garner and entire the Garner facility tested for radon and mitigated where appropriate, using vendors or contractors with specialized knowledge in the fields.

Commissioner Semple even implemented a statewide testing policy *via* a Department Administrative Directive that required testing all Connecticut DOC facilities and including testing all inmate housing units for radon on clear and formalized schedules, using licensed professionals in the field of radon testing and mitigation.  *See* (DOC A.D. 5.3 § 7 entitled "Radon Detection"); (Semple Decl. ¶¶ 24-25).  That policy is contained in A.D. 5.3 § 7, and it remains in the current version[12] of the Directive published on the DOC website that remains in effect.  It also specifically requires that testing "shall include the inmate housing areas." (DOC A.D. 5.3 § 7.b.).

---

[12] The radon policy was enacted June 29, 2018, implemented into Directive 5.3, and signed by Commissioner Semple.  The current version of the directive is effective as of May 3, 2019, when it superseded the previous version and is signed by Commissioner Cook.  The radon testing policy remained the same. Both versions are attached.  The current version is also available at https://portal.ct.gov/DOC/AD/AD-Chapter-5 (last visited Dec. 1, 2025).

Given all of that detailed in this section, the Court can and should grant the motion for summary judgment in its entirely.  The plaintiffs' entire action is premised on the allegations that the defendants deliberately ignored risk of high exposure of radon gas for the inmates, and those claims are premised on the allegation that the defendants intentionally refused to test in the inmate housing units for radon when they tested other (staff) areas of the Garner prison.  Those allegations are critical to their claims, and their claims crumble without them.

For example, how could the plaintiffs possibly maintain an action from December of 2013 forward?  The defendants during such time periods relied on testing done by the Department of Public Health and then further testing and mitigation by "licensed radon detection company[ies]," and the tests included the housing units.  *See* (DOC A.D. 5.3 § 7.b. and § 7.c.)(requiring that the testing be done by a licensed radon detection company).[13]  There is no deliberate indifference there, given this important (previously undisclosed) fact.   The law requires that officials "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference."  *Clark*, 2025 U.S. App. LEXIS 25894, *18 (quoting *Farmer*, 511 U.S. at 837).

This case falls well short of the stringent, subjective deliberate-indifference standard.  It also fails the objective element of deliberate indifference, given that the officials relied upon the expertise of those in the radon testing and mitigation industry, and also relied on DPH, who informed Link and Semple that inmates and staff were not being exposed to any unacceptable radon levels while DOC beginning the contracting process to hire testing and mitigation experts.

---

[13]   The Radon Detection policy also requires remediation in locations where test results show levels higher than 4.0, and it requires that this be done "using a licensed radon remediation vendor(s) . . . ."  *See* (DOC A.D. 5.3.§7.d.).

In fact, the operative complaint arguably concedes no claims from 2013 onward can survive; such claims arguably are not even included in the action based on the plain language in the complaint:  "[t]he time parameters for this action will run from June 18, 1993, *through DOC's testing of the entire Garner facility* and installation of a proper, effective, and fully functioning radon mitigation system throughout the entire Garner facility . . . ."  (Doc. 156 ¶ 11)(added italics).

DPH tested Garner facility-wide in 2013, and TRC and A&R have continued to test and mitigate thereafter.  Further still, there have been no levels above 4.0 detected anywhere in Garner since March of 2019.  Repeated testing, mitigation, and retesting, has culminated in nearly the last six straight years of levels at or below 4.0 constitutes "a proper, effective, and fully functioning radon mitigation system throughout the entire facility."  So, by the complaint's concessions, no injunctive claims can survive as a matter of law.  And given the complaint's concessions, the damages claims fail as well on both elements, let alone qualified immunity.

For the relevant defendants and conduct before 2013, that was before DPH tested for radon at Garner.  Those defendants did not know of elevated radon levels; they did not draw the required subjective inferences.  The evidence confirms this.  The claims against them fail as a matter of law.  *See Vega*, 963 F.3d at 279 n.104 ("We do not hold that Defendants should have taken affirmative steps to discover a risk of which they had no knowledge, nor could we under the Eighth Amendment standard.").  There is no deliberate indifference as a matter of law for those defendants and that conduct.  Nor can there be any Equal Protection claim, as the defendants who had no subjective knowledge or belief about allegedly unsafe radon levels cannot be alleged to have treated the plaintiffs differently at all, let alone so unequally that it could violate the Fourteenth Amendment.

And for the defendants and conduct for 2013 onward, Garner was repeatedly and regularly tested for radon and retested and remediated where needed.  This was done first by a separate state agency, and then by private contractors that specialize in this area and who the defendants relied upon to ensure Garner met industry standards.  The Court should grant the defendants motion and enter summary judgment for the defendants on all claims based on the merits in light of the key factual allegations in the plaintiffs' complaints turning out to be false beyond genuine dispute.

Another case in this District proves illustrative.  *Toliver v. Semple*, No. 3:16CV1899(SRU)(Doc. 5), 2016 U.S. Dist. LEXIS 168166 *6-7 (D. Conn. Dec. 6, 2016).  In *Toliver*, the plaintiff attempted to sue DOC officials concerning alleged radon at Garner, but the plaintiff also disclosed in his complaint that DOC officials tested for radon at Garner, resulting in dismissal of those claims:

> Toliver contends that the exposure to radon constitutes an unconstitutional condition of confinement.  Although he may state an Eighth Amendment claim for exposure to unsafe conditions that pose an unreasonable risk of harm to future health, *Helling*, 509 U.S. at 34-35, ***Toliver presents evidence that the defendants took immediate remedial action.  Toliver has attached to his complaint documents noting that radon testing was done at Garner in December 2013 and January 2014.***  Following receipt of the recommendations, the Department of Correction contracted for mitigation work, which was completed by June 2014.  *See* ECF No. 1 at 26-32.  ***As the defendants acted promptly when informed of the problem, they were not deliberately indifferent.  The claim regarding Garner is dismissed.***

*Id.* (emphasis added).  In *Toliver*, the plaintiff disclosed in his complaint the radon testing and mitigation at Garner that occurred during 2013 and 2014; that resulted in dismissal of those claims at the outset of the case.

Given the evidence presented here at summary judgment, there can be no genuine dispute that the inmate housing areas were tested in 2013 and have been tested and mitigated since.  The

Court should grant summary judgment on all claims for all defendants on this basis alone; the defendants are entitled to judgment as a matter of law.

**C.    All Claims Based on Theories of Supervisory Liability Fail as a Matter of Law.**

While unclear, it appears much of plaintiffs' claims assert or rely on theories of supervisory liability.  *See, e.g.*, (Doc. 156 p. 2 ¶ 4)("Defendants are current and former DOC officials who had or have supervisory responsibility for operations of all DOC facilities, including Garner."); *see also* (*Vega* Doc. 156 p. 5-7, ¶¶ 25-42); (*Cruz* Doc. 21 ¶¶ 32, 35); (*Vega* Doc. 49 p. 6-8 ¶¶ 26-39). Nearly all of the defendants they name are high-ranking supervisory officials, such as Commissioners of the entire department (Armstrong, Lantz, Arnone, Dzurenda, Semple, Cook, Quiros); Wardens of the entire prison (Dzurenda, Semple, Dilworth, Corcella, Washington); and Directors of Facilities and Engineering for the whole department (Batten and Link).  This is the case for every defendant except arguably defendant Pease.  And none of the defendants are alleged to have been directly involved or to have conducted testing, mitigation, or similar functions themselves.  Instead, all defendants are supervisors and appear to be sued under attempted theories of supervisory liability or vicarious liability.  However, any such attempts are impermissible and fail as a matter of law.

Supervisory liability or other theories of vicarious liability are inapplicable to § 1983 actions as a matter of law.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.*

The Second Circuit has confirmed that *direct* personal involvement of a defendant in the claimed constitutional violation is required for claims brought under § 1983. *See Tangreti*, 983 F.3d at 614-20. In *Tangreti*, the Second Circuit confirmed what the Supreme Court had already held in 2009 in *Aschroft v. Iqbal*: there can be no supervisory or vicarious liability for actions brought under 42 U.S.C. § 1983. *See Tangreti*, 983 F.3d at 614-20; *Iqbal*, 556 U.S. at 676, 677.

"We join these circuits in holding that after *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676).

Before *Tangreti*, plaintiffs in this Circuit sometimes still argued or relied on the five-factor "*Colon* test" from *Colon v. Coughlin*, 58 F.3d 865, 873 (1995) and claimed that it allowed for § 1983 liability based on alleged personal involvement arising from theories other than direct, personal involvement. However, the Supreme Court's decision in *Iqbal* in 2009 undercut the validity of the Second Circuit's *Colon* test. *See Iqbal*, 556 U.S. at 677 ("[i]n a § 1983 suit or a *Bivens* action--where masters do not answer for the torts of their servants--the term 'supervisory liability' is a misnomer."). The Second Circuit in *Tangreti* confirmed what *Iqbal* had already held: only direct, personal involvement of the defendant in the constitutional violation is sufficient in § 1983 actions; other theories of personal involvement are not sufficient.

The *Tangreti* holding is clear and unmistakable: "[t]o hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." *Tangreti*,

983 F.3d at 620. Without direct personal involvement, the plaintiffs cannot establish the elements of their § 1983 claims against the specific defendants. *Id*.

The plaintiffs fail to establish direct personal involvement for most if not all of the defendants. Instead, plain assessment of the complaint, claims, and the factual record here at summary judgment demonstrates that the defendants are simply named in this lawsuit because of their supervisory roles. This is so for all defendants, but it is especially so for Commissioners Armstrong, Lantz, Arnone, Dzurenda, Semple Cook, and Quiros, and Wardens Dzurenda, Falcone, Dilworth, Corcella, and Washington. It also applies to Directors Batten and Link. The defendants are all named by virtue of their supervisory roles. *See* (Doc. 156 ¶ 4)(stressing the supervisory nature of all of the defendants' roles); *see also* (*id.* ¶¶ 25-42). Such supervisory positions are insufficient as a matter of law to sue someone under § 1983. *See, e.g.*, *Barthelemy v. Quiros*, No. 3-22-CV-0275(SRU), 2022 U.S. Dist. LEXIS 74527, *6 (D. Conn. Apr. 25, 2022). "In other words, the mere fact that Commissioner Quiros is in a position of authority at the DOC is not enough: [plaintiff] must instead 'show that [Quiros himself] acted with deliberate indifference.'" *Id.* The decisions in *Iqbal*, *Tangreti*, and their progeny make that clear. This constitutes grounds for summary judgment both on the merits and on qualified immunity. *See Tangreti*, 983 F.3d at 615-620. The Court should grant the defendants motion in its entirety.

### D. Claims for Alleged Negligence or Sounding in Theories of Negligence Fail as a Matter of Law.

To the extent plaintiffs seek to impose any theories of negligence, they are precluded from doing so as a matter of law. *See* (Doc. 156 p. 10 ¶ 66)(alleging "Defendants *neglected* to install a radon mitigation system at Garner or even test the entire facility to determine the radon levels.")(emphasis added). There are no state tort claims in this case, and plaintiffs' § 1983 claims

cannot depend upon or attempt to impose any liability based on mere negligence. *See Farmer*, 511 U.S. at 838 ("But an official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.")(emphasis added).

First, plaintiffs concede—and the Second Circuit confirmed—that plaintiffs may not seek to hold the defendants liable for mere negligence. "We agree, and Plaintiffs do not dispute, that Defendants cannot be liable under the Eighth Amendment for mere negligence." *Vega*, 963 F.3d at 274. Plaintiffs are bound by this, and the defendants hold them to it.

Second, State officials are individually immune from direct state-law negligence claims bring in tort as a matter of law, if they had been brought. *See* Conn. Gen. Stat. § 4-165; *Gilman v. Shames*, 189 Conn. App. 736, 746 (2019); *Martin v. Brady*, 261 Conn. 372, 380 (2002). There are no direct negligence claims brought in this case at this stage,[14] nor are there any state-law claims remaining in the case. *See, e.g.*, (Doc. 156 p. 20-24); *Vega*, 963 F.3d at 284-86.

Finally, the defendants have maintained throughout the case that plaintiffs' § 1983 claims are impermissible attempts to smuggle negligence claims into court disguised in constitutional robes. *See* (Tr. 2-3-25 Status Conf.)("One of our themes and defenses, from the very beginning of the case being filed . . . was [that] these are negligence claims disguised in Constitutional robes."). It is well established that plaintiffs cannot sue for theories of negligence *via* 42 U.S.C. § 1983 for the claims in question under the Eighth and Fourteenth Amendments. *See Vega*, 963 F.3d at 274; *Morales v. New York State Dep't Corr.*, 842 F.2 27, 30 (2d Cir. 1988)(collecting cases);

---

[14] The plaintiffs did attempt to bring negligence claims in their Second Amendment Complaint (Doc. 114 p. 51-52)—which was never served—before withdrawing them when filing the operative Third Amended Complaint. Regardless of when or how, plaintiffs are prohibited from attempting to sneak negligence theories into this case.

*Daniels v. Williams*, 474 U.S. 327, 335-36 (1986); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986);

*Farmer*, 511 U.S. at 838; *see also Poe v. Leonard*, 282 F.3d 123, 145 (2d Cir. 2002).

To the extent any of plaintiffs' claims seek to impose lability based on mere negligence, or to the extent plaintiffs rely on any negligence theories, they must be precluded from doing so as a matter of law, and judgment should enter for the defendants for any such claims or attempts.

**E.     Claims Sounding in Alleged Conduct from Recent Years Fail as a Matter of Law; Plaintiffs Admit (or Cannot Dispute) That No Claim Sounding in Conduct from Recent years Can Survive.**

Summary judgment is appropriate where there is no genuine issue of fact.  When no jury could rule for a party on a given claim, summary judgment should enter, with Rule 56 properly being used as a "vital procedural tool to avoid wasteful trials." *Capitol Imaging Assocs.*, 996 F.2d at 541.  For claims based on recent years especially, summary judgment can quickly "isolate and dispose of factually unsupported claims." *Celotex Corp.*, 477 U.S. at 323-24.

Here, summary judgment should enter for all claims allegedly arising from or sounding in alleged conduct that occurring in 2018 or later, and certainly no claims from 2021 through the present can survive based on the record at this stage.  Arguments for different time periods are addressed below, separately.

**1.     Testing shows no levels over 4.0 during testing conducted in 2021, 2023, and 2025.**

From 2021 forward there have been no radon levels tested at Garner over 4.0.  The testing documents confirm this. (Mar. 2021)(BATES Page 000300); (Feb. 2023)(BATES Pages 000303; 000304); (Jan. 2025)(BATES Page 000309 - 00310).  Plaintiffs' expert and plaintiffs' counsel all agree and concede that there is no problem concerning radon levels at Garner or testing for radon levels at Garner for these years.  *See* (Tr., Dr. Hu p. 16-18); (Tr. 2-3-25 Status Conf. p. 9, 11).  The

testing results show no levels over the EPA action level for the testing done during 2021, 2023, and 2025.  Summary judgment should enter for all claims concerning these years.

> ### 2.    There is no genuine dispute that from 2018 and 2019 through the present fail as a matter of law.

The plaintiffs admit that from either 2018 or 2019 until the present, there are no problems at Garner concerning radon, radon testing, or mitigation.  The plaintiffs admitted this to the Court directly, on the record:

> MR. MINNELLA:    Yes, Your Honor.  I mean, our issue is up until, I believe 2018.  We've looked at the results and they seem fine after that, Your Honor.
>
> THE COURT:    So you don't have questions post-2018?
>
> MR. MINNELLA:    No, Your Honor.

(February 3, 2025, Status Conf., Tr. p. 9).  Plaintiffs were clear on this:

> MR. MINNELLA:    So finally, to give the State credit, they went and remediated it again.  And as far as we're concerned, everything is normal.  And they've done every effort, after 2018, to correct the situation, Your Honor.

(February 3, 2025, Status Conf., Tr. p. 11).  Given this, no reasonable jury could find for the plaintiffs for claims based on conduct from either 2018 or 2019 through the present.  No injunctive claims can survive, and damages claims against individuals for all conduct after 2017 fail as well.[15]

---

[15]    One of the lead, named plaintiff's conduct further confirms no reasonable jury could find for the plaintiffs for any claims sounding in conduct from 2018 until present.  Ian Cooke entered a settlement and signed a General Release in 2017, releasing all claims up until that time concerning the state or its current or former officials.  In that settlement, Cooke negotiated for one thing only:  a transfer *back to Garner* and the ability to remain there so long as safety and security considerations allowed.  (Attached Release).  Cooke would not have released any or all of his legal claims in

Further, in 2018, Commissioner Semple implemented a radon testing policy in the Department's A.D. 5.3 § 7.  *See* (A.D. 5.3 § 7)(2018).  That policy required that testing be done statewide, at all correctional facilities, using qualified professionals, and specifically requiring that testing be done in the inmate housing units.  *See id.*  Application of this policy means that Garner will be testing during the winter testing season every two years at a minimum.  *See id.*

The winter after the policy was implemented in 2018, testing was done at Garner in winter of 2019.  Most areas tested below 4.0, and the few areas that were above were mitigated and retested in March, 2019, which confirmed in the retesting that those areas were mitigated below 4.0.  (Testing Report, March 2019).

Further still, it appears the plaintiffs themselves agree that claims from 2019 forward cannot remain in the case.  Plaintiffs have put up billboards and implemented social media posts or ads concerning this case.  They have also started websites:  https://radoncase.com (last visited Dec. 1, 2025)(attached); https://radoncase.com (last visited Dec. 1, 2025)(attached).

In these billboards, posts, and websites, the plaintiffs themselves frame the relevant time period as ending at 2019.  *See* (Billboard)("1993-2019 Inmates at Risk").  The websites also essentially acknowledge that the scope of the case ends at 2018 or 2019, as the front page defines the scope of the case as such:  "If you lived at the facility **between** 1993 and ***2019***, you may already be included in the case and could be eligible for future compensation."  https://radoncase.com (emphases added); https://radoncase.com (same).

---

exchange for a transfer back to Garner (and nothing more) if he actually believed Garner was dangerous, unsafe, or posed a risk to those there.  No reasonable juror could find for the plaintiffs for any claims based on conduct in 2018, 2019, or any time thereafter.

Given the record at this stage, no reasonable jury could find for the plaintiffs for claims from 2018 or 2019 through the present.

> **3.     Further testing and the implementation of the formal DOC radon testing policy in 2018 also defeat any claims for conduct during 2018.**

Further, radon testing and the implementation of the formal DOC radon testing policy in 2018 also defeat any claims for conduct during 2018 itself.  While the evidence, admissions, acknowledgments, and concessions of the parties confirm that no claim can remain for 2019, it also confirms that claims from 2018 cannot survive either.

It was in 2018 when Commissioner Semple decided to implement his policy to require all correctional facilities be tested, statewide.  It also requires that testing be done during winter months, that mitigation be done where needed using qualified professionals.  And it requires any facilities with areas over the action level of 4.0 to be retested (and mitigated if necessary) every two years at the most.  Semple himself certainly was not deliberately indifferent, nor did he violate rights of equal protection, since he expanded the radon testing, formalized it in policy, and demanded that inmate housing areas be testing as a matter of department-wide policy going forward.  And the policy has been adhered to and applied to Garner, with testing done in 2019, 2021, 2023, and 2025.  Those relying on it or adhering to it cannot be liable either as a matter of law.

The Court should grant summary judgment for all claims in 2018, and thereafter.

> **4.     Any other claims also fail.**

The remaining claims, working back in the timeline, also fail as a matter of law.  The defendants address the claims further in the sections below.

**F.    Claims Based on Alleged Conduct Predating June 18, 1993, Have Already Been Dismissed and Remain Dismissed.**

This Court has already dismissed all claims arising or based on conduct from before June 18, 1993, the date the Supreme Court issued its decision in *Helling*.  *See* (Doc. 73 p. 26); *see also Vega*, 963 at 272 n.50.  This includes all claims, whether brought under the Eighth or Fourteenth Amendment.  *Vega*, 963 at 272 n.50.  At this stage, there appears to be no dispute about this.  *See id.*; (Doc. 179 p. 4-5)(citing Doc. 159 p. 9)(plaintiffs conceding this).  Further, given that Garner opened in November of 1992 (Doc. 156 p. 2 ¶ 2), this means that all claims concerning prison construction, design, cite selection, or the like have already all been dismissed and cannot be used to serve as a basis for liability or suit in this case.

The defendants reassert their defenses to all claims alleged arising from conduct occurring before June 18, 1993.  All such claims are already dismissed, fail to state a claim, are barred by the law of the case, and any individual damages claims are also barred by qualified immunity.

**G.    Claims Sounding in Alleged Conduct from Before 1995 and also any Before 2001 Fail as a Matter of Law; the Plaintiffs Have Not Named a Sufficient Defendant For that Time Period to Assert Claims for Liability Against.**

**1.    The plaintiffs have no named defendant for the time period before 1995 at all.**

The plaintiffs do not bring any claims against a properly named, individual-capacity defendant for the time period of beginning in either 1992 or even June 19, 1993, until January, 1995.  The parties have already litigated claims against former defendant Meachum.  *See* (Doc. 179 p. 3-4).  That resulted in the Court dismissing all claims brought against Meachum in his individual-capacity and dismissing Meachum entirely.  (*Id.* p.  3-4, 8).  The plaintiffs do not bring

any claims against a proper individual-capacity defendant for the time period of June 19, 1993 (or before) until on or about January 20, 1995. *See* (Armstrong Decl. ¶ 3).

The only two defendants named in the complaint for this time period are Meachum and Batten. *See* (Doc. 156 ¶¶ 30; 41); (Doc. 247 ¶¶ 30; 41). With all claims against Meachum already dismissed, that leaves presumably only Batten as the plaintiffs' sole alleged remaining defendant for their claims for this time period. However, Batten did not work at Garner or have responsibilities concerning Garner during 1992 through 1995. Batten had no involvement or work responsibilities concerning Garner until about late 2002. (Batten Decl. ¶ 8).

For all claims for alleged conduct from June 19, 1993, until about January 20, 1995, the plaintiffs lack any defendant for that time period; such claims therefore fail as a matter of law.

### 2.    Further, for all claims before late 2002, the plaintiffs do not name any defendants other than Commissioners of Correction.

Batten had no involvement with Garner before late 2002. He cannot serve as a basis for claims being brought for alleged conduct occurring before then.[16] Therefore, the only defendants that plaintiffs name for the time period from June 19, 1993, until late 2002 are all Commissioners of Correction (Armstrong and Lantz). Claims for that time period fail as a matter of law, given they amount to nothing more that supervisory liability claims. *See, e.g.*, *Barthelemy*, 2022 U.S. Dist. LEXIS 74527, at *6 ("the mere fact that Commissioner Quiros is in a position of authority at the DOC is not enough: [plaintiff] must instead 'show that [Quiros himself] acted with deliberate indifference."). The Court should grant summary judgment as a matter of law.

---

[16]    He cannot serve as a basis for any claims after either, given that he had no knowledge and no belief of any unsafe conditions at Garner based on radon (Batten Decl. ¶ 10).

H.    **All claims before 2013 fail as a matter of law.**

Plaintiffs also cannot establish any claims before 2013. In short, the relevant defendants did not know of any unsafe, elevated, or improper radon levels at Garner then. More important, none of the relevant defendants believed there to be unsafe environmental conditions at Garner concerning radon. That is, none of them drew the subjective inference required for the plaintiffs' deliberate indifference claims.

The plaintiffs are required to prove this, not just allege it or hope that the Court will infer it. The plaintiffs are no longer at the pleading stage. They cannot rely on unsubstantiated assertions in the complaint. The Second Circuit noted specifically that plaintiffs must prove the subjective requirements. "Plaintiffs seeking to recover against any individual defendant under the Eighth Amendment *must ultimately prove* that the individual defendant *had subjective knowledge* of the objectively serious risk alleged." *Vega*, 963 F.3d at 280 n.108 (emphasis added). "By contrast, our opinion is based on a failure to take steps to mitigate a known risk. We do not hold that Defendants should have taken affirmative steps to discover a risk of which they had no knowledge, nor could we under the Eighth Amendment standard." *Vega*, 963 F.3d at 279 n.104.

Here, none of the defendants sued for alleged conduct predating the initial 2013 radon testing at Garner possessed the required subjective knowledge nor drew the subjective inference of unsafe radon levels at Garner, nor did they believe there to be unsafe environmental conditions at Garner based on alleged radon levels or exposure. There was no constitutional requirement that the defendants seek out and discover a risk or condition that they had no knowledge of and that they did not subjectively believe to be present. *See Vega*, 963 F.3d at 279 n.104. At this stage in the litigation, the plaintiffs cannot overcome the evidence. "Plaintiffs seeking to recover against

any individual defendant under the Eighth Amendment must ultimately prove that the individual defendant had subjective knowledge of the objectively serious risk alleged." *See id.* at 280 n.108.

Further, the Fourteenth Amendment Deliberate indifference claims brought by pretrial detainees also fail based on this analysis. As addressed below, the law changed in 2017. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Before that, the Fourteenth Amendment claims would have been subject to the same analysis as the Eighth Amendment deliberate indifference claims. And for qualified immunity, Court's conduct the analysis based on the status of the law at the times in question. *See Kisela v. Hughes*, 584 U.S. 100, 104 (2018)("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct."). Therefore, all defendants before 2013 are entitled to qualified immunity so long as the application of the Eighth Amendment subjective element defeats plaintiffs claims brought under the Fourteenth Amendment, which is the case here.

For the Equal Protection claims, they fail as well. Given that no defendant possess subjective knowledge of allegedly excessive or unsafe radon levels at Garner, none of the defendants can be said to have treated the plaintiffs differently than others at other facilities or differently than other groups at all.

All claims concerning conduct occurring before 2013 fail. As a matter of law, no reasonable jury could find for the plaintiffs on these claims, especially given the Second Circuit's decision in this very case. Further, as addressed below, all claims arising from conduct before February 28, 2014, are also time-barred by the statutes of limitations or repose, which would include all claims predating 2013.

## I.    Plaintiffs Fail Their Burdens as to Any Claims Concerning Medical Conditions Other Than Lung Cancer Originating in the Lung.

There has been ample dispute in this litigation concerning the scope of medical conditions that can be appropriately considered in the action.  Throughout, the defendants have asserted that there is no justification based on the science to consider any risks or medical conditions other than lung cancer originating in the lung.  *See* (Doc. 199 p. 31, 34-42); *see also* (Doc. 242 p. 37-41).

Plaintiffs disagreed.  They wanted to add all sorts of other conditions that are not caused by radon exposure.  *See* (Doc. 242 p. 37); *see also* (Doc. 193 p. 6).  The operative complaint mentions COPD, emphysema, chronic interstitial pneumonia, and pulmonary fibrosis.  (Doc. 156 p. 17 ¶¶ 107, 108).  And then in their class certification papers they mentioned other health conditions as well.  *See* (Doc. 193 p. 6)(referencing "multiple sclerosis, Alzheimer's disease, Parkinson's disease, and Paget's disease of the bone.").

The Court acknowledged this in its class-certification decision (Doc. 242 p. 37-41), noting that plaintiffs made only a slim showing concerning other medical conditions, noting that the Court was doubtful that the claims would survive summary judgment.  *See* (*id.*)  The Court nevertheless allowed the plaintiffs to attempt to bolster their showing through discovery, but limited class certification for the damages class to lung cancer only at that stage.  (*Id.*)

Despite ample time and investigation—including expert discovery—the plaintiffs cannot establish any sufficient causal connection between alleged radon exposure and any medical or health condition other than lung cancer originating in the lung.  At this stage, there can be no genuine dispute that all claims concerning other medical conditions or medical concerns fail as a matter of law, and the Court should enter judgment for the defendants on all such claims.

Plaintiffs disclosed two medical doctors as experts during discovery, Dr. Boyer and Dr. Hu.  Both provided testimony and opinion confirming that there is no consensus in the medical community regarding causal connection between radon exposure and any other medical conditions besides than lung cancer.

Dr. Hu (one of plaintiffs' experts) confirmed:

> Q.    You were asked whether only lung cancer originating in the lung has a causal exposure to radon.  Would you agree with that, that that is the only condition that is causally related to radon exposure?
>
> A.    I would agree to that, and I state so in my report.

(Tr. Hu p. 13-14).  Dr. Hu further testified that the evidence is not sufficient to link radon exposure to any forms of cancer besides lung cancer.  (Tr. Hu. p. 42).

Plaintiff's other expert, Dr. Boyer, confirmed this as well.

> Q.    So you were asked some questions from the lawyer [for the plaintiffs] for you to answer . . .  Could you read that aloud [defense counsel asking Dr. Boyer to read his answer to question posed by plaintiffs' counsel]
>
> A.    (As Read)  Other medical conditions are considered to have an association with Radon exposure.  In other words, radon does not appear to cause these conditions.
>
> Q.    And when you use the word "associated," it means that it is not caused by radon, correct?
>
> A.    It means that causation has not been proven.
>
> Q.     Fair enough.

(Tr. Boyer p. 50).  Plaintiffs' expert confirmed in his deposition that other conditions may be "associated" with radon, but they have not been proven to be caused by radon.  In fact, Dr. Boyer

explained further that the abstracts alluding to "association" should not be relied upon, as they are not reliable or considered reliable in the literature. Essentially anything can be published in an abstract: "The issue with abstracts is that you can get almost anything published as an abstract and they [Harvard] only wanted work that had withstood the scrutiny of peer review, true peer review." (Tr. Boyer p. 30). Doctor Boyer confirmed that "Harvard does not even consider abstracts for academic promotion." *(Id.)* The only thing the plaintiffs could point to for the other medical conditions at the class certification stage were abstracts that referenced mere association. *See* (Doc. 242 p. 35-41). That is not sufficient, and there is no dispute about that now.

In fact, Dr. Boyer (in addition to Dr. Hu) also confirmed a key point for this litigation (one that the defendants have stressed from the beginning), namely, that the only medical condition causally connected to radon exposure is not just any lung cancer, but it is limited to lung cancer *originating in the lung*, as opposed to cancer that originates elsewhere in the body and then metastasizes to the lung.

> Q.    And when we say "lung cancer," we're talking about lung cancer that originates in the lung, correct?
>
> A     That is correct. There are associations with other things, but as we've already gone over, they are associations.

(Tr. Boyer p. 58).

That is, the Court's initial skepticism concerning the abstracts and slim showing about other medical conditions has proven prescient. (Doc. 242 p. 39)("the Court is not persuaded that these abstracts of various articles on regional-based gas exposure and medical studies will survive a challenge on summary judgment."). The defendants renew their challenge here at summary judgment. The slim showing the plaintiff's proffered at class certification has not been borne out

39

by the experts. The plaintiffs failed their burdens for any claims (regardless of plaintiff, time period, defendant, cause of action, or relief sought) concerning any medical conditions other than lung cancer originating in the lung. The Court should hold that any claims based on health conditions other than lung cancer originating in the lung are excluded or dismissed from the case, or the Court should enter judgment for the defendants on all such claims. Certainly, the classes should not be expanded to include any such conditions.

### J. The Damages Classes Fail as a Matter of Law Because Plaintiffs Fail to Identify a Named Plaintiff or Class Member with a Confirmed Diagnosis of Lung Cancer Originating in the Lung.

The classes are defined by the Court. *See* (Doc. 242 p. 1, 43-44). The damages classes are defined and limited to those who have been or in the future are diagnosed with lung cancer as a result of exposure to radon levels at Garner exceeding the EPA action level. *See* (*id.* p. 2, 43-44).

The plaintiffs have failed to sufficiently identify and establish any named plaintiff or class member with lung cancer originating in the lung. As it pertains to this, only four individuals have been mentioned or alluded to: Elbert Harris, Thomas Marra, Michael Cruz, and Nicholas Polis.

As an initial matter, even if these four individuals had lung developed lung cancer originating in the lung, that would be insufficient to satisfy the Rule 23 factors justifying or allowing a class action for the damages' classes. *See* Fed. R. Civ. Pro. 23.

Further, these four individuals do not qualify. First, it is true that Elbert Harris did have lung cancer. The DOC discovered it at Stage 1 and removed it. However, Mr. Elbert expressly refused to join this class action, electing instead to proceed with his own lawsuit. *See Elbert Harris v. Wiecker, et al.*, 3:18-CV-0695(AWT). There is no genuine dispute that Mr. Harris is neither a named plaintiff nor a class member.

Second is Thomas Marra.  The plaintiffs have alleged through this lawsuit—in their many complaints—that Thomas Marra not only has lung cancer, they allege that Marra has "terminal lung cancer".  (*Cruz* Doc. 1 p. 4 ¶ 16); (*Vega* Doc. 49 ¶ 21); (*Vega* Doc. 114 ¶ 19); (*Vega* Doc. 156 ¶ 16)(Third Amended Complaint alleging "Marra . . . suffers from terminal lung cancer"); *see also Grenier v. Semple*, 3:16-CV-1465(AVC)(Doc. 1 p. 4)(Doc. 15 p. 4 ¶ 13).  It turns out that is not true.  It was never true, not at any of the many times the plaintiffs alleged it.

Marra had all sorts of medical conditions and had had all sorts of diagnostic tests over the years on varies parts of his body.  But he did not have lung cancer, let alone a confirmed diagnosis of terminal lung cancer dating back to 2017.  (Doc. 310); (*Cruz* Doc. 1 ¶ 16); (*Vega* Doc. 156 ¶ 16).  This is undisputed at this late stage.  (Doc. 310).  Mr. Marra himself wrote the Court a letter—which is an admission, Fed. R. Evid. 801(d)(2)(A)—confirming that he did not have lung cancer and that he did not want any claim in the case to include or be based on any false allegation that he has terminal lung cancer.  *See* (Doc. 310)(Aug. 15, 2025, Letter of Thomas Marra).[17]

Concerning Cruz and Polis, the plaintiffs have failed to provide the defendants with necessary information and evidence to establish if they have lung cancer or to allow the defendants to investigate.  Both Cruz and Polis have discharged from DOC custody.  The plaintiffs have not provided medical records in discovery confirming diagnosis of lung cancer originating in the lung, which would have been required to press claims based on these individuals allegedly having lung cancer.  *See* (Doc. 243 p. 2); (Doc. 279 p. 6-7) (Tr. Boyer p. 58).

Plaintiffs contend that Mr. Polis has been diagnosed with stage 1 lung cancer.  *See* (Doc. 193 p. 8); (Doc. 193-8).  However, they have not confirmed this, and they certainly have not

---

[17]    It appears Mr. Marra died in November, 2025, apparently from natural causes.

provided the defendants with the information they would need to confirm and conduct expert discovery on it. At most, the documents provided with plaintiffs' class certification papers (Doc. 193-8 p. 2-5) suggests there is a nodule or maybe an adenocarcinoma, but this is far from definitive confirmation that Mr. Polis has developed lung cancer originating in the lung, rather then it developing elsewhere and metastasizing to the lung (which would not be attributed to radon exposure according to the experts). This is insufficient.[18]

After class certification was litigated, the parties met and conferred, discussed the needs of the case including discovery, and filed a joint status report for the Court. *See* (Doc. 243 p. 2); (Doc. 279 p. 6-7). The plaintiffs agreed to list and identify any individuals with lung cancer, and to provide the defendants with medical records for any outside medical care provided other than that occurring within or during DOC custody. This is confirmed in joint status reports. *See* (Doc. 243 p. 2); (Doc. 279 p. 5-10); (Tr., 2.3.25 Status Conf. p. 5, 14-15, 27-28); (Tr., 8-14-25 Status Conf. p. 10). This includes agreeing to identify any individual later diagnosed with lung cancer as soon as plaintiffs' team learns of the diagnosis. *See* (Doc. 243 p. 2).

To date, no such list of individuals with confirmed lung cancer diagnosis has been provided, nor have needed medical records been provided. And for Cruz and Polis specifically, no additional materials have been provided either. In fact, the January 24, 2025, status report confirms that Mr. Cruz and Mr. Polis executed releases for plaintiffs' counsel to obtain their medical records. Nevertheless, the most the plaintiffs can contend at this stage is that they alleged

---

[18] Further, the materials provided by the plaintiffs with their class certification papers also state that Polis is a current smoker with a smoking history of 30 pack years, and they also state that Polis also likely worked with asbestos. *See* (Doc. 193-8 p. 4-5). No expert was disclosed by plaintiffs to confirm the alleged lung cancer diagnosis, confirm if it originated in the lung, or to confirm it was caused by alleged radon exposure at Garner, all of which is required.

Cruz had lung cancer (Doc. 156 ¶ 9), but that is insufficient at this stage (as the false allegation for Marra demonstrates).

At this stage—approaching a decade after the original case was filed in August of 2016, *see Grenier v. Semple*, 3:16-CV-1465(AVC))—the defendants can only presume that the plaintiffs allegations concerning individuals that allegedly had lung cancer cannot be substantiated, and that at this stage the plaintiffs cannot identify anyone other than Elbert Harris that has received a confirmed diagnosis of lung cancer originating in the lung.  Or at the very least, given that the list and relevant medical records were not provided to allow the defendants to make fair and timely use of them during the discovery process, any attempts to make late disclosures now must be precluded,[19] as that is plainly not fair to the defendants.  It appears the plaintiffs cannot proceed on claims for individual damages based on lung cancer diagnoses, as they failed to establish that any plaintiff has lung cancer originating in the lung.  *See* (Tr., 8-14-25 Status Conf., p. 10)(plaintiffs' counsel acknowledging that none of the "main plaintiffs" have lung cancer). Notably, the damages classes are limited to those who develop lung cancer as a result of radon levels over the EPA action level of 4.0 at Garner.  *See* (Doc. 242).

The Court should enter summary judgment for the defendants as to all claims, and especially those in the damages' classes.  There appear to be no individuals that would fall within

---

[19]    The defendants reserve the right to file motions *in limine* at the summary judgment stage if needed. *See Camera v. Freston*, No. 3:18-CV-1595(SALM), 2022 WL ,557569, 2022 U.S. Dist. LEXIS 32331, *1-2 (D. Conn. Feb. 24, 2022)(granting motions *in limine* requesting that the Court preclude certain exhibits and arguments submitted by plaintiff in opposition to defendants' motion for summary judgment).

the scope of the damages' classes.  After years, plaintiffs cannot identify anyone with lung cancer (and certainly not enough people to warrant a class action), which is the sole medical condition with a causal link to radon exposure.  (Tr. Boyer p. 50, 58); (Tr. Hu p. 13-14).

### K.    The Plaintiffs' Have Not Identified Anyone that Was Incarcerated at Garner for a Significant Amount of Time at a Significant Enough Level of Radon Exposure to Establish Their Claims.

The plaintiffs need to prove *near-lifetime-and-continuous* exposure, to *exceedingly* high levels of radon, before being at increased or substantiated risk for increase in lung cancer risk. This has been contested throughout the case, as plaintiffs have at times suggested being at Garner for even one day is enough.  Plaintiffs' own expert opined that a nonsmoker would need near 35 years of continuous exposure at a level of 16.0 picocuries per liter, and over 20 years continuous exposure at 23.8.  (Tr. Hu p. 47-49).  The defendants dispute and object to even this model, as it was created by the expert out of whole cloth as part of his "best guess," and the model is not standard or used in the medical field, nor has it been peer reviewed.  (*Id.*)  However, even if such models were considered for arguments sake, the plaintiffs do not appear to have any plaintiff that would fit those criteria.

Therefore, all claims—damages' claims against individuals, and equitable claims against State offices as official-capacity defendants—fail, and the Court should enter summary judgment.

### L.    Merits:  Further Assessment of the Elements of Plaintiffs' Claims

The defendants have offered numerous arguments above that go to the merits of plaintiffs' claims.  They provide further assessment of the elements of plaintiffs' claims.

1. **Eighth Amendment conditions-of-confinement claims for deliberate indifference to health or safety fail as a matter of law, on both objective and subjective grounds.**

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S Const. amend. VIII. *See Clark v. Valletta*, 157 F.4th 201, 2025 U.S. App. LEXIS 25894, *17 (citing U.S. Const., amend. VIII). Here, there can be no genuine dispute that the defendants' conduct concerning alleged radon at Garner does not amount to Punishment at all, let alone Cruel and Unusual Punishment prohibited by the Bill of Rights.

The Eighth Amendment requires a much more egregious act than mistake, negligence, gross negligence, or even civil recklessness; it requires a subjective intent or *mens rea* so severe that it constitutes actual punishment. *See Farmer*, 511 U.S. at 837. The heightened subjective element is crucial for Cruel and Unusual Punishment claims. *Id.* "A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when the official's action involves the unnecessary and wanton infliction of pain." *Green v. Martin*, 224 F. Supp. 3d 154, 168 (D. Conn. 2016)(quotation omitted). The constitutional deprivations must be examined to determine whether they are sufficiently serious. *Green*, 224 F. Supp. 3d at 168 (citing *Helling v. McKinney*, 509 U.S. 25, 35-36, (1993); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). "Subjectively, the plaintiff must show that the defendants acted with 'knowing that inmates face a substantial risk of serious harm and disregard that risk.'" *Green*, 224 F. Supp. 3d at 168 (quoting *Farmer*, 511 U.S. at 847).

Deliberate indifference to serious safety or serious medical needs of prisoners can amount to the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. *Estelle*, 429 U.S. at 104. "A 'prison official cannot be found liable under the Eighth Amendment . . . unless

the official knows of and disregards an excessive risk to inmate health or safety; the official ***must***

***both*** be aware of facts from which the inference could be drawn that a substantial risk of serious

harm exists, ***and*** he ***must also*** draw the inference." *Clark*, 2025 U.S. App. LEXIS 25894, *18

(emphases added)(quoting *Farmer*, 511 U.S. at 837).

 For deliberate indifference claims, the subjective element requires a state of mind more

than negligence, gross negligence, or even civil recklessness. Instead, the Second Circuit has

repeatedly held that the state of mind required is akin to criminal recklessness. *See, e.g.*,

*Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003)("Deliberate indifference is 'a state of mind

that is the equivalent of criminal recklessness.'"); *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir.

2006)(same)(citing *Farmer*, 511 U.S. at 839-40) *Tangreti*, 983 F.3d at 620 ("it is not enough for

Tangreti to show that Bachmann was negligent, or even grossly negligent . . . .").

 Here, the defendants' conduct falls well, well short of such a high standard. There can be

no genuine dispute of material fact about that at this stage in the case. The Second Circuit's

decision in this very litigation has drawn a key distinction in deliberate indifference analysis for

cases where 1) the challenged conduct, policy, or practices are claimed to be constitutionally

insufficient, compared with 2) instances where the plaintiffs' claim the defendants did nothing at

all, amounting to total inaction. *See Vega*, 963 F.3d at 277-281 (citing *Taylor v. Barkes*, 575 U.S.

822 (2015)); *see also Clark*, 2025 U.S. App. LEXIS 25894, at 29-33 (citing *Vega*, 963 F.3d at 280;

*LaBounty v. Coughlin*, 137 F.3d 68 (2d Cir. 1998); *Taylor*, 575 U.S. at 825).

 Here the conduct from the defendants from 2013 forward did not amount to total inaction.

Instead, they either worked with or relied on DPH, TRC, and A&R, along with other DOC officials

as well. For any defendants' conduct before 2013, they lacked subjective knowledge outright.

Either way, it is not deliberate indifference on either subjective or objective elements. This is especially so given the advice provided by DPH, informing Link and Semple that the was no need to close Garner or move inmates or staff out of the facility while the matter was addressed. That also defeats the objective element, in addition to defeating the subjective element.

> ### 2. Any purported Eighth Amendment medical claims for deliberate indifference to serious medical needs fail as a matter of law, on procedural grounds as well as the merits.

First, there are no medical claims brought in this case, nor could there be. The plaintiffs have not named a doctor, medical provider, or medical administrator of any kind. *See generally* (Doc. 156). Every defendant is either a high-ranking custody official or a facilities official. So, as an initial matter, there simply are no medical claims in this case. That is, there can be no claims for deliberate indifference directly based on medical claims or medical theories that focus on specified medical tests, care, procedures, testing, screening, or the like. The plaintiffs would have needed to name correct medical providers to even attempt to pursue such claims. The Court noted in a previous decision that medical matters in this case are understood to be a form of relief sought, rather than direct claims for liability. (Doc. 242 n.17)("[t]he demand for radon mitigation and medical care and monitoring is understood to be a request for relief.").

Next, even if the claims can be construed as claiming the defendants somehow depriving plaintiffs of constitutionally required medical care, despite the defendants' non-medical statuses, any such claims fail on both the facts and the law. The defendants do not and did not provide medical care to inmates. They have or had no personal involvement in that. *See generally* (Defendants' Declarations). Instead, the defendants rely on others, such as the facility medical provides to address inmate medical needs and provide medical care. *See* (*id.*) Further, the

defendants are legally entitled to rely on medical staff to address such issues. "[A] supervisory official, such as defendant, is 'generally entitled to delegate medical responsibility to medical staff and [is] entitled to rely on the opinion of medical staff concerning the proper course of treatment.'" *Terbush v. Mitchell*, No. 3:15-CV-1339(SALM) 2017 U.S. Dist. LEXIS 22854, *18 (D. Conn. Feb. 17, 2017)(quoting *Abdush-Shahid v. Coughlin*, 933 F. Supp. 168, 183 (N.D.N.Y. 1996)(collecting cases)). The plaintiffs cannot show they are being denied (by the defendants specifically) access to their treating physicians or medical providers or being denied (by the defendants specifically) constitutionally required medical care. Any claims against the defendants here involving medical care or medical theories fail as a matter of law.

Finally, even if plaintiffs had brought direct medical claims, those would fail as a matter of law as well. The expert testimony establishes that there is not consensus in the medical community or literature concerning what testing or screening—and those are not the same things—if any, would be warranted for a patient concerned about radon exposure. *Compare* (Tr. Dr. Hu) *with* (Tr. Dr. Worcester); (Worcester Decl.).

In the absence of such a medical consensus, plaintiffs putative medical claims fail, as they cannot show constitutional violation rather than mere malpractice. The Sixth Circuit has recognized and held this in the context of specified treatment for gender dysphoria. *See Marcum v. Comm'r Cookie Crews*, 2025 U.S. App. LEXIS 27819, *8 (6th Cir. Oct. 23, 2025). "The existing record thus suggests that the *medical community has not reached a consensus* on the role hormone therapy should play in treating gender dysphoria." *Id.* (emphasis added). "And if Marcum could not even establish that this therapy qualifies as the standard of care for purposes of

a medical-malpractice claim, Kentucky's refusal to provide the therapy cannot satisfy the *more demanding* Eighth Amendment test."

As courts in this Circuit have regulatory held, "disagreements over medications, diagnostic techniques, forms of treatment, or the need for specialists *or the timing of their intervention*, are not adequate grounds for a Section 1983 claim." *Camera v. Freston*, No. 3:18-CV-01595(SALM), 2022 U.S. Dist. LEXIS 55068, *34 (D. Conn. Mar. 28, 2022)(cleaned up)(original emphasis)(quoting *Randle v. Alexander*, 960 F. Supp. 2d 457, 481 (S.D.N.Y. 2013)); *see also Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (N.D.N.Y. May 21, 2001)). "These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." *Camera*, 2022 U.S. Dist. LEXIS 55068 at *34-35. "'It is well-established that mere disagreement over the proper treatment does not create a constitutional claim,' and that 'negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.'" *Collins v. Figura*, No. 3:19 CV 1689(RMS), 2023 U.S. Dist. LEXIS 2383, *13 (D. Conn. Jan. 6, 2023)(quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)). *Clark*, 2025 U.S. App. LEXIS 25894, *32 quoting *Chance*).

Any purported medical claims fail as a matter of law. The Court should hold there are no such claims brought in this case, or alternatively, award summary judgment for the defendants.

### 3. Fourteenth Amendment Due Process claims fail as a matter of law.

"No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment." *Darnell v. Pineiro*, 849

F.3d 17, 29 (2d Cir. 2017)(citations omitted). "A pretrial detainee's claims are evaluated under the Due Process Clause because, '[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner—neither cruelly and unusually nor otherwise.'" *Id.* "A detainee's rights are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Darnell*, 849 F.3d at 29 (quoting *City of Revere*, 463 U.S. at 244).

It is worth noting that the law changed in this Circuit in 2017 for deliberate indifference claims brought by pre-trial under the Due Process Clause of the Fourteenth Amendment, when the Second Circuit decided *Darnell v. Pineiro*: "we conclude that the Supreme Court's decision in *Kingsley* altered the standard for deliberate indifference claims under the Due Process Clause." *Darnell*, 849 F.3d at 30 (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)).

For purposes of qualified immunity, however, the defendants' immunity is viewed in context of the law in place at the times in question. *See Golodner v. Berliner*, 770 F.3d 196, 203 (2d Cir. 2014)("qualified immunity hinges on a snapshot of the factual and legal circumstances at the time of the alleged violation."); *Southerland v. City of New York*, 681 F.3d 122, 125 (2d Cir. 2012)("the pertinent qualified immunity inquiry is whether the right was clearly established at the time of the defendant's actions.").

Therefore, in the qualified immunity sections below, the pre-*Darnell* analysis applies, which applied the Eighth Amendment deliberate indifference analysis (including its subjective-element analysis) for pre-trial detainees claiming deliberate indifference under the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979)("*A fortiori*, pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners."); *Revere*, 463 U.S. at 244 ("the due process rights of a person

in Kivlin's situation are at least as great as the Eighth Amendment protections available to a convicted prisoner.")(citing *Bell v. Wolfish*).

So, as a practical matter, analysis of the merits of the Due Process claims under the updated current or modern standards is not necessary for the Court to award judgment to the individual-capacity defendants subject to those claims because qualified immunity will bar all of the Fourteenth Amendment claims brought by the pre-trial plaintiffs. Nevertheless, the defendants still prevail on the merits using the post-Darnell analysis, given the undisputed record here. The defendants' conduct is sufficient to pass scrutiny under both elements of deliberate indifference under the Fourteenth Amendment, especially given the facts known to them (or not known to them), their reliance on industry experts, and the fact that the housing units were tested. The defendants otherwise incorporate their numerous merits arguments from above here, for brevity. The defendants are entitled to summary judgment for all Due Process claims.

### 4.    Fourteenth Amendment Equal Protection claims fail as a matter of law.

"The Fourteenth Amendment provides in relevant part that no state shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *Marcello v. Currey*, 364 F. Supp. 3d 155, 158 (D. Conn. 2019)(quoting U.S. Const. amend. XIV, § 1). "As the Supreme Court has recognized, 'most laws differentiate in some fashion between classes of persons,' and '[t]he Equal Protection Clause does not forbid classifications,' but 'simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.'" *Marcello*, 364 F. Supp. 3d at 158-159 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

"Equal protection cases generally fall into one of two categories. If the governmental distinction targets a suspect class (such as a class of persons based on race, gender, or religion) or

targets the exercise of a fundamental right (such as the right to vote), then the governmental classification will be subject to heightened or strict scrutiny. All other governmental classifications need only be supported by a rational basis." *Marcello*, 364 F. Supp. 3d at 159.

"The Equal Protection Clause protects prisoners from invidious discrimination. This provision does not mandate identical treatment for each individual; rather it requires that similarly situated persons be treated the same." *Muhmmaud v. Murphy*, 632 F. Supp. 2d 171, 178 (D. Conn. 2009)(citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985).

"It is well-established that '[m]erely being a prisoner is insufficient to place [one] in a suspected class.'" *Campbell v. Quiros*, No. 3:17-CV-0946(CSH), 2018 U.S. Dist. LEXIS 23207, *12 (D. Conn. Feb. 13, 2018)(quoting *Robles v. Dennison*, 745 F. Supp. 2d 244, 301 n.18 (W.D.N.Y. 2010), *aff'd*, 449 F. App'x 51 (2d Cir. 2011)(summary order)). "Courts have applied rational basis analysis to equal protection claims where prison policies distinguished between non-suspect classes of prisoners." *Campbell*, 2018 U.S. Dist. LEXIS 23207, *12 (collecting cases). "Neither inmates nor sexual offenders are a suspect class . . . and therefore 'a statutory classification' applied to them 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Petitpas v. Martin*, No. 20-3557-pr, 2021 WL 6101469, 2021 U.S. App. LEXIS 37889, *6 (2d Cir. Dec. 22, 2021)(summary order)(citing, *inter alia*, *Lee v. Governor of New York*, 87 F.3d 55, 60 (2d Cir. 1996)("prisoners either in the aggregate or specified by offense are not a suspect class")).

However, before the Court or parties even proceed to scrutiny of the challenged law, policy, or conduct, the plaintiffs must first identify a similarly situated group; the analysis does not proceed—and the claims fail as a matter of law—without such a group. "To successfully assert

an equal protection challenge, petitioners must *first* establish that the two classes at issue are similarly situated. '[T]he government can treat persons differently if they are not similarly situated.'" *Yuen Jin v. Mukasey*, 538 F.3d 143, 158 (2d Cir. 2008)(emphasis added)(quoting *Jankowski–Burczyk v. INS,* 291 F.3d 172, 176 (2d Cir. 2002)).

Plaintiffs fail this threshold obligation. They do not identify a similarly situated group. They do not offer evidence sufficient to establish that inmates housed at Garner are sufficiently similar to those housed elsewhere. The also lack a constitutional right to the housing or facility of their choice. Also, for the defendants' conduct before 2013, they lacked knowledge of the alleged radon at Garner, thus plaintiffs were not even treated differently than other inmates. For the defendants' conduct after the radon testing in 2013, their conduct also easily surpasses rational-basis analysis. The defendants did not believe there was any dangerous or unsafe living or working conditions at Garner following the 2013 tests, and this was based on the fact that the DPH officials informed DOC and defendants in this case (Semple and Link) that it was safe to keep Garner occupied and functioning while the mitigation and further testing processes were undertaken. The defendants are entitled to judgment.

### M.    Qualified Immunity Bars the Individual-Capacity Claims.

All claims against individual-capacity defendants seek money damages only. *See* (Doc. 179 p. 5 n.3). Plaintiffs confirmed this. (Doc. 159 p. 8-9). Qualified immunity bars those claims. This Court should enter judgment in the defendants' favors, under their First Affirmative Defense, as to all individual-capacity claims, on grounds of their qualified immunity. *See* (Answer)(Doc. 247 p. 31); Fed. R. Civ. Pro. 56; *see also* 42 U.S.C. § 1997e(c)(1).

"Qualified immunity protects public officials from legal actions brought under 42 U.S.C. § 1983 if their behavior does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mudge v. Zugalla*, 939 F.3d 72, 79 (2d Cir. 2019)(quotation omitted).  "The issues on qualified immunity are:  (1) whether plaintiff has shown facts making out [a] violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the officer to believe the conduct at issue was lawful."  *Mudge*, 939 F.3d at 79; *Francis v. Fiacco*, 942 F.3d 126, 145 (2d Cir. 2019); *Taravella v. Ton of Wolcott*, 599 F.3d 129, 134-36 (2d Cir. 2010).

"Qualified immunity shields government officials from civil suits for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007)(quoting *Harlow*, 457 U.S. at 818).  The immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions . . . ."  *Distiso v. Cook,* 691 F.3d 226, 240 (2d Cir. 2012)(quotation omitted).  It balances the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment and distraction when they perform duties reasonably.  *Wood v. Moss*, 572 U.S. 744, 758 (2014).  The qualified immunity defense is a "forgiving" and "broad shield that protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017)(citation omitted);  It applies regardless of whether the officials' error is "a mistake of law, mistake of fact, or a mistake based on mixed questions of law and fact."  *Doninger v. Niehoff*, 642 F.3d 334, 353 (2d Cir. 2011)(quotation omitted).

The immunity specifically allows "breathing room to make reasonable but mistaken judgments about open legal questions" including nuanced constitutional issues. *Francis*, 942 F.3d at 146 (quotation omitted); *Mara*, 921 F.3d at 69. Existing precedent must have placed the constitutionality of the officer's conduct "beyond debate." *See, e.g.*, *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015); *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020)("existing precedent must have placed the statutory or constitutional question *beyond debate*.")(original emphasis)(quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).

"The Supreme Court has lately emphasized the breadth of qualified immunity protection." *Francis*, 942 F.3d at 145. "[T]he Supreme Court has 'repeatedly told courts not to define clearly established law at a high level of generality,' instead emphasizing that 'clearly established law must be "particularized" to the facts of the case.'" *Id.* at 146 (citations omitted).

Defining a constitutional right too broadly is the cardinal error of qualified immunity analysis, and the Supreme Court is vigilant in its enforcement of this bedrock tenet of qualified immunity jurisprudence. *See, e.g.*, *City of Tahlequah v. Bond*, 595 U.S. 9, 13 (2021)("We have repeatedly told courts not to define clearly established law at too high a level of generality."). The purported clearly established right in question must be defined with specificity. *See, e.g.*, *City of Escondido, Cal. v. Emmons*, 139 S. Ct. at 503. This analysis requires a *high degree* of specificity. *Wesby*, 138 S. Ct. at 590 (emphasis added); *see also Farid v. Ellen*, 593 F.3d 233, 244 (2d Cir. 2010)(citation omitted). "[T]he law must be . . . clearly established with respect to the '*particular* conduct' and the 'specific context' at issue . . . ." *Mara*, 921 F.3d at 68-69 (emphasis

in original)(quoting *Mullenix*, 136 S. Ct. at 308).  The specificity requirement is a critical factor in qualified immunity jurisprudence in this Circuit.  *See, e.g.*, *Doninger*, 642 F.3d at 345.

"Qualified immunity applies to defeat a federal claim unless a plaintiff [demonstrates] (1) that the official violated a statutory or constitutional right, . . . (2) that the right was 'clearly established' at the time of the challenged conduct," *Francis*, 942 F.3d at 145,  and (3) even still qualified immunity also applies if official's conduct was objectively reasonable, such that a reasonable official would reasonably believe his conduct did not violate a clearly established right, *Taravella*, 599 F.3d at 134-36; *Clark*, 2025 U.S. App. LEXIS 25894 at *17 ("Even if an officer violated a plaintiff's clearly established rights, he 'will still be entitled to qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights.'")(quoting *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018)).

"In short, the law distinguishes the question whether behavior is lawful or appropriate from the question whether an individual government official should be required to pay damages from his own resources; whatever other remedies may be available for illegal conduct, money damages from a government agent are permitted only where any reasonable officer would clearly understand that his actions were unlawful." *Tanvir v. Tanzin*, 120 F.4th 1049, 1059-1060 (2024)). "While we can expect [officials] to be familiar with black-letter law applicable to commonly encountered situations, they cannot be subjected to personal liability under § 1983 based on anything less." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 161 (2d Cir. 2013).

The Court has flexibility or discretion for which order it assess qualified immunity arguments. *See Mudge*, 939 F.3d at 79 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Here, the defendants argue all forms of qualified immunity, including both the "objectively

reasonable" and the "clearly established" aspects of qualified immunity. The Court may consider the arguments in any order.

### 1.    No constitutional violations in the first instance.

"If a plaintiff cannot make the first showing, *i.e.*, a violation of constitutional rights, no further inquiry is necessary 'because where there is no viable constitutional claim, defendants have no need of an immunity shield.'" *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017)( "[i]f a plaintiff cannot make the first showing, *i.e.*, a violation of constitutional rights, no further inquiry is necessary 'because where there is no viable constitutional claim, defendants have no need of an immunity shield.'")(quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013)).

Here, plaintiffs failed to establish genuine dispute of facts concerning their claims. Plaintiffs' failing to support their claims entitles the defendants to judgement on the merits, as detailed above. However, it also means that plaintiffs cannot overcome the defendants' qualified immunity as a matter of law.

### 2.    The defendants violated no clearly established constitutional rights asserted in this case.

When plaintiffs sue high-ranking prison officials under the Eighth or Fourteenth Amendment over lack of sufficient prison safety standards, practices, or policies, they need sufficient precedent that analyze the constitutionality of minimum-required protocols. *See, e.g.*, *Taylor v. Barkes*, 135 S. Ct. 2042 (2015); *see also Allah v. Milling*, 876 F.3d 48 (2d. Cir. 2017)(awarding qualified immunity because no clearly-established precedent existed to inform prison officials that their policy was unconstitutional beyond debate).

"In addition to being firmly settled, the clearly established rights at issue must be sufficiently particularized to an inmate's individual circumstances." *Clark*, 2025 U.S. App. LEXIS

25894, *19.  At the motion to dismiss stage, the district court appeared to view the right in question as reckless exposure of prisoners to radon.  *See* (Doc. 73).  At this stage, that is too broad, especially given the record evidence before the Court, years later.  On appeal, the Second Circuit appeared to view the right as the right against total inaction to radon or to a carcinogen by prison officials that know of its presence in the facility.  *See Vega*, 963 F.3d at 277-281.

While the focus at the motion to dismiss stage was on the decisions in *Helling* and *LaBounty*, that was because of the plaintiffs' allegations that defendants' conduct amounted to total inaction in intentionally never testing the housing units.  However, at this stage, the Supreme Court's decision in *Taylor v. Barkes* and the Second Circuit's decisions in *Vega v. Semple* and *Clark v. Valletta* demonstrate how the alleged rights here were not (and are not) clearly established at the various times in question.

### Defendants and conduct before 2013 radon testing at Garner

For defendants' conduct before December of 2013,[20] they are immune because they did not know of any unsafe levels, nor did they believe there to be any unsafe environmental conditions at Garner.  Qualified immunity is based on the facts known to the defendants at the time.  *Golodner*, 770 F.3d at 203 ("qualified immunity hinges on a snapshot of the factual and legal circumstances at the time of the alleged violation.").  "The qualified immunity analysis thus is limited to 'the facts that were knowable to the defendant officers' at the time they engaged in the conduct in question." *Hernandez v. Mesa*, 582 U.S. 548, 554 (2017)(quoting *White*, 580 U. S. at 77; *Tanvir*, 120 F.4th at 1060 ("qualified immunity depends on the facts known to the official at the time of the alleged violation.").

---

[20]    As addressed below, the claims for alleged conduct before 2013 radon testing at Garner are also time-barred.

It was not clearly established at the times in question that the defendants had to affirmatively seek out and test for imperceptible radon that they did not know of and did not believe was existent in the first place. *Vega*, 963 F.3d at 279 n.104 ("We do not hold that Defendants should have taken affirmative steps to discover a risk of which they had no knowledge, nor could we under the Eighth Amendment standard.").

### Defendants and conduct after 2013 radon testing at Garner

For the defendants' conduct following December 2013, plaintiffs cannot overcome the analysis in *Taylor* or in *Clark*, or frankly, the analysis from the Second Circuit in this very litigation, *Vega*. *See Vega*, 963 F.3d at 277-81; *Clark*, 2025 U.S. App. LEXIS 25894, *29-32; *Taylor*, 575 U.S. at 822-827.  In *Taylor*, the Supreme Court addressed a prison suicide screening and prevention protocol.  The plaintiff challenged the protocol, arguing that the correctional defendants were deliberately indifferent because the protocols used a nurse rather than a physician to do the screening.  The Supreme Court reversed, holding that the right was not clearly established, that the Supreme Court had never addressed that right, let alone hold what protocols would have been sufficient.  *Taylor*, 575 U.S. at 822-827.  Throughout this litigation, the defendants here have stressed the importance of *Taylor* and its reasoning; it applies to this case and renders the defendants immune from suit.  Plaintiffs have largely ignored *Taylor* outright.

At the early motion to dismiss stage, this Court and the Second Circuit stressed that the key distinction between *Taylor* and the allegations in the complaint in this case:  namely, the difference between 1) the sufficiency of a challenged practice or policy, versus 2) alleged *total inaction*. *Vega*, 963 F.3d 259, 280 ("Unlike *Taylor*, where there was a risk-mitigation system in place that

allegedly should have been *better*, the Plaintiffs here complain that Defendants took no action whatsoever.")(original emphasis).

That is, the Second Circuit allowed the claims to survive qualified immunity at the motion to dismiss stage because the plaintiffs alleged *total inaction* by the defendants (alleging the defendants never tested in the inmate housing units at all, and by intentional choice), whereas in *Taylor*, there was a screening protocol in place and the plaintiff there was screened; the plaintiff's estate there challenged the constitutional sufficiency of that practice and screening.

That is, in short, the Second Circuit has drawn a key distinction in prison deliberate indifference cases when applying *Taylor*, and that distinction turns on whether there is a challenge to sufficiency of action or practice, or whether there is complete inaction by the defendants.

The Second Circuit recently recognized this distinction for interpreting *Taylor* when it reversed and awarded summary judgment for Connecticut correctional officials in *Clark*.  *See Clark*, 2025 U.S. App. LEXIS 25894, *29-32 (citing *Taylor* and *Vega*).  In *Clark*, the defendants provided treatment and care, they did not ignore the plaintiff outright or resort to total inaction. Therefore, the case in *Clark* was akin to *Taylor*, not *Vega*, and the defendants were entitled to summary judgment, because there was not sufficient precedent to confirm for the defendants— beyond all debate—in *Clark* that their course of treatment violated the Eighth Amendment.

Now, at this stage, the Court is no longer bound by the plaintiffs' untrue allegations in the complaint; false allegations that frustratingly served as the sole basis for this litigation surviving the motion to dismiss and continuing for nearly a decade.  The allegations that from 2013 forward, the inmate housing units were never tested is not true and never was.  And critically, the Second

Circuit relied on that specific allegation in its ruling distinguishing *Taylor* and allowing the case to survive.

Rather, the inmate housing units were testing for the presence of radon starting in December, 2013, when the entire Garner facility was first tested by the DPH. This included testing at the officers' stations, which are open areas near the center of the housing units for the first floors of the units. There were also tests placed in some additional areas or rooms in the housing units, such as staff offices, empty cells, or former cells that were converted to staff areas. There is certainly no constitutional precedent (nor even any expert witness) to hold that this clearly violated the Eighth Amendment, the Due Process Clause, or the Equal Protection Clause.

That is, this is not a case of *total inaction* like in *Helling* or *LaBounty*, as the plaintiffs have alleged throughout, and which the Second Circuit specifically analyzed as such while presuming the allegations true at the motion-to-dismiss stage. Instead, this is a case—like *Taylor* and *Clark*— where the challenged conduct is claimed to be allegedly insufficient, but not outright total inaction. *See Taylor*, 575 U.S. at 822-27; *Clark*, 2025 U.S. App. LEXIS 25894, at *20 (distinguishing *Labounty* by noting, "But that case involved *total inaction*")(original emphasis). Just like *Clark* was not a case with a total deprivation of care, and *Taylor* was not a case of a total lack or deprivation of safety protocols, this case here is not one of total inaction either. *See Clark*, 2025 U.S. App. LEXIS 25894, *20 (reversing denying of summary judgment in an Eighth Amendment deliberate indifference claim; "[t]he district court here erred by conducting its qualified-immunity analysis at too high a level of generality.").

In fact, the Second Circuit in *Clark* reviewed its analysis in *Vega*, and stressed the importance of how the Court in *Vega* relied on the distinction between 1) total inaction, versus 2)

constitutional challenges to existing practices or protocols, especially for how the Second Circuit interprets and applies *Taylor*. *Clark v*, 2025 U.S. App. LEXIS 25894, at *29 (in *Vega*, the Second Circuit "applied this exception to deny qualified immunity when officials 'failed to take *any* steps to mitigate' an egregious and obvious health risk.")(citing *Vega*, 963 F.3d at 280 (stressing that officials allegedly "took no action whatsoever" to mitigate prisoners' radon exposure).

That is, the Second Circuit has now twice opined that there is a key distinction between what the plaintiffs alleged in their complaint (total inaction) versus what the facts and evidence show, that is, what actually happened (testing conducted by DPH and TRC and mitigation by A&R as reflected in the reports and evidence in the record). "[T]otal inaction in the face of a 'known carcinogen' was 'obviously unconstitutional' in light of cases establishing that exposure to environmental tobacco smoke could violate the Eighth Amendment." *Clark*, 2025 U.S. App. LEXIS 25894 at *29 (citing *Vega*, 963 F.3d at 276-77).

"But the more particularized inquiry required by *Taylor* applies when defendants take *some action* that "allegedly should have been *better*." *Clark*, 2025 U.S. App. LEXIS 25894, *29 (quoting *Vega*, 963 F.3d at 280). This case clearly falls within the more particularized inquiry in *Taylor*. The detailed decisions of *Taylor*, *Vega*, and *Clark* all control the analysis here. When properly applied at this stage based on this record, the individual defendants are entitled to qualified immunity as a matter of law and are entitled to summary judgment.

Also noteworthy, one judge in this district has already ruled that conduct of the defendants in the 2013-2014 range was not deliberate indifference. *Toliver v. Semple*, No. 3:16-CV-1899(SRU)(Doc. 5), 2016 U.S. Dist. LEXIS 168166, *6 (D. Conn. Dec. 2016). The plaintiff in

*Toliver* attempted to sue claiming deliberate indifference concerning alleged radon at Garner. But

the plaintiff in *Toliver* also disclosed that DOC officials tested for radon at Garner:

> Toliver contends that the exposure to radon constitutes an unconstitutional condition of confinement. Although he may state an Eighth Amendment claim for exposure to unsafe conditions that pose an unreasonable risk of harm to future health, *Helling*, 509 U.S. at 34-35, ***Toliver presents evidence that the defendants took immediate remedial action. Toliver has attached to his complaint documents noting that radon testing was done at Garner in December 2013 and January 2014.*** Following receipt of the recommendations, the Department of Correction contracted for mitigation work, which was completed by June 2014. *See* ECF No. 1 at 26-32. ***As the defendants acted promptly when informed of the problem, they were not deliberately indifferent. The claim regarding Garner is dismissed.***

*Toliver*, 2016 U.S. Dist. LEXIS 168166 *6-7 (emphasis added). This further supports the

defendants' qualified immunity here, as it certainly would not have been clear 'beyond debate' to

reasonable correctional officials and administrators in the defendants' shoes at the times that that

their conduct would somehow amount to a violation of the Cruel and Unusual Punishment Clause

of the Eighth Amendment, the Due Process Clause of the Fourteenth Amendment, or the Equal

Protection Clause of the Fourteenth Amendment. *See, e.g.*, *Doninger*, 642 F.3d at 345 ("The

question is not what a lawyer would learn or intuit from researching case law, but what a reasonable

person in the defendant's position should know about the constitutionality of the

conduct.")(quotation omitted); *Zalaski*, 723 F.3d 382, 389 (2d Cir. 2013)("the inquiry is not how

courts or lawyers might have understood the state of the law at the time of the challenged

conduct."); *Wilson v. Lane*, 526 U.S. 603, 618 (1999)("If judges thus disagree on a constitutional

question, it is unfair to subject [officials] to money damages for picking the losing side of the

controversy."); *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)("Ashcroft deserves [qualified

immunity], not least because eight Court of Appeals judges agreed with his judgment in a case of first impression.")

This is not a case of total inaction. The defendants before 2013 lacked any knowledge and belief of an unsafe or dangerous radon condition at Garner. *Vega*, 963 F.3d at 279 n.104 ("We do not hold that Defendants should have taken affirmative steps to discover a risk of which they had no knowledge, nor could we under the Eighth Amendment standard."). And for the defendants from 2013 forward, the plaintiffs challenge the specific procedures that were implemented by the industry professionals that the defendants relied on for the radon testing and mitigation.

Ultimately there is no case in this Circuit that "address[es], let alone decide[s]" which radon testing and mitigation measures or protocols would be sufficient under the Eighth or Fourteenth Amendments. *See Pena*, 432 F.3d at 115 (holding that defendants were immune because previous precedent discussed "did not address, let alone decide" the right at issue). There is no precedent— including *Helling* or *LaBounty*—that "say[s], however, that detention facilities must implement procedures to identify such vulnerable inmates, *let alone specify what procedures would suffice*." *See Taylor*, 135 S. Ct. at 2045 (emphasis added). There is no precedent—including *Helling* or *LaBounty*—that "identif[ies] any minimum screening procedures or prevention protocols that facilities must use" as a constitutional mandate. *See Taylor*, 135 S. Ct. at 2045.

"It is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *City of Tahlequah*, 595 U.S. at 12 (citation omitted). "Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers." *Kisela*, 584 U.S. at 105 (quotation omitted). "[S]tate officials can be liable only for violations of

rights that have been established "beyond debate" and with "particular[ity]" by existing constitutional precedents." *Liberian Cmty. Ass'n of Conn.*, 970 F.3d at 192 (quoting *Wesby*, 138 S. Ct. at 589). That is, "[w]hile we can expect [officials] to be familiar with black-letter law applicable to commonly encountered situations, they cannot be subjected to personal liability under § 1983 based on anything less." *Gonzalez*, 728 F.3d at 161.

Given the state of the law and the relevant times, the individual defendants are entitled to qualified immunity as a matter of law, as they violated no clearly established Eighth or Fourteenth Amendment right. The Court should enter summary judgment for the individual-capacity defendants on all claims.

### 3. The defendants' conduct was objectively reasonable.

Even if plaintiffs could show 1) an actionable violation (which they did not), of 2) a clearly established Eighth or Fourteenth Amendment right concerning radon at Garner (which they cannot), that does not end the inquiry or deprive the defendants of qualified immunity. There is a third question in qualified immunity analysis: whether an official's conduct was objectively reasonable, *i.e.,* whether a reasonable official would reasonably believe her or his conduct did not violate a clearly established right. *Taravella*, 599 F.3d at 134-36; *Mudge*, 939 F.3d at 79. The Second Circuit has held that "this third question is indispensable." *Taravella*, 599 F.3d at 135.

"Even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Id.* at 134 (quotation omitted). Qualified immunity is properly awarded (including at summary judgment) under this analysis in instances where there is ambiguity in how the legal

requirements or obligations apply to the official under the governing law. *See id.* ("the district court has concluded--and we agree--that the Agreement is ambiguous as a matter of law. Dunn read the Agreement, sought legal advice, and reasonably concluded that Taravella could be terminated without a hearing."); *Security & Law Enforcement Employees, Dist. Council 82, etc. v. Carey*, 737 F.2d 187, 211 (1984)(qualified immunity for officials who ordered unconstitutional searches because, "[t]hese officials operated in an area in which the law was not charted clearly.").

"[Q]ualified immunity does not require application of a single 'reasonable person' standard as that concept is understood in the law of torts." *Doe v. Whelan*, 732 F.3d 151, 155 (2d Cir. 2013). "In the context of qualified immunity, [rather than the context of torts], a test permitting of a single, objectively-reasonable standard of conduct is irreconcilable with the Supreme Court's recognition that an officer may be shielded from liability even if his actions involve errors in judgment." *Doe*, 732 F.3d at 155 (quoting *Pearson*, 555 U.S. at 231; *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"'The objective reasonableness test is met -- and the defendant is entitled to immunity -- if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Tenenbaum v. Williams*, 193 F.3d 581, 596 (2d Cir. 1999). An officer's actions are objectively unreasonable for qualified immunity purposes only "when *no* officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller*, 66 F.3d 416, 420-421 (2d Cir. 1995)(added emphasis)(citing *Malley*, 475 U.S. at 341).

When determining whether reasonable officials in a defendant's shoes could disagree over the legality of conduct within specific contexts, government policies, manuals, and practices inform the analysis. Courts regularly rule that an official's reliance and adherence to government

policies, practices, manuals, or standard operating procedures demonstrates lack of bad faith and provides sufficient basis to award qualified immunity. *See, e.g.*, *Security & Law Enforcement Employees, Dist. Council 82, etc.*, 737 F.2d at 211 (awarding qualified immunity to officials who ordered unconstitutional searches because, "although erroneously conducted, from our review of the record, it appears that these searches were conducted based upon the defendants' good-faith reliance on the Department's rules and regulations in effect at the time.")[21]; *Wilson*, 526 U.S. at 617-18 (officers acted reasonably in following a department policy and were therefore entitled to qualified immunity even though that policy later turned out to be unconstitutional); *Allah v. Milling*, 876 F.3d 48 (2d. Cir. 2017)(awarding qualified immunity because no clearly-established precedent existed to inform prison officials that their policy was unconstitutional beyond debate); *Estate of Devine v. Fusaro*, 2016 U.S. Dist. LEXIS 4954, *22 (D. Conn. Jan. 14, 2016)("the guidance of a departmental manual may be at least relevant to deciding whether any individual police officer within that department should know that what he or she was doing was unlawful."); *Horn v. City of New Haven*, No. 3:18-CV-1502(RNC), 2024 U.S. Dist. LEXIS 59277, *36 (D. Conn. April 1, 2024)(awarding qualified immunity where the defendant "subjectively believed he was following standard operating procedures and that, in doing so, he subjectively believed he was acting properly.").

Here, reasonable officials in defendants' shoes at the various times could *at least disagree* on whether the conduct lawful under the Eighth and Fourteenth Amendments. Link and Semple

---

[21]  In the *Employees, Dist. Council 82, etc.* litigation, the Second Circuit awarded qualified immunity to the individual officials despite holding that the policies were unconstitutional and despite issuing an injunction prohibiting further compliance with such policies.

relied on DPH's advice. Link, Semple, Pease, and other defendants relied on DPH's, TRC's, and A&R's expertise. Semple also implemented a radon testing and mitigation policy. And Link, Pease, Cook, Corcella, Washington, and Quiros, relied on the policy. And defendants before 2013 had no knowledge or subjective belief of unsafe or dangerous conditions of confinement from radon at Garner, and they were not constitutionally required to take affirmative steps to search out for conditions they did not know to existent or be problematic. *Vega*, 963 F.3d at 279 n.104.

The defendants' conduct was objectively reasonable viewed through Eighth and Fourteenth Amendments as established at the relevant times of their conduct. They are all entitled to qualified immunity as a matter of law.

### N. All Claims Concerning Conduct Occurring Before February 28, 2014, and January 25, 2014, are Time Barred by the Statutes of Limitations or Repose.

"Section 1983 does not provide a specific statute of limitations. Thus, courts apply the statute of limitations for personal injury actions under state law." *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013)(citing *Owens v. Okure*, 488 U.S. 235, 249-51 (1989); *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002)). Actions arising in Connecticut that are brought under 42 U.S.C. § 1983 use the three-year statute of limitations derived from Connecticut General Statute § 52-577. *Lounsbury v. Jeffries*, 25 F.3d 131 (2d Cir. 1994)("In Connecticut, the answer is § 52-577. Accordingly, § 52-577 should have been applied to plaintiffs' claims under § 1983."). Section 52-577 provides that, "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." Conn. Gen. Stat. § 52-577; *see also Rogers v. Semple*, No. 3:20-CV-1813(MPS), 2021 U.S. Dist. LEXIS 6078, *4 (D. Conn. Jan. 13, 2001)(dismissing radon claim by an Connecticut inmate because there were no allegations of deliberate indifference by defendants during the limitations period.).

The plaintiffs filed this action on February 28, 2017. *See Cruz v. Semple*, 3:17-CV-0348(JBA)(Doc. 1)(filed February 28, 2017).[22] Therefore, all claims arising from conduct (acts or omissions) allegedly occurring before February 28, 2014 are time-barred. The defendants are entitled to summary judgment on their statutes of limitations and or statutes of repose arguments. *See* (Doc. 247 p. 32).

And for Mr. Vega specifically, he filed his action on January 25, 2017. So, for Mr. Vega specifically, all claims arising from conduct (acts or omissions) allegedly occurring before January 25, 2014 are time-barred. The defendants are entitled to summary judgment on their statutes of limitations and or statutes of repose arguments.

These defenses bar all claims against defendants Batten, Armstrong, Lantz, and Arnone, and they bar all claims against Dzurenda, Semple, Falcone, Pease, Link, and any other defendant that are based on conduct occurring before February 28, 2014, for the classes, or January 25, 2014 for plaintiff Vega specifically. The Court should enter summary judgment on the defendants Third and Fourth Affirmative Defenses. *See* (Doc. 247 p. 32).

## O.    Release

At least two of the named plaintiffs (Kenya Brown[23] and Ian Cooke) have released and waived their claims. Both entered into multiple settlement agreements and general releases with the State. *See* (attached releases). The defendants are entitled to summary judgment for all claims

---

[22]    The *Vega* matter was filed on January 25, 2017. However, that was filed by Mr. Vega himself, as a *pro se* filing an individual action. See 3:17-CV-0107(JBA)(Doc. 1) The *Cruz* matter was filed as the putative class action by class counsel and was later consolidated for convenience or administrative purposes with *Vega*. 3:18-CV-0348(JBA)(Docs. 1). *See also* (*Vega* Doc. 179 p. 2). But *Cruz* is the class-action matter, and its filing date controls for all plaintiffs besides Mr. Vega. *See* (*Vega* docket)(listing Cruz as "Lead case").
[23]    Kenya Brown changed his name to Kenya McCullough. His inmate number is #219191. *See* (RT60)(attached).

brought by Cooke or Brown. They are also entitled to summary judgment for any other putative plaintiffs or class members that have released their claims.

### P.    Official-Capacity Claims are Barred on Additional Grounds

There are additional grounds that bar the official-capacity claims. Also, plaintiffs have confirmed that the official-capacity claims seek injunctive relief only, and that no injunctive claims are brough against any individual-capacity defendants. *See* (Doc. 159 p. 8, 9); (Doc. 179 p. 5 n.3).

### 1.    Merits

First, the claims fail on their merits. The defendants incorporate their many merits arguments from above. There are no constitutional violations in this case, beyond all genuine dispute of material fact. There are no ongoing constitutional violations either. Therefore, there is nothing to enjoin, and no proper injunctive relief that can be obtained from the official-capacity defendants. The Court should enter summary judgment for the official-capacity defendants on all claims; the plaintiffs in the injunctive class cannot establish their case as a matter of law, and the defendants are entitled to judgment.

### 2.    Any claims for equitable relief must be limited to current inmates only and exclude any inmates or former inmates that are no longer in Connecticut DOC custody.

No official-capacity claims can survive for any inmates that have discharged from DOC custody, as a matter of law. *Vega*, 963 F.3d at 282-83 ("in arguing that this prospective relief cannot be granted to those putative class members who are not currently incarcerated, as there is no ongoing violation of federal law with regard to class members who are not in custody."); (Doc. 242 p. 42)("putative declaratory/injunctive relief class cannot include individuals no longer in Connecticut DOC custody.")(citing *Vega*, 963 F.3d at 282-83); *see also* (Doc. 242 p. 42-43)("the

Court modifies the putative declaratory/injunctive relief class, under Fed. R. Civ. P. 23(b)(2), to include individuals presently in DOC custody—whether at Garner or another DOC facility—incarcerated at Garner at any point from June 18, 1993 through the present").

This implicates a number of different doctrines and defenses, including merits, the law of the case, the scope of class certification, the PLRA, sovereign immunity, and mootness and the Court's subject-matter jurisdiction..  The defendants hereby again claim their entitlement to all equitable claims being dismissed for any non-incarcerated plaintiffs or class members.

### 3.     Prison Litigation Reform Act, 18 U.S.C. § 3626

"Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1)(A).  "The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  *Id.*  Further, the Court must give substantial weight to any adverse impact on public safety or the criminal justice system caused by the relief.  18 U.S.C. § 3626 ("The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.");  *see also Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974)("The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.") *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989).

Plaintiffs' injunctive claims are prohibited by these mandates of the Prison Litigation Reform Act.  Congress enacted these provisions to keep disgruntled prisoners from attempting to litigate every dissatisfaction in federal courts, and to allow the prison administrators sufficient latitude to manage and run their prisons with the limited resources available without being hailed into federal court every time an inmate disagrees with something.

The Supreme Court also has long stressed the importance of federal courts declining to enmesh themselves in the daily prison management.  *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 362 (1996)(Supreme Court "opinions have lamented [against] a court's 'in the name of the Constitution, becoming . . . enmeshed in the minutiae of prison operations.'").  Congress codified such concerns in § 3626 *via* the PLRA.  But plaintiffs' injunctive claims run afoul of these mandates.

The Court should award the official-capacity defendants summary judgment; the injunctive claims are barred by the PLRA.  *See* 18 U.S.C. § 3626; *see also Harnage v. Lightner*, No. 3:17-CV-263(AWT), 2019 U.S. Dist. LEXIS *25-27 (D. Conn. Jan. 24, 2019)(awarding summary judgment for the injunctive claims because they were "not narrowly tailored" and because the relief would "adversely impact the operation of the correctional facility.").

### 4.    The injunctive claims are Moot.

"A case becomes moot 'when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'"  *Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 444 (2d Cir. 2021)(citation omitted).  At this stage, there is no dispute that Garner is being appropriately tested for radon, consistent with industry standards.  *See* (Plimpton Decl. ¶¶ 1-25).  The parties agree:  "MR. MINNELLA:  So finally, to give the State credit, they went and remediated it again.

And as far as we're concerned, everything is normal.  And they've done every effort, after 2018, to correct the situation, Your Honor."  (Tr. 2-3-25 Status Conf. p. 11); (Plimpton Decl. ¶¶ 1-25).

Here, three Commissioners spanning over seven years have remained committed to the testing policy in A.D. § 7, and Garner has been repeatedly tested during that period.  There have been no levels over 4.0 since February of 2019.  There are no ongoing violations, nothing to enjoin, and the injunctive claims are moot.  The exceptions to mootness do not apply either, as there is no reasonable expectation that DOC is going to change course and stop testing or mitigating Garner in accordance with industry standards.  *See* (Quiros Decl.  ¶ 11).  The matter is not capable of repetition yet evading review due, in part, to this as well.

And of course, all injunctive claims are moot for any plaintiffs that have discharged from Connecticut DOC custody.  *See Vega*, 963 F.3d at 282-283.  "We agree with the district court that Tripathy's requests for declaratory and injunctive relief — which he sought in connection with each of his claims — were mooted by his release from prison." *Tripathy v. McKoy*, 103 F.4th 106, 113 (2d Cir. 2024).  "A persons transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."  *Id.* (quotation omitted).

All injunctive claims are moot.  The Court should enter judgment for the defendants and should dismiss all injunctive claims (and official-capacity defendants) for lack of jurisdiction.

### 5.    Sovereign Immunity.

States may raise their sovereign immunity at any time.  *See, e.g.*, *McGinty v. New York*, 251 F.3d 84, 94 (2001)(collecting cases); *see also Beaulieu v. Vermont*, 807 F.3d 478, 491 (2d Cir. 2015)).  The State of Connecticut's official-capacity defendants in this case have raised sovereign immunity throughout this litigation, and they preserve it again here at summary judgment.  The

State's sovereign immunity bars numerous claims against the officials-capacity defendants seeking equitable claims seeking non-monetary relief. For example, the plaintiff cannot seek retroactive declaratory relief in the form of a declaration to state or declare that alleged past conduct violated the plaintiffs' rights, in the past. *See Boyd v. Arnone*, No. 3:11-CV-0824(AWT), 2014 U.S. Dist. LEXIS 138296, *9 (D. Conn. Sep. 29, 2014)(citing *Puerto Rico Aquedecut & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993)).

### Q.    Decertification of the Classes Appears Appropriate.

The Court may decertify classes, in its sound discretion. *See Jin v Hsanghai Original, Inc.,* 990 F.3d 251, 261 (2d Cir. 2021 (quoting *Boucher v. Syracuse Univ.,* 164 F.3d 113, 118 (2d Cir. 1999). Here, the defendants do not see how the case can continue as a class action, for any of three classes. If the claims fail on the merits or other grounds raised herein and summary judgment enters, then this is moot. However, it is worth noting that there appears to be no way for the plaintiffs to satisfy Rule 23 requirements at this stage, given the record evidence and the expert discovery. *See e.g.*, (Tr., 2-3-23 Status Conf p. 19-42)(defendants arguing that classes should be decertified); (Tr., 8-14-25 Status Conf. p. 14-25)(same); *see also* (Docs. 199 - 232)(defendants opposing class certification). The defendants wish to obtain summary judgment, especially given the false allegations against them, and they therefore focus most of their briefing on the merits and other grounds for summary judgment. If the Court would like further briefing on class certification or decertification, the defendants would of course be happy to provide that to the Court.

### III.    CONCLUSION

The Court should grant the defendants' motion and enter judgment for the defendants as to all claims. Alternatively, were the Court not to grant the motion in full, the Court should grant the

defendants' motion in part and enter judgment for the defendants in part. The Court may also decertify some or all of the classes, in its sound discretion.

*Respectfully submitted*,

DEFENDANTS
 Semple, Armstrong, Lantz, Arnone,
 Dzurenda, Cook, Quiros,
 Falcone, Dilworth, Corcella, Washington,
 Batten, Link, and Pease,
  all as both individual-capacity defendants
  and as official-capacity defendants for
  their named offices.

WILLIAM TONG
ATTORNEY GENERAL

BY:   /s/ *Stephen R. Finucane*
      Stephen R. Finucane
      Assistant Attorney General
      165 Capitol Avenue
      Hartford, CT  06106
      Federal Bar #ct30030
      E-Mail:  stephen.finucane@ct.gov
      Tel: (860) 808-5450
      Fax: (860) 808-5591

**CERTIFICATION**

I hereby certify that on December 1, 2025, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing

system.  Parties may access this filing through the Court's system.

___/s/ _Stephen R. Finucane_____
Stephen R. Finucane
Assistant Attorney General